## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

GLS LEASCO, INC., a Michigan
Corporation,

      Plaintiff,

vs.

NAVISTAR, INC., a Delaware
Corporation,

      Defendant.

Case No. 23-cv-12927-MAG-APP

Hon. Mark A. Goldsmith

## DEFENDANT NAVISTAR, INC.'S ANSWER TO
## PLAINTIFF GLS LEASCO, INC.'S COMPLAINT

Defendant Navistar Inc. ("Defendant" or "Navistar"), by and through its undersigned counsel, answers Plaintiff's Complaint as follows:

## PARTIES, JURISDICTION, AND VENUE

1.    GLS is a Michigan corporation with its registered office and principal place of business located at 12225 Stephens Road, Warren, Michigan.

**ANSWER:  Upon information and belief, Navistar admits the allegations of this paragraph.**

2.    Navistar is a Delaware corporation registered and authorized to conduct business within the State of Michigan, with its principal place of business located in Lisle, Illinois.

**ANSWER:  Navistar admits the allegations of this paragraph.**

3.     Navistar conducts systematic and continuous business in Macomb County and throughout the State of Michigan, including by maintaining an International Truck distributorship within Macomb County; marketing, distributing and selling tractors, trailers, parts, and accessories within Macomb County and the State of Michigan; creating, soliciting, and servicing a market for such products in Macomb County and the State of Michigan; being registered to conduct business in the State of Michigan; and entering into multi-million dollar contracts with Macomb County and Michigan business entities (including GLS and the contract at issue) for such products.

**ANSWER:  Navistar admits that it conducts business in Michigan and is registered to do business in Michigan.  Navistar lacks knowledge or information sufficient to form a belief as to the truth of the remaining vague allegations and legal conclusions of this paragraph, and therefore, denies the same.**

4.     This case arises out of a contract Navistar entered into with GLS, a Macomb County business entity, for over $128 million in Navistar trucks (also referred to as tractors), as set forth in an April 8, 2022 letter agreement. Ex. A.

**ANSWER:  Navistar admits that Exhibit A to the Complaint purports to be a Letter Agreement dated April 8, 2022, the content of which speaks for itself, but denies the remaining allegations of this paragraph.**

5.     This Court has personal jurisdiction over Navistar under MCL 600.711 and 600.715.

**ANSWER: Navistar denies the allegations of this paragraph, as the lawsuit has been properly removed to the United States District Court for the Eastern District of Michigan pursuant to 28 U.S.C. § 1441(a) and 28 U.S.C. § 1332.**

6.     This Court has subject matter jurisdiction because the amount in controversy is in excess of $25,000.

**ANSWER: Navistar admits that GLS has alleged damages in excess of $25,000 but denies the remaining allegations of this paragraph, as the lawsuit has been properly removed to the United States District Court for the Eastern District of Michigan pursuant to 28 U.S.C. § 1441(a) and 28 U.S.C. § 1332.**

7.     Venue is proper in Macomb County under MCL 600.1621.

**ANSWER: Navistar denies the allegations of this paragraph, as the lawsuit has been properly removed to the United States District Court for the Eastern District of Michigan  pursuant to 28 U.S.C. § 1441(a) and 28 U.S.C. § 1332.**

8.     This case is properly assigned to business court under MCL 600.8031 and MCL 600.8035 because it involves a business or commercial dispute in which all parties are business enterprises, and it relates to their contractual agreement and business dealings.

**ANSWER:  Navistar denies the allegations of this paragraph, as the lawsuit has been properly removed to the United States District Court for the**

Eastern District of Michigan pursuant to 28 U.S.C. § 1441(a) and 28 U.S.C. § 1332.

## FACTUAL ALLEGATIONS

9.      GLS is in the business of purchasing, leasing, and selling commercial trucks.

**ANSWER:  Upon information and belief, Navistar admits the allegations of this paragraph.**

10.      Navistar sells trucks, buses, and parts, and offers related financial services, within the State of Michigan and throughout the United States and Canada.

**ANSWER:  Navistar admits the allegations of this paragraph.**

11.      GLS has made substantial purchases from Navistar in the past, including the six hundred and thirty (630) Model Year 2018 tractors that are at issue in this lawsuit (the "MY2018 Tractors").

