UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GLS LEASCO, INC.,

    Plaintiff,

v.

NAVISTAR, INC.,

    Defendant.

Case No. 23-cv-12927

Hon. Mark A. Goldsmith

Magistrate Judge Anthony P. Patti

### STIPULATED ORDER GRANTING AMENDMENT OF COMPLAINT PURSUANT TO DEFENDANT'S WRITTEN CONSENT

**WHEREAS**, Fedeal Rule of Civil Procedure 15(a)(2) permits amendment of a Complaint with the opposing party's written consent;

**WHEREAS**, Plaintiff GLS Leasco, Inc. ("GLS") requested Defendant Navistar, Inc. ("Navistar") consent to amend the Complaint to add Central Transport LLC ("Central") as a Plaintiff (attached as Exhibit A to this Order);

**WHEREAS**, Central's inclusion as a Plaintiff will not affect this Court's diversity jurisdiction as its members are all Michigan residents, as set forth in the Proposed Amended Complaint;

**WHEREAS**, Central—which is affiliated with GLS—is represented by the same counsel as GLS, and amendment will not have any impact on the existing schedule or on the existing parties' ongoing discovery efforts; **AND**

**WHEREAS**, Navistar consents to the filing of the Amended Complaint;

**IT IS HEREBY ORDERED** that GLS may file the amended complaint that Navistar consented to, pursuant to Federal Rule of Civil Procedure 15(a)(2). Navistar shall have twenty-one (21) days from the entry of this Order to respond to the amended complaint.

**IT IS SO ORDERED.**

Dated: March 8, 2024  
      Detroit, Michigan

s/Mark A. Goldsmith  
MARK A. GOLDSMITH  
United States District Judge

The above order is stipulated to:

/s/*Scott R. Murphy (by permission)*  
BARNES & THORNBURG LLP  
By: Scott R. Murphy (P68015)  
     Anthony C. Sallah (P84136)  
171 Monroe Ave., N.W. Suite 1000  
Grand Rapids, MI 48903  
(616) 742-3930  
smurphy@btlaw.com  
asallah@btlaw.com

*Counsel for Defendant*

/s/*Thomas J. Davis*  
KIENBAUM, HARDY, VIVIANO,  
PELTON & FORREST, P.L.C.  
By: Joseph E. Viviano (P60378)  
     Thomas J. Davis (P78626)  
     Marianne J. Grano (P82901)  
48 S. Main St., Ste. 2  
Mt. Clemens, MI 48043  
(586) 469-1580  
jviviano@khvpf.com  
tdavis@khvpf.com  
mgrano@khvpf.com

BOIES SCHILLER FLEXNER LLP  
By: Hamish P.M. Hume  
(*Pro Hac* pending)  
1401 New York Ave. NW

2

Washington, DC 20005
(202) 274-1149
hhume@bsfllp.com

*Counsel for Plaintiff*

514645

# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GLS LEASCO, INC. and
CENTRAL TRANSPORT LLC,

    Plaintiffs,

v.

NAVISTAR, INC.,

    Defendant.

Case No. 23-cv-12927

Hon. Mark A. Goldsmith

Magistrate Judge Anthony P. Patti

## Amended Complaint

Plaintiffs GLS Leasco, Inc. ("GLS") and Central Transport, LLC ("Central") state as follows for their Complaint against Defendant Navistar, Inc. ("Navistar").

### PARTIES, JURISDICTION, AND VENUE

1.     GLS is a Michigan corporation with its registered office and principal place of business located at 12225 Stephens Road, Warren, Michigan.

2.     Central is a limited liability company organized under the laws of the State of Michigan, with the principal place of business located in Warren, Michigan. Central's sole owner and member is LTL Holding Company, LLC, a limited liability company organized under the laws of the State of Michigan, with its principal place of business in Warren, Michigan. LTL Holding Company's members are two individuals who are both Michigan residents, and a Michigan trust whose trustee is

a Michigan resident. There thus remains complete diversity between the parties following this amendment.

3.      Navistar is a Delaware corporation registered and authorized to conduct business within the State of Michigan, with its principal place of business located in Lisle, Illinois.

4.      Navistar conducts systematic and continuous business in Macomb County and throughout the State of Michigan, including by maintaining an International Truck distributorship within Macomb County; marketing, distributing and selling tractors, trailers, parts, and accessories within Macomb County and the State of Michigan; creating, soliciting, and servicing a market for such products in Macomb County and the State of Michigan; being registered to conduct business in the State of Michigan; and entering into multi-million dollar contracts with Macomb County and Michigan business entities (including GLS and the contract at issue) for such products.

