UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GLS LEASCO, INC. and
CENTRAL TRANSPORT, LLC,

      Case No. 23-cv-12927

      Plaintiffs,

      Hon. Mark A. Goldsmith

v.

      Magistrate Judge Anthony P. Patti

      NAVISTAR, INC.,

Defendant.

_____

**Plaintiffs' Motion for Leave to Amend Complaint to Add Fraud Claims**

Plaintiffs GLS Leasco, Inc. and Central Transport, LLC, through their counsel, move this Court for leave to file a Second Amended Complaint to add fraud claims based on facts recently learned in discovery. In support of the motion, Plaintiffs state the following:

1.      The undersigned counsel certifies that counsel personally spoke to opposing counsel on September 3, 2024, explaining the nature of the relief to be sought by way of this motion and seeking concurrence in the relief; opposing counsel expressly denied concurrence.

2.      The Court's original scheduling order set a deadline of 14 days to amend the complaint, absent good cause. That deadline was correspondingly January 16, 2024—well before the exchange of written discovery and before any depositions had occurred.

3.      Plaintiffs deposed three key Navistar employees between August 20 and August 22, 2024. Based on those witnesses' explanations of certain written documents and their admissions under oath, Plaintiffs have evidence of fraudulent conduct that it can now articulate with particularity, which was impossible before the January 16, 2024 scheduling order amendment date.

4.      Plaintiffs have moved diligently to file this motion, seeking consent from Defendant's counsel the week following the out-of-state depositions identified

above, with Defendant's counsel asking to postpone the discussion until after Labor Day weekend so that counsel could consult with his client.

5.      There is no undue prejudice or other reason to deny amendment, which per Rule 15(a) should be freely given. Navistar has not taken any depositions yet; discovery does not end for several months; the amendment merely adds a new legal theory to already-existing facts that have been the subject of discovery, and the new damages-related theories (attorneys' fees based on fraudulent conduct and exemplary damages) do not require expert testimony and do not impact the expert report deadlines.

Therefore, Plaintiffs move the Court for permission to file the attached Second Amended Complaint setting forth fraud claims against Defendant Navistar.

Respectfully submitted,

KIENBAUM HARDY VIVIANO
PELTON & FORREST, PLC:

By: _/s/ Thomas J. Davis_____
     Joseph E. Viviano (P60378)
     Eric J. Pelton (P40635)
     Thomas J. Davis (P78626)
Counsel for Plaintiffs
48 S. Main Street, Suite 2
Mount Clemens, MI 48043
(586) 469-1580
jviviano@khvpf.com
epelton@khvpf.com
tdavis@khvpf.com

Date:  September 3, 2024

-2-

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GLS LEASCO, INC. and
CENTRAL TRANSPORT LLC,

        Plaintiffs,

v.

NAVISTAR, INC.,

        Defendant.

Case No. 23-cv-12927

Hon. Mark A. Goldsmith

Magistrate Judge Anthony P. Patti

---

**Plaintiffs' Brief in Support of Motion for Leave to Amend Complaint
to Add Fraud Claims**

## Introduction

Plaintiffs GLS Leasco, Inc. and Central Transport, LLC brought this case as a simple breach of contract matter. The case was pled based on what Plaintiffs knew at the time: that in exchange for GLS waiving its right to sell back certain used trucks at a defined residual value, Navistar promised to provide it with 1,100 new trucks on a greatly accelerated timetable that it failed to meet. This caused Plaintiffs substantial damages due to their inability to sell the used trucks in a favorable used-truck market. But discovery—specifically, the depositions of three key Navistar witnesses in late August 2024—has revealed that Navistar's failure to provide Plaintiffs the promised trucks was not, as Navistar claimed, an unforeseeable and unavoidable result of supply-chain disruptions. Rather, Navistar viewed GLS as a disfavored customer in an era where demand greatly outstripped supply because it was not as profitable as other customers. And Navistar further viewed GLS's trade-in rights as an albatross that made GLS the lowest-margin customer in its region.

Navistar thus hatched a fraudulent scheme to induce Plaintiffs to give up their trade-back rights. As detailed in the attached proposed Second Amended Complaint, Navistar executives Mark Belisle and Sean Carmichael first told Plaintiffs (falsely) that Navistar could only produce 600 vehicles for Plaintiffs under the parties' existing contract, when in fact Navistar had reallocated Plaintiffs' trucks to more profitable customers. A few weeks later, Carmichael claimed Navistar could produce

1,100 vehicles over a three-month period, and would do so if Plaintiffs waived their trade-in rights. Unbeknownst to Plaintiffs until days ago, Belisle and Navistar had no intention of following through on the promise. On April 8, 2022, Carmichael signed an agreement wherein Plaintiffs waived their right to trade in used trucks to Navistar, in exchange for Navistar providing new trucks on an accelerated timetable. But that Agreement contained materially false claims that Navistar had already manufactured a significant portion of the new replacement trucks—something Carmichael and Navistar knew that was not true. Navistar, in fact, had no intention of fulfilling the promises in the agreement at the time Carmichael signed.

As of May 17, 2022, Plaintiffs' representative had not signed the agreement. Carmichael—knowing that he had made false representations about Navistar's ability and intention of producing trucks—did not tell Plaintiffs the truth. Instead, Carmichael issued a threat to Plaintiffs: sign the agreement and waive the trade-in rights or else Navistar would stop production and refuse to deliver already-produced trucks (trucks that Navistar already had a duty to produce under the existing July 2021 contract that the April 8, 2022 Letter Agreement was intended to replace.) The coercion worked, and Plaintiffs signed. A few days later, Navistar informed Plaintiffs of the truth: it had not produced the trucks and would not for many months.

These facts support a claim of fraud under well-established Michigan law, and there is good cause to permit amendment here. Plaintiffs could not have pled fraud—

with its heighted pleading requirements—within 14 days of the Court's scheduling order, and before discovery had even begun. The amendment merely adds a new theory covering facts that have been in Navistar's possession all along. And Navistar has not taken any depositions yet—meaning they can question all witnesses on the allegations of the proposed complaint—and thus is not prejudiced.

