UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GLS LEASCO, INC. and
CENTRAL TRANSPORT, LLC,

                                  Case No. 23-cv-12927

      Plaintiffs,

                                  Hon. Mark A. Goldsmith

v.

                                  Magistrate Judge Anthony P. Patti

      NAVISTAR, INC.,

Defendant.

---

**Plaintiffs' Opposition to Defendant's Motion to Dismiss
Count II of Plaintiffs' Second Amended Complaint**

## Statement of Issues Presented

Plaintiffs' Second Amended Complaint alleges facts in support of two distinct theories of fraud: fraud-in-the-inducement and bad faith fraud. Under well-established Michigan law, the economic loss doctrine does not bar either theory. Should the Court deny Defendant's motion to dismiss Plaintiffs' fraud claim?

**Controlling or Most Appropriate Authority**

*Bannister v. Knox Cnty. Bd. of Educ.*, 49 F.4th 1000 (6th Cir. 2022)

*Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.*, 532 N.W.2d 541 (Mich. Ct. App. 1995)

*Metropolitan Alloys Corp. v. Considar Metal Marketing, Inc.*, 2007 WL 2874005 (E.D. Mich. Sept. 25, 2007)

# Table of Contents

Statement of Issues Presented ........................................................................ i

Controlling or Most Appropriate Authority ............................................... ii

Table of Contents ........................................................................................ iii

Table of Authorities ....................................................................................iv

Introduction ..................................................................................................1

Background ....................................................................................................2

    1.   Navistar delays selling new trucks to Plaintiffs in 2021 as it attempts to figure out how to avoid Plaintiffs' trade-in rights—eventually agreeing only after GLS threatens litigation. ................................................................2

    2.   After signing the July 2021 Letter Agreement, Navistar decides to reallocate truck production to smaller, more profitable customers—falsely telling Plaintiffs that it could only build 600 trucks despite the parties' months-old agreement. ......................................................................................3

    3.   Belisle reveals his scheme: informing Plaintiffs that Navistar could now produce the promised trucks—on a faster timetable—if Plaintiffs gave up their trade-in rights, while secretly continuing Navistar's plan to give production slots to higher-paying customers..................................................4

Standard of Review ......................................................................................6

Argument ......................................................................................................7

    I.   The economic loss doctrine does not apply to a fraud-in-the-inducement claim...........................................................................................8

    II.   Even if Navistar's failure to address the bad-faith claim is overlooked, the economic loss doctrine does not apply to that claim either....................11

Conclusion ..................................................................................................14

# Table of Authorities

## Cases

*Bannister v. Knox Cnty. Bd. of Educ.*,
  49 F.4th 1000 (6th Cir. 2022) ................................................................8

*Bell Atl. Corp. v Twombly*,
  550 U.S. 544 (2007) ...............................................................................6

*Charter Twp. of Shelby v. Tech. Integration Grp. Servs., Inc.*,
  2013 WL 951379, at *3-4 (Mich. Ct. App. Mar. 5, 2013) ..............7, 12

*Chemico Sys., Inc. v. Spencer*,
  2023 WL 1993783, at *7 (E.D. Mich. Feb. 14, 2023)..........................12

*Cord L.L.C. v. RPF Oil Co., Inc.*,
  2012 WL 3023197, at *2 (Mich. Ct. App. July 24, 2012)....................10

*Crossing at Eagle Pond Apartments, LLC v. Lubrizol Corp.*,
  790 F. App'x 775 (6th Cir. 2019) ..........................................................8

*Custom Data Sols., Inc. v. Preferred Cap., Inc.*,
  733 N.W.2d 102 (Mich. Ct. App. 2006) .................................................7

*Dinsmore Instrument Co. v. Bombardier, Inc.*,
  199 F.3d 318 (6th Cir. 1999)...................................................................9

*Fremont Reorganizing Corp. v. Duke*,
  811 F. Supp. 2d 1323 (E.D. Mich. 2011)................................................7

