UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GLS LEASCO, INC. and CENTRAL
TRANSPORT LLC,

     Plaintiffs,                     Case No. 23-cv-12927

v.                                   Hon. Mark A. Goldsmith

NAVISTAR, INC.,             Magistrate Judge Anthony P. Patti

     Defendant.

---

## **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant Navistar, Inc. ("Navistar"), by and through its counsel of record, Barnes & Thornburg LLP, moves for summary judgment under Federal Rule of Civil Procedure 56 on Counts I and II of Plaintiffs' Second Amended Complaint. Pursuant to Eastern District of Michigan Local Rule 7.1(a) and to the Court's Practice Guidelines, on December 10, 2024, defense counsel verbally communicated with Plaintiffs' counsel, explaining the nature of the relief to be sought by way of this motion and seeking concurrence in the relief; Plaintiffs' counsel expressly denied concurrence. In support of this motion, Navistar relies on the attached brief setting forth the factual and legal arguments supporting summary judgment and further states as follows:

     1.      It is a basic principle of contract law that "[i]mpossible conditions cannot be performed; and, if a person contracts to do what at the time is absolutely impossible, the contract will not bind him, because no man can be obliged to perform an

impossibility." *Jacksonville, M., P. Ry. & Nav. Co. v. Hooper*, 160 U.S. 514, 528 (1896)). Here, all of Plaintiffs' claims are based on their allegation that they believed that Navistar would meet the production schedule set out in the letter agreement that GLS Leasco, Inc. ("GLS") and Navistar entered on May 18, 2022. But by the time GLS executed the agreement, both Plaintiffs and Navistar knew that it would be impossible for Navistar to build the trucks under a production schedule that had already lapsed.

2.      They knew that, because the production schedule called for specific quantifies of trucks to be built in particular months from January through May 2022, and they also knew that the required amounts of trucks had not in fact been built in January, or in February, or in March, or in April or even in May. And they also knew that it was physically impossible to produce trucks during that timeframe, for example, because they were provided with production schedules reflecting the actual number of trucks built by Navistar. In short, both parties knew at the time of contracting that meeting the production schedule in the letter agreement would be physically impossible, which renders that term in the letter agreement void from the outset.

3.       Further, impossibility also includes impracticability because of extreme or unreasonable difficulty. Here, the order changes that GLS made the end of March 2022 affected 555 of the trucks earmarked for Central Transport, LLC ("Central"), required Navistar to adjust its manufacturing line, and thus made it impracticable for Navistar to produce the trucks scheduled for March, April, and May 2022.

4.      The breach-of-contract claim fails for an additional, independent reason: GLS and Central cannot satisfy the damages element for their breach-of-contract claim. GLS and Central never actually bought the trucks; they were instead purchased by a separate entity named Equipment Leasing Company. That company is the buyer, not GLS or Central, as Equipment Leasing Company made the payments and took title to the trucks. And under the Michigan's Uniform Commercial Code, only a buyer of goods may recover consequential damages for breach of contract. Thus, because Plaintiffs are not the buyer of the goods, they cannot exercise the remedies available under Michigan's Uniform Commercial Code.

5.      Finally, Plaintiffs' fraud claim (concerning which Navistar has a pending motion to dismiss based on the economic-loss doctrine) also fails because Plaintiffs could not reasonably rely on the production schedule in the letter agreement when they knew that it was "based on available production" and when they had been provided information demonstrating the actual production schedule, which differed from the dates listed in the letter agreement. Under Michigan law, a "plaintiff cannot claim to have been defrauded where he had information available to him that he chose to ignore." *Nieves v. Bell Indus., Inc.*, 517 N.W.2d 235, 238 (Mich. App. 1994) (citation omitted).

WHEREFORE, Defendant respectfully prays that this Honorable Court grant its Motion for Summary Judgment and dismiss Counts I and II of Plaintiffs' Second Amended Complaint.

Dated:  December 13, 2024          BARNES & THORNBURG LLP

*/s/ Scott R. Murphy*
Scott R. Murphy (P68015)
Anthony C. Sallah (P84136)
171 Monroe Ave. NW, Suite 1000
Grand Rapids, MI 49503
616-742-3930
smurphy@btlaw.com
asallah@btlaw.com
*Attorneys for Defendant Navistar, Inc.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GLS LEASCO, INC. and CENTRAL
TRANSPORT LLC,

     Plaintiffs,

v.

NAVISTAR, INC.,

     Defendant.

