UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GLS LEASCO, INC. and
CENTRAL TRANSPORT, LLC,

     Plaintiffs,

v.

     NAVISTAR, INC.,

Defendant.

Case No. 23-cv-12927

Hon. Mark A. Goldsmith

Magistrate Judge Anthony P. Patti

_____

**Plaintiffs' Motion for Partial Summary Judgment**

The undersigned counsel certifies that counsel personally spoke to opposing counsel, explaining the nature of the relief to be sought by way of this Motion and seeking concurrence in the relief; opposing counsel expressly denied concurrence.

Pursuant to Federal Rule of Civil Procedure 56(a), Plaintiffs GLS Leasco, Inc. and Central Transport, LLC respectfully request that the Court grant summary judgment to them on Navistar's liability for breach contract or, at a minimum, on the issue of whether Navistar breached the contract. The bases for this Motion are set forth in the accompanying brief.

Respectfully submitted,

KIENBAUM HARDY
VIVIANO PELTON & FORREST, P.L.C.:

By: /s/ Thomas J. Davis
      Eric J. Pelton (P40635)
      Thomas J. Davis (P78626)
Counsel for Plaintiffs
280 N. Old Woodward Ave., Ste. 400
Birmingham, MI 48009
(248) 645-0000
epelton@khvpf.com
Date: December 13, 2024    tdavis@khvpf.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GLS LEASCO, INC. and
CENTRAL TRANSPORT, LLC,

                                      Case No. 23-cv-12927

      Plaintiffs,

                                        Hon. Mark A. Goldsmith

v.

                                        Magistrate Judge Anthony P. Patti

      NAVISTAR, INC.,

Defendant.

_____

**Plaintiffs' Brief in Support of Their Motion
for Partial Summary Judgment**

## Table of Contents

Statement of Issues Presented ................................................................. iii

Controlling or Most Appropriate Authority .............................................. v

Table of Authorities ................................................................................ vii

Statement of Material Facts ...................................................................... 1

    A.    GLS Purchases Tractors from Navistar in 2017 ................................... 1

    B.    GLS and Navistar Enter into the July 2021 Agreement ....................... 1

    C.    The Parties Negotiate a New Agreement in Early 2022 ....................... 2

    D.    GLS and Navistar Enter into the April 2022 Agreement ..................... 4

    E.    Navistar Breaches the April 2022 Agreement, Damaging
        Plaintiffs ........................................................................................... 7

    F.    GLS's Affiliate Takes Ownership of and Pays for the New
        Tractors ............................................................................................. 8

    G.    Procedural History ............................................................................. 9

Introduction ............................................................................................ 10

Standard of Review ................................................................................. 10

Argument 11

I.    Navistar breached the April 2022 Agreement ................................... 11

II.    Navistar's Affirmative Defenses Cannot Survive Summary
    Judgment ............................................................................................ 12

    A.    Navistar cannot avoid liability based on "delay" or
        "impossibility" .................................................................................. 12

    B.    Navistar has no defense based on waiver, estoppel, or
        laches ................................................................................................ 14

C.  Navistar's release, modification, and accord defenses based on the $6.2 million no-trade credit likewise fail as a matter of law ..................................................................... 18

D.  Navistar's novation defense is meritless ............................................. 20

E.  Navistar's "first to breach," failure to satisfy a condition precedent, and lack of mutuality arguments are futile ....................... 21

F.  Navistar's impracticability defense fails as a matter of law ................................................................................................. 23

Conclusion ........................................................................................................ 25

## Statement of Issues Presented

1. In Michigan, breach of contract requires proof that a party failed to perform a contractual obligation, injuring the other party. Here, Navistar's own witnesses agree it was obliged to deliver 1,110 tractors by the end of June 2022 but did not do so, injuring Plaintiffs (among other reasons) by preventing GLS from selling used tractors in a historically strong used truck market. Should the Court grant judgment to Plaintiffs on the issue of whether Navistar breached the contract?

2. Navistar has stated several affirmative defenses to the breach. There is no basis for Navistar to demand a trial on its affirmative defenses because all fail as a matter of law. Plaintiffs raise the following issues as to the affirmative defenses:

    a. Navistar asserts "delay" and "impossibility" on the theory that Navistar's dealer made changes to Plaintiffs' orders that made it impossible to produce all the tractors by June 2022. But these changes all occurred before the parties signed the agreement. Because an "impossibility" defense cannot rest on circumstances the parties knew about when contracting, should the Court dismiss this defense?

    b. Navistar next asserts waiver, estoppel, and laches defenses because in early April 2022 (weeks before GLS signed the contract), Navistar's dealer sent a document showing some tractors scheduled for production after June 1, 2022. However, there is no material dispute that Navistar's production schedules are fluid and generally moved up as a contract deadline approaches, and that Plaintiffs knew this. Moreover, Navistar reaffirmed the June 2022 deadline *after* the dealer's communication. Should the Court dismiss these defenses as well?

    c. Navistar next asserts defenses of release, modification, and accord relying on a provision of the contract satisfying and terminating *pre-existing* agreements related to older tractors. Navistar's argument ignores that Plaintiffs are not suing over breaches of those old agreements; rather, they are suing over breach of the 2022 agreement *itself*. Should the Court dismiss these defenses as well?

-iii-

d. Navistar next asserts a novation defense, claiming (without explanation) that its choice to swap one dealer (Summit) for another (Allegiance) to help with the transaction at issue extinguished Navistar's obligations. But here, the swap occurred *before* the contract was presented to GLS, and that contract identifies Allegiance as the dealer. Nor does Navistar explain how this swap somehow negates its own obligations. Should the Court grant summary judgment on this defense?

e. Navistar next asserts "first to breach," failure of conditions precedent, and lack of mutuality based on its argument that GLS had its affiliate ELC pay for the tractors and guaranteed ELC's payments, rather than pay directly. But as a matter of law, a party may assign its rights and duties under a contract unless it contains an anti-assignment clause (which the relevant contract does not). Should the Court dismiss these defenses?

f. Finally, Navistar asserts a commercial impracticability defense. Such a defense requires an "unforeseeable event" that renders performance impracticable. But here, the events Navistar relies upon were known to it well before the parties entered into the agreement, rendering the defense unavailable as a matter of law. Should the Court grant summary judgment on this defense as well?

