Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF MICHIGAN
 3                    SOUTHERN DIVISION
 4   _____
 5   GLS LEASCO, INC., and CENTRAL
 6   TRANSPORT LLC,,
 7         Plaintiffs,
 8      v.                                    Case No.
 9   NAVISTAR INC.,                            23-cv-12927
10         Defendant.
11   _____
12              DEPOSITION OF JUSTIN FINK
13   DATE:          Wednesday, July 31, 2024
14   TIME:          9:14 a.m.
15   LOCATION:      Veritext Offices
16                  600 North Pearl Street, Suite 2230
17                  Dallas, TX 75201
18   OFFICIATED BY: Paul Krueger
19   JOB NO.:       6751285
20
21
22
23
24
25
```

Page 14

1   Q   Okay.  Was Central one of the, if not the
2 largest client of Summit's at that time?
3   A   Which -- which time?
4   Q   Well, let's say 2021 timeframe.
5   A   One of the largest.
6   Q   Okay.  Going back briefly to Allegiance.  As
7 CEO of Allegiance, were your duties generally the same
8 at Allegiance as they were as CEO of Summit?
9   A   Generally.
10   Q   Okay.  When you were managing director at
11 Allegiance, did you have any involvement with the
12 sales or contracts, contract negotiations, for
13 instance with Navistar -- or not -- sorry.  Not
14 Navistar.  Central or GLS while you were managing
15 director, or was that outside your role?
16   A   I don't remember if I did specifically
17 during that time.  It wouldn't have been outside my
18 role.  I just don't recall if it -- in that particular
19 time.
20   Q   Got you.  So even as managing director, you
21 would've had some -- if not involvement, at least
22 you'd have knowledge of what was going on with respect
23 to Allegiance and GLS Central?
24   A   Yes.
25   Q   Okay.  So I'm going kind of just ask these

Page 15

1 questions -- just more general background.  And we'll
2 start with Summit, and then if there's any difference
3 with Allegiance, let me know.
4   A   Yeah.
5   Q   But why don't you just describe for me
6 generally what is -- how does the actual relationship
7 work?
8       So there's the customer -- Central, for
9 instance, and then there's Navistar, the manufacturer,
10 and you're the dealer.  Kind of describe that.
11       I mean, is it fair to say that they're
12 somewhat of a middleman, or how would you -- how would
13 you describe the relation between you and Navistar?
14       MR. MURPHY:  Object to form.  Compound
15 question.
16       MR. DAVIS:  You can go ahead and
17 answer.  If you need me to rephrase it, I can.
18       THE WITNESS:  Depends on the customer
19 situation.  In general, the dealers are a distribution
20 channel for Navistar products.
21 BY MR. DAVIS:
22   Q   Okay.  Well, let me put it this way.  So
23 Navistar does not sell vehicles directly to end
24 consumers like Central; correct?
25       MR. MURPHY:  Object to form.

Page 16

1       Go ahead.
2       THE WITNESS:  They have national
3 accounts that I'm not as familiar with how those
4 accounts are handled.
5 BY MR. DAVIS:
6   Q   All right.  Well, they certainly didn't sell
7 directly to Central.  You would agree with that?
8   A   During my time at Summit?
9   Q   Correct.
10   A   We sold the -- we were the seller, you know,
11 of the vehicles to Central.
12   Q   Okay.  So I just want you to describe in
13 general, what is the relationship then between Summit
14 and Navistar in that timeframe?  Like, what is the
15 relationship between the two companies?
16   A   Well, we were a -- one of their truck
17 dealership -- truck dealerships that, you know,
18 operate in the United States at -- at Summit.
19       We were one of the -- the larger, in terms
20 of locations.  They manufacture the trucks.  We, you
21 know, as the dealer purchase the trucks from the
22 manufacturer, then sell them through to the customers.
23   Q   Okay.  Now, during the -- let's say the 2021
24 timeframe through when you left, was Summit -- I'm
25 sorry -- was Navistar the only manufacturer that you

Page 17

1 acted as a dealer for with respect to heavy trucks?
2   A   We had one other manufacturer that we
3 represented at Summit, but on a much smaller scale.
4 Actually two other manufacturers that we represented.
5   Q   Who were they?
6   A   Volvo and Mack.
7   Q   Okay.  All right.  Did Volvo and Mack -- in
8 your view, were they competitors for Navistar heavy
9 trucks, or did they have a different product line?
