CONFIDENTIAL

**EXHIBIT N**

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

GLS LEASCO, INC. and          )

CENTRAL TRANSPORT, LLC,       )

        Plaintiffs,         ) Case No.

  -vs-                        ) 23-cv-12927

NAVISTAR, INC.,               )

        Defendant.          )


  ***CONTAINS CONFIDENTIAL INFORMATION***

    The deposition of GUY SEAN CARMICHAEL, called for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken before ALICE M. SCHWINGER, CSR NO. 84-2913, a Certified Shorthand Reporter of the State of Illinois, at 2020 Calamos Court, Naperville, Illinois, on the 21st day of August, A.D. 2024, commencing at 9:02 a.m.

CONFIDENTIAL

Page 18

```
 1        Q.   Okay.  And who would be the person that
 2   would -- if you said you had a sit-down meeting,
 3   who would be the person you would meet with to
 4   discuss that number?
 5        A.   Jeff Felix.
 6        Q.   And then you said that sometimes, based
 7   on production and so forth, that number could be
 8   adjusted throughout the year?
 9        A.   Correct.
10        Q.   All right.  And how is that adjustment
11   conveyed to you?  The same way?
12        A.   The same way.  It could be based on the
13   plant.  You know, they could send out a memo or
14   note, or it could be through executive leadership.
15        Q.   All right.  And, again, as far as you're
16   aware, that -- that will be recorded somewhere,
17   written down for you to review?
18        A.   I don't want to commit to that because
19   it could be a verbal as well.
20        Q.   All right.  Well, you've seen it in
21   writing before.  Let's put it that way.
22        A.   I've heard it verbally as well.
23        Q.   Okay.  You've heard it verbally, but
24   have you also seen it in writing?
```

Page 19

```
 1        A.   Depends on the case, sir.
 2        Q.   In any case, have you ever had the --
 3   you're the one that brought up this concept that
 4   the number you're given at the beginning of the
 5   year can change from time to time, and I'm asking
 6   you, is that change, the time you've been at
 7   Navistar, ever been conveyed to you in writing?
 8        A.   Upon occasion, yes.
 9        Q.   And who would be the person that would
10   convey that to you, whether verbally or in writing?
11        A.   It could be the plant, somebody at the
12   plant, or a Jeff Felix.
13        Q.   All right.  So you're saying somebody at
14   the plant is able to change your forecast that
15   is -- that's part of your evaluation?
16        A.   Yes, they can.
17        Q.   All right.  Who at the plant would have
18   that power?
19        A.   I don't have those names, sir.
20        Q.   All right.  Yesterday -- well, you
21   weren't here, but you're aware that Mr. Akinosho
22   was deposed yesterday?
23        A.   Yes, sir.
24        Q.   And he discussed the CRC, and he said
```

Page 20

```
 1   that was affiliated with the plant; is that right?
 2        A.   That's correct.
 3        Q.   When you say "the plant," are you
 4   talking about the CRC?
 5        A.   It's one and the same, yes, sir.
 6        Q.   Okay.  So it wouldn't be physically
 7   somebody in -- in the Escobedo plant in Mexico.  It
 8   would be somebody in CRC making those changes, is
 9   what you're saying?
10        A.   They could be in CRC, and they could be
11   in Escobedo.  Each plant is run separately.
12        Q.   And during this time frame, again, we're
13   talking 2021 through 2023, who was in charge of
14   CRC, as far as you knew?
15        A.   I don't recall who's --
16        Q.   Okay.  Do you know who Maria Averhart
17   is?
18        A.   Yes.
19        Q.   Was she --
20        A.   She was on board at that time, yes.
21        Q.   Okay.  And was she, as far as you knew,
22   that she was -- if we were looking for the person
23   who was in charge of CRC, is it Maria or is it
24   somebody else?
```

Page 21

```
 1        A.   That would be who I would contact, yes,
 2   sir.
 3        Q.   Do you know where she actually
 4   physically is located?
 5        A.   No, I do not.
 6        Q.   I have here, just to kind of speed up
 7   the process, could you -- we're going to mark this
 8   as 1 --
 9        THE COURT REPORTER:  143.
10   BY MR. DAVIS:
11        Q.   As 143.
12             (WHEREUPON, a certain document was
13             marked Exhibit No. 143, for
14             identification, as of August 21,
15             2024.)
16   BY MR. DAVIS:
17        Q.   And 143 is a copy that I printed a
18   couple of days ago off your LinkedIn page.  Does
19   this appear to be your LinkedIn page, sir?
20        A.   Yes, sir.
21        Q.   All right.  So looking at experience,
22   you've listed vice president of sales for the
23   southwest region as your current title, and then
24   you list two other positions at Navistar, director
```

CONFIDENTIAL

## Page 22

1  of dealer sales, director of fleet sales.  Are
2  those titles accurate?
3      A.  Yes, sir.
4      Q.  All right.  And are those dates accurate
5  as well?
6      A.  To the best of my knowledge, yes, sir.
7      Q.  Is this -- you created your LinkedIn
8  profile, I assume; right?
9      A.  I have a -- I have an admin that updates
10 my profile.
11     Q.  Okay.  Are there any other positions
12 you've held at Navistar besides the three listed on
13 your LinkedIn profile?
14     A.  No, sir.
15     Q.  All right.  And then prior to that, the
16 employer you have listed is Chicago International;
17 is that right?
18     A.  Yes, sir.
19     Q.  And is that the position -- is that the
20 job you held immediately before joining Navistar?
21     A.  Yes.
22     Q.  And what is Chicago International?
23     A.  Chicago International is a truck dealer
24 that -- under the International brand.

## Page 23

1      Q.  So it's a dealership?
2      A.  Yes, sir.
3      Q.  All right.  And based in Rockford,
4  Illinois; is that right?
5      A.  That is not correct.  So looking at
6  this, I was the branch manager in Rockford.  Used
7  truck, when I held that position, I was in Huntley,
8  Illinois.  And same with the trailer.
9      Q.  Okay.
10     A.  That was where the corporate -- main
11 corporate location was.
12     Q.  All right.  And then prior to -- that's
13 the last employer you have listed.  Where did you
14 work prior to Chicago International?
15     A.  Excuse me.  Sorry about that.  Family
16 business, construction business here in Illinois.
17     Q.  All right.  And what's your educational
18 background?
19     A.  I've had some college, but from a
20 dealership side, the ATD Academy.  ATD, American
21 Truck Dealer Academy.
22     Q.  Okay.  Going back to your Navistar
23 experience, when you were director of dealer sales,
24 what did that entail?

## Page 24

1      A.  It entailed going out and making sure
2  that the dealers had the support they needed,
3  whether it be our holding up them to compliance,
4  whether it be signage, could be a variety of
5  things.  Understanding what their parts inventory
6  looked like, new truck inventory on the ground,
7  aged inventories, things like that.
8      Q.  In your current position as vice
9  president of sales, does the -- I assume there is a
10 new director of sales, or there is a director of
11 sales, still?
12     A.  Yes, sir.
13     Q.  Okay.  And is that somebody that reports
14 to you?
15     A.  Yes, sir.
16     Q.  All right.  Who is the director of sales
17 just in this time frame, from July 2021 to the
18 present?
19     A.  We did not have one.
20     Q.  Didn't have one.  Who was performing
21 duties that normally would have been performed by
22 that person?
23     A.  I would have been.
24     Q.  Okay.  So you were also acting as the --

## Page 25

1      A.  Yes.
2      Q.  -- dealer sales director?
3          And Mr. Akinosho yesterday said that he
4  was a truck sales manager during the time in
5  question.  Does that sound right?
6      A.  Yes.
7      Q.  Okay.  And is that a position that would
8  have reported to director of dealer sales, or is it
9  on the same level?
10     A.  I have all my TSMs report directly to
11 me, even today.
12     Q.  All right.  You're saying you do have a
13 director of dealer sales now?
14     A.  Correct.
15     Q.  Okay.  When -- who is that?
16     A.  His name is Chas Voyles.
17     Q.  And when did he start?
18     A.  Probably roughly about 16 months ago
19 for -- in this position.
20     Q.  All right.  I was going to say, we've
21 seen Chas Voyles' name in documentation.
22     A.  Yes, sir.
23     Q.  So what was his position before that,
24 then?

Page 134

1  suggesting that he was -- would be okay with that
2  schedule not being followed?
3      **A.   No, it's not a conversation we had.**
4      Q.   All right.  So let's talk about this.
5  So even -- so you didn't sign this in -- 15, you
6  didn't sign it until 7/29.  That was when the final
7  agreement was signed by all three parties; right?
8      **A.   Yes.**
9      Q.   Okay.  Now, is it fair to say that you
10  knew -- well, actually, let me ask one more
11  question.  You couldn't have signed that without
12  the executive committee signing off and allowing
13  you to sign it; right?
14      **A.   Correct.**
15      Q.   Okay.  So if that deal was signed on the
16  29th, that was signed with the approval of the
17  executive committee?
18      **A.   If that deal was signed on the 29th, I**
19  **would have had approval prior to signing it myself,**
20  **yes.**
21      Q.   Okay.  And that's the case on all the
22  deals.  You said certain deals, executive committee
23  has to be involved.  If the executive committee is
24  involved, they're the ones that have to authorize

Page 135

1  you to sign; right?
2      **A.   Can you repeat that statement?**
3      Q.   Sure.  You had mentioned earlier that at
4  a certain SPA level, that's when executive
5  committee is called into action, I guess, for lack
6  of a better word.  When that happens, they are the
7  ones that have to authorize you to sign off on the
8  final deal?
9      **A.   Yes, sir.**
10      Q.   Okay.  And if they're not involved, then
11  you have the authority to sign off; is that right?
12      **A.   We go -- we still have a process through**
13  **CSA, yes.**
14      Q.   I see.  All right.  So you would agree
15  at the time this agreement was signed in July -- on
16  July 29, 2021, that Navistar already knew that the
17  demand for new trucks exceeded supply for 2022?
18      MR. SALLAH:  Object to foundation.
19  BY THE WITNESS:
20      **A.   I don't know that I can answer that.**
21  BY MR. DAVIS:
22      Q.   All right.  Let me give you Exhibit 112,
23  which was used yesterday with Mr. Akinosho.
24  Actually, let me see one -- I just need to -- all