**ANSWER:  Navistar admits that GLS has made purchases from Navistar in the past. Navistar denies any remaining allegations of this paragraph.**

12.      On November 6, 2017, Navistar and GLS entered into an Optional Trade-In Agreement. Under the Optional Trade-In Agreement, as more particularly set forth therein and without limitation, Navistar granted GLS the option to trade in the MY2018 Tractors for a specified residual value.

**ANSWER:  Upon information and belief, Navistar admits it entered into an Optional Trade-In Agreement in 2017, the contents of which speak for itself.**

13.    In February 2021, GLS issued a request for quotation for new tractors to multiple original equipment manufacturers, including Navistar.

**ANSWER: Upon information and belief, Navistar admits that GLS issued a request for quotation for new tractors to Navistar in February 2021, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph and, therefore, denies the same.**

14.    In April 2021, GLS notified Navistar that it had been selected to supply 1305 tractors.

**ANSWER:  Navistar admits the allegations of this paragraph.**

15.    On July 13, 2021, GLS entered into a letter agreement with Navistar and its dealer representative, Summit Truck Group, for the supply of 1,305 International Tractors (the "July 2021 Letter Agreement").

**ANSWER:  Navistar admits that the parties signed a document dated July 13, 2021 and that said document speaks for itself, and Navistar denies any allegation contrary to or inconsistent with it, and otherwise denies the remaining allegations of this paragraph.**

16.    Under the July 2021 Letter Agreement, as more particularly set forth therein and without limitation:

  a.  Navistar agreed to supply 1,100 2023MY tractors and 205 2024MY tractors for $113,843 per tractor;

b. Navistar recognized GLS's option to turn in 1046 used tractors (including the MY2018 Tractors);

c. Navistar agreed that the new MY2023 units would be produced and delivered to GLS from February 2022 to December 2022; and,

d. Navistar agreed that the new MY2024 units would be produced and delivered to GLS from January 2023 to February 2023.

**ANSWER:  Navistar admits that the parties signed a document dated July 13, 2021 and that said document speaks for itself, and Navistar denies any allegation contrary to or inconsistent with it, and otherwise denies the remaining allegations of this paragraph..**

17.    At the end of 2021, Summit Truck Group was sold to Rush Enterprises, and at Navistar's behest, Navistar and GLS entered into negotiations for a new letter agreement excluding Summit Truck Group.

**ANSWER:  Navistar admits it entered into negotiations with GLS at the end of 2021 for a new letter agreement. Navistar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph, and therefore denies same.**

18.    On April 8, 2022, Navistar and GLS entered into a new letter agreement (the "Letter Agreement"), Ex. A, which stated: "This Letter Agreement is intended to replace the previous agreement among GLS LeasCo., Summit Truck Group and Navistar dated July 13th, 2021." *Id.* at p.l.

**ANSWER:  Navistar admits that Navistar and GLS signed the April 8, 2022 document attached as Exhibit A to the Complaint, and further states that the contents of the April 2022 Letter Agreement speak for themselves and Navistar denies any allegations contrary to or inconsistent with it.**

19.     During the negotiation of the Letter Agreement and at the time the parties entered into the Letter Agreement, it was widely known in the trucking industry, and was specifically known to Navistar and GLS, that the market for used trucks was historically strong.

**ANSWER:  Navistar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore, denies the same.**

20.     At the time, Navistar was having difficulty producing new tractors with its Bendix Fusion collision mitigation system, resulting in production slots opening up for customers willing to accept delivery of new tractors without the Bendix system.

**ANSWER:  Navistar admits only that it experienced historic supply chain issues and that supply of the Bendix Fusion collision mitigation system was delayed. Otherwise, denied.**

21.     Consistent with the foregoing, the negotiations leading up to the Letter Agreement involved the following key points:

   a.   With full awareness of GLS's intention and expectation to purchase and take delivery of new tractors as soon as possible, and then to sell

in the historically strong re-sale market the MY2018 tractors that were being replaced by the new tractors, Navistar proposed an earlier delivery schedule for new tractors if GLS would accept delivery without the Bendix system (to be installed at a later date);

b.   In exchange for the earlier production schedule that allowed GLS to sell its MY2018 tractors in the historically strong re-sale market, GLS expressed its willingness to consider waiving its trade-in option (including with respect to the MY2018 Tractors);

c.   To further entice GLS to enter into this transaction, Navistar offered a rebate payment related to new tractor purchases, which ended up being $6.2 million in the Letter Agreement (or roughly $6,000 per new tractor).