5.      This case arises out of a contract Navistar entered into with GLS, negotiating on behalf of several affiliated companies including Central, for over $128 million in Navistar trucks (also referred to as tractors), as set forth in an April 8, 2022 letter agreement. **Ex. A**.

6.      The Macomb County Circuit Court had personal jurisdiction over Navistar under MCL 600.711 and 600.715. Navistar has since removed this case to federal court.

7. The amount in controversy exceeds $75,000.

8. Venue was proper in Macomb County under MCL 600.1621.  Navistar has since removed this case to the Eastern District of Michigan, where venue is proper.

9. This case was properly assigned to the Macomb County business court under MCL 600.8031 and MCL 600.8035 because it involves a business or commercial dispute in which all parties are business enterprises, and it relates to their contractual agreement and business dealings. Navistar has since removed this case to federal court.

## FACTUAL ALLEGATIONS

10. GLS is in the business of purchasing, leasing, and selling commercial trucks, including leasing trucks to Central.

11. Navistar sells trucks, buses, and parts, and offers related financial services, within the State of Michigan and throughout the United States and Canada.

12. GLS—acting for itself and on behalf of various affiliated entities including Central—made substantial purchases from Navistar in the past, including the six hundred and thirty (630) Model Year 2018 tractors that are at issue in this lawsuit (the "MY2018 Tractors").

13. The MY2018 tractors at issue were purchased by GLS Leasco, Inc. for the purpose of leasing those tractors to Central Transport, LLC.

14. On November 6, 2017, Navistar and GLS entered into an Optional Trade-In Agreement. Under the Optional Trade-In Agreement, as more particularly set forth therein and without limitation, Navistar granted GLS the option to trade in the MY2018 Tractors for a specified residual value.

15. In February 2021, GLS issued a request for quotation for new tractors to multiple original equipment manufacturers, including Navistar.

16. In April 2021, GLS notified Navistar that it had been selected to supply 1305 tractors, many of which Navistar would be supplied to Central, with the others to be supplied to other entities GLS was negotiating on behalf of.

17. Navistar paints the GLS tractors yellow (Central's color, which is unique in the industry) that it knows are intended for leasing to Central. Navistar also applies Central decals before delivering the tractors directly to Central facilities.

18. On July 13, 2021, GLS entered into a letter agreement with Navistar and its dealer representative, Summit Truck Group, for the supply of 1,305 International Tractors (the "July 2021 Letter Agreement").

19. Under the July 2021 Letter Agreement, as more particularly set forth therein and without limitation:

    a. Navistar agreed to supply 1,100 2023MY tractors and 205 2024MY tractors for $113,843 per tractor;

4

    b. Navistar recognized GLS's option to turn in 1046 used tractors (including the MY2018 Tractors);

    c. Navistar agreed that the new MY2023 units would be produced and delivered to GLS from February 2022 to December 2022; and,

    d. Navistar agreed that the new MY2024 units would be produced and delivered to GLS from January 2023 to February 2023.

20. At the end of 2021, Summit Truck Group was sold to Rush Enterprises, and at Navistar's behest, Navistar and GLS entered into negotiations for a new letter agreement excluding Summit Truck Group.

21. On April 8, 2022, Navistar and GLS entered into a new letter agreement (the "Letter Agreement"), **Ex. A**, which stated: "This Letter Agreement is intended to replace the previous agreement among GLS LeasCo., Summit Truck Group and Navistar dated July 13th, 2021." *Id.* at p.1. The Agreement identified, by name, Central along with other entities who were the intended recipients of the tractors.

22. During the negotiation of the Letter Agreement and at the time the parties entered into the Letter Agreement, it was widely known in the trucking industry, and was specifically known to Navistar and GLS, that the market for used trucks was historically strong.

23. At the time, Navistar was having difficulty producing new tractors with its Bendix Fusion collision mitigation system, resulting in production slots opening up for customers willing to accept delivery of new tractors without the Bendix system.