## Argument

Rule 15(a)(2) provides that a Court should "freely give leave [to amend] when justice so requires," reinforcing the "principle that cases 'should be tried on their merits rather than the technicalities of pleadings.'" *Inge v. Rock Fin. Corp.*, 388 F.3d 930, 936 (6th Cir. 2004) (*quoting Moore v. City of Paducah*, 790 F.2d 557, 559 (6th Cir. 1986)). In determining whether to allow amendment, the trial court may consider factors such as "undue delay, bad faith or dilatory motive on the part of a movant, repeated failures to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of the amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

When a motion to amend comes after a scheduling order deadline, the moving party must also "show good cause under Rule 16(b) for the failure to seek leave to amend prior to the expiration of the deadline before [the Court] will consider whether the amendment is proper." *Hill v. Banks*, 85 F. App'x 432, 433 (6th Cir. 2003). The "primary measure of Rule 16's 'good cause' standard is the moving party's diligence

in attempting to meet the case management order's requirements." *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir. 2002). Another "relevant consideration is possible prejudice to the party opposing the modification." *Id.* Plaintiffs meet both standards.

**1.     There is good cause to add a new claim based on facts uncovered in discovery**. This Court's scheduling order at II.A sets a deadline for amendment "14 days after the Court's order" which was entered on January 2, 2024—meaning amendment was due by January 16, 2024 without needing to show good cause. But Plaintiffs could not have pled its fraud claim by January 16, 2024. Under Rule 9(b), a party must plead fraud with particularity, meaning the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008). But here, those fraudulent statements were not self-apparent; rather, Plaintiffs learned of the fraudulent nature of those statements through recent deposition testimony, including testimony explaining internal Navistar documents—documents that were not produced until months after the January 16, 2024 cutoff.

This includes (1) Mark Belisle's testimony regarding his discretion as the Group Vice President for Dealer Sales and Operations to reallocate truck production among customers, including to Plaintiffs if so desired; (2) internal Navistar production data, produced only recently in an interrogatory response, specifying

-4-

Navistar's actual production figures for those months; (3) testimony from Navistar's Wale Akinosho and Sean Carmichael explaining internal Navistar documents and processes, including Navistar's internal "order board" system, its pricing mechanics, factors that determine Navistar new-vehicle profitability, and Navistar's production processes; and (4) Carmichael's express admissions at his deposition as to the knowingly false nature of his representations and confirmation that he made threats to Navistar's dealership contact to coerce Plaintiffs into waiving their trade-back rights while having no intention of fulfilling Navistar's end of the bargain.[1]

Here, Plaintiffs had no access to internal Navistar documents, Navistar production figures, or Navistar witness testimony on January 16, 2024. But it has that information now, after these depositions. When, as here, a party moves for leave to amend once learning of new facts supporting a claim in discovery, the Rule 16(b) good cause standard is met. *See, e.g.*, *Kathawa v. Friedman*, No. 18-13026, 2019 WL 5445832, at *2 (E.D. Mich. Oct. 24, 2019).

2.  **The Rule 15(a)(2) standard is met here, as there is no undue delay, bad faith, dilatory motive, prejudice, or other reason to deny leave.** Having moved diligently to amend once learning of new facts in discovery, leave should be granted here as there is no prejudice or other reason to deviate from the liberal

---

[1] The depositions in question took place in Naperville, Illinois on August 20, 21, and 22, and Plaintiffs are awaiting the court reporter's completion of the transcripts.

standard for amending a complaint. For the reasons stated above, there is no undue delay here; Plaintiffs are filing this motion shortly after the deposition testimony giving rise to the basis for its new claim. Nor could Navistar claim bad faith.

As to undue prejudice, the "court considers whether the assertion of the new claim or defense would: require the opponent to expend significant additional resources to conduct discovery and prepare for trial; significantly delay the resolution of the dispute; or prevent the plaintiff from bringing a timely action in another jurisdiction." *Phelps v. McClellan*, 30 F.3d 658, 662–63 (6th Cir. 1994). There are no such concerns here. The fraud claims arise out of the same general facts that are already the subject of discovery; at best, what is different is how those facts may now be understood to make out a different legal claim. Moreover, Navistar has not yet taken any depositions, it can question witnesses on the proposed amended complaint, and several months remain in discovery to address any new issues. The distinct damages theories arising from the fraud claim—attorneys' fees and exemplary damages—are not subjects of expert testimony,[2] so there is no need for

---

[2] *See, e.g.*, *Oppenhuizen v. Wennersten*, 2 Mich. App. 288, 299 (1966) (recognizing availability of attorneys' fees as an element of damages in a fraud claim); *Associated Const. Servs. Corp. v. Commerce 8800, L.L.C.*, 2015 WL 5735005, at *3 (Mich. Ct. App. Sept. 29, 2015) (same); *Unibar Maint. Servs., Inc. v. Saigh*, 283 Mich. App. 609, 632 (2009) (affirming award of exemplary damages to defrauded corporation, noting that exemplary damages are those that *cannot* be quantitatively calculated).

those matters to be addressed in expert reports. No discovery extension is required, and the resolution of this dispute will remain on track.

Finally, while Navistar will proclaim its innocence of the fraud claims, that is not relevant to the futility exception to Rule 15; Navistar's denial is a matter for summary judgment or trial. As pled, Michigan law recognizes at least two distinct theories to support fraud here on the facts alleged: fraud in the inducement and bad faith. "Fraud in the inducement…addresses a situation where the claim is that one party was tricked into contracting. It is based on pre-contractual conduct which is, under the law, a recognized tort." *Llewellyn-Jones v. Metro Prop. Grp., LLC*, 22 F. Supp. 3d 760, 778 (E.D. Mich. 2014). As detailed in Plaintiffs' proposed Second Amended Complaint at ¶¶ 46-105, Navistar fraudulently induced Plaintiffs to enter into the April 2022 agreement by—among other things—falsely claiming that it could not fulfill its obligations under the parties' July 2021 agreement.