*Galeana Telecomms. Invs., Inc. v. Amerifone Corp.*,
  202 F. Supp. 3d 711 (E.D. Mich. 2016)................................................13

*Hart v. Ludwig*,
  79 N.W.2d 895 (Mich. 1956)................................................................12

*Hi-Way Motor Co. v. Int'l Harvester Co.*,
  247 N.W.2d 813 (Mich. 1976)..............................................................12

*Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.*,
  532 N.W.2d 541 (Mich. Ct. App. 1995) .................................... 9, 10, 13

*Llewellyn-Jones v. Metro Prop. Grp., LLC*,
   22 F. Supp. 3d 760 (E.D. Mich. 2014)...............................................................7, 9

*Metropolitan Alloys Corp. v. Considar Metal Marketing, Inc.*,
   2007 WL 2874005, at *6 (E.D. Mich. Sept. 25, 2007).......................................13

*Neibarger v. Universal Coops., Inc.*,
   486 N.W.2d 612 (Mich. 1992)............................................................................8, 9

*Rinaldo's Const. Corp. v. Mich. Bell Tel. Co.*,
   559 N.W.2d 647 (Mich. 1997)..............................................................................12

*Rutan v. Straehly*,
   286 N.W. 639 (Mich. 1939)...................................................................................12

*Think Operations, LLC v. Top Shelf Barber Supplies*,
   2021 WL 21597, at *4 (W.D. Mich. Jan. 4, 2021) ..............................................10

*United States v. BAE Sys. Tactical Vehicle Sys., LP*,
   2016 WL 894567, at *4 (E.D. Mich. Mar. 9, 2016) .............................................10

## Introduction

This case began as a breach of contract action. Plaintiffs alleged that Defendant Navistar, Inc. ("Navistar") breached an April 2022 Letter Agreement by not meeting its promised truck production and delivery schedule. But during discovery, Plaintiffs learned that Navistar had engaged in a fraudulent scheme extending well beyond the confines of the April 2022 Letter Agreement. The objective of the scheme was to induce Plaintiffs to relinquish their rights to trade in used 2018 Navistar trucks at a set price—rights that made Navistar's then-operative contract with Plaintiffs, signed in July 2021, one of the least profitable in the company.

To accomplish this goal, Navistar engaged in two acts of fraud. First, it lied about its ability to produce trucks *under the July 2021 contract*, claiming it could only produce 600 of the 1,305 promised trucks when, in fact, it reassigned Plaintiffs' production slots to more profitable customers. Soon thereafter, Navistar told Plaintiffs that it would be able to produce 1,100 trucks in 2022 if Plaintiffs would agree to a new contract that waived their trade-in rights. Plaintiffs, who needed trucks to operate their business, agreed. But Navistar then engaged in a second act of fraud: it signed the April 2022 Letter Agreement in bad faith, knowing at the time it signed that it had no intention of performing.

-1-

Navistar's Motion to Dismiss miscomprehends the fraud claim at issue, as Navistar rests its Motion entirely on an "economic loss" doctrine that is inapplicable to either fraud theory. Indeed, Navistar ignores entirely the bad-faith fraud theory, which alone is a basis to deny the Motion. Plaintiffs' Second Amended Complaint states a valid fraud claim.

## Background

In 2017, Plaintiff GLS Leasco, Inc. ("GLS"), acting on behalf of various affiliates including Plaintiff Central Transport, LLC ("Central"), purchased numerous Model Year 2018 trucks, including the 630 trucks at issue here ("MY 2018 Trucks"), from Navistar. (PageID.248 ¶ 12.) The MY 2018 Trucks were subject to an Optional Trade-In Agreement, which Navistar and GLS entered into in November 2017. (PageID.249 ¶ 14.) The Optional Trade-In Agreement gave GLS the right to trade in the MY 2018 Trucks in exchange for a specified "residual" payment. (*Id.*) Under this Optional Trade-In Agreement, the residual value of the MY 2018 Trucks was almost $35 million. (PageID.253 ¶ 29(d).)