Case No. 23-cv-12927

Hon. Mark A. Goldsmith

Magistrate Judge Anthony P. Patti

---

## **DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

**Page**

ISSUES PRESENTED ................................................................................IV

CONTROLLING OR MOST APPROPRIATE AUTHORITY................................. V

STATEMENT OF MATERIAL FACTS........................................................ 1

ARGUMENT ....................................................................................... 7

I.    The Letter Agreement's production schedule is void under the impossibility doctrine.............................................................................................. 8

    A.    When GLS signed the contract on May 18, 2022, both parties knew that it would be impossible to meet the contract's production schedule, as both parties knew that the trucks allegedly scheduled to be produced in January through April 2022 had not been built. ...................................................................................... 9

    B.    Further, GLS's changes to its orders in March made meeting the production schedule impracticable.............................................. 13

II.    GLS and Central cannot recover consequential damages under Michigan's Uniform Commercial Code because they were not the buyers of the trucks. .. 14

III.    Plaintiffs' fraud claim should be dismissed for lack of reasonable reliance, because Plaintiffs cannot ignore the production schedule information made available to them before signing the Letter Agreement. .................................. 16

IV.    CONCLUSION................................................................................ 20

LOCAL RULE CERTIFICATION .............................................................. 21

CERTIFICATE OF SERVICE ................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AFT Mich. v. State,*
  866 N.W.2d 782 (Mich. 2015) ........................................................................ 10

*Bank of Am., NA v. First Am. Title Ins. Co.,*
  878 N.W.2d 816 (Mich. 2016) ........................................................................ 15

*Bissell v. L.W. Edison Co.,*
  156 N.W.2d 623 (Mich. App. 1967).............................................................. 13

*Bodnar v. St. John Providence, Inc.,*
  933 N.W.2d 363 (Mich. App. 2019).............................................................. 10

*Bryant v. BMW of N. Am. LLC,*
  585 F. Supp. 3d 1178 (E.D. Wis. 2022)........................................................ 16

*DBD Kazoo LLC v. W. Michigan LLC,*
  No. 361299, 2024 WL 500208 (Mich. Ct. App. Feb. 8, 2024) ................... 19

*Extrusion Painting, Inc. v. Awnings Unlimited, Inc.,*
  37 F. Supp. 2d 985 (E.D. Mich. 1999)........................................................... 10

*In re StockX Customer Data Sec. Breach Litig.,*
  19 F.4th 873 (6th Cir. 2021)...................................................................... 10, 11

*Jacksonville, M., P. Ry. & Nav. Co. v. Hooper,*
  160 U.S. 514 (1896)..................................................................................... 8, 12

*Jones v. United States,*
  96 U.S. 24 (1877) ............................................................................................... 8

*Naji v. City of Dearborn, Michigan,*
  120 F.4th 520 (6th Cir. 2024)........................................................................... 8

*Nathan v. Brownstone Plastics, LLC,*
  511 B.R. 863 (E.D. Mich. 2014) ............................................................... 8, 12

*Nieves v. Bell Indus., Inc.,*
  517 N.W.2d 235 (Mich. App. 1994)............................................................... 18

*Oraha v. Troy Motors, Inc.*,
    No. 358183, 2022 WL 3330152 (Mich. Ct. App. Aug. 11, 2022).............................. 18

*Rogers Plaza, Inc. v. SS Kresge Co.*,
    189 N.W.2d 346 (Mich. App. 1971)....................................................................8, 9, 10, 12

*Upjohn Co. v. New Hampshire Ins. Co.*,
    476 N.W.2d 392 (Mich. 1991) ........................................................................................ 9

**Statutes**

MCL 440.1103 ............................................................................................................. 8

MCL 440.1305(1)........................................................................................................ 15

MCL 440.2713(1)........................................................................................................ 15

MCL 440.2714(1)........................................................................................................ 15

MCL 440.2715 ............................................................................................................ 15

**Other Authorities**

17A Am. Jur. 2d Contracts § 126 ............................................................................... 8

Restatement (First) of Contracts § 454 (1932)............................................................ 13

**Rules**

Fed. R. Civ. P. 56(a) .................................................................................................. 8

## ISSUES PRESENTED

1.      Was the production schedule in the contract impossible to meet at the time the parties entered the contract and therefore void, when the schedule required build dates that predated the effective date of the contract and when the parties knew that such build dates were impossible to meet?

The Court should respond "Yes."

2.      Was the production schedule in the contract also impracticable to meet because GLS changed its orders in March to put a different engine in the trucks and therefore made it unrealistically difficult to meet the production schedule?

The Court should respond "Yes."

3.      Have Plaintiffs failed to establish the damages element of their breach-of-contract claim, given that they were not the buyer of the trucks (another company called Equipment Leasing Company was) and so cannot recover consequential damages under Michigan's Commercial Code?

The Court should respond "Yes."

4.      Should the Court dismiss Plaintiffs' fraud claim where Plaintiffs cannot prove reasonable reliance on any misrepresentation because they were provided with information reflecting the actual production schedule?

The Court should respond "Yes."