# Controlling or Most Appropriate Authority

*Able Demolition v. Pontiac,*
   275 Mich. App. 577 (2007).................................................................22

*Batshon v. Mar–Que Gen. Contractors, Inc.,*
   463 Mich. 646 (2001)......................................................................18

*Bd. of Control of E. Mich. Univ. v. Burgess,*
   45 Mich. App. 183 (1973)................................................................13

*Chainworks, Inc. v. Webco Indus., Inc.,*
   2006 WL 461251 (W.D. Mich. Feb. 24, 2006) ...................................24

*City of Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool,*
   473 Mich. 188 (2005)......................................................................15

*Encore Big Beaver LLC v. Uncle Julio's of Fla., Inc.,*
   2022 WL 428405 (E.D. Mich. Feb. 11, 2022)............................. 11, 12

*Ford Motor Co. v. AirPro Diagnostics LLC,*
   632 F. Supp. 3d 753 (E.D. Mich. 2022)..................................... 11, 12

*Hergenreder v. Bickford Senior Living Grp., LLC,*
   656 F.3d 411 (6th Cir. 2011)...................................................... 20, 22

*Hillman Power Co. v. On-Site Equip. Maint., Inc.,*
   685 F. Supp. 3d 528 (E.D. Mich. 2023)..................................... 15, 18

*Imperial Hotels Corp. v. Dore,*
   257 F.3d 615 (6th Cir. 2001)............................................................21

*Jawad A. Shah, M.D., PC v. State Farm Mut. Auto. Ins. Co.,*
   324 Mich. App. 182 (2018)..............................................................22

*Johnson Controls, Inc. v. Jay Indus., Inc.,*
   459 F.3d 717 (6th Cir. 2006).................................................... 15, 17

*Nationwide Mut. Ins. Co. v. Quality Builders, Inc.,*
   192 Mich. App. 643 (1992)..............................................................19

*Pub. Health Dep't v. Rivergate Manor,*
   452 Mich. 495 (1996)............................................................... 15, 18

*Quality Prods. & Concepts Co. v. Nagel Precision, Inc.,*
469 Mich. 362 (2003)..............................................................................19

*Roberts v. Farmers Ins. Exch.,*
275 Mich. App. 58 (2007).......................................................................13

*Roth Steel Prod. v. Sharon Steel Corp.*,
705 F.2d 134 (6th Cir. 1983)...................................................................24

*Skaates v. Kayser*,
333 Mich. App. 61 (2020)........................................................................21

*Superior Commc'ns v. City of Riverview*,
881 F.3d 432 (6th Cir. 2018)........................................................... 15, 17

## Statutes

MCL § 440.2210 ........................................................................... 22, 23

MCL § 440.2615 ..................................................................................24

# Table of Authorities

## Cases

*Able Demolition v. Pontiac*,
    275 Mich. App. 577 (2007)....................................................................22

*Batshon v. Mar–Que Gen. Contractors, Inc.*,
    463 Mich. 646 (2001).......................................................................18

*Bd. of Control of E. Mich. Univ. v. Burgess*,
    45 Mich. App. 183 (1973)..................................................................13

*Chainworks, Inc. v. Webco Indus., Inc.*,
    2006 WL 461251 (W.D. Mich. Feb. 24, 2006) ....................................24

*City of Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool*,
    473 Mich. 188 (2005)......................................................................15

*Ctr. Garment Co. v. United Refrigerator Co.*,
    341 N.E.2d 669 (Mass. 1976) ..........................................................25

*Dicastal N. Am., Inc. v. Markowitz Metals Grp., LLC*,
    633 F. Supp. 3d 999 (W.D. Mich. 2022) ............................................15

*Encore Big Beaver LLC v. Uncle Julio's of Fla., Inc.*,
    2022 WL 428405 (E.D. Mich. Feb. 11, 2022)............................. 11, 12

*Exelon Generation Co., LLC v. Gen. Atomics Techs. Corp.*,
    559 F. Supp. 2d 892 (N.D. Ill. 2008) .................................................25

*Ford Motor Co. v. AirPro Diagnostics LLC*,
    632 F. Supp. 3d 753 (E.D. Mich. 2022)..................................... 11, 12

*Hergenreder v. Bickford Senior Living Grp., LLC*,
    656 F.3d 411 (6th Cir. 2011)................................................... 20, 22

*Hillman Power Co. v. On-Site Equip. Maint., Inc.*,
    685 F. Supp. 3d 528 (E.D. Mich. 2023).................................... 15, 18

*Hunley v. DuPont Automotive*,
    341 F.3d 491 (6th Cir. 2003)...............................................................12

*Imperial Hotels Corp. v. Dore*,
    257 F.3d 615 (6th Cir. 2001)................................................................21

*Innovation Ventures, LLC v. Custom Nutrition Labs., LLC*,
    912 F.3d 316 (6th Cir. 2018)................................................................15

*Jawad A. Shah, M.D., PC v. State Farm Mut. Auto. Ins. Co.*,
    324 Mich. App. 182 (2018)..................................................................22

*Johnson Controls, Inc. v. Jay Indus., Inc.*,
    459 F.3d 717 (6th Cir. 2006)....................................................... 15, 17

*Klapp v. United Ins. Grp. Agency, Inc.*,
    468 Mich. 459 (2003)...........................................................................20

*Nationwide Mut. Ins. Co. v. Quality Builders, Inc.*,
    192 Mich. App. 643 (1992)..................................................................19

*Pub. Health Dep't v. Rivergate Manor*,
    452 Mich. 495 (1996)................................................................... 15, 18

*Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*,
    469 Mich. 362 (2003)...........................................................................19

*Roberts v. Farmers Ins. Exch.*,
    275 Mich. App. 58 (2007)....................................................................13

*Roth Steel Prod. v. Sharon Steel Corp.*,
    705 F.2d 134 (6th Cir. 1983)................................................................24

*Skaates v. Kayser*,
    333 Mich. App. 61 (2020)....................................................................21

*Speedeon Data, LLC v. Integrated Direct Mktg., LLC*,
    718 F. App'x 333 (6th Cir. 2017) .........................................................12

*Stinger Indus., LLC v. Hill-Rom Co. Inc., Hill-Rom Medaes, Inc.*,
    23 F. App'x 472 (6th Cir. 2001) ..........................................................22

*Superior Commc'ns v. City of Riverview*,
    881 F.3d 432 (6th Cir. 2018)....................................................... 15, 17

*Upsher-Smith Lab'ys, Inc. v. Mylan Lab'ys, Inc.*,
   944 F. Supp. 1411 (D. Minn. 1996) .......................................................................25

**Statutes**

MCL § 440.2210 ................................................................................. 22, 23

MCL § 440.2615 .......................................................................................24

**Rules**

Fed. R. Civ. P. 56 ................................................................................ 10, 11

**Statement of Material Facts**

1.      Plaintiff GLS Leasco, Inc. ("GLS") purchases and leases semi-truck tractors, including to its affiliate Plaintiff Central Transport, LLC ("Central"). Central offers less-than-truckload freight shipping services. Ex. A, Blain Decl. ¶ 1.