10   A   They were competitors to Navistar.
11   Q   All right.  So was the relationship between
12 Summit and Navistar governed by some sort of contract?
13   A   There are dealer contracts in place.  Yeah.
14   Q   And are those generally for a term of years,
15 or is it -- it's just at will?
16   A   There are different ones.  I -- I don't -- I
17 don't know the answer there.
18   Q   Okay.  Do you know whether there's any sort
19 of -- whether it be provisions in the contract itself
20 or laws that would protect a dealership from
21 retaliation by Navistar, if there happen to be
22 disagreements of any kind with the nature of either
23 the relationship between Navistar and Summit, or
24 between Summit and his customers?
25       MR. MURPHY:  Object to form.

5 (Pages 14 - 17)

Page 134
1  know, communication on a cover letter -- you know,
2  exchange back and forth between the dealership and --
3  and the customer and Navistar.
4       Once the SPA is set and finalized to be
5  accurate, I would say we -- we would proceed to order
6  the trucks.
7    Q   Okay.  And proceed to order based on the
8  schedule that would've been written in the document
9  that I handed you as Exhibit 11, for instance?
10    A   Our salesman would order the trucks to
11  accommodate the delivery schedule of the document.
12    Q   Okay.  All right.  So looking up from Jim
13  Lollis' July 21st email, Simnick responds to Lollis
14  and you're copied where he says, "Jim, we'll need to
15  get an agreement established and signed before
16  Navi -- between Navistar and Summit before I set up
17  this SPA."
18       "There is also some language we'll need to
19  add to the Central agreement document before the SPA
20  can be open for orders."  You see that?
21    A   Yes.
22    Q   All right.  And then you respond to
23  Carmichael, "Sean, what is he talking about?  Language
24  to be added to the agreement?  Is this the release
25  language?  Any other language won't be accepted."  You

Page 135
1  see that?
2    A   Yes.
3    Q   Okay.  So does that refresh your
4  recollection that after you thought that there had
5  already been a deal and you were just waiting for
6  Sean's signature, they wanted to make changes to the
7  deal?
8    A   It appears so.
9    Q   Okay.  Apart from this document though, do
10  you remember what those changes were or why they were
11  being requested?
12    A   No, sir, I don't.
13    Q   Okay.  Do you know whether Navistar ever
14  indicated that it had refused to follow through on the
15  deal that was signed on the 14th if those changes
16  weren't made?
17       MR. MURPHY:  Object to form.
18    A   Can you ask that again please?
19    Q   Sure.  Do you know whether in your
20  recollection that Navistar ever said, look, we're not
21  going to allow you to make orders unless they make the
22  changes to the contract that was just signed?
23    A   I don't recall them saying that.
24    Q   Okay.  I'm going to give you Exhibit No. 13.
25       THE OFFICER:  14.

Page 136
1       MR. DAVIS:  14.  Man.
2       (Exhibit 14 was marked for
3       identification.)
4  BY MR. DAVIS:
5    Q   And what I've handed you is an email chain
6  between you and Dan Simnick also dated July 27, 2021;
7  correct?
8    A   This is -- yeah.  Related to the Central
9  letter.  Updated letter.  Right.
10    Q   Okay.  And then your email -- going down
11  from the first one from Dan Simnick, go to the second
12  one from Justin Fink to Dan Simnick.
13       And you say, "Dan, will the SPA be open?
14  Update it tonight so we can order the trucks."  And
15  Dan replies, "You guys get their signature on that
16  agreement?  I can open them up immediately for
17  orders."  You see that; right?
18    A   Yes.
19    Q   Okay.  And Kyle had already signed the
20  agreement you had sent; correct?  The July 14th
21  agreement?
22    A   Correct.
23    Q   Okay.  So they're referring to
24  making -- getting Central to sign off on a revised
25  agreement; correct?

Page 137
1    A   Looks like that.
2    Q   Okay.  And you don't recall though any of
3  the reasons for that?
4    A   I don't.
5    Q   And do you don't remember having any further
6  discussions with Navistar about them trying to make
7  changes after you had a deal?
8    A   I don't -- I wouldn't have -- I've
9  never -- wouldn't communicate with Dan verbally.  He
10  wasn't one of my main people I worked with.  I'm not
11  sure what he was referring to.
12    Q   All right.  So I am now going to mark
13  Exhibit 15.
14       (Exhibit 15 was marked for
15       identification.)