Page 136

1  right.  This is a document that says Board of
2  Directors Operating Plan.  Have you seen this
3  document before, or have you seen documents like
4  this before?
5      **A.   Yeah, I have seen them in the past.  I**
6  **don't know if I've seen this exact one.**
7      Q.   Well, but it's fair to say that you
8  would receive copies of these presentations -- and
9  we'll go over some of that later on -- but you
10  would sometimes receive copies of this from Belisle
11  or from others; correct?
12      **A.   Yes, I mean, potentially we would.**
13  **Otherwise, he would share the information on a**
14  **call.**
15      Q.   Okay.  So it could be on a call as well.
16  So I'd like you to turn to -- if you look at the
17  little bottom -- at the bottom, there's numbers,
18  63271, turn to that page.
19      A.   Okay.
20      Q.   I may have jumped ahead.  One moment.
21  Actually, I apologize.  Go back a couple of pages,
22  63269.
23      A.   Yes, sir.
24      Q.   All right.  So you see here in this

Page 137

1  document that was produced for the Navistar Board
2  of Directors, it says:  Business environment and
3  customer demand exceeds supplier capacity.  And
4  under Navistar impacts, it says:  2022 order board
5  filled in May 2021.
6          Do you see that?
7      A.   Yes.
8      Q.   Do you have any reason to doubt that was
9  accurate?
10      **A.   Based on this, no.**
11      Q.   Okay.  And that's something that would
12  have been conveyed to you, given your role as vice
13  president; right?
14      **A.   Yes.**
15      Q.   And certainly would have been something
16  that would have been known to the executive
17  committee people at the level of Belisle and Dan
18  Kayser and people like that; right?
19      **A.   Yes.**
20      Q.   Okay.  And Mr. Akinosho discussed what
21  that means for the order board to be filled.  Your
22  understanding would also be that the 2022 order
23  board being filled is that -- he described it as
24  there is a cup and the cup can only be filled with

CONFIDENTIAL

---

Page 138

1  so much water, and the order board is filled when
2  there is no more room left in the cup.  Is that a
3  fair analogy?
4      A.  Yes.
5      Q.  Okay.  So as of -- so you would
6  interpret this to mean as of May 2021, there had
7  already been sufficient orders from customers to
8  fill the 2022 production?
9      A.  I wouldn't say just customers.  I would
10  say dealers.
11      Q.  Dealers and customers.
12      A.  Dealers and customers.
13      Q.  Because dealers get a portion of those
14  trucks, and then they sell them on to end
15  customers?
16      A.  They would have an allocated number to
17  them.
18      Q.  Okay.  So -- but both of those, the
19  order board consists of both of those things, both
20  the co-op and the dealer allocations; correct?
21      A.  Everything, yes.
22      Q.  Everything.  All right.  I'm going to
23  show you -- this will be Exhibit 150.
24

---

Page 139

1          (WHEREUPON, a certain document was
2           marked Exhibit No. 150, for
3           identification, as of August 21,
4           2024.)
5  BY MR. DAVIS:
6      Q.  All right.  Here's Exhibit 150, and this
7  is an e-mail from you to Wale Akinosho.  And the --
8  people -- other people here are the other TSMs in
9  your region; is that right?
10      MR. SALLAH:  Can I have a copy?
11      MR. DAVIS:  Oh, I'm sorry.
12      MR. SALLAH:  That's okay.
13      MR. DAVIS:  There you go.
14      MR. SALLAH:  Thanks.
15  BY THE WITNESS:
16      A.  Yes.
17  BY MR. DAVIS:
18      Q.  All right.  And you're telling the team
19  that we had a call late Friday to discuss next
20  year's production forecast.  Right?
21      A.  Yes.
22      Q.  And is that a call that you would have
23  had with Mr. Felix or Mr. Belisle?
24      A.  Or the plant, correct.

---

Page 140

1      Q.  Okay.  All right.  And, again, this is
2  in that same time frame of May 2021.  This e-mail
3  is consistent with the order board being filled as
4  of May 2021.  You're having to make allocation
5  decisions because we don't have -- you don't have
6  the capacity to shift orders the way you normally
7  would; right?
8      A.  It would be a review of what we have on
9  the order board.
10      Q.  All right.  And what I'm saying is that
11  this e-mail, you would agree, is consistent with
12  the board of directors' statement that the order
13  board was filled as of May of 2021; right?
14      MR. SALLAH:  Object to form.
15  BY THE WITNESS:
16      A.  I think when you look at the top 75
17  customers like Central and GLS are in, that's in a
18  different bucket than what this is referring to
19  here, in my opinion, based on what I know today.
20  BY MR. DAVIS:
21      Q.  All right.  So regardless of whether you
22  think this document refers to that, again, you
23  don't have any basis to believe the order board
24  wasn't filled as of May 2021?

---

Page 141

1      A.  I cannot not confirm other than the
2  presentation that you showed me.
3      Q.  All right.  Would you agree that you
4  knew that there were already production issues in
5  20 -- well, let me just ask you this.  I'll send
6  you another document that you are on.
7      A.  Are we done with this one?
8      Q.  Yeah, we're done with that one.
9      All right.  This is 151.
10          (WHEREUPON, a certain document was
11           marked Exhibit No. 151, for
12           identification, as of August 21,
13           2024.)
14  BY MR. DAVIS:
15      Q.  So this is an e-mail from you to Jim
16  Lollis, copying Fink and Robichaud on June 25,
17  2021; correct?
18      A.  Correct.
19      Q.  And this is about a month, a little bit
20  more than a month before the agreement was signed
21  on July 29.  You would agree with that; right?
22      A.  Yes.
23      Q.  And you're saying to Lollis that:  We
24  need to make sure Kyle knows that every week that

CONFIDENTIAL

Page 202

1  A.  Correct.
2  Q.  All right.  Now, going back to the
3  discovery requests at the very beginning.  I'm
4  going to ask you to look at -- I believe it was the
5  very first document I gave to you.
6  THE COURT REPORTER:  143?
7  BY MR. DAVIS:
8  Q.  Yeah, 143, I believe.  It should be the
9  responses to the first interrogatories.  Yeah,
10  the responses -- the answers to GLS Leasco's first
11  set of interrogatories.  Do you have that one?
12  A.  I'm sorry.  Say it again.
13  Q.  Navistar's answers to GLS/Leasco's first
14  set of interrogatories.
15  A.  Yes.
16  Q.  Okay.  And what exhibit is that?  I'm
17  sorry.  What's the exhibit number on that, then?
18  A.  It says 110.
19  Q.  Oh, 110.  Yep, 110.  There we go.  All
20  right.  So I want to ask you to turn to -- again,
21  the interrogatory answer to number 7, we talked
22  about part of this before.  It's on pages 7 and 8.
23  And you see there it indicates that you have
24  general knowledge of, quote, supply chain issues

Page 203

1  and delays in specifying and ordering Model Year 23
2  trucks and communications with GLS regarding the
3  same.
4  Do you see that?
5  A.  No.
6  Q.  Pages 7 and 8.
7  MR. SALLAH:  Are we looking at --
8  BY MR. DAVIS:
9  Q.  Maybe he's looking at the second.  I'm
10  asking about the first interrogatory responses.
11  MR. SALLAH:  Okay.  Because you said
12  Interrogatory No. 5.
13  BY MR. DAVIS:
14  Q.  I'm sorry.  It's Interrogatory No. 3.
15  Let me -- hand me that exhibit, sir.  Let's make
16  sure.
17  It's Exhibit 110, and so I'm asking
18  pages 7 at the bottom and then spills over onto 8.
19  A.  Could you repeat your question?
20  Q.  Sure.  It says that you have general
21  knowledge of, quote, supply chain issues and delays
22  in specifying and ordering Model Year 23 trucks and
23  communications with GLS regarding the same.
24  Do you see that?

Page 204

1  A.  Yes.
2  Q.  Okay.  Is that accurate, you have
3  general knowledge of supply chain issues and
4  delays?
5  MR. SALLAH:  Object to form.
6  BY MR. DAVIS:
7  Q.  Go ahead.
8  A.  I would say general, yes.
9  Q.  Okay.  Well, let's talk about that.  So
10  what are -- what were the supply chain issues and
11  delays that you claim related to specifying and
12  ordering Model Year 23 trucks?
13  A.  Not excluding or including all, I'm just
14  going to rattle off what I believe to be off the
15  top of my head.  We could have frame rail issues.
16  We could have engine, you know, availability
17  issues.  We could have collision mitigation type
18  issues.  We could have brake issues, amongst many
19  others.
20  Q.  Okay.  What was the frame rail issue?
21  A.  Shortage.  Plant burned down.
22  Q.  When did that happen?
23  A.  I don't have the exact dates.  Sometime
24  during that calendar year, I believe.

Page 205

1  Q.  What calendar year?
2  A.  2023.
3  Q.  Did that --
4  A.  I'm sorry.  2022.
5  Q.  But you don't remember what month?
6  A.  No, sir.
7  Q.  What plant?  Where at?
8  A.  I don't know where it's at.  I believe
9  it's in Mexico, but I'm not certain.
10  Q.  And frame rails for what vehicles?
11  A.  For all of our product issues -- our
12  products.
13  Q.  Okay.  What was the -- next one you
14  said was engine availability.  What was the issue
15  there?
16  A.  Again, as we discussed earlier, the A26
17  engines available for putting in trucks.
18  Q.  And when did those issues start arising?
19  A.  I would say first half of 2022.
20  Q.  And is that the issue that required
21  shifting some trucks over to the X15 engine?
22  A.  That would be correct.
23  Q.  Okay.  And those shifts happened in
24  March of 2022.  Do you have any reason to dispute

52  (Pages 202 to 205)

CONFIDENTIAL

Page 206

1    that?
2         A.   I would have to see further detail, but
3    that's in the wheelhouse.
4         Q.   Okay.  So you have -- you couldn't tell
5    me any other specific date --
6         A.   I couldn't tell you exact dates, no,
7    sir.
8         Q.   All right.  When you say "collision,"
9    what issue are you talking about there?
10        A.   One of our suppliers, I don't know if it
11   was Bendix or Meritor, whatever -- one that Kyle
12   puts on his equipment, had an issue being able to
13   supply us the actual component, and I believe that
14   forced us into a prewire situation.
15        Q.   And you would agree that happened early
16   in 2022; correct?
17        A.   It could have been late 2021, rolling
18   into early 2022.
19        Q.   All right.  And then what's the brake
20   issue you're talking about?
21        A.   I believe, again, availability of
22   product from a vendor that they inspect our trucks
23   with.
24        Q.   Well, what company?  What company's

Page 207

1    brakes --
2         A.   I don't know if it was, again, Meritor
3    or Bendix.  I really don't.
4         Q.   And when was that?
5         A.   I would say, guesstimate, Q3.
6         Q.   Q3 of when?
7         A.   2022.
8         Q.   Any other issues that -- supply chain
9    issues that you believe impacted the Central deal?
10        A.   These are the ones off the top of my
11   head that I can remember today.
12        Q.   Okay.  So you -- there's no more that
13   you have today that you can discuss?
14        A.   I'm sorry?
15        Q.   Nothing else you can remember today?
16        A.   Correct.
17        Q.   All right.  What would you look at to
18   refresh your recollection?
19        A.   What would I look at to refresh my
20   recollection?  I would have to go back through some
21   lists of, you know, as we laid out this deal
22   between Jim and the componentry that was actually
23   built with -- on the spec because that will give me
24   some timing, order changes.