**ANSWER:  Navistar admits that the parties negotiated a number of key points with respect to the April 8, 2022 Letter Agreement including producing certain tractors with a Bendix Prewire with credit for aftermarket install, and a payment of $6,200,000 to Central conditioned upon GLS to add OnCommand 3G/4G and 5G for all 2021 model year and newer units as well as other points. The April 8, 2022 Letter Agreement speaks for itself and Navistar denies any allegations contrary to or inconsistent with it.  Navistar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph and, therefore, denies the same.**

22.     The earlier production schedule for the new tractors was a critical part of the consideration Navistar offered to GLS.

**ANSWER:  Navistar denies the allegations of this paragraph.**

23.     GLS would never have waived its trade-in rights, including with respect to the MY2018 Tractors, in the absence of Navistar's agreement to the earlier production schedule, which both parties understood would allow GLS to sell the MY2018 tractors in the historically strong re-sale market.

**ANSWER:  Navistar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, therefore, denies the same.**

24.     In order to secure the earlier production slots, GLS agreed to allow Navistar to complete the installation and wiring of its Bendix system after delivery of GLS's new tractors.

**ANSWER: Navistar admits that it built tractors without the Bendix system to GLS as contemplated by the Letter Agreement.  Navistar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph and, therefore, denies the same.**

25.     Consistent with the foregoing, GLS and Navistar entered into the Letter Agreement with the mutual understanding and recognition that Navistar's earlier production schedule for the new tractors would allow GLS to take advantage of the

historically strong market conditions for used tractors (including for the MY2018 Tractors).

**ANSWER:  Navistar denies the allegations of this paragraph.**

26.    Accordingly, under the Letter Agreement, as more particularly set forth therein and without limitation:

    a.  Navistar agreed to produce 1100 MY2023 tractors from January 2022 through May 2022 (instead of the previously agreed upon production schedule of February 2022 to December 2022). *Id* at pp.1-2.

    b.  In exchange for Navistar's promised earlier production schedule and a $6,200,000 rebate to GLS on the new tractor purchases, Navistar was released from its obligation to pay GLS the previously agreed upon residual value of specified used tractors (including the MY2018 Tractors).

    c.  The Letter Agreement's "No Trade Agreement" provision confirms that the residual value of the MY2018 Tractors (z. e., the amount Navistar would have been required to pay for trade-ins in the absence of the No Trade Agreement provision), as of May 1,2022, was $57,000 per vehicle.

    d.  The "No Trade Agreement" provision confirms that in the absence of this agreement, Navistar would have owed GLS, at GLS's option, in

excess of $50 million for trade-in vehicles, including nearly $35 million for the MY2018 Tractors.

e. The "No Trade Agreement" provision states: "This Agreement Letter is all encompassing for any and all current or future issues for 941 model year 2017 – 2019 International units and terminates any and all other agreements pertaining to these units." *Id.* at p.3.

**ANSWER: Navistar denies that it agreed to produce 1100 MY2023 tractors from January 2022 through May 2022. Further answering, GLS did not sign the Letter Agreement until May 18, 2022 and delayed ordering 555 of the tractors until March of 2022. Navistar admits the average residual sale price for the Central 2018 International RH613 model tractor was $57,000 but the averages fluctuated based on OTB, mileage at the time of trade in, and the tractors meeting full trade terms and conditions, all of which varied vehicle by vehicle. Navistar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph and, therefore, denies the same.**

27. Navistar was fully aware during negotiation of the Letter Agreement and at all relevant times that:

a. GLS would be unable to sell its used tractors, including the MY2018 Tractors, and take advantage of the historically strong used truck market, until Navistar replaced the used tractors with new tractors;

11

    b.  Time was of the essence for the Letter Agreement's production schedule for new tractors;

    c.  GLS had agreed to waive its option to trade-in the MY2018 Tractors in consideration of Navistar's promised earlier production schedule;

    d.  the used tractor market was historically strong and would not remain so indefinitely;

    e.  there was a risk of a price drop in the market for used tractors with a production delay; and,

    f.  taking advantage of the historically strong market conditions for used tractors was the key reason GLS traded the security of Navistar's residual trade-in obligations for Navistar's earlier production schedule.