24. Consistent with the foregoing, the negotiations leading up to the Letter Agreement involved the following key points:

    a. With full awareness of GLS's intention and expectation to purchase and take delivery of new tractors as soon as possible, and then to sell in the historically strong re-sale market the MY2018 tractors that were being replaced by the new tractors, Navistar proposed an earlier delivery schedule for new tractors intended for GLS to lease to Central if GLS would accept delivery without the Bendix system (to be installed at a later date);

    b. In exchange for the earlier production schedule that allowed GLS to sell its MY2018 tractors in the historically strong re-sale market, GLS expressed its willingness to consider waiving its trade-in option (including with respect to the MY2018 Tractors);

    c. To further entice GLS to enter into this transaction, Navistar offered a rebate payment related to new tractor purchases, which ended up being $6.2 million in the Letter Agreement (or roughly $6,000 per new

6

tractor), with the bulk of those payments to be issued to Central Transport

25. The earlier production schedule for the new tractors was a critical part of the consideration Navistar offered to GLS.

26. GLS would never have waived its trade-in rights, including with respect to the MY2018 Tractors, in the absence of Navistar's agreement to the earlier production schedule, which both parties understood would allow GLS to sell the MY2018 tractors in the historically strong re-sale market.

27. In order to secure the earlier production slots, GLS agreed to allow Navistar to complete the installation and wiring of its Bendix system after delivery of GLS's new tractors.

28. Consistent with the foregoing, GLS and Navistar entered into the Letter Agreement with the mutual understanding and recognition that Navistar's earlier production schedule for the new tractors would allow GLS to take advantage of the historically strong market conditions for used tractors (including for the MY2018 Tractors). Central was the intended beneficiary of these new tractors, which GLS and Navistar understood would be used to replace the used tractors in Central's fleet on the promised timetable in the Letter Agreement.

29. Accordingly, under the Letter Agreement, as more particularly set forth therein and without limitation:

a. Navistar agreed to produce 1100 MY2023 tractors from January 2022 through May 2022 (instead of the previously agreed upon production schedule of February 2022 to December 2022). *Id.* at pp.1-2.

b. In exchange for Navistar's promised earlier production schedule and a $6,200,000 rebate to Central and other entities related to the new tractor purchases, Navistar was released from its obligation to pay GLS the previously agreed upon residual value of specified used tractors (including the MY2018 Tractors).

c. The Letter Agreement's "No Trade Agreement" provision confirms that the residual value of the MY2018 Tractors (*i.e.*, the amount Navistar would have been required to pay for trade-ins in the absence of the No Trade Agreement provision), as of May 1, 2022, was $57,000 per vehicle.

d. The "No Trade Agreement" provision confirms that in the absence of this agreement, Navistar would have owed GLS, at GLS's option, in excess of $50 million for trade-in vehicles, including nearly $35 million for the MY2018 Tractors.

e. The "No Trade Agreement" provision states: "This Agreement Letter is all-encompassing for any and all current or future issues for 941

8

model year 2017 – 2019 International units and terminates any and all other agreements pertaining to these units." *Id*. at p.3.

30. Navistar was fully aware during negotiation of the Letter Agreement and at all relevant times that:

    a. GLS would be unable to sell its used tractors, including the MY2018 Tractors, and take advantage of the historically strong used truck market, until Navistar replaced the used tractors with new tractors;

    b. The used tractors in question were a part of Central's fleet, and the new tractors would be leased by GLS to Central to replace the used tractors.

    c. Time was of the essence for the Letter Agreement's production schedule for new tractors;

    d. GLS had agreed to waive its option to trade-in the MY2018 Tractors in consideration of Navistar's promised earlier production schedule;

    e. the used tractor market was historically strong and would not remain so indefinitely;

    f. there was a risk of a price drop in the market for used tractors with a production delay; and,

    g. taking advantage of the historically strong market conditions for used tractors was the key reason GLS traded the security of Navistar's residual trade-in obligations for Navistar's earlier production schedule.

9

31. Navistar's knowledge of the market conditions is further demonstrated by Navistar's own efforts to capitalize on the historically strong used truck market during the relevant time period.

32. On May 2, 2022, *Fleet Maintenance* published an article entitled, "Navistar relocates Used Truck Center to better serve high-demand market."

33. The article states that "Navistar recently opened a new 13,000 sq.-ft. Used Truck Center located in Joliet, Illinois."

34. Tony Stinsa, a Navistar vice president, provided the following quotation for the article: "The used truck market continues to be in a state of abnormally low available inventory and historically high pricing levels…Within the International [*i.e.* Navistar brand] used truck ecosystem, we are participating actively in this market."

35. It was entirely foreseeable to Navistar, and Navistar knew at the time the parties entered into the Letter Agreement, that its failure to meet the production schedule would impair GLS's ability to take advantage of the historically strong market conditions for used tractors and could result in consequential damages in the form of re-sales at lower prices than would have been available if the promised production schedule was honored and fulfilled.