Likewise, in Michigan, a "promise will constitute a fraudulent misrepresentation if, at the time it was made, the promissor had no intention of performing." *De Blouw v. Ramm & Co.*, 284 Mich. 589, 594–95 (1938); *Hi-Way Motor Co. v. Int'l Harvester Co.*, 398 Mich. 330, 337–38 (1976) (affirming rule that "fraudulent misrepresentation may be based upon a promise made in bad faith without intention of performance"); *Dhadphale v. Delaney*, 2019 WL 3997150, at *4 (E.D. Mich. Aug. 23, 2019) (recognizing same). Here, Plaintiffs allege—and,

-7-

indeed, Navistar Regional Vice President Sean Carmichael has admitted—that (1) Navistar represented to Plaintiffs that it would, and agreed to, fulfill a specific production and delivery schedule for new trucks in the April 8, 2022 Letter Agreement; (2) that Carmichael signed the document knowing that it contained material misrepresentations of fact *and* that Navistar had no intention of fulfilling the promises made; and (3) several weeks later, before Plaintiffs had signed the April 8, 2022 Letter Agreement, Navistar reiterated its false promise to perform despite having already surreptitiously moved production beyond the promised schedule. Carmichael then issued economic threats to coerce Plaintiffs into signing the agreement, revealing the truth to Plaintiffs about the real production schedule days after Plaintiffs signed.

## Conclusion

The Court should grant Plaintiffs' motion for leave to amend.

Respectfully submitted,

KIENBAUM HARDY VIVIANO
PELTON & FORREST, PLC:

By: */s/ Thomas J. Davis*
    Joseph E. Viviano (P60378)
    Eric J. Pelton (P40635)
    Thomas J. Davis (P78626)
Counsel for Plaintiffs
48 S. Main Street, Suite 2
Mount Clemens, MI 48043
(586) 469-1580
jviviano@khvpf.com
epelton@khvpf.com
tdavis@khvpf.com

Date:  September 3, 2024

## LOCAL RULE CERTIFICATION

I, Thomas J. Davis, certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts). I also certify that it is the appropriate length. Local Rule 7.1(d)(3).

Respectfully submitted,

KIENBAUM HARDY VIVIANO
PELTON & FORREST, PLC:

By: */s/ Thomas J. Davis*
    Joseph E. Viviano (P60378)
    Eric J. Pelton (P40635)
    Thomas J. Davis (P78626)
Counsel for Plaintiffs
48 S. Main Street, Suite 2
Mount Clemens, MI 48043
(586) 469-1580
jviviano@khvpf.com
epelton@khvpf.com
tdavis@khvpf.com

Dated:  September 3, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2024, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to all ECF participants on record.

/s/ Thomas J. Davis
(P78626)
Kienbaum Hardy
Viviano Pelton & Forrest, P.L.C.
280 N. Old Woodward Ave., Ste. 400
Birmingham, Michigan 48009
(248) 645-0000
tdavis@khvpf.com

**(PROPOSED) SECOND AMENDED COMPLAINT**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GLS LEASCO, INC. and
CENTRAL TRANSPORT LLC,

     Plaintiffs,

v.

NAVISTAR, INC.,

     Defendant.

Case No. 23-cv-12927

Hon. Mark A. Goldsmith

Magistrate Judge Anthony P. Patti

### Second Amended Complaint

Plaintiffs GLS Leasco, Inc. ("GLS") and Central Transport, LLC ("Central") state as follows for their Second Amended Complaint against Defendant Navistar, Inc. ("Navistar").

## <u>PARTIES, JURISDICTION, AND VENUE</u>

1.    GLS is a Michigan corporation with its registered office and principal place of business located at 12225 Stephens Road, Warren, Michigan.

2.    Central is a limited liability company organized under the laws of the State of Michigan, with the principal place of business located in Warren, Michigan. Central's sole owner and member is LTL Holding Company, LLC, a limited liability company organized under the laws of the State of Michigan, with its principal place of business in Warren, Michigan. LTL Holding Company's members are two individuals who are both Michigan residents, and a Michigan trust whose trustee is

a Michigan resident. There thus remains complete diversity between the parties following this amendment.

3.    Navistar is a Delaware corporation registered and authorized to conduct business within the State of Michigan, with its principal place of business located in Lisle, Illinois.

4.    Navistar conducts systematic and continuous business in Macomb County and throughout the State of Michigan, including by maintaining an International Truck distributorship within Macomb County; marketing, distributing and selling tractors, trailers, parts, and accessories within Macomb County and the State of Michigan; creating, soliciting, and servicing a market for such products in Macomb County and the State of Michigan; being registered to conduct business in the State of Michigan; and entering into multi-million dollar contracts with Macomb County and Michigan business entities (including GLS and the contract at issue) for such products.

5.    This case arises out of a contract Navistar entered into with GLS, negotiating on behalf of several affiliated companies including Central, for over $128 million in Navistar trucks (also referred to as tractors), as set forth in an April 8, 2022 letter agreement. **Ex. A**.

6.     The Macomb County Circuit Court had personal jurisdiction over Navistar under MCL 600.711 and 600.715. Navistar has since removed this case to federal court.

7.     The amount in controversy exceeds $75,000.

8.     Venue was proper in Macomb County under MCL 600.1621. Navistar has since removed this case to the Eastern District of Michigan, where venue is proper.

9.     This case was properly assigned to the Macomb County business court under MCL 600.8031 and MCL 600.8035 because it involves a business or commercial dispute in which all parties are business enterprises, and it relates to their contractual agreement and business dealings. Navistar has since removed this case to federal court.

## FACTUAL ALLEGATIONS

10.     GLS is in the business of purchasing, leasing, and selling commercial trucks, including leasing trucks to Central.

11.     Navistar sells trucks, buses, and parts, and offers related financial services, within the State of Michigan and throughout the United States and Canada.

12.     GLS—acting for itself and on behalf of various affiliated entities including Central—made substantial purchases from Navistar in the past, including

3

the six hundred and thirty (630) Model Year 2018 trucks that are at issue in this lawsuit (the "MY2018 Trucks").

13.     The MY2018 trucks at issue were purchased by GLS Leasco, Inc. for the purpose of leasing those trucks to Central Transport, LLC.