1. **Navistar delays selling new trucks to Plaintiffs in 2021 as it attempts to figure out how to avoid Plaintiffs' trade-in rights—eventually agreeing only after GLS threatens litigation.**

GLS could not trade in the MY 2018 Trucks until Navistar replaced them with new ones. (PageID.254 ¶ 30(a).) But Plaintiffs' trade-in rights obligated Navistar to repurchase the MY 2018 Trucks at a price far higher than Navistar believed they

were worth. (PageID.259 ¶ 49.) This trade-in obligation, among other reasons, made Plaintiffs one of Navistar's least profitable customers, and a disfavored one. (*Id.* ¶¶ 47-50.) Thus, in 2021, Navistar tried to delay providing Plaintiffs with new trucks to avoid having to take the trade-ins. (PageID.260 ¶ 51.) It was only after GLS threatened litigation that Navistar agreed to sell Plaintiffs new trucks. (*Id.* ¶ 52.) Accordingly, in July 2021, GLS and Navistar entered into an agreement for the production and delivery of 1,100 MY 2023 trucks and 205 MY 2024 trucks (the "July 2021 Letter Agreement"). (PageID.250 ¶ 19(a).) Per the agreement, these 1,305 trucks would be delivered between February 2022 and February 2023. (*Id.* ¶¶ 19(c), 19(d).)

**2. After signing the July 2021 Letter Agreement, Navistar decides to reallocate truck production to smaller, more profitable customers—falsely telling Plaintiffs that it could only build 600 trucks despite the parties' months-old agreement.**

In 2021, demand for new trucks far outpaced supply. (PageID.259-60 ¶ 50.) Although Navistar had the capacity to produce the trucks it had promised to Plaintiffs, it knew that it could make significantly more profit if it reallocated its available production capacity to other, higher-margin customers. (*Id.*) Internal documents show Navistar scheming to take away production slots from Plaintiffs and other less-profitable customers and instead reallocate them to higher-margin customers. (PageID.261-262 ¶¶ 57-59.)

In December 2021, Navistar executives Mark Belisle and Sean Carmichael travelled to Plaintiffs' headquarters in Warren, Michigan to announce that Navistar could only produce 600 of the 1,305 trucks promised under the July 2021 Letter Agreement. (PageID.262 ¶ 61.) This was a false statement: Belisle—a top-level executive with the discretion to allocate production as he saw fit—knew that Navistar had the capacity to produce all of Plaintiffs' 1,305 trucks but chose instead to reallocate all but 600 slots to smaller, higher-margin customers to which Navistar did not owe any preexisting contractual obligations. (PageID.263 ¶¶ 62-63.)

### 3. Belisle reveals his scheme: informing Plaintiffs that Navistar could now produce the promised trucks—on a faster timetable—if Plaintiffs gave up their trade-in rights, while secretly continuing Navistar's plan to give production slots to higher-paying customers.

A few weeks later, Belisle revealed his plan in internal communications: to present Plaintiffs with an "opportunity" to receive 1,100 trucks on an accelerated basis in exchange for Plaintiffs giving up their trade-in rights. (PageID.263-264 ¶¶ 65-69.) Navistar knew that, as of January 2022, the market for used trucks was historically strong; thus, it knew that its promise of an accelerated delivery schedule—if an honest offer—would have allowed Plaintiffs to replace their MY 2018 Trucks earlier and sell them in a favorable used truck market. (PageID.251 ¶ 24; PageID.265 ¶¶ 71, 73.)

However, Navistar did not make an honest offer. Even though it had reached the broad outlines of an agreement with Plaintiffs in January 2022 to produce 1,100

trucks on an accelerated timetable, Navistar executives continued to discuss schemes to reassign production slots to more profitable customers—and indeed diverted to other customers the production slots promised to Plaintiffs. (PageID.265-66 ¶¶ 71-72, 74-78.) Yet Navistar did not inform Plaintiffs of these changes. (PageID.268 ¶ 86.)