# CONTROLLING OR MOST APPROPRIATE AUTHORITY

*Bank of Am., NA v. First Am. Title Ins. Co.*,
  878 N.W.2d 816 (Mich. 2016) .......................................................................... 15

*Bissell v. L.W. Edison Co.*,
  156 N.W.2d 623 (Mich. App. 1967)................................................................. 13

*Jacksonville, M., P. Ry. & Nav. Co. v. Hooper*,
  160 U.S. 514 (1896)...................................................................................... 8, 12

*Jones v. United States*,
  96 U.S. 24 (1877) ............................................................................................... 8

*Nieves v. Bell Indus., Inc.*,
  517 N.W.2d 235 (Mich. App. 1994)................................................................. 18

*Rogers Plaza, Inc. v. SS Kresge Co.*,
  189 N.W.2d 346 (Mich. App. 1971).................................................8, 9, 10, 12

MCL 440.1305(1)..................................................................................................... 15

## STATEMENT OF MATERIAL FACTS

1.      On April 8, 2022, Navistar signed a three-page letter agreement (the "Letter Agreement") between Navistar, GLS, and the dealership, Allegiance Truck Group ("Allegiance") for the purchase of model-year 2023 trucks (i.e., semi-trucks). (ECF No. 29-1, PageID.280.)  A copy of the Letter Agreement is attached as <u>Exhibit A</u>.

2.      The Letter Agreement states that Navistar would manufacture, "based on available production at the time of" the Letter Agreement, 1,100 model-year 2023 trucks. (*Id.*) In pertinent part, the Letter Agreement states the following concerning the "RH New Truck Builds" and "LT New Truck Builds":

**New Truck Delivery** – based on available production at the time of this letter.

| New Truck Build Month | RH New Truck Builds | LT New Truck Builds | Trades |
|---|---|---|---|
| January | 42 | | 0 |
| February | 32 | | 0 |
| March | 342 | | 0 |
| April | 42 | 300 | 0 |
| May | 3 | 339 | 0 |
| June- Spillover month | | | 0 |
| **Total** | **461** | **639** | **0** |

3.      Part of GLS's plan for purchasing trucks under the Letter Agreement was to lease a portion of the trucks (630) to its affiliate, Central, for use in Central's trucking business. In particular, the second amended complaint alleges that the model-year 2023 trucks "would be leased by GLS to Central to replace" GLS's fleet of model-year 2018 trucks at the time. (ECF No. 29, PageID.254, ¶ 30(b).)

4.     Regarding Central, Plaintiffs' second amended complaint alleges that "Navistar promised to produce the new tractors intended to replace the MY2018 Tractors as follows:

    a.  75 RH model Tractors during March 2022;

    b.  225 LT model Tractors during April 2022;

    c.  330 LT model Tractors during May 2022."

(ECF No. 29, ¶ 37, PageID.256.)

5.     The Letter Agreement expressly states that Navistar was "working diligently to secure production dates as early as possible based on the current production environment" and that delivery of the new trucks would be "based on available production at the time" of the Letter Agreement. (ECF No. 29-1.)

6.     The Letter Agreement was intended to replace a prior July 2021 letter agreement executed by GLS, Navistar, and Summit Truck Group, a different dealer, for the model-year 2023 trucks. (ECF No. 29, ¶ 72.) In particular, the Letter Agreement states: "This Agreement Letter is all-encompassing for any and all current or future issues for 941 model year 2017–2019 International units and terminates any and all other agreements pertaining to these units." (ECF No. 29-1.)

7.     Plaintiffs claim to have expected that Navistar "would produce a significant number of trucks, you know, end of March, April, May" knowing that a handful of trucks may "spillover" into June. (GLS Corp. Rep. Dep., 9/10/24 at pp. 196:11–197:22, attached as Exhibit B.)

2

8.      Plaintiffs understood, before executing the Letter Agreement, that "the general supply and production constraints . . . were impacting Navistar's production for all of its customers." (GLS Corp. Rep. Dep., 11/13/24 at p. 20:3–21, attached as Exhibit B.)

9.      Sean Carmichael signed and transmitted the Letter Agreement to GLS on April 8, 2022. However, Kyle Blain from GLS did not sign the Letter Agreement on GLS's behalf until May 18, 2022, forty days later.  (ECF No. 29-1, PageID.280.)

10.      During negotiations for the Letter Agreement, GLS requested that Jim Lollis act as GLS's dealer representative as part of the transaction.  At or around this time, Summit Truck Group (GLS's dealer under the July 2021 Agreement) was purchased by another dealership (Rush Truck Centers) and ceased to exist and transitioned to Allegiance. (Jim Lollis Dep., 8/6/24 at p. 12:4–21, attached as Exhibit C.)

11.      On March 29, 2022, Allegiance cancelled eight Central RH orders for 555 trucks with A26 engines and replaced them with new LT orders (which required building those 555 trucks with Cummings X15 engines). (Lollis Dep., at pp. 266:15–267:2, 285:18–287:16, Ex. C.)

12.      Shortly after changing engine manufacturers for 555 individual trucks, Allegiance processed additional "OCRs" or spec changes to the new LT orders for Central. (Navistar Corporate Rep. Dep. 12/4/24 (Rough Tr.) at pp. 166–170, attached as Exhibit D.)

3

13.     From April 13, 2022, until delivery of the last tractor in September 2023, Brianne Perkins, the senior maintenance coordinator for Central, regularly communicated with Allegiance concerning production schedules, delivery dates, and invoicing for the model-year 2023 trucks. (Brianne Perkins Dep., 9/18/24 at pp. 8:23–9:8, 35:8–36:1, 36:20–37:10, 42:4–18, 82:1–6, 86:14–18, 89:22–90:6, attached as Exhibit E; Lollis Dep., at pp. 290:24–292:22, Ex. C.) And Perkins gave weekly updates on production and delivery schedules to Blain.  (Perkins Dep., 9/18/24 at pp. 87:4–19, Ex. E.)