2.      Defendant Navistar, Inc. ("Navistar") manufactures and sells semi-truck tractors. Def.'s Answer to Pls.' Am. Compl. ¶ 11, PageID.155-56.

**A.      GLS Purchases Tractors from Navistar in 2017**

3.      In 2017, GLS purchased 630 MY 2018 tractors from Navistar for the purpose of leasing them to Central. Ex. A, Blain Decl. ¶ 2.

4.      GLS and Navistar also entered into an agreement that gave GLS the option to trade-in the MY 2018 tractors four years later for a specified payment (the "2017 Optional Trade-In Agreement"). *See generally* Ex. F, Dep. Ex. 88.

**B.      GLS and Navistar Enter into the July 2021 Agreement**

5.      Four years later, GLS planned to trade the now-used MY 2018 tractors in and replace them with new tractors. Ex. A, Blain Decl. ¶ 3.

6.      In July 2021, GLS, Navistar, and Navistar's dealer, Summit Truck Group, executed an agreement to accomplish that objective (the "July 2021 Agreement"). Ex. G, Dep. Ex. 15; Ex. H, Fink Dep. 16:12-18, 137:12-138:8.

7.      Under the July 2021 Agreement, GLS retained its right to trade in the now-used 2018 MY tractors. Ex. G, Dep. Ex. 15 at NAV00051901.

1

8.     Navistar promised to deliver 1,305 tractors total: 1,100 MY 2023 tractors to GLS and its affiliates between February and December 2022, and 205 MY 2024 tractors in 2023. *Id.* at NAV00051899-900; Ex. I, Akinosho Dep. 47:22-48:2.

9.     But Navistar had filled all of its 2022 production schedule slots several months earlier. Ex. J, Dep. Ex. 112 at NAV00063269 ("2022 order board filled in May 2021"); Ex. I, Akinosho Dep. 69:3-70:11.

10.     On July 13, 2021, Navistar announced to its dealers that its 2022 production schedule was full and, a few days later, Navistar stopped taking new orders. Ex. K, Dep. Ex. 30 at 1; Ex. L, Dep. Ex. 117 at NAV00006463; Ex. M, Dep. Ex. 153 at NAV00043669.

11.     Sean Carmichael, the Vice President of Sales who signed the July 2021 Agreement for Navistar, knew in May 2021 that Navistar had already accepted enough orders to fill its 2022 production schedule. Ex. N, Carmichael Dep. 21:21-22:3, 136:24-138:10; Ex. G, Dep. Ex. 15 at NAV00051902.

12.     On July 29, 2021, Navistar committed to producing 1,100 tractors for GLS and its affiliates in 2022. Ex. G, Dep. Ex. 15 at NAV00051899-900.

**C.     The Parties Negotiate a New Agreement in Early 2022**

13.     On December 16, 2021, Navistar informed GLS that it would not produce 1,100 tractors for GLS and its affiliates in 2022 and would only deliver 600 tractors instead. Ex. O, Dep. Ex. 162 at NAV00065876.

2

14.     Navistar claimed that it was having trouble getting parts from its suppliers, including Bendix collision mitigation systems and Cummins engines. *Id.*; Ex. N, Carmichael Dep. 206:8-18, 272:3-19, 328:24-329:3.

15.     In January 2022, Navistar made a new proposal to GLS: if GLS waived its right to trade-in the MY 2018 tractors and agreed to take new tractors without Bendix, Navistar would deliver 1,100 new tractors to GLS in the first half of 2022. Ex. N, Carmichael Dep. 273:17-279:3; Ex. P, Dep. Ex. 164 at NAV00067055.

16.     GLS agreed to this proposal, intending to sell the MY 2018 tractors itself. Ex. N, Carmichael Dep. 284:4-19, 390:17-392:16; Ex. Q, Dep. Ex. 166 at NAV00013686; Ex. R, Dep. Ex. 189 at NAV00028033.

17.     Demand for used tractors was high at that time, and market prices for used tractors were nearing historic peaks. Ex. S, Dep. Ex. 109 at NAV00014891; Ex. T, Def.'s Rebuttal Expert Report at 9; Ex. U, Dep. Ex. 157 at NAV00077308.

18.     GLS and Navistar reached an agreement in principle on January 13, 2022, and began negotiating the details of a contract that would supersede the July 2021 Agreement. Ex. Q, Dep. Ex. 166 at NAV00013686; Ex. V, Dep. Ex. 36 at 1.

19.     In February, Navistar sent GLS a draft contract and reiterated that all 1,100 new tractors would be "built and delivered by June" 2022. Ex. W, Dep. Ex. 57 at NAV00016306; Ex. X, Lollis Dep. 165:17-167:11.

20.     Around March 2022, Navistar realized that it would not have enough A26 engines for all of the tractors it planned to build in the spring. Ex. U, Dep. Ex. 157 at NAV00077311; Ex. Y, at NAV00017869; Ex. Z, Navistar Corporate Representative ("Navistar") Dep.[1] 153:24-155:7.

21.     GLS agreed to accept a different model of tractor with a different engine, the X15, instead. Ex. Y at NAV00017869; Ex. AA at NAV00017160.

22.     At his deposition, Carmichael admitted that he was aware of Navistar's issues obtaining Bendix parts and A26 engines before April 8, 2022. Ex. N, Carmichael Dep. 381:6-382:2; Ex. BB, Dep. Ex. 181 at NAV00082410.

### D.     GLS and Navistar Enter into the April 2022 Agreement

23.     On April 8, 2022, Carmichael signed a new letter agreement on behalf of Navistar (the "April 2022 Agreement") that was intended to supersede the July 2021 Agreement. Ex. N, Carmichael Dep. 220:23-221:8; Ex. V, Dep. Ex. 36 at 1, 4.

24.     Navistar promised to deliver 1,100 new tractors by the end of June 2022, with 630 to be delivered directly to Central. Ex. V, Dep. Ex. 36 at 2; Ex. CC, Dep. Ex. 168 at NAV00014389-90; *see also* Ex. N, Carmichael Dep. 390:2-393:22; Ex. R, Dep. Ex. 189 at NAV00028033.