16       This is Exhibit 15.  All right.  And I'll
17  represent to you this one's produced to us by
18  Navistar.  Go ahead, and I'd like you to look through
19  this document and then look at the last page.  All
20  right.  So turning to the last page, that's your
21  signature dated 7/29/21; correct?
22    A   Yes.
23    Q   And also appears to be signed by Carmichael
24  and Blaine on the same date, 7/29/21; correct?
25    A   Yes.

35 (Pages 134 - 137)
Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

|  |  |
|---|---|
| Page 138 | Page 140 |

Page 138

1   Q   Okay. So looking at this document then,
2   does this appear to you to be the final version of the
3   contract between Summit, Navistar, and Central from
4   2021?
5   A   Is it -- yeah. The changes that Dan was
6   suggesting, which appeared to be, you know, a few on
7   the back page there were translated to here, I would
8   say yes.
9   Q   Okay. So let's just walk through this --
10  some of these -- turning to the second page -- so you
11  understood that this agreement was that there was
12  going to be 1,305 new trucks delivered on the
13  schedule -- on page 2 -- 100 deliveries starting in
14  February 2022, and then every month thereafter until
15  February 2023, where there'd be 105?
16  A   Yes.
17  Q   That was your understanding? And then, so
18  you're saying that based on this final document, you
19  would be able to order the trucks based on the
20  schedule that's listed in here?
21  A   Yes.
22  Q   Okay. Now, could we go back -- I think this
23  may have been Exhibit No. 1, if I'm not mistaken.
24  This was your email with Friedrich Baumann. Do you
25  have that in front of you?

Page 139

1   A   I do.
2   Q   Okay. So just to clarify on this -- I don't
3   think I asked you this question. So you're thanking
4   Friedrich and Mark. And you say, "Thank you for your
5   support on Central to finalize the 1305 with A26." So
6   that's referring to this agreement that was signed the
7   day before; right?
8   A   Yes.
9   Q   Okay. And what did you mean in that first
10  sentence where you say, "It's difficult to determine
11  the right mix of small and larger fleet business
12  deciding who we should play with long term?" What
13  does that refer to? I'm sorry.
14      I apologize. Let me -- I've left the first
15  part off. You say, "I know that in this environment
16  it's difficult to determine the right mix of small and
17  larger fleet business deciding who we should play with
18  long term." You see that?
19  A   Yes.
20  Q   Okay. What did -- what are you referring to
21  there?
22  A   Don't recall when writing that, but it
23  appears the decision to continue to do business with
24  large customers.
25  Q   Okay. And in this environment you're

Page 140

1   referring to the COVID environment; correct?
2   A   Yes.
3   Q   Okay. And then why is -- what's difficult
4   there? Is that because larger fleets are lower
5   margin?
6   A   I think it was just -- there's only so many
7   trucks that are being built and it's that environment
8   where you can sell more than what you have.
9   Q   Right. And you have to make choices as to
10  who you sell to; right?
11  A   Yes.
12  Q   Okay. And turning to the second page -- I
13  know we discussed this briefly, but now that you've
14  seen the context of the documents leading up to
15  it -- where you say, "Sometimes I think Summit gets
16  criticized for consistently submitting for low margin
17  fleet deals. I hope you know it is never my intent to
18  discount international product."
19      And then you go on from there. You see
20  that; right?
21  A   Yes.
22  Q   All right. Having now reviewed the
23  documents that you were on leading up to this, is it
24  fair to say that you were expressing acknowledgement
25  that you just used a large allocation on a lower

Page 141

1   margin customer and that's a difficult decision to
2   make?
3       MR. MURPHY: Object to form.
4   Mischaracterizes his testimony.
5   A   I think it's a challenging deal to get done.
6   It was saying, you know, thanks for supporting us to
7   get the deal done.
8   Q   No. I understand that, but my question is
9   not about the first part. It's about the second part
10  where you say you get criticized for consistently
11  submitting for low margin fleet deals. This was a
12  lower margin deal, was it not?
13  A   With the deals we were familiar with, it was
14  an aggressively high SPA.
15  Q   Which means it was an excessively low margin
16  then for Navistar; correct?
17  A   I don't see their margin. I don't have any
18  idea what they make on trucks, but it was higher than
19  deals we had done before.
20  Q   No. I understand. Well, and just so we're
21  clear for the record, when this -- when you've said
22  when the SPA is higher, that means that Navistar's
23  margin is necessarily lower than it otherwise would've
24  been; correct?
25  A   Yes.