Page 208

1         Q.   Anything else?
2         A.   No, that should do it.
3         Q.   All right.  This will be Exhibit 156.
4              (WHEREUPON, a certain document was
5              marked Exhibit No. 156, for
6              identification, as of August 21,
7              2024.)
8    BY MR. DAVIS:
9         Q.   Okay.  This is an e-mail chain, Dan
10   Kayser to Mark Belisle, Paul Martin, Justina
11   Morosin, and copying David Brown, Kat Burm, and Dan
12   Kayser.  Who is Dan Kayser, again?
13        A.   Dan Kayser, at the time this letter was
14   written or this e-mail was typed, he was head of
15   national accounts.
16        Q.   Okay.  And we know who Mark is.  Paul
17   Martin, you have mentioned.  Who is Justina
18   Morosin?
19        A.   She's over the bus.
20        Q.   Okay.  David Brown, you've discussed.
21   Who is Kat Burm?
22        A.   I believe she is David Brown's
23   counterpart for national accounts.
24        Q.   All right.  And the subject here is

Page 209

1    Goran timeline.  This is about the time that Göran
2    Nyberg was joining Navistar; correct?
3         A.   I don't know what day he joined.  And
4    it's pronounced Göran.
5         Q.   Göran.  This was around the time -- I'm
6    not -- I didn't ask you if you know the specific
7    day.  He joined in early 2022; is that right?
8         A.   I stick to my original statement.  I
9    don't know when he joined.
10        Q.   You don't know.  All right.  So have you
11   ever seen this timeline before?
12        A.   Not that I recall.
13        Q.   I'm going to -- one second.  Let me just
14   show you a final version of this.
15              Attached is 157.  I'm giving you 157.
16              (WHEREUPON, a certain document was
17              marked Exhibit No. 157, for
18              identification, as of August 21,
19              2024.)
20   BY MR. DAVIS:
21        Q.   All right.  And what I've handed you is
22   157 is an e-mail dated March 2, 2022, and it has
23   attached an agenda for a commercial team meeting
24   and a two-year timeline of events and then a

Thompson Court Reporters, Inc.
thompsonreporters.com

CONFIDENTIAL

Page 214

1      Q.   All right.  Going down further, it says:
2   QLS sensors became major hurdle to keeping trucks
3   on the road.  Over 10k units down with no QLS
4   sensors and supplier issues.
5         Do you see that?
6      A.   Yes.
7      Q.   Do you recall that?
8      A.   I do recall the QLS issues.
9      Q.   Is that an issue that impacted the
10  Central deal at all?
11     A.   I can't confirm or deny.  I know it was
12  an industry thing.
13     Q.   But regardless, that was an issue that
14  had already arisen by that July to August 2021 time
15  frame?
16     A.   In that time frame.
17     Q.   Okay.  It says:  Allison TCM becomes
18  gating supply issue with over 6,000 in offline
19  through the summer.
20         What is Allison TCM?
21     A.   A truck -- it's -- doesn't -- has no
22  bearing on Central orders, but it's a TCM.  It's an
23  electric brain box.
24     Q.   Okay.

Page 215

1      A.   And Allison as in Allison Transmission.
2   That's not something that Kyle runs or GLS.
3      Q.   All right.  September to October,
4   looking -- of 2021, looking down five bullets:
5   Decision made to reduce 2022 order board from
6   86,000 expected production to 70,000 units.
7   Announced to field team and dealers and customers
8   that we are losing at least 40 percent of expected
9   2022 production.
10         Is that your recollection of that time
11  frame as well?
12         MR. SALLAH:  Object to foundation.
13  BY THE WITNESS:
14     A.   I don't -- again, the losing production,
15  yes.  Validating those time frames, I would just
16  have to go off of what was written by an executive
17  here.
18  BY MR. DAVIS:
19     Q.   All right.  Well, my question is you, as
20  a witness, don't have anything to suggest that this
21  is incorrect?  Let me ask you that.
22     A.   I do not.
23     Q.   Okay.  Turning to the next page,
24  November-December of 2021:  Bendix ABS control

Page 216

1   modules become gating supplier causing significant
2   downtime and increased offline.
3         Do you see that?
4      A.   Yes.
5      Q.   Is that the Bendix that you were
6   referring to earlier?
7      A.   Yes.
8      Q.   What is gating supply -- or gating
9   supplier mean?
10     A.   I'm not familiar with that statement.
11     Q.   Okay.  But that was an issue that was
12  preventing the completion of trucks; correct?
13     A.   It was a -- yes, based on a supply
14  issue.
15     Q.   Okay.  So you're saying that the Bendix
16  issues that you discussed were known to Navistar in
17  November or December of 2021?
18     A.   No.
19         MR. SALLAH:  Object to foundation.
20  BY MR. DAVIS:
21     Q.   Go ahead.
22     A.   No, I'm not stating the time frame.  I'm
23  saying I'm aware that we had a Bendix issue that
24  was affecting production.

Page 217

1      Q.   Okay.  And you see that the executives
2   identified this in -- as happening in
3   November-December 2021.  I'm asking you is that
4   your recollection that that was the time frame or
5   not?
6      A.   Vaguely in that time frame, I believe
7   that would be -- to be true.
8      Q.   All right.  And you don't have anything
9   that you can tell me, as you sit here today, to say
10  that the executives were wrong and it actually
11  happened later than this?
12     A.   No, I do not.
13         MR. SALLAH:  Object to form.
14  BY MR. DAVIS:
15     Q.   Go ahead.  You can answer.
16     A.   No, I do not --
17     Q.   All right.
18     A.   -- have recollection of any of that.
19     Q.   All right.  Turn to the next page.  This
20  is now January '22 to February 2022.  And on the
21  last page of the timeline, it says:  Bendix radars
22  become gating supplier and actions put in place to
23  reach out to customers/dealers to remove radars
24  from orders or change to an accommodation package.

55  (Pages 214 to 217)

CONFIDENTIAL

Page 218

1          Do you see that?
2     A.   I see that.
3     Q.   And is that referring to the switch of
4  some customers to a prewire option?
5     A.   I believe that to be true.
6     Q.   Okay.  And you don't have any reason to
7  believe that that did not actually occur in January
8  or February of 2022, do you?
9     A.   I can't confirm those dates.  I --
10 again, I don't know.  I'd have to -- I would have
11 to go off of what they've written here.
12    Q.   All right.  So you're not denying those
13 dates either?
14    A.   No, sir.
15    Q.   And we're going to come back to that
16 Bendix issue, but Mr. Carmichael, it's true,
17 correct, that the -- well, let's move down here.
18 It says:  20,000 orders converted to accommodation
19 package and no units with radars to be built in
20 March and April to catch up with offline and
21 service parts.
22         Do you see that?
23    A.   What bullet point was that?
24    Q.   The white bullet point under the Bendix

Page 219

1  radar one we just read.
2     A.   Oh, okay.  Repeat your question.
3     Q.   Yeah.  So you see there where it says
4  that 20,000 orders were converted to accommodation
5  package?
6     A.   Correct.
7     Q.   And that's the prewire option; correct?
8     A.   That would be the prewire.
9     Q.   Okay.  And, in fact, and we'll get to
10 this in more detail in a little bit, but there did
11 come a time where we re -- you renegotiated the
12 letter agreement with Central; correct?
13    A.   We --
14         MR. SALLAH:  Object to form.
15 BY MR. DAVIS:
16    Q.   Go ahead.
17    A.   We negotiated the cover letter.
18    Q.   The cover letter, the one that was
19 signed by you in April of 2022 and signed by
20 Central in May of 2022; right?
21    A.   I would say they're separate deal
22 transactions.
23    Q.   What are separate deal transactions?
24    A.   They're -- it's not the same deal.  The

Page 220

1  deal structure.
2     Q.   All right.  Why don't you pull
3  out exhibit -- it was Exhibit 36, just so we can
4  orient ourselves.
5     A.   You're talk -- can I clarify?  Are you
6  stating that this is part of the 2021 deal?
7     Q.   No.  I'm saying there came a time, you
8  would agree, where the original deal that was
9  Exhibit 15 was renegotiated, and that happened --
10 it was signed off on in April by you and in May by
11 Kyle Blain.  Do you recall that?
12    A.   This is stating 20 --
13    Q.   So I'll come back to the timeline in a
14 second.  I just want to get our -- get on the same
15 page with you, that we're talking about the same
16 document.  Okay?  I believe it was 36 or 38.  It
17 was one of the first ones I gave you.  I believe
18 it's 36.
19         MR. DAVIS:  Oh, you don't think so?
20 BY MR. DAVIS:
21    Q.   Maybe I didn't.  No, I didn't give it to
22 you.  I'm sorry.
23         This is Exhibit 36.  And this is a --
24 this is the letter agreement.  The cover date says

Page 221

1  April 8, 2022; right?
2     A.   Yes, sir.
3     Q.   All right.  And turning to the back, you
4  signed it on April 8, 2022; right?
5     A.   Correct.
6     Q.   And Kyle Blain signed it on May 18,
7  2022?
8     A.   So it appears.
9     Q.   Okay.  So this is what I'm talking about
10 when I say renegotiated.  At some point, obviously,
11 Exhibit 15 was renegotiated, and Exhibit 36 is what
12 took its place.
13    A.   Fair statement.
14    Q.   All right.
15    A.   Now, we're aligned.
16    Q.   All right.  Good.  So my question is
17 this:  Is it not correct that the Bendix issue and
18 the availability or the agreements of Central to
19 take the prewire option was one of the reasons that
20 allowed you to make the offer you did in
21 Exhibit 36?
22         MR. SALLAH:  Object to form.  Foundation.
23 BY MR. DAVIS:
24    Q.   Go ahead.

56 (Pages 218 to 221)

CONFIDENTIAL

Page 222

1     A.   Can you rephrase that?
2     Q.   Sure.  Look at the first -- look at the
3  first page of the agreement.
4     A.   Yes.
5     Q.   It says:  New and used quantity and
6  pricing per unit.  Do you see that?  And identifies
7  that there's going to be a Bendix prewire.  Do you
8  see that?
9     A.   Yes.
10    Q.   And then there is the same -- that's for
11  the 500 RH A26s.  And then for the International
12  LTs, it also says there's a Bendix prewire as well.
13    A.   Correct.
14    Q.   And my question is, is it not true that
15  the fact that Central stated that they would
16  take -- well, let me -- let me back up.  Some
17  fleets would not take a vehicle if it didn't have
18  Bendix installed; correct?
19    A.   Correct.
20    Q.   All right.  They are just -- we won't
21  take them unless Bendix is complete and installed
22  on the system, but others said we'll take a
23  prewire; correct?
24    A.   Others, yes.