**ANSWER: Navistar denies the allegations of this paragraph, including subparts (a) through (f) and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations concerning the reasons why GLS entered into the Letter Agreement and, therefore, denies the same.**

28.    Navistar's knowledge of the market conditions is further demonstrated by Navistar's own efforts to capitalize on the historically strong used track market during the relevant time period.

**ANSWER:  Navistar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, therefore, denies the same.**

29.     On May 2, 2022, *Fleet Maintenance* published an article entitled, "Navistar relocates Used Truck Center to better serve high-demand market."

**ANSWER:  Navistar admits the allegations of this paragraph.**

30.     The article states that "Navistar recently opened a new 13,000 sq.-ft. Used Track Center located in Joliet, Illinois."

**ANSWER: Navistar states that the contents of the referenced article speak for themselves and denies any allegations contrary to or inconsistent with them, and otherwise admits the allegations of this paragraph.**

31.     Tony Stinsa, a Navistar vice president, provided the following quotation for the article: "The used truck market continues to be in a state of abnormally low available inventory and historically high pricing levels...Within the International [*i.e.* Navistar brand] used truck ecosystem, we are participating actively in this market."

**ANSWER: Navistar states that the contents of the referenced article speak for themselves and denies any allegations contrary to or inconsistent with them, and otherwise denies that the referenced article contains the quote exactly as written in paragraph 31 of the Complaint.**

32.     It was entirely foreseeable to Navistar, and Navistar knew at the time the parties entered into the Letter Agreement, that its failure to meet the production schedule would impair GLS's ability to take advantage of the historically strong market conditions for used tractors and could result in consequential damages in the form of

re-sales at lower prices than would have been available if the promised production schedule was honored and fulfilled.

**ANSWER: Navistar denies the allegations of this paragraph.**

33.     Under the Letter Agreement, Navistar promised to produce all new tractors, including the replacements for the MY2018 Tractors, by the end of May 2022.

**ANSWER: Navistar denies the allegations of this paragraph.**

34.     Specifically, Navistar promised to produce the new tractors intended to replace the MY2018 Tractors as follows:

      a.  75 RH model Tractors during March 2022;

      b.  225 LT model Tractors during April 2022;

      c.  330 LT model Tractors during May 2022.

**ANSWER: Navistar denies the allegations of this paragraph.**

35.     However, by the end of May, Navistar had only delivered 18 of the 630 new tractors intended to replace the MY2018 Tractors.

**ANSWER: Navistar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, therefore, denies the same. Further answering, Navistar admits that it built a total of 367 tractors by the end of May 2022, 112 for Central Transportation and 255 for Universal Transportation.**

36.     Navistar's late delivery of the new tractors extended well over a year. Rather than adhere to the production schedule it promised in the Letter Agreement, Navistar delivered the new tractors intended to replace the MY2018 Tractor as follows:

     a.  95 in June 2022;

     b.  74 in July 2022;

     c.  80 in August 2022;

     d.  31 in September 2022;

     e.  11 in October 2022;

     f.  30 in November 2022;

     g.  50 in December 2022;

     h.  66 in January 2023;

     i.  103 in February 2023;

     j.  39 in March 2023;

     k.  6 in April 2023;

     l.  1 in May 2023;

     m. 18 in June 2023;

     n.  6 in July 2023;

     o.  1 in August 2023;

     p.  1 in September 2023.

**ANSWER: Navistar denies that the parties agreed to a production delivery schedule in the Letter Agreement.  Navistar lacks knowledge or information**

sufficient to form a belief as to the truth of the remaining allegations of this paragraph and, therefore, denies the same.

37.     Navistar's failure to timely deliver the new tractors intended to replace the MY2018 Tractors precluded GLS from selling the MY2018 Tractors during the period of Navistar's delay and precluded GLS from benefitting from the historically strong market conditions for used tractors.

**ANSWER:  Navistar denies the allegations of this paragraph.**

38.     During the months following the time period in which Navistar was contractually obligated supposed to have completed its deliveries, the price for the MY2018 tractors dropped by over 75%, causing GLS to suffer substantial damages in the form of lost sales revenue.