36. Under the Letter Agreement, Navistar promised to produce all new tractors, including the replacements for the MY2018 Tractors, by the end of May 2022.

10

37. Specifically, Navistar promised to produce the new tractors intended to replace the MY2018 Tractors as follows:

    a. 75 RH model Tractors during March 2022;

    b. 225 LT model Tractors during April 2022;

    c. 330 LT model Tractors during May 2022.

38. However, by the end of May, Navistar had only delivered 18 of the 630 new tractors intended to replace the MY2018 Tractors.

39. Navistar's late delivery of the new tractors extended well over a year. Rather than adhere to the production schedule it promised in the Letter Agreement, Navistar delivered the new tractors intended to replace the MY2018 Tractor as follows:

    a. 95 in June 2022;

    b. 74 in July 2022;

    c. 80 in August 2022;

    d. 31 in September 2022;

    e. 11 in October 2022;

    f. 30 in November 2022;

    g. 50 in December 2022;

    h. 66 in January 2023;

    i. 103 in February 2023;

    j. 39 in March 2023;

    k. 6 in April 2023;

    l. 1 in May 2023;

    m. 18 in June 2023;

    n. 6 in July 2023;

    o. 1 in August 2023;

    p. 1 in September 2023.

40. Navistar's failure to timely deliver the new tractors intended to replace the MY2018 Tractors precluded GLS from selling the MY2018 Tractors during the period of Navistar's delay and precluded GLS from benefitting from the historically strong market conditions for used tractors.

41. During the months following the time period in which Navistar was contractually obligated supposed to have completed its deliveries, the price for the MY2018 tractors dropped by over 75%, causing GLS to suffer substantial damages in the form of lost sales revenue.

42. As a direct result of Navistar's delay, GLS lost tens of thousands of dollars in lost revenue and profits for each one of the MY2018 Tractors it sold, totaling tens of millions of dollars in damages.

43. In addition, as a direct result of Navistar's production delay, Central sustained far higher maintenance, fuel, driver recruitment, and repair costs due to the need to keep the MY2018 Tractors in service instead of replacing them with new tractors.

44. In addition, as a direct result of Navistar's production delay, GLS has been required to pay a higher rate of interest and incurred higher costs related to financing the new tractors that replaced the MY2018 Tractors.

45. It was entirely foreseeable to Navistar, and Navistar knew, that Central would sustain far higher maintenance, fuel, driver recruitment, and repair costs and financing costs if Navistar did not timely deliver the new tractors under the Letter Agreement.

## COUNT ONE: BREACH OF CONTRACT

46. GLS and Central incorporate the foregoing allegations.

47. The Letter Agreement constitutes a binding contract between GLS and Navistar, with GLS and Central among the identified beneficiaries of that contract.

48. Navistar's failure to meet the required production schedule is a material breach of the Letter Agreement.

49. GLS and Central have suffered tens of millions of dollars of damages caused by Navistar's material breach of the Letter Agreement, including without limitation consequential damages, incidental damages, and lost profits related to GLS's inability to sell its used tractors into the historically strong used tractor market as intended and expected by both parties at the time of the Letter Agreement, Central's increased maintenance, fuel, driver recruitment, and repair costs during the period

of Navistar's delay, and GLS's higher financing costs and interest expenses related to the purchase of new tractors.

**WHEREFORE**, Plaintiffs GLS and Central request that the Court enter judgment in its favor and against Defendant Navistar in an amount greater than $75,000.00, plus interest, costs, attorneys' fees, and such further relief as the Court deems just and equitable.

        Respectfully submitted,

        KIENBAUM HARDY VIVIANO
        PELTON & FORREST, PLC:

        By: /s/ *Joseph E. Viviano*
            Joseph E. Viviano (P60378)
            Thomas J. Davis (P786726)
            Marianne J. Grano (P82901)
        Counsel for Plaintiff
        48 S. Main Street, Suite 2
        Mount Clemens, MI 48043
        (586) 469-1580
        jviviano@khvpf.com
        tdavis@khvpf.com
        mgrano@khvpf.com

        and

        BOIES SCHILLER FLEXNER LLP
        By: Hamish P.M. Hume (*Pro Hac Vice* pending)
        Co-Counsel for Plaintiff
        1401 New York Ave. NW
        Washington, DC 20005
        (202) 274-1149
March __, 2024        hhume@bsfllp.com