14.     On November 6, 2017, Navistar and GLS entered into an Optional Trade-In Agreement. Under the Optional Trade-In Agreement, as more particularly set forth therein and without limitation, Navistar granted GLS the option to trade in the MY2018 Trucks for a specified residual value.

15.     In February 2021, GLS issued a request for quotation for new trucks to multiple original equipment manufacturers, including Navistar.

16.     In April 2021, GLS notified Navistar that it had been selected to supply 1305 trucks, many of which Navistar would be supplied to Central, with the others to be supplied to other entities GLS was negotiating on behalf of.

17.     Navistar paints the GLS trucks yellow (Central's color, which is unique in the industry) that it knows are intended for leasing to Central. Navistar also applies Central decals before delivering the trucks directly to Central facilities.

18.     On July 13, 2021, GLS entered into a letter agreement with Navistar and its dealer representative, Summit Truck Group, for the supply of 1,305 International trucks (the "July 2021 Letter Agreement").

19.     Under the July 2021 Letter Agreement, as more particularly set forth therein and without limitation:

    a.  Navistar agreed to supply 1,100 2023MY trucks and 205 2024MY trucks for $113,843 per truck;

    b.  Navistar recognized GLS's option to turn in 1046 used trucks (including the MY2018 Trucks);

    c.  Navistar agreed that the new MY2023 units would be produced and delivered to GLS from February 2022 to December 2022; and,

    d.  Navistar agreed that the new MY2024 units would be produced and delivered to GLS from January 2023 to February 2023.

20.     At the end of 2021, Summit Truck Group was sold to Rush Enterprises, and at Navistar's behest, Navistar and GLS entered into negotiations for a new letter agreement excluding Summit Truck Group.

21.     On April 8, 2022, Navistar and GLS entered into a new letter agreement (the "Letter Agreement"), **Ex. A**, which stated: "This Letter Agreement is intended to replace the previous agreement among GLS LeasCo., Summit Truck Group and Navistar dated July 13th, 2021." *Id.* at p.1. The Agreement identified, by name, Central along with other entities who were the intended recipients of the trucks.

22.     During the negotiation of the Letter Agreement and at the time the parties entered into the Letter Agreement, it was widely known in the trucking

industry, and was specifically known to Navistar and GLS, that the market for used trucks was historically strong.

23.    At the time, Navistar stated that it had difficulty producing new trucks with its Bendix Fusion collision mitigation system, and told GLS that it would have additional production slots opening up for customers willing to accept delivery of new trucks without the Bendix system. GLS agreed.

24.    Consistent with the foregoing, the negotiations leading up to the Letter Agreement involved the following key points:

a.    With full awareness of GLS's intention and expectation to purchase and take delivery of new trucks as soon as possible, and then to sell in the historically strong re-sale market the MY2018 trucks that were being replaced by the new trucks, Navistar proposed an earlier delivery schedule for new trucks intended for GLS to lease to Central if GLS would accept delivery without the Bendix system (to be installed at a later date);

b.    In exchange for the earlier production schedule that allowed GLS to sell its MY2018 trucks in the historically strong re-sale market, GLS expressed its willingness to consider waiving its trade-in option (including with respect to the MY2018 Trucks);

c.  To further entice GLS to enter into this transaction, Navistar offered a rebate payment related to new truck purchases, which ended up being $6.2 million in the Letter Agreement (or roughly $6,000 per new truck), with the bulk of those payments to be issued to Central Transport

25.    The earlier production schedule for the new trucks was a critical part of the consideration Navistar offered to GLS.

26.    GLS would never have waived its trade-in rights, including with respect to the MY2018 Trucks, in the absence of Navistar's agreement to the earlier production schedule, which both parties understood would allow GLS to sell the MY2018 Trucks in the historically strong re-sale market.

27.    In order to secure the earlier production slots, GLS agreed to allow Navistar to complete the installation and wiring of its Bendix system after delivery of GLS's new trucks.

28.    Consistent with the foregoing, GLS and Navistar entered into the Letter Agreement with the mutual understanding and recognition that Navistar's earlier production schedule for the new trucks would allow GLS to take advantage of the historically strong market conditions for used trucks (including for the MY2018 Trucks). Central was the intended beneficiary of these new trucks, which GLS and Navistar understood would be used to replace the used trucks in Central's fleet on the promised timetable in the Letter Agreement.

7

29.     Accordingly, under the Letter Agreement, as more particularly set forth therein and without limitation:

a.  Navistar agreed to produce 1100 MY2023 trucks from January 2022 through May 2022 (instead of the previously agreed upon production schedule of February 2022 to December 2022). *Id.* at pp.1-2.

b.  In exchange for Navistar's promised earlier production schedule and a $6,200,000 rebate to Central and other entities related to the new truck purchases, Navistar was released from its obligation to pay GLS the previously agreed upon residual value of specified used trucks (including the MY2018 Trucks).

c.  The Letter Agreement's "No Trade Agreement" provision confirms that the residual value of the MY2018 Trucks (*i.e.*, the amount Navistar would have been required to pay for trade-ins in the absence of the No Trade Agreement provision), as of May 1, 2022, was $57,000 per vehicle.

d.  The "No Trade Agreement" provision confirms that in the absence of this agreement, Navistar would have owed GLS, at GLS's option, in excess of $50 million for trade-in trucks, including nearly $35 million for the MY2018 Trucks.

e. The "No Trade Agreement" provision states: "This Agreement Letter is all-encompassing for any and all current or future issues for 941 model year 2017 – 2019 International units and terminates any and all other agreements pertaining to these units." *Id.* at p.3.

30. Navistar was fully aware during negotiation of the Letter Agreement and at all relevant times that:

a. GLS would be unable to sell its used trucks, including the MY2018 Trucks, and take advantage of the historically strong used truck market, until Navistar replaced the used trucks with new trucks;

b. the used trucks in question were a part of Central's fleet, and the new trucks would be leased by GLS to Central to replace the used trucks.

c. time was of the essence for the Letter Agreement's production schedule for new trucks;

d. GLS had agreed to waive its option to trade-in the MY2018 Trucks in consideration of Navistar's promised earlier production schedule;

e. the used truck market was historically strong and would not remain so indefinitely;

f. there was a risk of a price drop in the market for used trucks with a production delay; and,

9

g. taking advantage of the historically strong market conditions for used trucks was the key reason GLS traded the security of Navistar's residual trade-in obligations for Navistar's earlier production schedule.