Instead, on April 8, 2022, Carmichael signed the final Letter Agreement (the "April 2022 Letter Agreement"). (PageID.267 ¶ 79.) The April 2022 Letter Agreement claimed that, "[a]t the time of this letter," Navistar had already built over 400 trucks for Plaintiffs—an assertion Carmichael admits that he knew was false, as Navistar had only produced 131 trucks for Plaintiffs on the day he signed. (*Id.* ¶¶ 79, 81.) Plaintiffs had no access to Navistar's internal manufacturing data and could not confirm whether this assertion was accurate. (PageID.268 ¶ 82.) The April 2022 Letter Agreement also represented that Navistar would build a certain number of trucks for Plaintiffs in April 2022, but Carmichael knew that Navistar had not allocated a sufficient number of production slots to Plaintiffs. (*Id.* ¶ 84.) Thus, Navistar had no intention of performing the promises set forth in the April 2022 Letter Agreement when Carmichael signed it. (*Id.* ¶ 85.)

On May 2, 2022, Navistar decided to delay Plaintiffs' orders, pushing them out past the production and delivery dates outlined in the April 2022 Letter Agreement. (PageID.269 ¶ 88.) But rather than withdrawing the April 2022 Letter

Agreement, which Plaintiffs had not yet signed, or informing Plaintiffs that the representations in it were false, Navistar schemed to get Plaintiffs to sign it so it could eliminate Plaintiffs' trade-in rights. (*Id.* ¶¶ 88-89.)

On May 17, 2022, Carmichael threatened "to stop/postpone [Plaintiffs'] production and hold deliveries of built trucks" unless Plaintiffs signed the April 2022 Letter Agreement. (PageID.270 ¶ 91.) That same day, Navistar's dealer told Plaintiffs that the production schedule in the April 2022 Letter Agreement was still accurate and in place. (*Id.* ¶ 93.) The very next day, Plaintiffs signed the April 2022 Letter Agreement. (PageID.271 ¶ 95.) A few days later, signature secured, Navistar disclosed the truth: that it had no intention of fulfilling the terms of the April 2022 Letter Agreement. (*Id.* ¶ 96.)

Had Navistar (1) not made the false representations that it could not meet its obligations under the July 2021 Letter Agreement; or (2) disclosed that it had no intention of fulfilling the April 2022 Letter Agreement at the time it signed or when it coerced Plaintiffs into signing in May 2022, Plaintiffs would not have waived their contractual rights to trade in the MY 2018 Trucks. (PageID.272 ¶¶ 102-104.)

## Standard of Review

In order to survive a Rule 12(b)(6) motion to dismiss, a complaint need only contain "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v Twombly*, 550 U.S. 544, 570 (2007)). "Under Rule 12(b)(6), the complaint

is viewed in the light most favorable to plaintiffs, the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in favor of plaintiffs." *Fremont Reorganizing Corp. v. Duke*, 811 F. Supp. 2d 1323, 1333 (E.D. Mich. 2011).

## Argument

Plaintiffs have pled two distinct theories of fraud: (1) fraud in the inducement and (2) "bad-faith" fraud. The first theory "'addresses a situation where the claim is that one party was tricked into contracting.'" *Llewellyn-Jones v. Metro Prop. Grp., LLC*, 22 F. Supp. 3d 760, 778 (E.D. Mich. 2014) (citation omitted). The elements for fraudulent inducement are as follows:

> (1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth and as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage.