14.     Plaintiffs' corporate representative, Kyle Blain, testified that he was aware that Jim Lollis was "providing weekly updates on the production schedule" but that he was "deferring review of those communications to Brianne Perkins." (GLS Corp. Rep. Dep., 11/13/24 at p. 41:4–16, Ex. B.) While Blain testified that he believed these updates started in May 2022, these updates had started much earlier. (*Id.* at p. 41:12–16; *see infra* ¶¶ 15–19.)

15.     On April 13, 2022, over a month before GLS signed the Letter Agreement, Lollis sent Perkins and Blain a spreadsheet with estimated build dates for all 630 trucks earmarked for Central. (*See* LOLL 000047–48, attached as Exhibit F.)

16.     According to the estimated build schedule in that spreadsheet, over 420 of the trucks were not scheduled to be manufactured by Navistar until after June 1, 2022, and into July 2022. (*Id.*)

17.     Despite receiving a copy of the email, Plaintiffs' corporate representative testified that he did not recall this build schedule (as he was deferring review to Brianne Perkins), but that he would consider this updated build schedule to "be a material change" from the build schedule in the Letter Agreement. (ECF No. 33-5, PageID.456–457.)

18.     On April 21, 2022, Perkins followed up with Lollis and requested "the latest and greatest for production dates" and "weekly production updates" so she could track the production and delivery of trucks to Central. (*See* LOLL-000049, Ex. G.) Lollis reattached the manufacturing spreadsheet from the week before and told Perkins that he "will keep checking and update you." *Id.*

19.     Lollis had access to Navistar's system, and he accessed it "at least a couple of times a week" to check on production of the trucks. (Lollis Dep., at p. 199:8–20, Ex. C.)

20.     Further, GLS admitted that it could have verified the status of the build schedule for the model-year 2023 trucks at any time, including by "asking someone like Jim Lollis," GLS's dealer representative from Allegiance. (GLS Corp. Rep. Dep., 11/13/24 at pp. 35:4–15, 36:1–37:5, Ex. B.) When Blain signed the Letter Agreement on May 18, 2022, he did not "do anything to verify whether Navistar had built the number of trucks listed in paragraph 81 [of the Second Amended Complaint.]" (*Id.* at p. 34:23–27.)

21. On May 4, 2022, Lollis told Carmichael that the production of the trucks for Central was being pushed past June 2022. (Lollis Dep., at pp. 197:20–198:18, Ex. C; Lollis Dep. Ex. 62, attached as <u>Exhibit H</u>.)

22. On May 12, 2022, Lollis sent an email to Perkins "re Central-Delivery Status" and provided an updated production schedule. As of that day, 61 trucks were completed and awaiting shipment and 1 truck was scheduled to be delivered to Central on May 17, 2022. (*See* ALLEGIANCE00000017–19, attached as <u>Exhibit I</u>.)

23. On May 16, 2022, Lollis provided Perkins with another updated production schedule establishing that as of May 16, 2022, just two days before GLS signed the Letter Agreement, 65 trucks were in transit and estimating that 3 trucks would be delivered on or about May 16–18, 2022. (*See* ALLEGIANCE00000017-19, Ex. I.)

24. Navistar did not build or deliver 75 RH model trucks for Central during March 2022.  *See* Second Am. Compl. ¶ 108, ECF 29, PageID.256-57)

25. Navistar did not build or deliver 225 LT model trucks for Central during April 2022.  *Id.*

26. Navistar did not build or deliver 330 LT model trucks for Central during May 2022.  *Id.*

27. Blain admitted that if he had wanted to know if GLS had received any trucks, he could have asked Brianne Perkins how many trucks had been delivered at the

time he signed. (GLS Corp. Dep., 9/10/24 at p. 211:3–14, Ex. B; *see also id.* at p. 22:21–22 ("Q: Does Brianne Perkins report to you? A: Yes.").)

28. Plaintiffs allege that "by the end of May, Navistar had only delivered 18 of the 630 new tractors intended to replace the MY 2018 Tractors." (ECF No. 29, ¶ 37.) However, according to Central's business records, the first model-year 2023 truck was not delivered until June 1, 2022, well after GLS executed the Letter Agreement. (*Compare* Lollis Dep., at pp. 294:11–295:14, Ex C. (reflecting the first delivery on May 18, 2022) *with* GLS 0002914 attached as <u>Exhibit J</u>) (reflecting the first delivery on June 1, 2022).

29. GLS or Central did not purchase any of the 630 model-year 2023 trucks earmarked for Central under the Letter Agreement. (GLS Corp. Rep. Dep., 11/13/24 at p. 58:15–25, Ex B.)