---

[1] The final version of this transcript is not yet available. Plaintiffs will substitute this Exhibit with the relevant excerpts of the final version after it becomes available.

25.     Specifically, Navistar promised 42 new tractors in January, 32 new tractors in February, 342 new tractors in March, 342 new tractors in April, and 342 new tractors in May, with June as a "spillover month." Ex. V, Dep. Ex. 36 at 2.

26.     The April 2022 Agreement waived GLS's right to trade-in the MY 2018 tractors it had been leasing to Central. *Id.* at 3.

27.     Navistar agreed to pay GLS and its affiliates $6,200,000 in exchange for the "No Trade" provision of the April 2022 Agreement. *Id.*

28.     In return, the parties "terminated any and all other agreements pertaining to the" MY 2018 tractors and Plaintiffs agreed that they had been compensated for certain enumerated costs, including tractor rental costs associated with service downtime and the installation of communication devices. *Id.*

29.     GLS did not immediately sign the April 2022 Agreement in part because the parties were still negotiating a separate optional trade-in agreement for the new tractors. *Id.* at 4; Ex. DD, GLS Dep. 242:3-243:1.

30.     On April 13, 2022, before GLS signed the April 2022 Agreement, Navistar's dealer's representative, Jim Lollis, sent GLS a spreadsheet showing that Navistar had scheduled 15 of the tractors intended for Central to be built after June 2022. Ex. EE, LOLL-0000047 at LOLL-0000048.

31.     GLS's Brianne Perkins testified that this schedule was not troubling to her, as in her experience it was common for Navistar and other manufacturers to

modify their production schedules to meet their contractual obligations as the deadline approached. Ex. FF, Perkins Dep. 41:13-42:18, 103:12-104:4.

32.    Lollis agreed that production schedules are "usually a pretty fluid environment" but ultimately "Navistar will go in and rearrange the system, massage the numbers to get where they need them to be." Ex. X, Lollis Dep. 103:16-104:2.

33.    Navistar could change the order in which tractors would be built and customer orders would be fulfilled. Ex. GG, Belisle Dep. 175:5-12, 176:17-177:3; Ex. HH, Dep. Ex. 209 at NAV00061276-77; Ex. Z, Navistar Dep. 55:14-57:18.

34.     Navistar never withdrew the April 2022 Agreement before GLS signed it. Ex. A, Blain Decl. ¶ 6.

35.    Navistar never asked GLS if it could extend the delivery schedule for the new tractors past June 2022, and Plaintiffs never agreed that Navistar could extend the delivery schedule for the new tractors past June 2022. *Id.* ¶ 7.

36.    On May 17, 2022, at Carmichael's direction, Lollis told GLS that if it did not sign the Agreement soon, Navistar would "stop/postpone our production and hold deliveries of built tractors." Ex. II, Dep. Ex. 60; Ex. JJ, NAV00133580.

37.    GLS signed the April 2022 Agreement the next day, May 18, 2022. Ex. V, Dep. Ex. 36 at 4.

38.    When it signed the April 2022 Agreement, GLS expected all the tractors to be built by the end of June 2022. Ex. DD, GLS Dep. 220:19-222:2.

**E.**     **Navistar Breaches the April 2022 Agreement, Damaging Plaintiffs**

39.     Navistar built more than 10,000 tractors between January and June 2022 (and more than 7,000 tractors between March 2022 and June 2022). Ex. KK, Def.'s Answers & Objs. To Pls.' 2d Interrogs. at 4.

40.     Navistar did not build 1,100 tractors for GLS and its affiliates by the end of June 2022. Ex. LL, Def.'s Resp. to Pls.' 1st Set of Req. for Admis. at 10.

41.     Carmichael admitted this in contemporaneous emails to his colleagues and at deposition. Ex. N, Carmichael Dep. at 393:6-22; Ex. R, Dep. Ex. 189 at NAV00028033; Ex. MM, Dep. Ex. 167; Ex. NN, Dep. Ex. 188 at NAV00023147; Ex. OO, NAV00110596.

42.     Likewise, Navistar's dealer's representative Jim Lollis admitted that Navistar did not fulfill its promise to build the new tractors by the end of June 2022. Ex. X, Lollis Dep. 116:2-119:13; Ex. PP, Dep. Ex. 45 at NAV00028763.

43.     Navistar admitted the same during this litigation. Ex. LL, Def.'s Resp. to Pls.' 1st Set of Req. for Admis. at 10.

44.     GLS asserts that Navistar's failure to timely build and deliver the new tractors resulted in lost profits, as GLS could not sell the MY 2018 tractors in a historically strong used truck market. 2d Am. Compl. ¶ 108, PageID.273.

45.     By the time Navistar finished delivering the new tractors to replace the MY 2018 tractors, the average market value of a MY 2018 tractor with 400,000 miles

had decreased from almost $70,000 in May 2022 to approximately $28,000. Ex. T, Def.'s Rebuttal Expert Report at App. D, Sch. 1; Ex. QQ, ALLEGIANCE00003257.

46.     Central alleges that Navistar's delay forced it to cover the increased maintenance and repair costs associated with keeping the MY 2018 tractors in service past their trade-in dates. 2d Am. Compl. ¶ 108, PageID.273.

47.     Central also maintains that it incurred additional fuel expenses because the MY 2018 tractors were less fuel efficient than the new tractors. 2d Am. Compl. ¶ 108, PageID.273; Ex. RR, Central Dep. 11:10-16.

48.     Lastly, Central claims that it was required to expend additional money to recruit drivers. The MY 2018 tractors had manual transmissions, while the new tractors had automatic transmissions. The market for drivers who can operate manual transmissions is competitive, so Central had to spend more money recruiting them. 2d Am. Compl. ¶ 108, PageID.273; Ex. RR, Central Dep. 15:3-16:22.

**F.     GLS's Affiliate Takes Ownership of and Pays for the New Tractors**

49.     After GLS signed the April 2022 Agreement, it assigned ownership of the 630 new tractors intended for Central to its corporate affiliate, Equipment Leasing Company, LLC ("ELC"). Ex. A, Blain Decl. ¶¶ 9-10.

50.     Kyle Blain, the President of GLS, is also the President of ELC. *Id.* ¶ 10.

51.     ELC titled the 630 tractors and leases them to Central. *Id.* ¶¶ 11-12.

52.     GLS delegated its duty to pay for the 630 new tractors to ELC. *Id.* ¶ 13.

53.     Allegiance issued invoices for the 630 new tractors to ELC. *Id.* ¶ 14.

54.     ELC obtained financing for the 630 new tractors through Navistar Capital, Navistar's financing program with BMO Harris Bank N.A. *Id.* ¶ 15.