Page 223

1     Q.   And the customer -- and the Bendix
2  supply issue was such that you weren't going to
3  have any trucks being produced with Bendix for at
4  least a couple of months.  You recall that; right?
5     A.   For a large chunk of time.
6     Q.   Right.  And the fact that some customers
7  would not take trucks without Bendix meant that
8  their slots could be given to customers who would
9  take the preorder option; correct?
10    A.   Potentially.
11    Q.   All right.  And that was part of what
12  allowed you to promise the trucks identified in
13  Exhibit 36?
14    MR. SALLAH:  Object to form.
15  BY THE WITNESS:
16    A.   I couldn't honestly sit here and say
17  that that's true, based on what we were offering.
18  I think that was a spec issue that came up after we
19  had a -- after we had the initial spec built, this
20  thing came up after -- during that process early on
21  in the cycle.
22  BY MR. DAVIS:
23    Q.   What do you mean when you say the --
24  just explain that.

Page 224

1     A.   So the original spec would have had the
2  Bendix on it.  Right?  So this version is something
3  different than the original, so we would have had
4  to have updated this, but I don't know that that
5  would have affected, you know, based on your
6  comment of customers not taking the trucks, I
7  couldn't confirm that.
8     Q.   But regardless, the Bendix prewire
9  issue, or the Bendix issue, arose before this
10  document was signed by you.  That, you would agree
11  with?
12    A.   Yes.
13    Q.   All right.  Let's go back to the
14  timeline.  And, again, this is a document from
15  March 2nd of 2022.  You see the bullet?  It's about
16  halfway down the page, it says:  A26 quickly
17  becoming a gating supply issue with
18  approximately --
19    A.   Where are you at?
20    Q.   I'm on 77311.
21    A.   Okay.
22    Q.   All right.  And about halfway down that,
23  A26 quickly becoming a gating supply issue with
24  approximately 2k units that need to be moved out of

Page 225

1  spring production.
2     You see that?
3     A.   Yes.
4     Q.   And is that the A26 engine issue you
5  were discussing earlier?
6     MR. SALLAH:  Object to foundation.
7  BY THE WITNESS:
8     A.   I believe that's part of the issue, yes.
9  BY MR. DAVIS:
10    Q.   Okay.  Well, what's the other part of
11  the issue?
12    A.   I don't know the exact dates, but it
13  seems like it would be in that timeline.
14    Q.   Okay.  And, in fact, the A26 issue was
15  part of the reason that some of the trucks had to
16  be switched from RH to LT; correct?
17    A.   Yes, sir.
18    Q.   And the LT actually can't even -- let me
19  reverse that.  The RH cabs can't even take the X15
20  engine.  You need -- you need to have it in an LT;
21  is that right?
22    A.   That is correct.
23    Q.   Okay.  So that issue with the A26 engine
24  availability also arose before you signed

Thompson Court Reporters, Inc.
thompsonreporters.com

CONFIDENTIAL

Page 226

1  Exhibit 36; correct?
2      MR. SALLAH:  Object to form.
3  BY THE WITNESS:
4      A.  Can you rephrase that?
5  BY MR. DAVIS:
6      Q.  Yeah.  The A26 supply chain issue that
7  you were discussing as being a supply chain issue
8  that affected this deal, that is an issue that had
9  arisen prior to you signing Exhibit 36 on April 8,
10  2022?
11      A.  Based on this version of the cover
12  letter, yes.
13      Q.  All right.  Going down to the very last
14  bullet point on the timeline, it says:  Bendix ABS
15  is once again an issue with Bendix telling us we
16  will only receive 50 percent of requirements for
17  the foreseeable future with no recovery in sight.
18          Now, that's referring not to the prewire
19  but to the actual availability of the Bendix parts;
20  correct?
21      MR. SALLAH:  Object to foundation.
22  BY THE WITNESS:
23      A.  Rephrase your question, please.
24

Page 227

1  BY MR. DAVIS:
2      Q.  Sure.  Well, I'll just ask you.  What do
3  you understand that Bendix ABS issue to relate to?
4      A.  This is not the brake issue that I'm
5  referring to.
6      Q.  I'm not asking about the brake issue.
7      A.  Okay.  There -- I'm sorry.  Repeat it
8  again.
9      Q.  Well, what is -- Bendix ABS, that's --
10  ABS is what?
11      A.  Anti-brake.  Anti-brake system.
12      Q.  Okay.  So you're saying this is not the
13  braking issue that you were discussing?
14      A.  I'm referring to the collision
15  mitigation.
16      Q.  So this Bendix ABS is not the -- you
17  said -- one of the issues you identified, there was
18  a brake issue.  You said you didn't know what the
19  issue was, but it had to do with the availability
20  of the product, and you didn't know the
21  manufacturer?
22      A.  To my knowledge, I believe that was
23  later in the year.
24      Q.  Okay.  And you said you think that

Page 228

1  happened in Q3 of 2022?
2      A.  Right around that area, yes.
3      Q.  If we were to -- well, we'll get to it,
4  but if we were to show you documents indicating
5  that that was October or November of 2022, would
6  you have a reason to dispute that?
7      A.  It depends on who sent the document, I
8  guess.
9      Q.  Well, we'll get to that in a little bit.
10  Now, let's look at the very last bullet point here.
11  So this is, again, March of 2022, March 2, 2022:
12  Significant concerns today that supply base will
13  keep us at 14 percent market share which equates to
14  an approximate 10k reduction in production versus
15  '22 plan and 14k in 2023.
16          Do you see that?
17      A.  Yes, sir.
18      Q.  So would you agree that as of March
19  2022, there were significant concerns about future
20  supply chain issues?
21      A.  Based on this comment here, yes.
22      Q.  Well, and just based on your own
23  experience, you were aware that there had been lots
24  of supply chain issues over the previous year or

Page 229

1  so; correct?
2      A.  Yes, I have.
3      Q.  And you foresaw that there could be
4  additional supply chain issues going forward;
5  right?
6      MR. SALLAH:  Object to form.
7  BY MR. DAVIS:
8      Q.  Go ahead.
9      A.  And I would answer in the term of,
10  again, top 75 versus a retail customer and/or a
11  national account.  They were all looked at somewhat
12  different.  So it may not have affected them, and
13  it may have.  I don't know.
14      Q.  Well, that's what I'm getting at.  So
15  you didn't know exactly what the issue may have
16  been, because you can't foresee the future
17  necessarily, but you knew that there could be more
18  supply chain issues coming down the pike; right?
19      MR. SALLAH:  Object to form.
20  BY MR. DAVIS:
21      Q.  Go ahead.
22      A.  I would say, based on industry, yes.
23      Q.  I'd like you to go back to the -- one
24  moment.  Go to the original -- the draft e-mail

58  (Pages 226 to 229)

Page 270

1    A.   Yes, sir.
2    Q.   What are the chips at issue here?
3    A.   I'm sorry?
4    Q.   What are the -- what chips were in
5  shortage that was causing this problem?
6    A.   All chips for truck manufacturers, for
7  like ECMs and stuff, were all in great shortage.
8  Auto, everything.
9    Q.   Okay.
10    A.   Auto and truck.
11    Q.   All right.  And you recall this 70 units
12  was a specific request because Universal had a
13  contract that they needed to fulfill in the time
14  frame indicated; correct?
15    A.   I believe that to be true.
16    Q.   And you indicated that you would be able
17  to provide 43 units in January and the other 37 in
18  February?
19    A.   That was our -- our goal, yes.
20    Q.   And then, again, this confirms in your
21  notes that Central's allocation was to be reduced
22  from 1100 units down to 600 due to ongoing supplier
23  issues; right?
24    A.   That's what it states, yes.

Page 271

1    Q.   All right.  No reason to dispute that's
2  what you wrote in your notes at the time; right?
3    A.   Correct.
4    Q.   One moment.  On that same exhibit, turn
5  to the second page.  It indicates:  Navistar to
6  review a "No Trade Credit" that would support
7  Central selling their own trades.
8      You see that?
9    A.   Correct.
10    Q.   All right.  So this conversation on
11  December 17th was when the idea of a no trade
12  credit was first floated?
13    A.   I believe so.
14    Q.   And you would agree a no trade agreement
15  would eliminate any OA that you had on the
16  trade-ins that were part of this deal; correct?
17    A.   Correct.
18    Q.   Now, I'm going to give you Exhibit 163.
19      (WHEREUPON, a certain document was
20      marked Exhibit No. 163, for
21      identification, as of August 21,
22      2024.)
23  BY MR. DAVIS:
24    Q.   All right.  This is another e-mail on

Page 272

1  12/17 from Kyle Blain to you and Belisle; correct?
2    A.   Yes.
3    Q.   All right.  And in this e-mail, he
4  says -- and this is the first large paragraph
5  there:  Although I understand the production
6  limitations that have been experienced, failing to
7  fulfill the agreement that we came to in July of
8  this year just isn't right considering the history.
9  There must be options to find the additional units
10  that would complete our expected deliveries.  We
11  have addressed the issue with the two named
12  suppliers that were provided as restraining
13  production.  And then he lists Bendix and Cummins.
14      Do you see that?
15    A.   Yes.
16    Q.   Is there any reason to doubt that those
17  are the two suppliers that you identified as
18  causing problems in your December 16th meeting?
19    A.   No reason to deny that.
20    Q.   Okay.  No reason to believe you
21  indicated any other supplier issues at that
22  meeting?
23    A.   Not at that time.
24    Q.   Okay.  Hand you 164.

Page 273

1      (WHEREUPON, a certain document was
2      marked Exhibit No. 164, for
3      identification, as of August 21,
4      2024.)
5  BY MR. DAVIS:
6    Q.   All right.  This is an e-mail chain, the
7  top one is between Tony Stinsa and Brock Frederick,
8  but we're going to go to the third page, which
9  is -- the second to third page which is an e-mail
10  from Belisle to Paul Martin, Chet, and Friedrich
11  Baumann, on which you were copied.
12      Do you see that?
13    A.   Yes.
14    Q.   All right.  And that e-mail was dated
15  January 7, 2022; correct?
16    A.   Yes.
17    Q.   All right.  So he says, Belisle says the
18  following -- this is on January 7:  Gentlemen, we
19  have an opportunity with Central that I believe we
20  need to pursue ASAP.  As you know, Central has
21  agreed to full surcharges and unhappily accepted
22  the 600 units instead of 1100 this year, however,
23  Sean has continued to work with them based on the
24  Bendix situation and moving dealers, warranties.