**ANSWER:  Navistar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, therefore, denies the same.**

39.     As a direct result of Navistar's delay, GLS lost tens of thousands of dollars in lost revenue and profits for each one of the MY2018 Tractors it sold, totaling tens of millions of dollars in damages.

**ANSWER:  Navistar denies the allegations of this paragraph.**

40.     In addition, as a direct result of Navistar's production delay, GLS sustained far higher maintenance, fuel, driver recruitment, and repair costs due to the

need to keep the MY2018 Tractors in service instead of replacing them with new tractors.

**ANSWER: Navistar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, therefore, denies the same.**

41.     In addition, as a direct result of Navistar's production delay, GLS has been required to pay a higher rate of interest and incurred higher costs related to financing the new tractors that replaced the MY2018 Tractors.

**ANSWER: Navistar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, therefore, denies the same.**

42.     It was entirely foreseeable to Navistar, and Navistar knew, that GLS would sustain far higher maintenance, fuel, driver recruitment, and repair costs and financing costs if Navistar did not timely deliver the new tractors under the Letter Agreement.

**ANSWER: Navistar denies the allegations of this paragraph.**

### COUNT ONE: BREACH OF CONTRACT

43.     GLS incorporates the foregoing allegations.

**ANSWER: Navistar incorporates the foregoing answers and responses to the foregoing allegations as if fully rewritten herein.**

44.    The Letter Agreement constitutes a binding contract between GLS and Navistar.

**ANSWER: This paragraph contains legal characterizations and argument, to which no response is required. To the extent a response is required, Navistar denies the allegations of this paragraph.**

45.    Navistar's failure to meet the required production schedule is a material breach of the Letter Agreement.

**ANSWER:  Navistar denies the allegations of this paragraph.**

46.    GLS has suffered tens of millions of dollars of damages caused by Navistar's material breach of the Letter Agreement, including without limitation consequential damages, incidental damages, and lost profits related to GLS's inability to sell its used tractors into the historically strong used tractor market as intended and expected by both parties at the time of the Letter Agreement, GLS's increased maintenance, fuel, driver recruitment, and repair costs during the period of GLS's delay, and GLS's higher financing costs and interest expenses related to the purchase of new tractors.

**ANSWER:  Navistar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, therefore, denies the same.**

WHEREFORE, Navistar requests that this Honorable Court enter an Order dismissing the Complaint in its entirety with prejudice, awarding Navistar its costs,

including reasonable attorneys' fees, and granting any other relief that this Court deems appropriate.

## **<u>GENERAL DENIAL</u>**

To the extent any of the foregoing allegations are not specifically admitted, each is hereby denied.

## AFFIRMATIVE AND ADDITIONAL DEFENSES

1. GLS's Complaint fails to state a claim upon which relief can be granted.

2. GLS's Complaint is barred by the doctrine of unclean hands.

3. GLS's Complaint is barred by waiver, estoppel, release, laches, novation, modification, and/or undue delay.

4. GLS's Complaint is barred because GLS was the first party to materially breach.

5. GLS's Complaint is barred because it has failed to satisfy the conditions precedent to recovery.

6. GLS's Complaint is barred by the doctrine of impossibility, impractibility, and/or frustration of purpose.

7. GLS's claims are barred to the extent it failed to mitigate its damages.

8. Navistar reserves the right to assert additional affirmative defenses as the case progresses.


Dated: November 21, 2023        BARNES & THORNBURG LLP

                                */s/ Scott R. Murphy*
                                Scott R. Murphy (P68015)
                                Anthony C. Sallah (P84136)
                                171 Monroe Ave. NW, Suite 1000
                                Grand Rapids, MI 49503
                                616-742-3930
                                smurphy@btlaw.com
                                asallah@btlaw.com
                                *Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 21, 2023 a copy of the foregoing pleading was filed electronically and served by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.

Dated: November 21, 2023

BARNES & THORNBURG LLP

 /s/ Scott R. Murphy
Scott R. Murphy (P68015)
Anthony C. Sallah (P84136)
171 Monroe Ave. NW, Suite 1000
Grand Rapids, MI 49503
616-742-3930
smurphy@btlaw.com
asallah@btlaw.com
*Attorneys for Defendant*