31. Navistar's knowledge of the market conditions is further demonstrated by Navistar's own efforts to capitalize on the historically strong used truck market during the relevant time period.

32. On May 2, 2022, *Fleet Maintenance* published an article entitled, "Navistar relocates Used Truck Center to better serve high-demand market."

33. The article states that "Navistar recently opened a new 13,000 sq.-ft. Used Truck Center located in Joliet, Illinois."

34. Tony Stinsa, a Navistar vice president, provided the following quotation for the article: "The used truck market continues to be in a state of abnormally low available inventory and historically high pricing levels…Within the International [*i.e.* Navistar brand] used truck ecosystem, we are participating actively in this market."

35. It was entirely foreseeable to Navistar, and Navistar knew at the time the parties entered into the Letter Agreement, that its failure to meet the production schedule would impair GLS's ability to take advantage of the historically strong market conditions for used trucks and could result in consequential damages in the

form of re-sales at lower prices than would have been available if the promised production schedule was honored and fulfilled.

36.    Under the Letter Agreement, Navistar promised to produce all new trucks, including the replacements for the MY2018 Trucks, by the end of May 2022.

37.    Specifically, Navistar promised to produce the new trucks intended to replace the MY2018 Trucks as follows:

      a.  75 RH model Trucks during March 2022;

      b.  225 LT model Trucks during April 2022;

      c.  330 LT model Trucks during May 2022.

38.    However, by the end of May, Navistar had only delivered 18 of the 630 new trucks intended to replace the MY2018 Trucks.

39.    Navistar's late delivery of the new trucks extended well over a year. Rather than adhere to the production schedule it promised in the Letter Agreement, Navistar delivered the new trucks intended to replace the MY2018 Truck as follows:

      a.  95 in June 2022;

      b.  74 in July 2022;

      c.  80 in August 2022;

      d.  31 in September 2022;

      e.  11 in October 2022;

      f.  30 in November 2022;

g.  50 in December 2022;

h.  66 in January 2023;

i.  103 in February 2023;

j.  39 in March 2023;

k.  6 in April 2023;

l.  1 in May 2023;

m. 18 in June 2023;

n.  6 in July 2023;

o.  1 in August 2023;

p.  1 in September 2023.

40.    Navistar's failure to timely deliver the new trucks intended to replace the MY2018 Trucks precluded GLS from selling the MY2018 Trucks during the period of Navistar's delay and precluded GLS from benefitting from the historically strong market conditions for used trucks.

41.    During the months following the time period in which Navistar was contractually obligated to have completed its deliveries, the price for the MY2018 trucks dropped by over 75%, causing GLS to suffer substantial damages in the form of lost sales revenue.

42.     As a direct result of Navistar's delay, GLS lost tens of thousands of dollars in lost revenue and profits for each one of the MY2018 Trucks it sold, totaling tens of millions of dollars in damages.

43.     In addition, as a direct result of Navistar's production delay, Central sustained far higher maintenance, fuel, driver recruitment, and repair costs due to the need to keep the MY2018 Trucks in service instead of replacing them with new trucks.

44.     In addition, as a direct result of Navistar's production delay, GLS has been required to pay a higher rate of interest and incurred higher costs related to financing the new trucks that replaced the MY2018 Trucks.

45.     It was entirely foreseeable to Navistar, and Navistar knew, that Central would sustain far higher maintenance, fuel, driver recruitment, and repair costs and financing costs if Navistar did not timely deliver the new trucks under the Letter Agreement.

## **SUPPLEMENTAL FACTUAL ALLEGATIONS**

46.     Navistar offers different prices to different customers, with smaller customers generally paying higher prices—often significantly higher prices—than purchasers of larger quantities of vehicles for the same class of truck.

47.     Navistar internally has a "Special Price Allowance" figure (or "SPA") calculated for each of its customer contracts. The SPA is calculated as a percentage,

with that percentage reflecting the discount from the list price of the vehicle. A higher SPA means that the customer is receiving a larger discount and thus a higher SPA means that the customer is less profitable for Navistar.

48.     In 2021 and 2022, Plaintiffs (who Navistar treated as a single customer in internal documentation) had one of the highest—if not the very highest—SPA of all dealer-led transactions in Navistar's Southwest Region. Plaintiffs were thus one of Navistar's least profitable customers.

49.     Plaintiffs' high SPA stemmed from several factors. Plaintiffs were a longtime, loyal customer of Navistar that continued to make purchases from Navistar during a period of time where Navistar was suffering from significant reputational and financial troubles due to the highly-publicized failure of its Maxxforce truck engine. As one of a then-dwindling number of fleet customers, Navistar had offered GLS favorable pricing.

50.     Another major contributor to Plaintiffs' high SPA was Navistar's agreement to buy back the used MY 2018 Trucks from Plaintiffs at a specified $62,000 per-truck price if Plaintiffs purchased a new replacement truck. As of 2021, Navistar's Used Truck Organization believed that Plaintiffs' trucks were worth far less, and Navistar viewed its repurchase obligation as a financial albatross that made selling new trucks to Plaintiffs particularly unprofitable.

51.     Perversely, Plaintiffs' loyalty to Navistar—and the favorable pricing that followed from that loyalty—would cause Navistar to view Plaintiffs as an undesirable customer once Navistar found itself with far greater demand for new trucks than it had supply. In this environment, Navistar could make significantly more profit for itself by selling trucks to customers with a lower SPA.

52.     When originally negotiating with Plaintiffs in early 2021, Navistar proposed various schemes to avoid paying the full residual value that had been negotiated in the 2017 Optional Trade Back ("OTB") agreement, including (1) proposing significant delays in providing new trucks to Plaintiffs, knowing Plaintiffs could not timely turn in its old trucks, thus triggering a monthly penalty to the residual value owed by Navistar under the OTB agreement; and (2) proposing timely delivery of new trucks, but refusing to allow OTB trade-ins until many months after new truck delivery, again to trigger this OTB penalty clause. Justin Fink—the CEO of the Navistar dealer responsible for Plaintiffs' account—called Navistar's conduct "insanity" and insisted Navistar fulfill its contractual promise on the OTB turn-in.