*Custom Data Sols., Inc. v. Preferred Cap., Inc.*, 733 N.W.2d 102, 105 (Mich. Ct. App. 2006) (citation omitted). Under the second theory, "'one can be held liable for broken promises when one has, at the time of the promise, a then-existing bad faith intent to break the promise.'" *Llewellyn-Jones*, 22 F. Supp. 3d at 785 (citation omitted); *Charter Twp. of Shelby v. Tech. Integration Grp. Servs., Inc.*, 2013 WL 951379, at *3-4 (Mich. Ct. App. Mar. 5, 2013).

Navistar does not deny that Plaintiffs have properly pled all the elements of a fraud claim. Instead—focusing solely on the fraudulent inducement theory of liability—Navistar contends that the fraud claim must be dismissed under the "economic loss" doctrine. (PageID.533-36.) But as discussed below, the economic loss doctrine does not apply to the fraud-in-the-inducement claim as pled. And, in any event, Navistar fails to address Plaintiffs' "bad faith" fraud theory and has waived any argument to the contrary. *See, e.g.*, *Bannister v. Knox Cnty. Bd. of Educ.*, 49 F.4th 1000, 1011 (6th Cir. 2022).

Navistar's failure to address one of Plaintiffs' two fraud theories means that the Court could simply deny the Motion at this stage without further analysis; given that there is an unchallenged theory of fraud in the case, the relief sought (dismissal of Plaintiffs' fraud claim) is unwarranted. But even if the Court addresses the merits of Navistar's Motion, the economic loss doctrine has no applicability to the bad-faith fraud claim either.

## I.  The economic loss doctrine does not apply to a fraud-in-the-inducement claim.

The "economic-loss doctrine prohibits buyers from bringing tort suits against sellers for economic losses arising from the product that the parties exchanged in a commercial context." *Crossing at Eagle Pond Apartments, LLC v. Lubrizol Corp.*, 790 F. App'x 775, 777 (6th Cir. 2019) (citing *Neibarger v. Universal Coops., Inc.*, 486 N.W.2d 612, 615 (Mich. 1992)). "Economic loss generally refers to non-

physical commercial losses (like the money spent on a faulty product or the lost sales caused by its poor performance) in contrast to the injuries that have long been the central domain of tort law: physical injuries to the plaintiff's person or property (property other than the product itself)." *Id.* (internal quotations omitted). The doctrine, in essence, is "animated by the idea that tort remedies should not bail out parties who could have anticipated losses caused by failed performance and negotiated an appropriate response." *Llewellyn-Jones*, 22 F. Supp. 3d at 778. But, as here, allegations of fraud "extraneous to the contractual dispute" are not subject to the doctrine. *Dinsmore Instrument Co. v. Bombardier, Inc.*, 199 F.3d 318, 320 (6th Cir. 1999) (citing Michigan law).

One such example of an "extraneous" dispute is a fraud-in-the-inducement claim. *Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.*, 532 N.W.2d 541, 544 (Mich. Ct. App. 1995). Fraud in the inducement involves a claim that "one party was tricked into contracting. It is based on pre-contractual conduct which is, under the law, a recognized tort." *Id.* The rationale of the economic loss doctrine does not apply in such circumstances because there is no fair and free contract; rather, the "ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior." *Id.* at 545. That renders the fraud "extraneous to the contract." *Id.* Courts routinely apply this reasoning to fraudulent inducement claims involving fraudulent statements used to "obtain sub-

contracts or modifications to contracts." *United States v. BAE Sys. Tactical Vehicle Sys., LP*, 2016 WL 894567, at *4 (E.D. Mich. Mar. 9, 2016); *Think Operations, LLC v. Top Shelf Barber Supplies*, 2021 WL 21597, at *4 (W.D. Mich. Jan. 4, 2021) ("[F]raudulently inducing another to *amend* or *modify* the terms of a contract is arguably equivalent to inducing another to enter the contract itself.") (emphasis in original); *cf. Cord L.L.C. v. RPF Oil Co., Inc.*, 2012 WL 3023197, at *2 (Mich. Ct. App. July 24, 2012) (finding a question of fact as to plaintiff's claim that it was fraudulently induced to terminate a contract). So too here.