30. GLS does not own the model-year 2023 trucks purchased under the Letter Agreement. (*Id.* at p. 59:8–10.)

31. Equipment Leasing Company, LLC, a separate company, purchased all of the 630 model-year 2023 trucks intended for Central under the Letter Agreement from Allegiance and was invoiced by the dealership. *Id.*

32. The dealership invoices contained separate terms and conditions that were signed by Equipment Leasing Company, LLC. (*See* LOLL-0016086, <u>Exhibit K</u>.)

## ARGUMENT

"Summary judgment is appropriate when there is no genuine dispute of material fact, and the moving party is entitled to judgment as a matter of law." *Naji v. City of*

7

*Dearborn, Michigan*, 120 F.4th 520, 523 (6th Cir. 2024) (citing Fed. R. Civ. P. 56(a)). The court must "construe the evidence and make all reasonable inferences in favor of the nonmoving party." *Id.*

## I. The Letter Agreement's production schedule is void under the impossibility doctrine.

It is well settled that if the parties know at the time a contract is formed that performance is impossible, then the contract is void. *E.g.*, *Jacksonville, M., P. Ry. & Nav. Co. v. Hooper*, 160 U.S. 514, 528 (1896) ("Impossible conditions cannot be performed; and, if a person contracts to do what at the time is absolutely impossible, the contract will not bind him, because no man can be obliged to perform an impossibility."); *Jones v. United States*, 96 U.S. 24, 29 (1877) (same); *Nathan v. Brownstone Plastics, LLC*, 511 B.R. 863, 867 (E.D. Mich. 2014) ("Where the impossibility of performance is known to both parties at the time of making the agreement, the promise is not binding.") (quoting *Rogers Plaza, Inc. v. SS Kresge Co.*, 189 N.W.2d 346, 351 (Mich. App. 1971)); 17A Am. Jur. 2d Contracts § 126 ("Where an obvious legal or physical impossibility of performance appears on the face of the contract, the contract is void."). This basic principle of contract law continues to apply under Michigan's Uniform Commercial Code. MCL 440.1103 (stating that "principles of law" supplement Michigan's Uniform Commercial Code so long as they are not "displaced by particular provisions of this act").

As to the issue of knowledge, a "corporation is considered to have acquired the collective knowledge of its employees . . . ." *Upjohn Co. v. New Hampshire Ins. Co.*, 476

N.W.2d 392, 401–03 (Mich. 1991); *id.* at 214 ("The knowledge possessed by a corporation about a particular thing is the sum total of all the knowledge which its officers and agents, who are authorized and charged with the doing of the particular thing acquire, while acting under and within the scope of their authority.") (quotation marks omitted).

> **A.** **When GLS signed the contract on May 18, 2022, both parties knew that it would be impossible to meet the contract's production schedule, as both parties knew that the trucks allegedly scheduled to be produced in January through April 2022 had not been built.**

Here, GLS and Navistar knew at the time they entered the contract that compliance with the production schedule in the Letter Agreement would be impossible. On May 18, 2022, the day that the contract took effect, GLS and Navistar knew that it would be impossible to meet the production schedule because the build dates had already passed prior to GLS signing the contract, no trucks had been delivered to Central, and Navistar's production schedule was delayed for the reasons discussed below, such as supply chain constraints and changes made to GLS's order.

While impossibility "excuse[s] performance only to the extent to which performance is impossible" and "may not excuse performance of the remaining work," *Rogers Plaza*, 189 N.W.2d at 356, here the performance that was impossible was the *timing* component of producing the trucks under the production schedule. Specifically, the breach-of-contract claim focuses solely on whether Navistar met the production schedule. (*E.g.*, ECF No. 29, PageID.252, ¶ 25 ("The earlier production schedule for

9

the new trucks was a critical part of the consideration Navistar offered to GLS."); *id.* PageID.253, ¶ 29(a) ("Navistar agreed to produce 1100 MY2023 trucks from January 2022 through May 2022 (instead of the previously agreed upon production schedule of February 2022 to December 2022)."); *id.* PageID. 254, ¶ 30 ("time was of the essence for the Letter Agreement's production schedule for new trucks"); *id.* ¶ 107 ("Navistar's failure to meet the required production schedule is a material breach of the Letter Agreement.").) And the complaint concedes that Navistar did deliver all the trucks to GLS and Central, though not according to the Letter Agreement's impossible schedule. (*Id.* PageID.256–57, ¶¶ 38–39.)

For the following reasons, the Letter Agreement's production schedule was impossible—and therefore void—at the time it was entered on May 18, 2022.