55.     GLS guaranteed ELC's debt to Navistar Capital. *Id.* ¶ 16 & Ex. 4.

56.     Allegiance provided the signed invoices to Navistar Capital. *See, e.g.*, Ex. SS at LOLL-0001229; Ex. TT at LOLL-0003227.

57.     Neither Navistar, Navistar Capital, BMO, nor Allegiance has ever alerted ELC that Navistar has not received payment for the 630 new tractors. Ex. A, Blain Decl. ¶ 17.

58.     Outside of this litigation, Navistar has never objected to the fact that ELC paid the invoices for the for the 630 new tractors. *Id.* ¶ 18.

59.     The April 2022 Agreement does not contain a prohibition on assignment or delegation. *See generally* Ex. V, Dep. Ex. 36.

**G.     Procedural History**

60.     GLS and Central have sued Navistar for fraud and breach of the April 2022 Agreement. 2d Am. Compl. ¶¶ 105-114, PageID.272-74.

61.     Navistar asserted several affirmative defenses to Plaintiffs' breach of contract claim, the bases for which Navistar detailed in sworn interrogatory answers. Def.'s Answer to Pls.' Am. Compl., PageID.172-73; Ex. UU, Def.'s Answers & Objs. to 30(b)(6) Dep. Topics 20-34 Re: Affirmative Defenses ("Interrogatory Answers").

## Introduction

On April 8, 2022, Navistar signed an agreement promising to manufacture and deliver 1,100 tractors to GLS's affiliates, including 630 new tractors to Central. Navistar did not rescind its offer before GLS signed it 40 days later. Instead, on May 17, 2022, it issued a threat to GLS to sign or else it would *not* produce the promised tractors. GLS did so, signing on May 18, 2022. Navistar then failed to produce and deliver the tractors as promised, completing delivery over a year late.

Navistar Vice President Sean Carmichael admitted in internal emails and at deposition that Navistar breached its contract with GLS. Navistar nonetheless offers a hodgepodge of arguments trying to excuse its breach, ranging from nonsensical ("GLS breached first because its affiliate paid for the tractors") to brazen (claiming that Navistar's breach should be excused due to production delays that it *knew about* when demanding that GLS sign the still-pending contract, which it could have rescinded). The Court should grant summary judgment to Plaintiffs on the issue of Navistar's liability for breach of the April 2022 Agreement or, at a minimum, on the issue of whether Navistar breached that contract.

## Standard of Review

Summary judgment is appropriate where, as here, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). A court may grant summary judgment as to a party's liability

10

for a claim but defer judgment on the amount of damages owed. *See id.* (a court may grant summary judgment on "part" of a claim or defense); *Encore Big Beaver LLC v. Uncle Julio's of Fla., Inc.*, 2022 WL 428405, at *4 (E.D. Mich. Feb. 11, 2022) (granting summary judgment as to liability only for breach of contract).

**Argument**

## I.   Navistar breached the April 2022 Agreement

"Under Michigan law, a plaintiff claiming a breach of contract must prove: '(1) a contract between the parties, (2) the terms of the contract require performance of a certain action, (3) a breach, and (4) the breach caused injury to the other party.'" *Ford Motor Co. v. AirPro Diagnostics LLC*, 632 F. Supp. 3d 753, 762 (E.D. Mich. 2022) (citation omitted).

Navistar breached the April 2022 Agreement. That Agreement required Navistar to deliver 1,100 new tractors to GLS and its affiliates by the end of June 2022. (*See* Statement of Material Facts ("Facts") ¶ 24.) Navistar admittedly did not manufacture and deliver all the tractors by the end of June 2022. (*Id.* ¶¶ 40-43.) And Navistar's breach harmed Plaintiffs' businesses: GLS was unable to timely sell the MY 2018 tractors at higher prices in a strong used truck market and Central had to incur additional maintenance, repair, fuel, and driver recruitment costs associated with keeping the MY 2018 tractors in service past their trade-in date. (*Id.* ¶¶ 44-48.)

11

Accordingly, the Court should grant summary judgment to Plaintiffs as to Navistar's breach of the April 2022 Agreement. *See, e.g.*, *Encore Big Beaver LLC*, 2022 WL 428405, at *4; *Ford Motor Co.*, 632 F. Supp. 3d at 765.

## II. Navistar's Affirmative Defenses Cannot Survive Summary Judgment

Separate and apart from Navistar's failure to raise any genuine issue of material fact regarding its breach of the parties' agreement, it has also failed to raise any such issues related to its remaining[2] affirmative defenses, all of which fail and warrant summary judgment in Plaintiffs' favor. *See, e.g.*, *Speedeon Data, LLC v. Integrated Direct Mktg., LLC*, 718 F. App'x 333, 337 (6th Cir. 2017). Navistar's affirmative defenses to the breach of contract claim fall into six main categories, which Plaintiffs address in turn below.

### A. Navistar cannot avoid liability based on "delay" or "impossibility"

Navistar's first grouping of affirmative defenses—delay and impossibility—contends that "GLS's delay in signing the 2023 Letter Agreement until May 18, 2022," and certain order changes by Navistar's agent Lollis both before and after Navistar signed the agreement on April 8, 2022 rendered it "impossible for Navistar

---

[2] Navistar has offered no factual basis for two defenses—frustration of purpose and unclean hands—and said it would withdraw them. (Ex. UU, Interrogatory Answers at 3, 8.) It nonetheless refused to sign a stipulated order to that effect. But since Navistar has failed to offer any support, those defenses necessarily fail. *See Hunley v. DuPont Automotive*, 341 F.3d 491, 496 (6th Cir. 2003).

to deliver the [new] Tractors" within the "*March, April and May 2022 time period*"
because of. (Ex. UU, Interrogatory Answers at 2.)

This argument is meritless and contrary to two fundamental principles of
contract law. First, a "simple offer may be revoked for any reason or for no reason
by the offeror at any time prior to its acceptance by the offeree." *Bd. of Control of E.
Mich. Univ. v. Burgess*, 45 Mich. App. 183, 186 (1973). Second, a party cannot avoid
liability based on a "supervening event" making performance impossible when that
event was "reasonably foreseeable" at the time the contract was formed. *See Roberts
v. Farmers Ins. Exch.,* 275 Mich. App. 58, 74 (2007) (quotation and citation omitted).
But here, Navistar knew of the purported "delays" causing the impossibility yet
maintained its offer to GLS nonetheless; indeed, it pressured GLS to sign despite
these "delays." (Facts ¶¶ 29, 34, 36.)