CONFIDENTIAL

Page 274

1    Accurate?
2    **A. I'm not understanding the dealer**
3    **warranties, but accurate.**
4    Q. Okay. It says: Central will take units
5    with the Bendix accommodation package, in either
6    A26 or X15 RH or LT configuration. At the same
7    price and same cost to us.
8    Do you see that?
9    **A. Yes.**
10   Q. So this is indicating that Central had
11   already agreed as of January 7th to take the Bendix
12   prewire; correct?
13   **A. Yes.**
14   Q. All right. And it says: We are
15   building 75 in Jan and Feb of this year then don't
16   have any scheduled yet for the rest of the year.
17   See that?
18   **A. Yes.**
19   Q. So of the 600 that you had promised, as
20   of this date, you had only scheduled 150 of them?
21   **A. Correct.**
22   Q. All right. And then it says: In verbal
23   conversation, Sean has floated that we build them
24   300 [sic] a month in March, April, and May to get

Page 275

1    them to their 1100 for the year and they would
2    accept a 10,000 no trade credit on all the OTB
3    units. See below from Dan Simnick for OA.
4    Do you see that?
5    **A. I see that.**
6    Q. Okay. So you had floated that idea of
7    350 a month to Kyle?
8    MR. SALLAH: Object to form.
9    BY THE WITNESS:
10   **A. I don't know if that's the correct time.**
11   **Vaguely in that time frame, I thought it was more**
12   **through June, but based on product and**
13   **availability. I mean...**
14   BY MR. DAVIS:
15   Q. All right. My question is do you have
16   any reason to dispute what Belisle was saying in an
17   e-mail copied to you, that you had floated 350 a
18   month in March, April, and May, as of January 2022?
19   **A. Not based --**
20   MR. SALLAH: Object to form.
21   BY THE WITNESS:
22   **A. Not based on this information.**
23   BY MR. DAVIS:
24   Q. But you have nothing to dispute that, as

Page 276

1    we sit here today?
2    **A. Not based on what's in writing here.**
3    Q. Do you have anything other than what's
4    in writing to dispute that?
5    **A. Not at this time.**
6    Q. Going down a little bit, it says:
7    Paul -- would that be Paul Martin?
8    **A. I believe so.**
9    Q. Paul, I believe we can actually slip
10   these into production (based on current supplier
11   ability) as incremental production for 2022.
12   Do you see that?
13   **A. Yes.**
14   Q. And then it says: Sean and I want to
15   pursue this option ASAP.
16   Correct?
17   **A. Yes.**
18   Q. That is an option that you and Belisle
19   had discussed at that time?
20   **A. I believe that to be true, based on**
21   **this.**
22   Q. Okay. And he says: I believe we can
23   actually slip these into production.
24   So you believed that it was possible to

Page 277

1    produce 350 a month in March, April, and May, at
2    that time?
3    **A. Based on the guidance of Mark here, yes.**
4    Q. But you also believed it was possible
5    that you couldn't produce 350 in those three months
6    at the same time; correct?
7    **A. All I have to go is based on what my --**
8    **my direct supervisor is telling me or indirect**
9    **supervisor.**
10   Q. Okay. But you -- in having these
11   conversations, he believed it may have been
12   possible, but at the same time you were saying
13   maybe it was not possible; correct?
14   **A. It could go either way, yes.**
15   Q. Okay. It could have gone either way at
16   this point?
17   **A. Yeah. It was based on supply and**
18   **production availability.**
19   Q. Because you could foresee that it's
20   possible that those dates couldn't hold?
21   **A. Just based on what's historically been**
22   **running since COVID.**
23   Q. Right. Well, and one other thing. What
24   is your understanding, then, of what Belisle is

CONFIDENTIAL

Page 278

1  suggesting here, that there would be a 10,000 no
2  trade credit on all the OTB units?
3      A.   Could you rephrase?
4      Q.   Mark Belisle says that in verbal
5  conversation, Sean has floated that we would build
6  them 350 a month and they would accept a 10,000 no
7  trade credit on all the OTB units.
8           What is he discussing there?
9      A.   He's referring to GLS, Kyle, I would
10 presume, that they would be willing to take $10,000
11 per truck that is on an OTB, but does not state
12 what year models.
13     Q.   Okay.  And what you mean take OTB, take
14 10,000 in exchange for not being allowed to trade
15 them to you?
16     A.   They would take $10,000 and dispose of
17 the equipment on their own.
18     Q.   I see, which means they wouldn't trade
19 them into you?
20     A.   Correct.
21     Q.   And that was something you were floating
22 in January of 2022?
23        MR. SALLAH:  Object to form.
24

Page 279

1  BY THE WITNESS:
2      A.   I would say based -- to the best of my
3  knowledge, based on this e-mail.
4  BY MR. DAVIS:
5      Q.   Okay.  Do you remember -- well, you know
6  who Tony Stinsa is, obviously?
7      A.   Yes, sir.
8      Q.   This is Exhibit 148?
9        THE COURT REPORTER:  165.
10       MR. DAVIS:  I'm sorry.  165.  My eyesight
11 really is going here.
12       THE WITNESS:  Glad I'm not the only one.
13       MR. DAVIS:  You're lucky.  You're going to
14 need your bifocals soon.  I told you that
15 yesterday.
16          (WHEREUPON, a certain document was
17           marked Exhibit No. 165, for
18           identification, as of August 21,
19           2024.)
20 BY MR. DAVIS:
21     Q.   All right.  So this is Exhibit 165.
22 This is an e-mail from Tony Stinsa to you on
23 January 12, 2022; correct?
24     A.   Yes, sir.

Page 280

1      Q.   All right.  And he says:  Sean, thanks
2  for the great discussion earlier.  The plan we
3  talked about was having UTO take half the units and
4  UTO would be on the hook for the units at the show
5  value to customer.  With any commensurate roll-out
6  and mileage deductions per our appraisal to new
7  truck.
8          (WHEREUPON, there was a brief
9           interruption.)
10 BY MR. DAVIS:
11     Q.   Sean, thanks for the great discussion
12 earlier.  The plan we talked about was having UTO
13 take half the units and UTO would be on the hook
14 for the units at show value to the customer.  With
15 any commensurate rollout and mileage deductions per
16 our appraisal to new truck.
17          Okay.  So what does show value mean?
18     A.   I don't know the term "show value."
19     Q.   All right.  Then he says:  As mentioned
20 in my text after our brief call, the fact that
21 Central Transport will likely be selling these
22 units in the market at the same time as we are, and
23 not simply continuing to run them, makes me pause a
24 bit on the strategy of providing full show values

Page 281

1  and being able to sell the units profitably.
2          Do you see that?
3      A.   Yes.
4      Q.   All right.  Now, there's a reference to
5  a text.  Mr. Stinsa has produced some texts, but
6  there are none from either January 12 or the days
7  prior to that.  Do you still have text messages on
8  your phone with -- well, let me ask you this:  Is
9  the phone you use, you do use your phone to text
10 with people at work; correct?
11     A.   Yes.
12     Q.   Okay.  Is that a phone that you own or
13 is it owned by the company?
14     A.   I own.
15     Q.   But you use it for business purposes?
16     A.   Yes.
17     Q.   And have you ever gone through and
18 deleted your old texts, or are they still there, to
19 the best of your knowledge?
20     A.   They would still be there, to the best
21 of my knowledge.  I'm not saying it can't happen,
22 but to the best of my knowledge, as I sit here
23 today.
24     Q.   Have you ever provided them to be

Thompson Court Reporters, Inc.
thompsonreporters.com

CONFIDENTIAL

Page 282

1    collected in this case?
2        MR. SALLAH:  Object to form.
3    BY THE WITNESS:
4        A.   I don't -- yeah, I think I have.  I
5    think I've submitted one.  I think it's probably
6    with Tony, would be the only one that I would have.
7    BY MR. DAVIS:
8        Q.   Submitted one text?
9        A.   Yeah, to -- internally.
10       Q.   Okay.
11       A.   I think it's one.
12       Q.   All right.  And then he asked:  Since
13   you think they are actually going to be selling
14   them, we'd like the deal with Central on the No
15   Trade Credit to consider the following stipulation.
16   And he asked for Central Transport to agree not to
17   sell their retained units for lower than the
18   equivalent OTB for the given unit.
19       Do you see that?
20       A.   Yes.
21       Q.   What did you understand that to mean?
22       A.   You would have to go to Tony.  I don't
23   understand what the channels are.
24       Q.   Okay.

Page 283

1        A.   I wouldn't know the channels they sell
2    to.
3        Q.   All right.  So as we sit here today, you
4    don't have any information that you can give me on
5    how the no trade credit would work in the
6    stipulations.  Is that fair?
7        A.   How the no trade works -- credit would
8    work?  Can you rephrase?
9        Q.   Yeah.  How the no trade credit would
10   work, including the stipulation about agreements
11   not to sell or retain units for lower than the
12   equivalent OTB.
13       MR. SALLAH:  Object to form.
14   BY THE WITNESS:
15       A.   I think he's talking about in the open
16   market, he wants to make sure that they're
17   consistent, but, again, I would have to ask Tony.
18   BY MR. DAVIS:
19       Q.   Okay.  So you're just guessing?  You
20   don't really know?
21       A.   I don't really know.  I mean...
22       Q.   Now, you did, in fact, make an offer to
23   Central that included the no trade agreement and
24   the stipulation that Tony Stinsa was asking for;

Page 284

1    correct?
2        A.   I believe that's covered in the cover
3    letter.
4        Q.   Okay.  Well, let's -- before we get to
5    the cover letter, let's -- I'm going to give you
6    Exhibit 168 -- 166.
7             (WHEREUPON, a certain document was
8              marked Exhibit No. 166, for
9              identification, as of August 21,
10             2024.)
11   BY MR. DAVIS:
12       Q.   This is an e-mail from Kyle Blain to you
13   on January 13, 2022; correct?
14       A.   Yes.
15       Q.   He says:  Let's go with the 1100 trucks
16   delivering into June; right?
17       A.   Correct.
18       Q.   We will sell the trades as discussed?
19       A.   Yes.
20       Q.   Okay.  And then he asked for 7 million
21   as a significant gain that will be realized by not
22   having the trade.  And then he says:  Additionally,
23   this amount would be inclusive of the Universal
24   rental, QLS downtime, forward uptime losses on the