53.     It was only after GLS threatened legal action—through a letter by its General Counsel on July 1, 2021—that Navistar came to an agreement to produce new trucks that allowed Plaintiffs to trade back the used trucks under the parties' previous trade-back agreement.

54.     Under the July 2021 Letter Agreement, Navistar promised to supply 1305 new RH model heavy trucks to GLS and its affiliated entities Central and Universal. The schedule was 100 per month starting in February 2022, with a final delivery of 105 trucks in February 2023.

55.     Despite signing the July 2021 Letter Agreement, Navistar continued to view GLS/Central as an undesirable, low-margin customer. Navistar had no intention of producing the new trucks promised under that July 2021 Agreement, despite having the manufacturing capacity to do so.

56.     The July 2021 Letter Agreement was signed on July 29, 2021. Although Navistar promised to produce 1305 trucks for Plaintiffs under that agreement, Southwest Regional Vice President Sean Carmichael immediately refused to allow Navistar's dealer to order all the trucks promised.

57.     Ultimately, in late August 2021, Navistar permitted its dealer to order only 1,000 RH model trucks for Plaintiffs, rather than the 1305 called for in the July 2021 Letter Agreement.

58.     At this time, Navistar had many available customers for the supply of trucks it could manufacture. While Navistar has claimed that it simply lacked the capacity to fulfill all its promised orders, it did not simply allocate production on a proportional basis to all customers. Rather, it picked winners and losers, with profit margin being a key factor by Navistar in deciding which customers would be denied

16

their promised trucks so that Navistar could sell them to higher-margin customers. An internal spreadsheet dated August 27, 2021 and used by Navistar in the reallocation process for the Southwest Region (where Plaintiffs were assigned) showed that nearly all of the reallocation of production was taken from customers with the lowest profit margins, including Plaintiffs.

59.   On October 22, 2021, Chester Ciesielski—the Navistar Vice-President responsible for the heavy truck business throughout Navistar—recommended to Carmichael that Plaintiffs have all but 600 of their promised orders reallocated to other customers.

60.   Minutes from a November 16, 2021 Navistar Dealer Advisory Committee meeting quote Navistar Group Vice President of Dealer Sales and Operations Mark Belisle as stating that his "goal is to have 25% of what we build in 2022 going to small customers" and that Navistar's "large customers are not going to be able to get all the trucks they want, need, or think they need." Belisle confirmed at his deposition that he made this statement.

61.   On December 16, 2021, Belisle and Carmichael travelled to Plaintiff's headquarters in Warren, Michigan to meet with Plaintiffs' representative Kyle Blain and others.

62.   At the December 16, 2021 meeting with Blain, Belisle and Carmichael announced to Plaintiffs, for the first time, that Navistar would only produce 600

trucks for Plaintiffs in 2022 instead of 1,305 trucks, claiming that they did not have the available production to build the trucks.

63.    This was a false statement; Belisle knew that Navistar *did* have the capacity to build more than 600 trucks for Plaintiffs in 2022; indeed, he had the discretion to allocate production to Plaintiffs to fulfill Navistar's contractual obligations.

64.    Instead, Belisle and his team had simply reallocated that production away from Plaintiffs to sell to more profitable customers, including Navistar's favored, higher-margin "small" customers that Navistar did not have any existing contractual obligation to sell to.

65.    Belisle made the false statement as part of a fraudulent scheme to deprive GLS and Central of the trade-back agreement that Navistar had been seeking to avoid going back to early 2021.

66.    Only a few weeks later, in an internal email dated January 7, 2021, Mark Belisle disclosed to several senior executives—including Carmichael and Used Truck Organization Vice President Tony Stinsa—that he and Carmichael created an "opportunity" with Plaintiffs that he wanted to "pursue ASAP."

67.    In that email, he acknowledged the falsity of his statement to Kyle Blain a few weeks earlier by revealing that Navistar could produce at least 1,100 additional

trucks as "incremental production" (that is, *beyond* the existing production that Navistar had made available to other customers) in the next few months.

68.    Further, the Bendix unavailability issue did not impact Navistar's ability to produce 1,305 trucks for Plaintiffs under the July 2021 Letter Agreement. Discovery has disclosed that Navistar planned to offer Bendix pre-wire to all its heavy truck customers in December 2021 and did offer it to all in January 2022. Plaintiffs agreed to accept the Bendix pre-wire option (and Navistar purported to implement it) while the July 2021 Letter Agreement was still in effect, to the trucks ordered under that Agreement.

69.    In the January 7, 2022 email, Belisle explained the "opportunity" that he and Carmichael had been concocting: Carmichael had "floated" to Kyle Blain that Navistar now had additional production and could produce 350 trucks per month in March, April, and May of 2022 in exchange for Plaintiffs waiving their rights to trade in their used MY2018 Trucks to Navistar at the promised residual price.

70.    In the same email, Belisle noted that if GLS accepted this proposal, Navistar would save an average of $21,093 owed to Plaintiffs for each of the 612 MY18 RH trucks that GLS otherwise could turn in. He posited that Navistar "can turn this from a $7000 - $8000 [variable margin]… deal to a $17,000 or $18,000 [variable margin] per unit deal or approx $11m increase."

71.     Navistar, in fact, had no intention of providing trucks to Plaintiffs on this accelerated timetable. Instead, it relied on its knowledge that Plaintiffs had a significant need for new trucks—trucks that Navistar had already promised and then threatened to renege on providing—and the false promise of accelerated production to induce Plaintiffs into waiving contractual rights that Navistar felt were unfavorable.

72.     Navistar proposed this offer to Plaintiffs, with the parties agreeing to the broad outlines of a deal in January 2022 that included (a) the production of trucks for GLS/Central in March, April, and May 2022; and (b) the no-trade agreement. It was further understood that the production timing would allow Plaintiffs to take advantage of the historically strong market conditions for used trucks.