Per this authority, the economic loss doctrine does not apply to Plaintiffs' claim. Plaintiffs' first fraud theory is that in December 2021, Belisle and Carmichael made false representations about Navistar's ability to produce trucks under the parties' existing agreement—one that required it to honor a trade-in agreement that Navistar wanted to avoid—as part of a scheme to induce Plaintiffs to enter into the April 2022 Letter Agreement. (*Supra* at 3-4.) Consequently, the alleged fraud is not interwoven with the April 2022 Letter Agreement that serves as the basis for Plaintiffs' breach of contract claim, because the misrepresentations do not involve the terms of the April 2022 Letter Agreement at all or the quality of the goods under the April 2022 Letter Agreement. *Cf. Huron Tool*, 532 N.W.2d at 545. Rather, the misrepresentations were *extraneous* and pre-dated the April 2022 Letter Agreement. Plaintiffs' claim is that if Navistar had not lied in December 2021, Plaintiffs would

never have entered into the April 2022 Letter Agreement and waived their trade-in rights. That claim is not barred by the economic loss doctrine.

Navistar's arguments to the contrary fail to appreciate the nature and quality of Plaintiffs' fraud theory. Navistar suggests that the fraud claim is interwoven with the breach of contract claim because they rest on the same factual allegations and produce the same harm. (PageID.535-37.) But as discussed, the fraud claim involves separate facts and harms; in particular, and as pled, a fraud claim (1) permits both exemplary damages and attorneys' fees in addition to other damages; and (2) permits equitable relief that a party may elect as an alternative remedy. (*See* PageID.274.) The conduct at issue occurred before the parties signed the April 2022 Letter Agreement that Navistar breached. And the harms are distinct. The fraud caused Plaintiffs to enter into the April 2022 Letter Agreement and waive their trade-in rights under a prior contract. The alleged fraud is thus factually and legally distinguishable from the claim that Navistar failed to produce the trucks required by the April 2022 Letter Agreement.

## II.    Even if Navistar's failure to address the bad-faith claim is overlooked, the economic loss doctrine does not apply to that claim either.

As discussed, Navistar fails to address Plaintiffs' other fraud theory—that Navistar entered into the April 2022 Letter Agreement in bad faith, having no intention of fulfilling that contract at the time it signed or at the time Plaintiffs

signed. But even disregarding Navistar's waiver, that theory is not barred by the economic loss doctrine either.

Michigan recognizes that "a fraudulent misrepresentation may be based upon a promise made in bad faith without intention of performance." *Hi-Way Motor Co. v. Int'l Harvester Co.*, 247 N.W.2d 813, 816 (Mich. 1976); *see also Rutan v. Straehly*, 286 N.W. 639, 642 (Mich. 1939) (fraud can be based "upon statements promissory in nature and relating to future actions, or upon failure to perform a promise or agreement to do something at a future time…when the fraud is based upon a promise accompanied by a present intention not to perform it"). Bad-faith fraud is somewhat akin to fraudulent inducement. *See Charter Twp. of Shelby*, 2013 WL 951379, at *4 ("Essentially, fraud by a bad-faith promise is the same as fraud in the inducement").

Further, like fraudulent inducement, the economic loss doctrine does not apply to a bad-faith fraud claim. *See Chemico Sys., Inc. v. Spencer*, 2023 WL 1993783, at *7 (E.D. Mich. Feb. 14, 2023) ("courts continue to recognize fraudulent inducement and bad-faith promises as viable tort claims, notwithstanding *Hart*");[1]

---

[1] *Hart v. Ludwig*, 79 N.W.2d 895, 897 (Mich. 1956) held that a party cannot bring a tort action for breach of contract, absent "some breach of duty distinct from breach of contract." As the Michigan Supreme Court has recognized, the *Hart* doctrine and the economic loss doctrine are the same thing. *See Rinaldo's Const. Corp. v. Mich. Bell Tel. Co.*, 559 N.W.2d 647, 658 (Mich. 1997).