*First*, the contract came into existence on May 18, 2022, when Blain accepted the contract for GLS and executed the Letter Agreement. (ECF No. 29-1, PageID.280.) "Under Michigan law, '[a] valid contract requires,' among other things, "(4) mutuality of agreement[] and (5) mutuality of obligation."' *In re StockX Customer Data Sec. Breach Litig.*, 19 F.4th 873, 881 (6th Cir. 2021) (quoting *AFT Mich. v. State*, 866 N.W.2d 782 (Mich. 2015)). Mutuality of agreement in turn requires "an offer and acceptance." *In re StockX*, 19 F.4th at 881 (quoting *Bodnar v. St. John Providence, Inc.*, 933 N.W.2d 363, 369– 70 (Mich. App. 2019)). In short, "[b]efore a contract can be said to exist there must be both an offer and a valid acceptance." *Extrusion Painting, Inc. v. Awnings Unlimited, Inc.*, 37 F. Supp. 2d 985, 992 (E.D. Mich. 1999). The contract therefore did not come into

existence until Blain signed it and accepted its terms. Indeed, Blain himself testified there was not a "done deal" until he signed the Letter Agreement (GLS Corp. Dep., 9/10/24 at p. 135:3–7, Ex. B.) and that the prior "July 2021 agreement was not superseded until [he] signed [the Letter Agreement]" on May 18. (GLS Corp. Rep. Depo, 11/13/2024 at p. 47:15-17, Ex. B..) In addition, as a logical corollary to the Letter Agreement not existing before May 18, 2022, Navistar had no duty under the contract before May 18, 2022, to produce trucks (such as in January through May 17, 2022) because the contract had yet not been signed. *In re StockX*, 19 F.4th at 881 ("Under Michigan law, '[a] valid contract requires . . . (5) mutuality of obligation.").  In other words, by waiting 40 days to countersign the Letter Agreement, Plaintiffs contributed to the delay they now complaint of.

*Second*, GLS and Navistar both were aware of the deadlines set by the production schedule in the Letter Agreement. Specifically, both parties knew that the production schedule in the Letter Agreement called for 42 trucks to be built in January 2022, for 32 trucks to be built in February 2022, for 342 trucks to be built in March 2022, and for another 342 trucks to be built in April 2022. The evidence that they knew this is simple: both signed the contract containing the already lapsed production schedule. (ECF No. 29-1, PageID.280.)

*Third*, GLS and Navistar both knew on May 12, 2024 (just six days before Blain signed the contract), that those past deadlines had not been met. They knew that only 61 trucks had been built by the end of April despite the fact that Central was expecting

11

delivery of hundreds more. (*See* ALLEGIANCE00000017–19, Ex. I. (email from Lollis, the dealer representing GLS, to Perkins, the senior maintenance coordinator for Central, stating that only 61 trucks had been completed).) Further, on May 16, 2024 (just two days before Blain signed the contract), Lollis informed Perkins that the production build schedule had shifted significantly. (*See* ALLEGIANCE00000017–19, Ex. I.) More fundamentally, GLS knew that the production schedule had shifted significantly because Central had yet to take delivery of a single truck by May 18, 2024, even though, according to paragraph 37 of the second amended complaint, they should have already received 300 trucks in March and April and the remaining 330 in May 2022. (Lollis Dep., at pp. 294:11–295:14, Ex. C); GLS 0002914, Ex. J).

*Fourth*, GLS and Navistar knew that there was no way to build the hundreds of trucks identified on the production schedule prior to the execution of the Letter Agreement because that opportunity had already passed.

As a result, GLS and Navistar both knew on May 18, 2022, when the agreement took effect, that it was physically impossible to meet the production schedule set out in the contract. As a result, the production schedule in the Letter Agreement is void. *E.g.*, *Jacksonville*, 160 U.S. at 528 (1896) ("[I]f a person contracts to do what at the time is absolutely impossible, the contract will not bind him, because no man can be obliged to perform an impossibility."); *Nathan*, 511 B.R. at 867 ("Where the impossibility of performance is known to both parties at the time of making the agreement, the promise is not binding.") (quoting *Rogers Plaza*, 189 N.W.2d at 351).

Given that this promise of producing trucks on the timeline set forth in the production schedule was impossible by the time the contract was formed, the promised production schedule was void, and Navistar is entitled to summary judgment on the breach-of-contract claim.

### B. Further, GLS's changes to its orders in March made meeting the production schedule impracticable.

In addition to actual impossibility, impossibility means "not only strict impossibility but impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved." *Bissell v. L.W. Edison Co.*, 156 N.W.2d 623, 626–27 (Mich. App. 1967); *see also* Restatement (First) of Contracts § 454 (1932). Here, in addition to the impossibility already discussed, the order changes made by the dealership that impacted Central's truck specifications made completing production in accordance with the Letter Agreement's production schedule impracticable.

The production schedule provided for Navistar to produce 1,100 trucks for GLS in January through May 2022, 630 of which were to be delivered to Central. But on March 29, 2022, Allegiance changed the specifications on 555 of the Central trucks. Specifically, Allegiance cancelled eight orders for RH trucks for Central that incorporated A26 engines and replaced those with new orders for LT trucks with the Cummins X15 engines. (Lollis Dep. at pp. 308:3–309:22, Ex. C.) Lollis, Allegiance's dealer representative for GLS and Central, processed those change orders. By the time this change was processed, the manufacturing line (specifically Navistar's EAP line in