Specifically, Navistar alleges that Lollis made changes to GLS's orders both
before and after April 8, 2022—but *before* May 18, 2022—which allegedly delayed
Navistar's ability to deliver the new tractors. (Ex. UU, Interrogatory Answers at 1-
2.) But Navistar was aware of the pre-April 8 "delays" before it made the April 8,
2022 offer to produce all the tractors by the end of June 2022. (Facts ¶¶ 23-24.) And
it could have unilaterally withdrawn the offer before May 18, 2022 if it believed that
any purported delays after April 8, 2022 made its promise untenable. It did not. (*Id.*
¶ 34.) Instead, on May 17, 2022, Navistar demanded that GLS sign the agreement

13

immediately or else it would "stop/postpone [Plaintiffs'] production and hold deliveries of built tractors." (*Id.* ¶ 36.) There is no material dispute, then, that Navistar knew of the purported delays on May 18, 2022 yet nonetheless effectively *renewed* its offer to GLS that it would manufacture and deliver all trucks by the end of June 2022.

In any event, Navistar's Interrogatory Answers do not create a genuine dispute of material fact that it was impossible to manufacture and deliver tractors under the contract. It claims in its Interrogatory Answer that GLS's alleged delay, coupled with supply chain constraints, "made it impossible for Navistar to deliver the [new] Tractors to Central in the *March, April and May 2022* time period." (Ex. UU, Interrogatory Answers at 2.) But the April 2022 Agreement required Navistar to deliver all tractors by the end of *June* 2022. (Facts ¶ 24.) Thus, Navistar's claim that it could not deliver in March, April, and May 2022 (although untrue)[3] is beside the point. There is no factual basis to support the defense that delivery by the end of *June 2022* was impossible.

### B.   Navistar has no defense based on waiver, estoppel, or laches

Next, Navistar claims that Plaintiffs have waived, are estopped, or are barred by laches. Waiver of a contractual right requires a "'voluntary and intentional abandonment of a known right,'" *Johnson Controls, Inc. v. Jay Indus., Inc.*, 459 F.3d

---

[3] Navistar built *far* more than 1,100 tractors in that timeframe. (Facts ¶ 39.)

717, 725 (6th Cir. 2006) (citation omitted), as measured "according to the 'reasonable commercial standards of fair dealing in the trade,'" *Dicastal N. Am., Inc. v. Markowitz Metals Grp., LLC*, 633 F. Supp. 3d 999, 1018 (W.D. Mich. 2022) (citation omitted). It requires "clear and convincing evidence [of] the mutual intention of the parties to waive." *Superior Commc'ns v. City of Riverview*, 881 F.3d 432, 440 (6th Cir. 2018).

Estoppel "'prevents one party to a contract from enforcing a specific provision,'" *City of Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool*, 473 Mich. 188, 203-04 (2005) (citation omitted), when that party "intentionally or negligently induces another party to believe certain facts, upon which the latter justifiably relies and acts, such that they will be prejudiced if the former party is allowed to deny the existence of those facts," *Hillman Power Co. v. On-Site Equip. Maint., Inc.*, 685 F. Supp. 3d 528, 536 (E.D. Mich. 2023).

Finally, laches requires proof of an unreasonable and unexcused delay in bringing a claim, combined with material prejudice to the party raising the defense that is caused by the delay. *Pub. Health Dep't v. Rivergate Manor*, 452 Mich. 495, 507 (1996). Michigan courts typically reject a laches defense when a claim is brought within the limitations period, absent a strong showing of prejudice. *Innovation Ventures, LLC v. Custom Nutrition Labs., LLC*, 912 F.3d 316, 343 (6th Cir. 2018).

None of these doctrines apply here as a matter of law. Navistar's defenses are based on its assertion that Plaintiffs knew that Navistar could not timely deliver the new tractors because of the inherently "fluid" schedule of production dates and delays impacting Navistar's ability to build and deliver the new tractors, including because "over 420 of the tractors were not even scheduled to be built by Navistar until <u>after</u> June 1, 2022." (Ex. UU, Interrogatory Answers at 3-5.) But as the uncontested evidence here shows, the parties all acknowledged that, regardless of the "fluid" production schedule, Navistar had agreed to deliver all of the new tractors to Plaintiffs by the end of June 2022. (Facts ¶¶ 24, 38.)

Thus, while Navistar might have breached by not delivering tractors as scheduled in March, April, or May, the contract's explicit incorporation of a "spillover" month of June suggested that there was some flexibility that extended to June, but no further. (*Id.* ¶¶ 24-25, 35, 38.) Plaintiffs, as a matter of reasonable business sense, could have foregone any potential claim for breach given the earlier delays with the expectation that the ultimate promise—delivery of all tractors by the end of June—would still be fulfilled. (*Id.* ¶ 38.) Navistar again simply ignores this June 2022 deadline in the parties' schedule. It is irrelevant that "over 420 of the tractors were not even scheduled to be built by Navistar until <u>after</u> June 1, 2022," (Ex. UU, Interrogatory Answers at 3), so long as those tractors would be delivered to Plaintiffs by the end of June, consistent with the parties' agreement. Navistar

16

admittedly had the capacity to build—and did build—far more than 1,100 tractors between March 2022 and June 2022 *and* could change the order in which customer orders would be fulfilled if necessary to meet contractual obligations. (Facts ¶¶ 33, 39.)