Page 285

1    2017 to 2019 MY units through June 2022.
2        Do you see that?
3        A.   I do see that.
4        Q.   And you believe that is referring to the
5    no trade portion of the deal?
6        A.   How the funds roll up, correct.
7        Q.   All right.  And what did you understand
8    the no trade was supposed to cover?
9        A.   Basically everything that is outlined in
10   the cover letter.
11       Q.   All right.  So we'll get to the cover
12   letter, so we'll talk about it when we get there.
13       All right.  But this was the point where
14   you first -- well, he's responding to your offer of
15   1100 trucks delivering into June with a no trade
16   credit; correct?
17       A.   Yes, but the dollar was not 7 million.
18       Q.   We'll get to that.
19       A.   Okay.
20       Q.   That number changed, but the offer
21   was --
22       A.   His counteroffer, yes.
23       Q.   1100 trucks delivering into June and the
24   no trade credit, the amount would change later;

72  (Pages 282 to 285)

CONFIDENTIAL

Page 326

1 through that.  This is your response to him;
2 correct?
3     **A.  Yes.**
4     Q.  And you say:  Jim, I will change the
5 verbiage on that line.
6         That's what you said; right?  Top
7 e-mail.
8     **A.  I see it.**
9     Q.  All right.  That's what you told him,
10 you would change the verbiage on that line.  So you
11 took that language out of whatever you were putting
12 together?
13    **A.  Whatever we were putting together, based**
14 **on his guidance.**
15    Q.  And then I'll just ask, you say:  Please
16 remember Kyle did not want one of the changes that
17 Universal agreed to, so that was a big delay early
18 on as well.
19        What are you talking about?
20    **A.  I think when we were -- when I was**
21 **looking at this or thinking through the process, we**
22 **were talking about on the prewire, it was a --**
23 **again, vaguely remember, not sure a hundred**
24 **percent, but I believe that there was a commitment**

Page 327

1 **to do the prewire and then a pause, and then there**
2 **was back on doing the prewire.**
3    Q.  Okay.
4    **A.  But I'm not a hundred percent sure.**
5 **That's just vaguely what I remember.**
6    Q.  Okay.  And you don't remember what the
7 time frame of that was either, do you?
8    **A.  I don't.  I really don't.  I would say**
9 **Q1.**
10    Q.  Q1.  So before you -- before the 4/18
11 agreement -- or the 4/8 agreement was signed, then;
12 right?
13    **A.  I would believe so, yes.**
14    Q.  I'm going to hand you now Exhibit 179.
15        (WHEREUPON, a certain document was
16         marked Exhibit No. 179, for
17         identification, as of August 21,
18         2024.)
19 BY MR. DAVIS:
20    Q.  So this is an e-mail chain between you
21 and Jim Lollis, 3/14/2022; correct?
22    **A.  Correct.**
23    Q.  Okay.  And going back a page, you see
24 that there's an e-mail from February 17th between

Page 328

1 you and Kyle Blain, copying Lollis, and it's
2 referencing the cover letter, the current draft of
3 the cover letter; correct?
4    **A.  I -- when you say update the current**
5 **cover letter, which one are you referring to, sir?**
6    Q.  Right.  Well, the attach -- the e-mail
7 that I was given by Navistar does not have the
8 attachment, but you see your e-mail from Carmichael
9 to Kyle Blain, and it says:  Kyle, attached is the
10 updated cover letter with regards to the 1100 units
11 building in 2022.  As we sit right now, all units
12 we built and delivered by June, we have added
13 language as discussed for the following items.
14        And then you have some bullet points;
15 correct?
16    **A.  Yes, sir.**
17    Q.  Okay.  And then going up, you have
18 Kyle's response to you.  And then at the top, you
19 asked Lollis -- I'm sorry, you say to Lollis:
20 Kyle/Joe must tell us who gets the 600 ISX units
21 this week or build slots will start pushing.
22        You see that?
23    **A.  Yes.**
24    Q.  The ISX units are the -- I'm sorry,

Page 329

1 the -- well, those are the Cummins engines;
2 correct?
3    **A.  The LT with Cummins, yes, sir.**
4    Q.  So you were telling Lollis that Kyle
5 needs to tell you who gets those LTs; correct?
6    **A.  Based on this e-mail, yes.**
7    Q.  Okay.  And this was on 3/14?
8    **A.  Yes.**
9    Q.  All right.  So I'm going to give you an
10 e-mail dated 3/15.
11        (WHEREUPON, a certain document was
12         marked Exhibit No. 180, for
13         identification, as of August 21,
14         2024.)
15 BY MR. DAVIS:
16    Q.  180.  This is an e-mail chain between
17 you and Carmichael -- I'm sorry, between you and
18 Blain dated 3/15, and then the second e-mail in the
19 chain is from March 14, 2022; correct?
20    **A.  That is correct.**
21    Q.  The e-mail on the 14th says Kyle, and it
22 has some information that says:  We need to know
23 how you want the 600 ISX units divided up between
24 companies.  Once we have this info, we can finalize

83  (Pages 326 to 329)

CONFIDENTIAL

Page 330

1  everything.
2      That's what you said; correct?
3      **A.   That is correct.**
4      Q.   And the next day, he told you the LTs
5  will all go to CT; correct?
6      **A.   That is correct.**
7      Q.   That means they'll all go to Central?
8      **A.   Correct.**
9      Q.   All right.  So he met your requested
10  deadline the very next day; right?
11      **A.   Yes.**
12      Q.   Right.  So you're not ascribing any
13  fault to him in delaying giving you the LT mix;
14  right?
15      **A.   I'm not describing any fault to Kyle**
16  **Blain, but I do not know when the trucks were**
17  **entered into the system.**
18      Q.   Okay.  Well, he's not the one that
19  enters the trucks into the system.
20      **A.   Nope, nor am I.**
21      Q.   All right.  Nor are you, you said?
22      **A.   Nope.**
23      Q.   Okay.  This will be 181.
24

Page 331

1          (WHEREUPON, a certain document was
2          marked Exhibit No. 181, for
3          identification, as of August 21,
4          2024.)
5  BY MR. DAVIS:
6      Q.   And this is an e-mail that you've sent
7  to numerous individuals.  These are your TSMs and
8  your admin that you're sending this to; correct?
9      **A.   Yes.**
10      Q.   Okay.  And it -- the subject is the
11  sales review deck from Friday.  You see that?
12      **A.   Yes.**
13      Q.   Okay.  And so you would -- you would
14  take part in a weekly sales review with corporate,
15  and then you would convey the information you learn
16  to your TSMs; right?
17      **A.   To the best of my ability, yes.**
18      Q.   All right.  And you indicate in here:
19  Unique customers as you know this is a big chunk
20  being of our SIP.
21      What's SIP?
22      **A.   Sales incentive plan.**
23      Q.   Okay.  Mark is using the slide to show
24  that as we lose production, we lose opportunities

Page 332

1  for unique customers.
2      See that?
3      **A.   Yes.**
4      Q.   Okay.  And what was your understanding
5  as to why, as you lose production, you lose
6  opportunities for unique customers?
7      **A.   For those new -- I would assume new**
8  **reconquest type customers, we would need to show**
9  **that we weren't hitting our targets.**
10      Q.   You're saying to get those customers
11  back, you need to show that you could deliver the
12  trucks on time?
13      **A.   That we could produce the trucks and get**
14  **them delivered.**
15      Q.   Right.  And if they know that you're not
16  meeting existing orders, they're not going to be
17  very enthused to go with Navistar; right?
18      **A.   We're going to be challenged.**
19      Q.   Okay.  And this then reflects your
20  knowledge that the time, you were losing production
21  in the March of 2022 time frame; correct?
22      **A.   Just give me a second to read, please.**
23      Q.   Sure.
24      **A.   Can you repeat?**

Page 333

1          **(WHEREUPON, the record was read**
2          **as requested.)**
3  BY THE WITNESS:
4      **A.   I think it reflects, yes, that we were**
5  **losing production, but it was also implying that we**
6  **needed to clean up our order board to make sure**
7  **that the orders in the system were truly going to**
8  **said customer.**
9  BY MR. DAVIS:
10      Q.   So it was reflecting both of those
11  things, then?
12      **A.   To the best of my knowledge today, yes.**
13      Q.   All right.  I'm going to give you
14  another -- actually, I believe it's one of the
15  attachments to that document.  I'm sorry.
16      **A.   This one?**
17      Q.   Yeah, it's listed as a separate
18  document.  Give me a moment.
19      This will be 182.  Let me just confirm
20  that, this is an attachment.  I'm sorry.
21          (WHEREUPON, a certain document was
22          marked Exhibit No. 182, for
23          identification, as of August 21,
24          2024.)

Thompson Court Reporters, Inc.
thompsonreporters.com

CONFIDENTIAL

Page 334

1  BY MR. DAVIS:
2      Q.  Yes, I can confirm this is one of the
3  attachments that you had sent.  The original or the
4  parent document is NAV00082410 and NAV00082447 is
5  one of the attachments that you had on it.  All
6  right?  So I'm going to ask you to --
7          MR. SALLAH:  Do you have a copy?
8          MR. DAVIS:  Yeah.  You know what?  Instead of
9  marking -- well, did we already mark it with a
10  sticker?
11         MR. SALLAH:  Yes.
12         MR. DAVIS:  All right.  It's marked as 182.
13  It's fine.  It's marked separately, but it is an
14  attachment to 181, for the record.
15  BY MR. DAVIS:
16     Q.  All right.  Turn to the very first page
17  of this Orders and Production Update dated
18  March 23, 2022.  All right?
19     A.  Yep.
20     Q.  It states:  Multiple suppliers impacting
21  all plants.
22         You see that?
23     A.  Yes.
24     Q.  Supply, that refers to supply chain

Page 335

1  issues; correct?
2      A.  I'm sorry?
3      Q.  And that refers to supply chain issues;
4  correct?
5      A.  Correct.
6      Q.  All right.  And then the next sentence,
7  it says:  Supply of material remains a great
8  challenge; multiple suppliers causing disruptions.
9          Correct?
10     A.  Yes.
11     Q.  And then EAP Line 1 and 2 are down today
12  and tomorrow due to lack of material (IP insourcing
13  and tires).
14         You see that; right?
15     A.  Yes.
16     Q.  So this is reflecting, as of March 23rd,
17  you and certainly Navistar would have been aware of
18  those supply chain issues; correct?
19     A.  Correct.
20     Q.  All right.  Go back to that document, to
21  185.  It also indicates there's a risk of
22  additional down days at all plants in March due to
23  supplier issues; right?
24     A.  That's what it states.