73.     On January 20, 2022, Navistar and Plaintiffs reached the broad outlines of a new agreement to replace the July 2021 letter agreement, including the number of trucks Navistar would produce for Plaintiffs from January 2022 through May 2022, but other details required finalization.

74.     On the same date, Belisle, Stinsa, Carmichael, and other Navistar executives participated in a self-congratulatory email chain, bragging and joking about their apparent success in eliminating GLS's trade-back rights. Carmichael was lauded for doing a "great job here in taking advantage of the used truck market,"

reflecting Navistar's awareness that Plaintiffs were waiving approximately $62,000 per-vehicle trade-in rights because of the strong used truck market.

75.   Despite promising Plaintiffs accelerated production, Belisle and other executives continued to discuss reassigning production to higher-margin customers.

76.   For example, a February 24, 2022 email from Navistar executive Dan Keyser to Belisle and others indicated that Navistar wanted to refocus its truck allocation based on "margin." He provided a list of the 30 Navistar customers with the lowest profit margins (including Plaintiffs), directed the team to "identify lowest margin (highest SPA orders), determine which of this list is not touchable," and for the rest, have production "postponed indefinitely."

77.   On April 7, 2022, Belisle emailed Carmichael, instructing him to "make some decisions about who we build for and who we don't build for in a timely fashion," and citing profitability and the need for small customers as a factor to consider, as well as "trades (good or bad)."

78.   An April 14, 2022 email from Navistar executive Paul Martin to Navistar's then Head of Commercial Operations Göran Nyberg (and earlier provided to Dan Keyser and Mark Belisle) was explicit about Navistar's intention to lie to its non-preferred customers. It noted Navistar's intention to reassign trucks to more profitable customers but recognized that "if we are seen to be 'picking and choosing' customers in the marketplace, it would be a problem." As to disfavored customers,

21

Belisle, Keyser, and Martin decided that the "story… needs to be" that "due to supply chain issues we are going to need to push orders out."

79.    Navistar has attempted to sell that same story to Plaintiffs, including in this litigation. However, Navistar's Sean Carmichael admitted at deposition that the only "supply chain" issues that allegedly affected Plaintiffs were all known to Navistar and accounted for *before* Navistar signed the April 8, 2022 letter agreement stating 1,100 trucks would be produced by May 2022.

80.    On April 8, 2022, Sean Carmichael signed the final draft of the 2022 Letter Agreement. It states that "[a]t the time of this letter" – that is, April 8, 2022 – "Navistar can supply (1,100) new 2023 International LT/RH production slots from January 2022 through June 2022," and identified "New Truck Build Months" that were "based on available production at the time of this letter."

81.    Carmichael admitted that he was directed to sign the agreement by Navistar's Deal Council—which included Belisle and other top-level Navistar executives.

82.    The April 8, 2022 Letter Agreement contained a production chart indicating that Navistar had built 42 new RH trucks for Plaintiffs in January, 32 in February, and 342 in March. Carmichael admitted at his deposition that he knew this representation was false; *i.e.*, he knew that Navistar had only manufactured 131 trucks for Plaintiffs as of the day he represented that over 400 trucks had been built

as of March in the April 8, 2022 letter. He also admitted that neither he nor anyone else at Navistar updated the production chart in that letter to account for reality, but instead signed the agreement making the false representation as to past production.

83.     Plaintiffs had no access to Navistar's manufacturing data and thus could not identify whether Navistar had built the number of trucks it claimed it had built.

84.     Carmichael further admitted, both in subsequent internal communications and at his deposition, that Navistar's April 8, 2022 Letter Agreement was a promise that all the trucks identified on the production schedule would be built and delivered by June 2022.

85.     The Letter Agreement Carmichael signed on Navistar's behalf contained another material misrepresentation: it stated that 42 new RH trucks and 300 LT new trucks would be built in April 2022, but Carmichael knew that Navistar had not scheduled anywhere near that level of production for Plaintiffs in April 2022.

86.     Navistar had no intention of performing the promises set forth in the April 2022 Letter Agreement when Carmichael signed at the direction of Belisle and other Navistar executives.

87.     Navistar did not inform Plaintiffs that its representations as to production in the Letter Agreement were false. Nor did it inform Plaintiffs that it had no intention of fulfilling the promises in the Letter Agreement. Instead, Navistar—which generally communicated information about production through its dealership

contact (here, Jim Lollis from Allegiance Trucks)—claimed to Plaintiffs that it was producing the promised trucks on schedule.

88.   On May 4, 2022, Mr. Lollis saw that several hundred Central trucks had their production dates pushed out several months past the June 2022 delivery date. He asked whether these were "real" moves or not—Navistar would often use dummy dates on its order board temporarily when readjusting allocation among customers— but Navistar did not inform Lollis that the moves were "real." Lollis thus believed that production and delivery of Plaintiffs' new trucks would be substantially completed as scheduled.

89.   In fact, as of May 2, 2022, Navistar had made the decision to push Plaintiffs' orders past the production and delivery dates outlined in the Letter Agreement, which Plaintiffs had not yet signed. Sean Carmichael's subordinate Wale Akinosho—working with Mark Belisle's subordinate David Brown—created a "tracker" sheet indicating how many of Plaintiffs' orders were being pushed out.

90.   Navistar did not inform Plaintiffs that it was pushing production of trucks out past the promised delivery dates. To the contrary, Navistar was scheming to ensure that Plaintiffs signed the Letter Agreement (thus eliminating Plaintiffs' trade-back rights) before Plaintiffs found out that it would not receive the bargained-for production schedule.

91.     In an April 29, 2022 email chain, Sean Carmichael and Navistar executive Dan Simnick discussed an email from Kyle Blain related to the promised trucks. In the email, Simnick indicated that Navistar should not do anything "until they at least sign the agreement letter."

92.     On May 17, 2021, Carmichael took things a step farther: he told Navistar's agent (dealer contact Jim Lollis) to inform Kyle Blain that "if we do not have a signed agreement based on the 1100 new with no-trades," that "Navistar is going to stop/postpone our production and hold deliveries of built trucks."