*cf. Galeana Telecomms. Invs., Inc. v. Amerifone Corp.*, 202 F. Supp. 3d 711, 728-29 (E.D. Mich. 2016) (Goldsmith, J.) (recognizing—in a case involving both a classic fraud and a bad-faith fraud theory—that the *Hart* doctrine does not prohibit a claim for fraudulent misrepresentation) (citing cases). The reasoning of *Metropolitan Alloys Corp. v. Considar Metal Marketing, Inc.*, 2007 WL 2874005 (E.D. Mich. Sept. 25, 2007), is directly on point. There, the plaintiff alleged "that Defendant made the intentionally misleading representation that it had sufficient resources to supply the quantities of… zinc needed by Plaintiff to meet its customer's demands, when in fact it lacked the resources to make good on this offer." *Id.* at *6. The Court rejected the applicability of the economic loss doctrine to this claim because, if proven, the allegations "would establish the perpetration of a fraud separate and apart from Defendant's alleged failure to fulfill a contractual obligation." *Id.* The misrepresentation did not involve the "'quality and characteristics'" of the zinc to be supplied, "but rather would have produced the independent harm of inducing Plaintiff to enter into a contract with a party that knowingly and intentionally made a promise it could not keep." *Id.* (quoting *Huron Tool*, 532 N.W.2d at 546).

So too here. Navistar knew when it signed the April 2022 Letter Agreement that it would not keep the promises therein. (*Supra* at 5.) It knew that it would not keep those promises on May 2, 2022, when it internally shifted production of Plaintiffs' trucks beyond the contractual deadline. (*Id.*) And having ensured that it

-13-

could not keep its promises, Navistar did not tell Plaintiffs that it was too late or rescind the still-unsigned April 2022 Letter Agreement. (*Id.*) Instead, Navistar repeated the false statement that the production schedule had not changed and threatened Kyle Blain with a total shutdown of production and deliveries (despite still having an existing contractual obligation to produce from July 2021) unless Blain signed. (*Supra* at 6.) This was an extra-contractual harm that induced Plaintiffs to sign a contract containing promises that Navistar knew it would not keep. That states a bad-faith fraud claim, and the economic loss doctrine does not apply.

## Conclusion

For the foregoing reasons, the Court should deny Navistar's Motion to Dismiss Plaintiffs' fraud claim.

Respectfully submitted,

KIENBAUM HARDY
VIVIANO PELTON & FORREST, P.L.C.:


By:  _/s/ Thomas J. Davis_
      Eric J. Pelton (P40635)
      Joseph E. Viviano (P60378)
      Thomas J. Davis (P78626)
      Marianne J. Grano (P82901)
      Lauren Walas (P87669)
Counsel for Plaintiffs
280 N. Old Woodward Ave.
Ste. 400
Birmingham, MI 48009
(248) 645-0000
epelton@khvpf.com
jviviano@khvpf.com
tdavis@khvpf.com
mgrano@khvpf.com
lwalas@khvpf.com

Date:  November 4, 2024

## LOCAL RULE CERTIFICATION

I, Thomas J. Davis, certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts). I also certify that it is the appropriate length. Local Rule 7.1(d)(3).

*/s/ Thomas J. Davis*
Thomas J. Davis (P78626)
Kienbaum Hardy
Viviano Pelton & Forrest, P.L.C.
280 N. Old Woodward Ave.
Ste. 400
Birmingham, MI 48009
(248) 645-0000
tdavis@khvpf.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2024, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to all ECF participants on record.

/s/ Thomas J. Davis
Thomas J. Davis (P78626)
Kienbaum Hardy
Viviano Pelton & Forrest, P.L.C.
280 N. Old Woodward Ave.
Ste. 400
Birmingham, MI 48009
(248) 645-0000
tdavis@khvpf.com