Escobedo, Mexico) was already finalized (lineset) through the end of May, making it impossible to produce the trucks based on the production schedule contained in the Letter Agreement. (Carmichael Dep., at p. 314:9–10, Ex. L ("Q: EAP is the Escobedo plant; right? A: Escobedo plant, correct."); Navistar Corporate Rep. Dep. 12/4/24 (Rough Tr.) at pp. 166–170, Ex. D.)  That change, coupled with supply-chain impacts in May 2022 that caused 1,253 lost productions slots, made it impracticable for Navistar to meet the March, April, and May production requirements, which contemplated building all 630 trucks for Central. Further, GLS authorized these order changes, as GLS's dealer representative at Allegiance requested the changes. (Lollis Dep., at pp. 308:3–09:22, Ex. C.) And in fact, Lollis admitted that "it wasn't feasible for Navistar to build 342 trucks in March of 2022 if [Central] hadn't even ordered the trucks yet[.]" (Lollis Dep., p. 308:15–23, Ex. C ("There's no way.").)  Thus, even as to any duty that Navistar might have had to produce trucks after May 18, 2022, for the May slots on the production schedule, the undisputed evidence is that it was impracticable to meet the production schedule for March, April, and May 2022 in light of the order changes on March 29, 2022 and in early April.

## II.   GLS and Central cannot recover consequential damages under Michigan's Uniform Commercial Code because they were not the buyers of the trucks.

GLS's breach-of-contract claim (and Central's derivative breach-of-contract claim as a third-party beneficiary) also fails for a second, independent reason: neither company was the buyer of the trucks (as another entity called Equipment Leasing

14

Company bought the trucks), and so neither can recover consequential damages under the Michigan Uniform Commercial Code. This bars their claim, because the only damages they allegedly suffered were consequential damages, which means they cannot make out the damages element of their claim.

The element of a breach-of-contract claim are that "(1) there was a contract, (2) the other party breached the contract, and (3) the breach resulted in damages to the party claiming breach." *Bank of Am., NA v. First Am. Title Ins. Co.*, 878 N.W.2d 816, 829 (Mich. 2016). As to the damages element, Michigan's Commercial Code provides that even though its remedies are to be liberally construed, "neither consequential or special damages nor penal damages may be had *except as specifically provided* in this act or by other rule of law." MCL 440.1305(1) (emphasis added). The act in turn authorizes consequential damages for a "buyer." For example, in an instance of non-delivery or repudiation, a "buyer" may recover both the difference between market price and contract price and "consequential damages." MCL 440.2713(1). Similarly, for accepted goods, a "buyer" may recover, in a proper case, "consequential damages." MCL 440.2714(1), (3); *see also* MCL 440.2715 (titled "Buyer's incidental and consequential damages"). But the act never provides for consequential damages for non-buyers.

Here, an entity called Equipment Leasing Company, not GLS or Central, was the buyer of the goods in question (the trucks). Equipment Leasing Company purchased all 630 of the model-year 2023 trucks that were intended for Central under the Letter Agreement. *See*, for example, Allegiance Invoice # 02304 dated 6/13/22 to

15

Equipment Leasing Company, LLC, attached as <u>Exhibit M</u> (reflecting the first invoice issued for Central's trucks). GLS admitted that it did not purchase any of the 630 trucks intended for Central and that instead Equipment Leasing Company did. (GLS Corp. Rep. Dep., 11/13/24 at p. 58:15-17, Ex. B.) In other words, a given truck can have only one buyer, and for each truck at issue, that buyer was Equipment Leasing Co., not GLS and not Central. *See Bryant v. BMW of N. Am. LLC*, 585 F. Supp. 3d 1178, 1182–83 (E.D. Wis. 2022) (dismissing a breach-of-contract claim under Wisconsin's Uniform Commercial Code for lack of standing because Plaintiff was not the buyer: "Steamer Motor Company, Schaefer's auto dealership, was the purchaser of the allegedly defective vehicle, not Schaefer").

Because neither GLS nor Central was a buyer under the UCC, neither can recover consequential damages. And because consequential damages are the only damages that they seek (i.e., the alleged lost profits of not being able to sell their model year 2018 trucks and Central's claims for additional maintenance costs, driver recruitment costs, etc. (*see* Second Am. Compl. ¶ 108, ECF 29, PageID.273)), their breach-of-contract claim fails as a matter of law.

## III.  Plaintiffs' fraud claim should be dismissed for lack of reasonable reliance, because Plaintiffs cannot ignore the production schedule information made available to them before signing the Letter Agreement.

Navistar's motion to dismiss Plaintiffs' fraud claim is pending. (ECF No. 36). For the reasons expressed in that pending motion, Plaintiffs' fraud claim should be dismissed. But even if it were not barred by the economic-loss doctrine, Plaintiffs' fraud

claim would fail for two additional reasons: lack of reasonable reliance and lack of scienter. As to the first, Plaintiffs could not reasonably have reasonably relied on the Letter Agreement's production schedule because they were provided true information regarding the production schedule in real time that they chose to ignore, and that information contradicts their allegation that Navistar falsely represented it would produce trucks at the times and in the manner they allege. Given that Navistar supplied them with accurate information about the production schedule, no reasonable jury could find that Navistar intended for them to rely on the out-of-date production schedule in the Letter Agreement.