Given this, there is no evidentiary basis for Navistar to argue that Plaintiffs voluntarily and intentionally abandoned a known right to receive tractors by the end of June 2022. *See Johnson Controls*, 459 F.3d at 725. Nor is there evidence of a "mutual intention . . . to waive" that term. *Superior Commc'ns*, 881 F.3d at 440. Navistar will argue that Lollis sent a spreadsheet to GLS *before* May 18, 2022 showing that a mere 15 trucks were not scheduled to be built until after June 2022. (Facts ¶ 30.) But GLS knew—and Lollis and Navistar confirmed—that the production dates on Navistar's order board were not set in stone; Navistar could, and was expected to, modify its production schedule as a contractual deadline approached. (*Id.* ¶¶ 31-33.) As of May 18, 2022, Navistar reaffirmed a promise to deliver by the end of June. (*Id.* ¶ 36.) GLS signed with that expectation. (*Id.* ¶ 38.) And Carmichael confirmed the same by admitting that GLS expected Navistar to complete all deliveries by the end of June so it could "pull out" the MY 2018 tractors in time to sell them in a hot market. (Ex. R.)[4]

---

[4] This argument falters for yet another reason: at best, this could suggest that Plaintiffs waived their right to receive 15 of the 1,100 new tractors before the end of June 2022. It does not, however, support Navistar's claim that Plaintiffs waived their

Similarly, Navistar's estoppel claim is nonsensical, given that it was *Navistar* who "intentionally or negligently induce[d] [Plaintiffs] to believe certain facts" they relied upon to their detriment, *Hillman Power Co.*, 685 F. Supp. 3d at 536, by continually promising timely delivery. (Facts ¶¶ 15, 24, 34-36.) And its laches defense fails because Plaintiffs filed this suit within the statute of limitations, and Navistar has presented no showing that the passage of time between the events at issue and Plaintiffs' filing of suit caused any prejudice. *Rivergate Manor*, 452 Mich. at 507.

### C.   Navistar's release, modification, and accord defenses based on the $6.2 million no-trade credit likewise fail as a matter of law

Navistar next argues that its $6.2 million payment under the April 2022 Agreement's "No Trade" provision constitutes a release, modification, or accord and satisfaction of any future claims related to MY 2017-2019 tractors. (Ex. UU, Interrogatory Answers at 4-5, 9.) None of these defenses pass muster.

Under Michigan law, a release is only valid if it is "fairly and knowingly made" with "the intent of the parties . . . ascertained from the plain and ordinary meaning of the language." *Batshon v. Mar–Que Gen. Contractors, Inc.*, 463 Mich. 646, 648 n.4 (2001). Modification requires the party asserting the modification argument to "establish that the parties mutually intended to modify the *particular*

---

right to receive 1,100 tractors by the end of June or that Plaintiffs waived their right to enforce any delivery deadline whatsoever.

original contract" at issue. *Quality Prods. & Concepts Co. v. Nagel Precision, Inc.,* 469 Mich. 362, 373 (2003). Accord and satisfaction "is based on contract principles," with "accord" being "an agreement between parties to give and accept, in settlement of a claim or previous agreement, something other than that which is claimed to be due," and "satisfaction" being "the performance or execution of the new agreement." *Nationwide Mut. Ins. Co. v. Quality Builders, Inc.*, 192 Mich. App. 643, 646 (1992).

None of these defenses apply. The "No Trade" portion of the April 2022 Agreement merely states that Navistar would pay Plaintiffs $6.2 million in exchange for Plaintiffs releasing Navistar from its prior duty to repurchase older tractors, including the MY 2018 tractors. (Facts ¶¶ 26-27.) It further states that it "terminates any and all other agreements pertaining to" the older tractors and that Plaintiffs have been compensated items such as tractor rental costs incurred by GLS for service downtime and the installation of communication devices. (*Id.* ¶ 28.)

Navistar's argument misunderstands, however, that Plaintiffs are not suing over "other agreements" pertaining to the older tractors. It is suing about the *April 2022 Agreement* itself. (*Id.* ¶ 60.) Navistar agreed to a new obligation to deliver 1,100 new tractors to GLS and its affiliates by the end of June. (*Id.* ¶¶ 23-24.) Navistar failed to perform that obligation. (*Id.* ¶ 40.) The MY 2018 tractors here are relevant only to Plaintiff's *damages* for the breach of the April 2022 Agreement; Plaintiffs are not seeking damages for earlier, pre-April 2022 agreements. (*Id.* ¶¶ 44, 60.) The

"No Trade" provision cannot thus release, modify, or accord and satisfy Navistar's contractual duties to timely deliver tractors.

Nor can the contract be read as Navistar suggests. In interpreting a contract, courts must "give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." *Klapp v. United Ins. Grp. Agency, Inc.*, 468 Mich. 459, 468 (2003). But that is what Navistar demands. In Michigan, "mutuality of obligation" is required to establish a valid contract. *Hergenreder v. Bickford Senior Living Grp., LLC*, 656 F.3d 411, 417 (6th Cir. 2011). Navistar's argument, in effect, is that the "No Trade" provision rendered Navistar free from the primary obligation set forth in the April 2022 Agreement: timely production and delivery of new tractors. It would render the contract illusory, and its promises entirely nugatory. The Court should reject Navistar's release, modification, and accord and satisfaction arguments as a matter of law.

### D. Navistar's novation defense is meritless

Navistar next claims that novation occurred when it substituted Allegiance Trucks for Summit Truck Group as the dealership that would sell the tractors to Plaintiffs. (Ex. UU, Interrogatory Answers at 5.) A novation occurs when the following four elements are present: "'(1) parties capable of contracting; (2) a valid obligation to be displaced; (3) the consent of all parties to the substitution based upon

20

sufficient consideration; (4) the extinction of the old obligation and the creation of a valid new one.'" *Imperial Hotels Corp. v. Dore*, 257 F.3d 615, 620 (6th Cir. 2001) (citation omitted).

Navistar's argument here is confusing. For one thing, Allegiance had already been substituted for Summit when the April 8, 2022 offer was made; Allegiance is specifically identified as the dealer in the April 2022 Agreement. (Ex. V.) And even were that not so, Navistar does not explain how *its* decision to swap one dealer (Summit) for another (Allegiance) to assist Navistar with the transaction would in any way negate Navistar's duty to produce and deliver tractors to Plaintiffs by the end of June 2022. There is no conceivable defense based on novation here.

### E. Navistar's "first to breach," failure to satisfy a condition precedent, and lack of mutuality arguments are futile

Navistar contends that Plaintiffs' claims fail because Plaintiffs were the first to materially breach the agreement, failed to satisfy conditions precedent to recovery, and because the agreement lacked mutuality. (Ex. UU, Interrogatory Answers at 5-6, 8-9.)

In Michigan, a party is excused from nonperformance if it shows that the other party to the contract previously breached the agreement in a material or substantial way. *Skaates v. Kayser*, 333 Mich. App. 61, 80 (2020). In determining whether an initial breach is substantial enough, an important consideration is "'whether the nonbreaching party obtained the benefit which he or she reasonably expected to

21

receive.'" *Id.* (citation omitted). Failure to satisfy a condition precedent applies when a fact or event that the parties intended to take place before there is a right to performance does not occur, excusing a failure of performance. *Able Demolition v. Pontiac*, 275 Mich. App. 577, 583 (2007). And lack of mutuality, also referred to as mutuality of obligation, *see Hergenreder*, 656 F.3d at 417, requires a showing that "'only one of the contracting parties is bound to perform, and the other party remains entirely free to choose whether or not to perform,'" rendering the contract illusory and unenforceable. *Stinger Indus., LLC v. Hill-Rom Co. Inc., Hill-Rom Medaes, Inc.*, 23 F. App'x 472, 474 (6th Cir. 2001) (citation omitted).