Page 336

1      Q.  And this is also indicating that there
2  are issues with A26 orders.  Does that refer to the
3  actual engines being built?
4          MR. SALLAH:  Object to form.
5  BY MR. DAVIS:
6      Q.  Would that be your understanding?
7      A.  That would be a speculation on my half.
8      Q.  Okay.  And then looking at the next page
9  of that, actually, 82449, this is a list of top
10  critical production supplier units at risk, and
11  this is indicating potential -- or the top
12  potential issues affecting production; correct?
13     A.  Correct.  That --
14     Q.  And you would frequently -- I mean, this
15  was a -- this was an update that you received every
16  week or so?
17     A.  No, I don't want to say every week.  I
18  don't know that we received it weekly.  It may be a
19  monthly or -- I don't recall how often.
20     Q.  You agree, though, certainly this isn't
21  a one-off.  You would receive a report like this
22  every so often?
23     A.  Every so often, yes.
24     Q.  Okay.  All right.

Page 337

1      A.  It may be quarterly.
2      Q.  All right.  Here's the same report for
3  April 6, 2022.  We'll mark that as 183.
4          (WHEREUPON, a certain document was
5          marked Exhibit No. 183, for
6          identification, as of August 21,
7          2024.)
8          MR. DAVIS:  You're going to have to share.  I
9  only have the two copies of this one.
10         MR. SALLAH:  Just scoot over a little bit so
11  you stay in the video.  I'm good right here, Sean.
12         THE WITNESS:  You good, sir?
13         THE VIDEOGRAPHER:  Yes.
14  BY MR. DAVIS:
15     Q.  All right.  And, actually, I apologize,
16  let me -- I don't have this printed, so I'm going
17  to have to just share it with you.  This is
18  actually an attachment to Navistar 84373.  I don't
19  have a way to mark it, but I'm going to just show
20  you the document to confirm that you did receive
21  it.  All right?
22     A.  What should I do with this document now?
23     Q.  You can hold on to it.  I'm going to ask
24  you questions about it.  I'm just going to show you

Thompson Court Reporters, Inc.
thompsonreporters.com

CONFIDENTIAL

Page 378

```
1       Q.   Okay.
2       A.   '22.
3       Q.   '22.  I apologize.  Thank you.  And
4   that's something that your higher-ups were asking
5   you to get done.  You would agree with that;
6   correct?
7       A.   I don't know that they were asking.  I
8   think I was concerned that if we did not have a
9   cover letter signed, that we were at risk.
10      Q.   Okay.  So you were concerned without a
11  cover letter that others at Navistar may not follow
12  the production schedule --
13      A.   No, I was -- we were at risk that we
14  weren't going to be able to produce trucks, and
15  there's some liability, not only for Allegiance but
16  for Navistar as well.
17      Q.   And you would agree you never told Kyle
18  before he signed that agreement that there was a
19  risk that his trucks weren't going to come on the
20  schedule that was --
21      A.   I don't recall.
22      Q.   And you don't know if anybody at
23  Navistar conveyed that to him either, do you?
24      A.   I don't recall.  I would not know if
```

Page 379

```
1   anybody else did.
2       Q.   Okay.  All you can say is that you don't
3   know what the production schedule was on 5/4 in
4   Navistar's system.  That's what you're testifying
5   to?
6       MR. SALLAH:  Objection.  Form.
7   BY THE WITNESS:
8       A.   I'm saying I don't recall.
9   BY MR. DAVIS:
10      Q.   You don't recall.  So you may have known
11  what the production schedule -- what the order
12  board looked like on 5/4?
13      A.   I may have known, but I do not recall.
14      Q.   Okay.  You would agree somebody at
15  Navistar would have known; correct?
16      MR. SALLAH:  Objection.  Foundation.
17  BY THE WITNESS:
18      A.   I would believe somebody would have
19  knowledge of an order board.
20  BY MR. DAVIS:
21      Q.   Okay.  And just to close this out, 5/17
22  you told Jim Lollis that if he doesn't sign,
23  they're going to stop delivering trucks that have
24  already been produced, right, if he doesn't sign?
```

Page 380

```
1   Or at least you were concerned that that would
2   happen; right?
3       A.   I was concerned, as we do not have an
4   order.
5       Q.   Right.  And specifically, you said you
6   have to sign the agreement with the no trade clause
7   in it.  You would agree with that; right?
8       A.   Yes.
9       Q.   Okay.  And then he did sign after you
10  sent -- after you made that communication to
11  Lollis?
12      A.   On the 18th, yes.
13      Q.   The very next day?
14      A.   Yeah, the 18th.
15      Q.   All right.  Now, Mr. Carmichael, would
16  you agree with me that you knew -- you talked about
17  various supply chain issues, but you would agree
18  that you knew that those supply chain issues had
19  already occurred before Kyle Blain signed that
20  agreement; correct?
21      MR. SALLAH:  Object to form.
22  BY THE WITNESS:
23      A.   I believed that we had supply
24  constraints, based on the internal e-mails or the
```

Page 381

```
1   internal presentations that he had sent, but I
2   hadn't, in my best knowledge, had no idea it was
3   going to affect the PAM/Central/Universal truck
4   builds.
5   BY MR. DAVIS:
6       Q.   No, I'm talking about the ones
7   specifically that you said did affect PAM and
8   Central.  You talked about the A26 issue; right?
9       A.   Yes.
10      Q.   Okay.  That occurred before that
11  agreement was even signed by you; correct?
12      A.   Yes.
13      MR. SALLAH:  Object to form.
14  BY MR. DAVIS:
15      Q.   Okay.  The Bendix -- the Bendix supply
16  chain issues, that occurred before you had even
17  signed Exhibit 36; correct?
18      MR. SALLAH:  Same objection.
19  BY THE WITNESS:
20      A.   The Bendix?  Can you --
21  BY MR. DAVIS:
22      Q.   The Bendix collision mitigation issue?
23      A.   Yes.
24      Q.   That had occurred before you even signed
```

Thompson Court Reporters, Inc.
thompsonreporters.com

CONFIDENTIAL

Page 382

1  the agreement?
2  **A.  Yes.**
3      Q.   Okay.  And you mentioned the WABCO -- or
4  the brake issue, and you said you don't remember.
5  Would it refresh your memory if I showed you one of
6  the other e-mails you asked Jim Lollis to collect?
7      **A.  You can.**
8      Q.   Okay.  Well, we'll get to that in a
9  moment.  But you believe that took place in quarter
10  3 or later?
11     **A.   To the best of my knowledge.**
12     Q.   After the trucks should already have
13  been built under the production schedule in that
14  Exhibit 36; right?
15     MR. SALLAH:  Object to form.
16  BY THE WITNESS:
17     **A.   Based on that production schedule and**
18  **production timing and availability, yeah.**
19  BY MR. DAVIS:
20     Q.   Okay.  And you mentioned a frame rail
21  issue, and you weren't able to give me any timing
22  as to when that issue occurred?
23     **A.   You asked me the question on what**
24  **challenges that we had.**

Page 383

1      Q.   Yeah.  And --
2      **A.   I listed frame rails as one them for**
3  **Navistar.**
4      Q.   And frame rails was one of the issues
5  that you're saying affected --
6      **A.   I'm not saying that.**
7      Q.   You're not saying that.  So frame rail
8  is not one of the issues that impacted production
9  to Nav -- to Central?
10     **A.   I would -- I'm sorry.  Go ahead.**
11     Q.   No.  Are you -- that's where I'm
12  confused.  Are you saying frame rails are or not an
13  issue that affected the production of trucks for
14  Central?
15     **A.   I don't recall.**
16     Q.   You don't recall.  Okay.  And do you
17  remember when frame rail issues arose in general?
18     **A.   I don't recall, sir.**
19     Q.   Okay.  So you don't even -- was it after
20  the brakes issue?
21     **A.   I don't recall.**
22     Q.   You don't recall.  All right.  Give me
23  one moment.  So I'm going to give you Exhibit 187.
24

Page 384

1      (WHEREUPON, a certain document was
2      marked Exhibit No. 187, for
3      identification, as of August 21,
4      2024.)
5  BY MR. DAVIS:
6      Q.   All right.  So this is an e-mail chain.
7  The top of the chain is between you and Chas
8  Voyles, Jr.  And I think you mentioned who Chas is,
9  but just for the record --
10     MR. SALLAH:  Sorry.  What exhibit are we on?
11  187?
12     MR. DAVIS:  187.  Yeah.
13  BY THE WITNESS:
14     **A.   Could you repeat?**
15  BY MR. DAVIS:
16     Q.   Yeah.  The top in this e-mail chain is
17  from Chas Voyles to you; correct?
18     **A.   That is correct.**
19     Q.   And I think you said who he was, but who
20  was Chas Voyles?
21     **A.   Chas Voyles is -- was our director of**
22  **service for the southwest region, and currently, he**
23  **is the director of dealer sales in the southwest**
24  **region.**

Page 385

1      Q.   All right.  So I just want to go down
2  further in the chain.  Two e-mails down in the
3  chain is an e-mail from you to Mark Belisle, and
4  the subject is urgent, Central/Universal warranty
5  issue.
6          You see that; correct?
7      **A.   I'm sorry.  I'm not seeing that.  The**
8  **second one?**
9      Q.   Third one.
10     **A.   Third one.  I'm sorry.**
11     Q.   Third one.  It's from you to Belisle,
12  June 27, 2022; right?
13     **A.   Ask your question.**
14     Q.   Am I correct that we're looking at an
15  e-mail from you to Belisle on June 27, 2022?
16     **A.   Correct.**
17     Q.   And in that e-mail, you said:
18  Morning -- or you say:  Mark, Morning.  Hate to
19  start a Monday like this but need your help on this
20  urgent internal topic.  Being told via CSA that we
21  are having issues with talking/approving the
22  warranty for Central/Universal on the 2018 and 2019
23  units.  Here are the issues at hand on 840
24  2018/2019 trades that pushed out due to collision

Thompson Court Reporters, Inc.
thompsonreporters.com

CONFIDENTIAL

Page 386

1  mitigation, A26 shortages and production
2  constraints (causing changes to cover letter before
3  we could have customer sign).
4       You see that; right?
5       A.  Yes.
6       Q.  So you are at this point telling Mark
7  Belisle that the production issues were the
8  collision mitigation.  That's Bendix; right?
9       A.  Yes.
10      Q.  A26 shortages?
11      A.  Yes.
12      Q.  And production constraints that occurred
13 before the customer signed; correct?
14      A.  Correct.
15      Q.  All right.  Do you recall ever conveying
16 to anyone at Navistar that there were any
17 production constraints that -- besides the A26 and
18 the Bendix that would have impacted Central before
19 the trucks should have been produced by -- well,
20 let me put it another way.
21      Were there any other issues by June of
22 2022, besides Bendix and the A26 shortage, that you
23 claimed affected the Central build?
24      A.  That I --