93.     Carmichael issued this threat even though Navistar still had a preexisting contractual obligation to deliver at least 100 new trucks per month under the July 2021 Letter Agreement. That obligation had still not yet been superseded.

94.     In the same communication, Lollis informed Plaintiffs that the timely production dates remained correct, as Navistar had not informed Lollis (or Plaintiffs) that the dates had already been moved behind-the-scenes two weeks earlier.

95.     Navistar knew at the time of this threat that it had no intention of honoring its promise to deliver the trucks as called for in the Letter Agreement. Indeed, as discussed, Carmichael's subordinate Wale Akinosho had already been tracking Navistar's actions in pushing production of hundreds of Plaintiffs' orders into September 2022 or later. Carmichael (and Navistar) also knew that Plaintiffs

would not agree to sign the Letter Agreement had Navistar disclosed this intention not to produce the trucks on schedule.

96.     Navistar's threat to stop production and withhold trucks already produced had the intended effect—the next day, on May 18, 2022, Kyle Blain signed the Letter Agreement on Plaintiffs' behalf.

97.     A few days later—on May 26, 2022—having secured Blain's signature, Navistar finally told Lollis (and through him, Plaintiffs) the truth: Navistar had pushed out production on Plaintiffs' trucks and would not be fulfilling the terms of the Letter Agreement.

98.     In discovery, Carmichael has confirmed (1) that Navistar had breached its Letter Agreement with Plaintiffs; (2) that Navistar knew the representations about its production were false when he signed; and (3) Navistar recognized the negative consequences of that conduct was to preclude Plaintiffs from taking advantage of a historically high used truck market.

99.     For instance, on June 27, 2022 Carmichael wrote to Belisle that the alleged production issues caused "changes to the cover letter [*i.e.*, the Letter Agreement] before we could have the customer sign," and that "[w]e should have delivered all units by the end of June! We are now looking at September at best!"

100.     As another example, in a December 13, 2022 email to Navistar finance executive Kerri Podewell, Carmichael wrote the following:

A) All builds where [*sic*] to be completed by the end of June per written agreement that came after order board and allocation adjustment. B) We had a no trade agreement that made it very important to hit the June date so Central could sell these 2017,2018,2019 units in the open market… Unfortunately, we could not produce the New Trucks as promised, so Central could pull out the trades in time.

101.   Navistar manufactured at least 4701 heavy day-cab trucks and at least 6067 heavy sleeper trucks between January 2022 and May 2022—more than enough to timely fulfill the entire 1,100 truck order under the Letter Agreement.

102.   Belisle could have, but refused to, use his authority to ensure timely production of Plaintiffs' trucks as promised.

103.   Rather, Navistar intentionally and willfully breached its agreement, having made (1) false representations of material fact to induce Plaintiffs to enter into a new contract in the first place; and (2) promises it had no intention of keeping, both when Navistar signed the April 8, 2022 Letter Agreement and when it coerced Plaintiffs into signing the Agreement on May 18, 2022.

104.   Navistar took these actions for its own financial benefit in eliminating Plaintiffs' trade-back rights—knowing it had already secretly decided *not* to fulfill the agreement.

105.   Had Navistar not made the false representations, Plaintiffs would not have entered into the Letter Agreement and would not have waived their rights to trade in their used trucks.

## **COUNT ONE: BREACH OF CONTRACT**

106.   GLS and Central incorporate the foregoing allegations.

107.   The Letter Agreement constitutes a binding contract between GLS and Navistar, with GLS and Central among the identified beneficiaries of that contract.

108.   Navistar's failure to meet the required production schedule is a material breach of the Letter Agreement.

109.   GLS and Central have suffered tens of millions of dollars of damages caused by Navistar's material breach of the Letter Agreement, including without limitation consequential damages, incidental damages, and lost profits related to GLS's inability to sell its used trucks into the historically strong used truck market as intended and expected by both parties at the time of the Letter Agreement, Central's increased maintenance, fuel, driver recruitment, and repair costs during the period of Navistar's delay, and GLS's higher financing costs and interest expenses related to the purchase of new trucks.

**WHEREFORE**, Plaintiffs GLS and Central request that the Court enter judgment in its favor and against Defendant Navistar in an amount greater than $75,000.00, plus interest, costs, attorneys' fees, and such further relief as the Court deems just and equitable.

## **COUNT TWO: FRAUD**

110.   GLS and Central incorporate the foregoing allegations.

28

111. Navistar made material misrepresentations—both material misrepresentation of facts, and material misrepresentation of their intention to honor the promises set forth in the Letter Agreement.

112. The representations, including the alleged intention to honor the terms of the agreement at the time each party signed, were knowingly false when made, or made recklessly, without any knowledge of their truth.

113. The material misrepresentations were made with the intention that they should be acted on by Plaintiffs.

114. Plaintiffs acted in reliance on the material misrepresentations.

115. Plaintiffs were injured as a result of the material misrepresentations.

**WHEREFORE**, Plaintiffs GLS and Central request that the Court enter judgment in its favor and against Defendant Navistar in an amount greater than $75,000.00, plus interest, costs, exemplary damages, attorneys' fees, equitable relief as appropriate (including potential reformation or rescission of part or all of the fraudulently-induced contract), and such further relief as the Court deems just and equitable.

Respectfully submitted,

KIENBAUM HARDY VIVIANO
PELTON & FORREST, PLC

By: _/s/_____
        Joseph E. Viviano (P60378)
        Eric J. Pelton (P40635)
        Thomas J. Davis (P78626)
Counsel for Plaintiffs
48 S. Main Street, Suite 2
Mount Clemens, MI 48043
(586) 469-1580
jviviano@khvpf.com
epelton@khvpf.com
tdavis@khvpf.com

and

BOIES SCHILLER FLEXNER LLP
By:  Hamish P.M. Hume (*Pro Hac Vice*
pending)
Co-Counsel for Plaintiffs
1401 New York Ave. NW
Washington, DC 20005
(202) 274-1149
hhume@bsfllp.com

September __, 2024

30