Plaintiffs' fraud claim alleges that Navistar "induce[d]" Plaintiffs to enter the 2022 Letter Agreement by "the false promise of accelerated production" so Plaintiffs would "waiv[e] contractual rights," namely "their rights to trade in their used trucks." (ECF No. 29, ¶ 70, PageID.264-65.) By the "false promise of accelerated production," Plaintiffs are referring to the Letter Agreement's production schedule. (GLS Corp. Rep. Dep, 11/13/2024 at pp. 23:20–24:4, Ex. B (testifying that the alleged false promise of accelerated production is the production schedule from the Letter Agreement).)

Blain testified that while he did not have direct access to Navistar's manufacturing data, he could speak to people such as Jim Lollis to determine what had been built and what was scheduled to be built. (*Id.* at pp. 35:16–36:4.) What is more, Blain testified that he did not recall receiving build schedules from Jim Lollis numerous times before he signed the Letter Agreement and that he was "deferring review of those

communications to Brianne Perkins." (GLS Corp. Rep. Dep, 11/13/2024 at pp. 41:4–16, Ex. B.) He also incorrectly testified that those communications began in May (*id.*), when in reality they began in early April 2022. And Ms. Perkins, to whom Mr. Blain deferred, received regular updates regarding the production schedule, including updates before Mr. Blain signed the Letter Agreement.

In light of these facts, Plaintiffs could not reasonably rely on that production schedule for two reasons. *First*, the Letter Agreement also included language that qualified the promise of the production schedule: it said that production was "based on *available* production" and that Navistar was "*working* to secure production dates." (ECF No. 29-1 (emphasis added).) Plaintiffs cannot read the production schedule in isolation and ignore those caveats. Reading the Letter Agreement as a whole, a reasonable person would understand that the production schedule was tentative.

*Second*, Plaintiffs could not reasonably rely on the Letter Agreement's production schedule, even without those caveats, when they had information readily available to them showing that actual production was not in fact meeting that production schedule. Under Michigan law, a "plaintiff cannot claim to have been defrauded where he had information available to him that he chose to ignore." *Nieves v. Bell Indus., Inc.*, 517 N.W.2d 235, 238 (Mich. App. 1994) (citation omitted); *Oraha v. Troy Motors, Inc.*, No. 358183, 2022 WL 3330152, at *3 (Mich. Ct. App. Aug. 11, 2022) (same). In any fraud claim, a plaintiff must prove reasonable reliance, and "a party's reliance will not be reasonable if the party is armed with actual knowledge of facts making any reliance on

18

alleged misrepresentations unreasonable." *DBD Kazoo LLC v. W. Michigan LLC*, No. 361299, 2024 WL 500208, at *7 (Mich. Ct. App. Feb. 8, 2024); *see also id.* at *8 ("a plaintiff cannot claim to have been defrauded where he had information available to him that he chose to ignore.").

Here, the documentary record proves that Plaintiffs had information available to them that they chose to ignore. On numerous instances before GLS signed the Letter Agreement, Plaintiffs were provided with real-time information concerning the production build schedules for the model-year 2023 trucks that differed from the production chart that Plaintiffs rely on to form the basis of the fraud claim. Plaintiffs' own corporate representative testified that the information reflected "a material change" from that very production schedule chart. Michigan law does not permit Plaintiffs to ignore information made freely available to them, and then cry fraud when that very information disproves their fraud claim.

Finally, these same facts mean that Plaintiffs cannot establish that Navistar intended for Plaintiffs to rely on the Letter Agreement's production schedule. Given that Navistar provided real-time information about the actual production schedule, no reasonable jury could find that Navistar intended for Plaintiffs to rely on the out-of-date production schedule in the Letter Agreement.

For at least these reasons, and for those expressed in Navistar's pending motion to dismiss, the Court should dismiss Plaintiffs' fraud claim.

## IV. CONCLUSION

For these reasons, the Court should grant Navistar summary judgment and reject as a matter of law GLS's and Central's breach-of-contract claim.

Dated: December 13, 2024

BARNES & THORNBURG LLP

*/s/ Scott R. Murphy*
Scott R. Murphy (P68015)
Anthony C. Sallah (P84136)
171 Monroe Ave. NW, Suite 1000
Grand Rapids, MI 49503
616-742-3930
smurphy@btlaw.com
asallah@btlaw.com
*Attorneys for Defendant Navistar, Inc.*

## LOCAL RULE CERTIFICATION

I, Scott R. Murphy, certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts). I also certify that it is the appropriate length. Local Rule 7.1(d)(3).

BARNES & THORNBURG LLP

Dated: December 13, 2024

*/s/ Scott R. Murphy*
Scott R. Murphy (P68015)
*Attorney for Defendant Navistar, Inc.*

21

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 13, 2024, the foregoing was electronically filed using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List.

BARNES & THORNBURG LLP

Dated: December 13, 2024          */s/ Scott R. Murphy*
                                  Scott R. Murphy (P68015)
                                  *Attorney for Defendant Navistar, Inc.*