Here, the factual basis for Navistar's claim under these theories is identical: GLS affiliate ELC was the entity that paid for the new tractors, even though GLS signed the April 2022 Agreement. (Ex. UU, Interrogatory Answers at 5-6, 8-9.) This argument is particularly unserious. For one thing, there was no breach. In Michigan, all contractual rights "'can be assigned unless the assignment is clearly restricted.'" *Jawad A. Shah, M.D., PC v. State Farm Mut. Auto. Ins. Co.*, 324 Mich. App. 182, 197 (2018) (citation omitted). And under Michigan's Uniform Commercial Code, a "party may perform that party's duty through a delegate unless otherwise agreed or unless the other party has a substantial interest in having that other party's original promisor perform or control the acts required by the contract." MCL § 440.2210(1). "[A]ll rights of either seller or buyer can be assigned except where the assignment

22

would materially change the duty of the other party, or increase materially the burden or risk imposed on the other party by that other party's contract, or impair materially the other party's chance of obtaining return performance." *Id.* at § 440.2210(2). Here, the April 2022 Agreement contained no clause prohibiting assignment, so GLS did not violate it by delegating its obligation to pay for the new tractors to ELC. (Facts ¶ 59.)

In any event, Navistar could not show any material breach. Navistar's dealer invoiced the tractors to ELC and conveyed that information to Navistar Capital. (*Id.* ¶¶ 53, 56.) GLS guaranteed ELC's debt to Navistar Capital. (*Id.* ¶ 55.) And Navistar has never complained that it was not paid. (*Id.* ¶ 57.) Nothing about GLS's picayune business decision to have ELC pay suggests that Navistar's duties were "materially changed," that there was a material increase in the "burden or risk" imposed on Navistar, or that Navistar's "chance of obtaining return performance" was impaired because ELC (guaranteed by GLS) paid for the tractors. *See* MCL § 440.2210(2).

## F.   Navistar's impracticability defense fails as a matter of law

Finally, Navistar has raised the doctrine of commercial impracticability. (Ex. UU, Interrogatory Answers at 7.) Mich. Comp. Laws § 440.2615(a) provides that a seller's failure to timely deliver goods may be excused if delivery was made "impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made." This requires a threshold

showing that (1) "that an unforeseeable event occurred," (2) "the nonoccurrence of the event was a basic assumption underlying the agreement," and (3) "the event rendered performance impracticable." *Chainworks, Inc. v. Webco Indus., Inc.*, 2006 WL 461251, at *9 (W.D. Mich. Feb. 24, 2006).[5] Here, Navistar argues that supply chain issues and changes related to Plaintiffs' orders in March and April 2022 made it impracticable for Navistar to complete the delivery of the new tractors by the end of June 2022. (Ex. UU, Interrogatory Answers at 7.) This argument fails as a matter of law.

*First*, when a seller "continue[s] to accept an unprecedented amount of purchase orders . . . even though it knew that raw materials were in short supply," that decision is "within the control of the party asserting commercial impracticability" and the seller cannot rely on the defense. *Roth Steel Prod. v. Sharon Steel Corp.*, 705 F.2d 134, 150 (6th Cir. 1983). That is precisely what happened here: Navistar knew that it had already filled its 2022 production schedule as early as May 2021, yet took Plaintiffs' orders anyway. (Facts ¶¶ 9, 11-12, 23-24.)

*Second*, Navistar's difficulties obtaining parts from its suppliers do not support its impracticability defense. Courts routinely hold that supply chain issues like the ones Navistar experienced here are *foreseeable* contingencies. *See, e.g., Ctr.*

---

[5] If that threshold showing is made, the seller must show then that it "fairly and reasonably" allocated production among its customers. *Id.* § 440.2615(b).

*Garment Co. v. United Refrigerator Co.*, 341 N.E.2d 669, 673 (Mass. 1976); *Upsher-Smith Lab'ys, Inc. v. Mylan Lab'ys, Inc*., 944 F. Supp. 1411, 1429 (D. Minn. 1996). And, in fact, Navistar was acutely aware of its supply chain woes well before it signed the April 2022 Agreement—indeed, Carmichael expressly admitted this during his deposition. (Facts ¶ 22.) Moreover, the parties renegotiated the July 2021 Agreement due to Navistar's alleged supply chain issues. (*Id.* ¶¶ 13-14, 18.) That conclusively negates any claim that the supply chain issues were unforeseeable. *See Exelon Generation Co., LLC v. Gen. Atomics Techs. Corp.*, 559 F. Supp. 2d 892, 902 (N.D. Ill. 2008).

### Conclusion

For the foregoing reasons, the Court should grant summary judgment to Plaintiffs on Navistar's liability for breach of contract or, at a minimum, on the question of whether Navistar breached the April 2022 Agreement.

Respectfully submitted,

KIENBAUM HARDY
VIVIANO PELTON & FORREST, P.L.C.:

By: _/s/ Thomas J. Davis_
    Eric J. Pelton (P40635)
    Thomas J. Davis (P78626)
Counsel for Plaintiffs
280 N. Old Woodward Ave., Ste. 400
Birmingham, MI 48009
(248) 645-0000
epelton@khvpf.com
Date: December 13, 2024    tdavis@khvpf.com

## LOCAL RULE CERTIFICATION

I, Thomas J. Davis, certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts). I also certify that it is the appropriate length. Local Rule 7.1(d)(3).

*/s/ Thomas J. Davis*
Thomas J. Davis (P78626)
Kienbaum Hardy
Viviano Pelton & Forrest, P.L.C.
280 N. Old Woodward Ave., Ste. 400
Birmingham, MI 48009
(248) 645-0000
tdavis@khvpf.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 13, 2024, the foregoing and all accompanying documents were served via the Court's CM/ECF system, which sent electronic notice of the filing to all counsel of record.

/s/ Thomas J. Davis
Thomas J. Davis (P78626)
Kienbaum Hardy
Viviano Pelton & Forrest, P.L.C.
280 N. Old Woodward Ave., Ste. 400
Birmingham, MI 48009
(248) 645-0000
tdavis@khvpf.com