Page 387

1       MR. SALLAH:  Object to form.
2  BY MR. DAVIS:
3       Q.  Yeah.  Well, we just talked -- you just
4  told Mark Belisle about A26 shortages, Bendix, and
5  production constraints that all arose before he
6  signed; right?
7       A.  As that states, yes.
8       Q.  Have you ever -- were there any other
9  supply chain issues that would have impacted
10 Central by the time all those trucks should have
11 been produced in June 2022?
12      A.  I do not recall.
13      Q.  Okay.  So as you sit here, you cannot
14 think of one?
15      A.  I do not recall at this time.
16      Q.  Okay.  This is going to be 188.
17      (WHEREUPON, a certain document was
18        marked Exhibit No. 188, for
19        identification, as of August 21,
20        2024.)
21 BY MR. DAVIS:
22      Q.  All right.  So we are looking here that
23 Kevin O'Brien -- the top is an e-mail between you
24 and Kevin O'Brien, and then two down from there is

Page 388

1  an e-mail between you and Kerri Podewell.
2       Do you see that?
3       A.  Yes, sir.
4       Q.  And that's the one I want to talk about
5  dated June 28, 2022.  All right?  And you say:
6  Kerri, I would like to seek approval for the
7  following outstanding items for the Central,
8  Universal and PAM Transportation.  As you are
9  aware, finalizing this deal has been an ongoing
10 process.  No sooner did we finalize a no trade
11 agreement, we had to adjust for Bendix, then
12 shortly after that, we had to convert from A26 to
13 X15 due to supply constraints, all causing us to
14 miss our projected delivery schedule of June, now
15 more like September.
16      Do you see that?
17      A.  Yes.
18      Q.  Okay.  So I just want to explain.  When
19 say no sooner did we finalize a no trade agreement
20 we had to adjust for Bendix, you're talking about
21 that deal sheet from January, not the final signed
22 agreement; correct?
23      A.  Based on this, I would say that would be
24 accurate.

Page 389

1       Q.  Okay.  And then you say:  Shortly after
2  that, we had to convert from A26 to X15 due to
3  supply constraints.  Again, that was before you
4  signed Exhibit 36; correct?
5       A.  I would believe so.
6       Q.  Okay.  And then you say:  All causing us
7  to miss our projected delivery schedule of June,
8  now more like September.  Right?
9       A.  That's what it states, yes.
10      Q.  So at this point, you were not telling
11 Kerri Podewell on June 28th than there were any
12 other production issues affecting this deal;
13 correct?
14      A.  I was keeping it very high level.  I do
15 not know if there was more constraints at that time
16 or not.  I do not recall.
17      Q.  Well, if there were, you certainly
18 didn't include them in this communication to Kerri
19 Podewell.  You would agree; right?
20      A.  That would be a fair statement, yes.
21      Q.  And your memory as to what those
22 constraints could have been would have been a lot
23 fresher in June of 2022 than today, August of 2024.
24 You'd agree with that; right?

Thompson Court Reporters, Inc.
thompsonreporters.com

CONFIDENTIAL

Page 390

1    A.   I believe that's a fair statement.
2    Q.   All right.  And, Mr. Carmichael, I just
3  want to ask you this frankly.  You have repeatedly,
4  internally in Navistar, expressed your view that
5  Navistar had promised those trucks to Central by
6  June of 2022; correct?
7    A.   Based on production availability, yes.
8    Q.   Now, you had said that without the
9  caveat of production availability.  You said we
10  promised them trucks in June of 2022.  Would you
11  agree with that?
12    MR. SALLAH:  Object to form.
13  BY THE WITNESS:
14    A.   In certain transcripts internally, yes,
15  at a high level.
16  BY MR. DAVIS:
17    Q.   Let's give you 189.
18        (WHEREUPON, a certain document was
19         marked Exhibit No. 189, for
20         identification, as of August 21,
21         2024.)
22    MR. SALLAH:  Where are we at on time?
23    THE VIDEOGRAPHER:  6.47.
24    MR. DAVIS:  I'm sorry.  What number did I just

Page 391

1  mark this as.
2    THE WITNESS:  189.
3  BY MR. DAVIS:
4    Q.   So this is an e-mail from December of
5  2022 from you to Kerri Podewell; correct?
6    A.   12/13/2022, yes.
7    Q.   Yes.  All right.  And so -- Couple of
8  things that we need to align with on start.
9        So you are telling Kerri Podewell the
10  following:  Current MY2023 deal 1100 units.
11  That's the Exhibit 36 deal; correct?
12    A.   Can you give me a moment just to read?
13    Q.   Yeah, please.
14    A.   Go ahead, sir.
15    Q.   So in this, you're discussing the issue
16  of because production of these trucks was going to
17  pass into 2023, Navistar was indicating that they'd
18  have to pay a surcharge charge on the 2022 -- 2023
19  vehicles; right?
20    A.   Yes.
21    Q.   Okay.  And you were attempting to
22  resolve that issue for the customer here?
23    A.   Yes.
24    Q.   Okay.  And what you said is that:  As

Page 392

1  everyone is aware of the November 1st
2  implementation, the customer is extremely upset for
3  the following reasons.
4        And you said:  A) All builds were to be
5  completed by the end of June per written agreement
6  that came after order board and allocation
7  adjustment.
8        You see that; correct?
9    A.   Yes.
10    Q.   Okay.  B) We had a no trade agreement
11  that made it very important to hit the June date so
12  Central could sell those 2017, 2018, 2019 units in
13  the open market as UTO continues to lowball the
14  trades.
15        You said that; correct?
16    A.   Yes, I did.
17    Q.   And that was true?
18    A.   Based on my knowledge at that time.
19    Q.   All right.  And then you said a few
20  lines down:  Unfortunately, we could not produce
21  the new trucks as promised so Central could pull
22  out the trades in time.
23        Correct?
24    A.   Yes.

Page 393

1    Q.   And that's what you believed at the
2  time; right?
3    A.   That is correct.
4    Q.   All right.  Do you still believe that?
5    A.   Repeat differently.
6    Q.   Do you still believe that you had a no
7  trade agreement that made it very important to hit
8  the June dates so Central could sell these 2017,
9  2018, 2019 units in the open market as UTO
10  continues to lowball the trades.  Do you still
11  believe that today?
12    A.   Yes.
13    Q.   Okay.  And you agree that we -- that we,
14  Navistar, could not produce the new trucks as
15  promised so Central could pull out the trades in
16  time.  You still agree with that today; correct?
17    A.   The trade, based on that date of -- the
18  date of production, yes.
19    Q.   Yeah.  As promised, that day being the
20  end of June; right?
21    A.   Again, based on the letter and
22  production availability and this, yes.
23    MR. DAVIS:  Okay.  I think I'm almost done
24  here.  Yeah.  So I'm going to send -- I'm going to

Thompson Court Reporters, Inc.
thompsonreporters.com

CONFIDENTIAL

Page 394

1  give you this document.  I want to make sure, are
2  you going to dispute this is the one from
3  Allegiance?  I can probably pull up the same copy
4  from you guys, but -- if I need to.
5      MR. SALLAH:  What do you mean dispute?
6      MR. DAVIS:  That's the copy that was -- well,
7  we used that at the earlier deposition, but I have
8  the same copy from Navistar.  If we have to go off
9  the record so I can pull the one from Navistar, I
10  will, but --
11      MR. SALLAH:  Do you know the exhibit number?
12      MR. DAVIS:  Yeah, I'll have to find that.
13  Give me -- well, actually, you know what?  Let's
14  just -- I think this will be my last question, so
15  let's go off the record.  I'll get the one that you
16  produced, and then we won't have to have any
17  disputes about it, and then we'll be done.
18      THE VIDEOGRAPHER:  Going off the record.  The
19  time is 5:33 p.m.
20          (WHEREUPON, a short break was
21           taken.)
22      THE VIDEOGRAPHER:  Going on the record.  The
23  time is 5:35 p.m.
24

Page 395

1  BY MR. DAVIS:
2      Q.   All right.  So I'm going to show you
3  what was produced by Navistar as NAV00029810.  And
4  I think you discussed, you do recall having a
5  meeting in Detroit in June of 2023 where you and
6  others from Navistar met with Kyle Blain and others
7  from Central and Universal; correct?
8      A.   Correct.
9      Q.   All right.  And you remember putting
10  together this PowerPoint presentation that you gave
11  at that meeting; right?
12      A.   Yes, sir.
13      Q.   All right.  So I just want to go to --
14  now, you do state in here in 2022 industry
15  headwinds, you indicate supply chain issues
16  consisted of front-side radar, collision
17  mitigation, engines, frame rails, brakes, and
18  semiconductor chips; correct?
19      A.   Yes.
20      Q.   Okay.  But then you have a chart with a
21  production timeline, and you indicate July 21,
22  original cover letter proposed, August 2021, orders
23  placed.  The collision mitigation you list as
24  happening in January of 2022; correct?

Page 396

1      A.   Correct.
2      Q.   Okay.  Customer accepted the LT.  So
3  this is customer accepted the X15 engines in March
4  of 2022; correct?
5      A.   Yes.
6      Q.   Okay.  Again, before the cover letter
7  was signed by you; correct?
8      A.   Before, yes.
9      Q.   And then updated cover letter May 2022
10  because that's when Kyle signed; correct?
11      A.   That would be true.
12      Q.   Okay.  And then you list in your
13  presentation October 2022 was when customer was
14  notified re WABCO brake issue.
15          You see that?
16      A.   Yes, sir.
17      Q.   Does that refresh your recollection that
18  the brake issue in question was in October of 2022?
19      A.   That would be a fair statement.
20      Q.   Okay.  And then the customer accepted in
21  November 2022; correct?
22      A.   Yes.
23      Q.   And what that was is he agreed to take a
24  different brake than the one that was --

Page 397

1      A.   That he preferred, correct.
2      Q.   That he preferred, right.  And you would
3  agree with me, again, that if the brake issue
4  didn't occur until October 2022, that was after all
5  the trucks should have been produced under
6  Exhibit 36, June of 2022; correct?
7      A.   Based on that production schedule and
8  product availability.
9      Q.   And then you list new trucks delivered,
10  855 new trucks were delivered by December is what
11  this chart shows; correct?
12      A.   That is correct.  I can't read it that
13  small, but I'll take your word for it.
14      Q.   Yeah.  Well, if you --
15      A.   Could I see that?
16      Q.   Well that's -- just for the record,
17  that's Allegiance.  Let's give the --
18      A.   Oh.
19      Q.   Yeah.
20      A.   Yes.
21      Q.   All right.
22      A.   855.
23      MR. SALLAH:  I'm just going to note if we're
24  going to do the depositions in person, I just --

100  (Pages 394 to 397)