UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GLS LEASCO, INC. and
CENTRAL TRANSPORT, LLC,

                               Case No. 23-cv-12927

      Plaintiffs,

                               Hon. Mark A. Goldsmith

v.

                               Magistrate Judge Anthony P. Patti

      NAVISTAR, INC.,

Defendant.

_____

**Plaintiffs' Response in Opposition to
Defendant's Motion for Summary Judgment**

## Table of Contents

Counter-Statement of Issues Presented.................................................... iii

Controlling or Most Appropriate Authority...............................................iv

Table of Authorities ...............................................................................v

Counter-Statement of Material Facts .......................................................1

Statement of Additional Material Facts ...................................................6

    A.    The July 2021 Agreement Between GLS and Navistar .......................6

    B.    Navistar Agrees to Deliver 1,100 Tractors by the End of June 2022 Under a New Agreement .....................................................6

    C.    Navistar Could Have Delivered 1,100 Tractors to Plaintiffs by the End of June 2022 ........................................................8

    D.    Navistar Breaches the April 2022 Agreement, Damaging Plaintiffs ................................................................................9

Introduction............................................................................................10

Standard of Review.................................................................................11

Argument................................................................................................12

I.    Navistar's affirmative defenses of impossibility and impracticability both fail under the undisputed facts of this case, requiring denial of its Motion for Summary Judgment on Plaintiffs' contract claims..................................................12

    A. Navistar cannot rely on an impossibility or impracticability defense because the events giving rise to "impossibility" were foreseeable and avoidable................................12

    B. As a factual matter, at the time the parties contracted, it was not impossible or impracticable for Navistar to manufacture and deliver to GLS the 630 tractors meant for Central. .........................................................................17

II.    Plaintiffs' right to recover consequential damages arising
       from Navistar's breach is not affected by GLS's subsequent
       assignment of its purchase rights to affiliate ELC. ...................................18

III.   Plaintiffs' fraud claim also survives summary judgment
       because there is factual evidence establishing Plaintiffs'
       reasonable reliance on Navistar's false assertions that it
       would manufacture and deliver all tractors by the end of June
       2022. .........................................................................................................22

Conclusion ...........................................................................................................24

## Counter-Statement of Issues Presented

1. Under Michigan law, impossibility and impracticability defenses to breach of contract require a showing that the events giving rise to the alleged impossibility were unforeseeable at the time of contracting. Here, however, the alleged events Navistar relies on for its impossibility and impracticability defenses were not only foreseeable, they were actually known to Navistar at the time of contracting. Should the Court therefore deny Navistar's summary judgment motion based on impossibility and impracticability?

2. Even if the events giving rise to the alleged impossibility or impracticability were unforeseeable, the question of whether performance was impossible or impracticable is a question of fact. The record shows that—despite Navistar's claim of impossibility and impracticability—Navistar could have manufactured and delivered Plaintiffs' 1,100 tractors by the end of June 2022 but chose to give them to other customers. Should the Court deny Navistar's motion on the alternative ground that there is a material dispute of fact on its impossibility and impracticability defenses?

3. Under Michigan law, consequential damages are available to, at a minimum, a "buyer," defined as either the person who "buys" *or* "contracts to buy" goods. Further, an intended third-party beneficiary stands in the shoes of the buyer for purposes of a breach of contract claim. Given that GLS "contracted to buy" Navistar's tractors and given that Central was an intended third-party beneficiary of that contract, should the Court deny Navistar's motion on its theory that Plaintiffs were not the "buyer" here?

4. A claim for fraud in the inducement requires a plaintiff to show, among other things, that it reasonably relied on a material false representation of the defendant. Here, the record shows that Navistar could have produced 1,100 tractors by the end of June 2022, and that Plaintiffs thus reasonably relied on Navistar's repeated but false representations (in April 2022 and May 2022) that it would do so. Should the Court also deny Navistar's motion for summary judgment on Plaintiffs' fraud claim?

## Controlling or Most Appropriate Authority

*Belle Isle Grill Corp. v. Detroit,* 666 N.W.2d 271 (Mich. Ct. App. 2003)

*Bissell v. L.W. Edison Co.*, 156 N.W.2d 623 (Mich. Ct. App. 1967)

*Roth Steel Prod. v. Sharon Steel Corp.*, 705 F.2d 134 (6th Cir. 1983)

*Shay v. Aldrich*, 790 N.W.2d 629 (Mich. 2010)

*Vergote v. K Mart Corp.*, 404 N.W.2d 711 (Mich. Ct. App. 1987)

Mich. Comp. Laws § 440.2615

# Table of Authorities

## Cases

*Barnes v. B & V Const., Inc.*,
   357 N.W.2d 894 (Mich. Ct. App. 1984) ............................................................18

*Bay Gen. Indus., Inc. v. Johnson*,
   418 A.2d 1050 (D.C. 1980).................................................................................20

*Bd. of Control of E. Mich. Univ. v. Burgess*,
   206 N.W.2d 256 (Mich. Ct. App. 1973) ............................................................15

*Belle Isle Grill Corp. v. Detroit*,
   666 N.W.2d 271 (Mich. Ct. App. 2003) ............................................................22

*Bissell v. L.W. Edison Co.*,
   156 N.W.2d 623 (Mich. Ct. App. 1967) .................................................. 13, 14, 15

*Bryant v. BMW of N.A. LLC*,
   585 F. Supp. 3d 1178 (E.D. Wis. 2022)..............................................................21

*Chainworks, Inc. v. Webco Indus., Inc.*,
   2006 WL 461251 (W.D. Mich. Feb. 24, 2006) ..................................................14

*Exelon Generation Co. v. Gen. Atomics Techs. Corp.*,
   559 F. Supp. 2d 892 (N.D. Ill. 2008) .................................................................16

*First of Am. Bank v. Thompson*,
   552 N.W. 2d 516 (Mich. Ct. App. 1996) ...........................................................20

*Fitness Int'l, LLC v. Nat'l Retail Props. Ltd. P'ship*,
   2022 WL 7723954 (Mich. App. Oct. 13, 2022) .................................................14

*J.J. Fagan & Co. v. Burns*,
   226 N.W. 653 (Mich. 1929)...............................................................................13

*Llewellyn-Jones v. Metro Prop. Grp., LLC*,
   22 F. Supp. 3d 760 (E.D. Mich. 2014)...............................................................22

*Macomb Interceptor Drain Drainage Dist. v. Kilpatrick*,
   896 F. Supp. 2d 650 (E.D. Mich. 2012)..............................................................20

*Mich. Bean Co. v. Senn*,
   287 N.W.2d 257 (Mich. Ct. App. 1979) .................................................................13

*Prater v. Sezgin*,
   2005 WL 927149  (Mich. Ct. App. Apr. 21, 2005) ....................................... 13, 16

*Roberts v. Farmers Ins. Exch.*,
   737 N.W.2d 332 (Mich. Ct. App. 2007) .................................................................13

*Roth Steel Prod. v. Sharon Steel Corp.*,
   705 F.2d 134 (6th Cir. 1983) ..................................................................................17

*Shay v. Aldrich*,
   790 N.W.2d 629 (Mich. 2010) ................................................................................20

*Vergote v. K Mart Corp.*,
   404 N.W.2d 711 (1987) ...........................................................................................13

*Wiley v. United States*,
   20 F.3d 222 (6th Cir. 1994) .....................................................................................12

**Statutes**

Mich. Comp. Laws § 440.2103(1)(a) .......................................................................19

Mich. Comp. Laws § 440.2210(1) ............................................................................19

Mich. Comp. Laws § 440.2615 .................................................................................14

**Rules**

Fed. R. Civ. P. 56 ......................................................................................................12

## Counter-Statement of Material Facts

1.      Uncontested.

2.      Contested. The chart is in the April 2022 Agreement; however, the parties' agreement was that Defendant Navistar, Inc. ("Navistar") would manufacture and deliver 1,100 tractors by the end of June 2022. *See* ECF No. 51-23, Dep. Ex. 36 at 1-2; *see also* ECF No. 51-15, Carmichael Dep. 390:2-393:22; ECF No. 51-19, Dep. Ex. 189 at NAV00028033; ECF No. 51-24, Lollis Dep. 116:2-119:13, 165:17-167:11; ECF No. 51-29, Dep. Ex. 168 at NAV00014389-90; ECF No. 51-39, Dep. Ex. 167; ECF No. 51-40, Dep. Ex. 188 at NAV00023147; ECF No. 51-41, NAV00110596; ECF No. 51-42, Dep. Ex. 45 at NAV00028763; ECF No. 51-48, Dep. Ex. 57 at NAV00016306.

3.      Uncontested but immaterial. While Plaintiff GLS Leasco, Inc. ("GLS") planned to lease its tractors to Plaintiff Central Transport, LLC ("Central") at the time it was negotiating the April 2022 Agreement, GLS later delegated that task to its affiliate Equipment Leasing Company, LLC ("ELC"). *See* ECF No. 51-2, Blain Decl. ¶¶ 9-12.

4.      Uncontested but lacking material context. Navistar promised to deliver 1,100 tractors by the end of June 2022. *See supra* at ¶ 2. This is further reflected in the April 2022 Agreement's acknowledgment of a "June-Spillover month." ECF No. 51-23, Dep. Ex. 36 at 2. While Navistar may have breached by not delivering tractors

- 1 -

as scheduled in March, April, or May 2022, the explicit incorporation of the spillover month (and the parties' understanding of the Agreement) reflected some flexibility in the delivery date that extended to June 2022, but no later. *See supra* at ¶ 2; ECF No. 51, Pls.' Mot. Partial Summ. J. at PageID.1072-73.

5.    Contested. The quoted language is excerpted from the April 2022 Agreement; however, Navistar falsely implies that these snippets suggest that June delivery was not promised. The April 2022 Agreement states that "[a]t the time of this letter Navistar **can supply** (1,100) new 2023 International LT/RH production slots from January 2022 thru June 2022." ECF No. 51-23, Dep. Ex. 36 at 1 (emphasis added). Further, the parties' understanding of the April 2022 Agreement was that 1,100 tractors would be built and delivered by the end of June 2022. *See supra* at ¶ 2. And on May 17, 2022, the day before GLS signed the April 2022 Agreement, Sean Carmichael directed Jim Lollis to inform GLS that Navistar would "stop/postpone our production and hold deliveries of built tractors" if GLS did not sign soon. ECF No. 51-35, Dep. Ex. 60; ECF No. 51-36, NAV00133580.

6.    Uncontested, insofar as the April 2022 Agreement was intended to replace a prior July 2021 Agreement.

7.    Uncontested that GLS's expectation was that Navistar would produce and deliver significant numbers of tractors before the end-of-June 2022 deadline;

contested insofar as Navistar is suggesting that this testimony alters the meaning of the contract as understood by the parties. *See supra* at ¶ 2.

8.      Contested. The quoted excerpts regarding production constraints referred to a December 2021 meeting. Ex. 1, GLS Nov. 13, 2024 Dep. 18:14-20:21. Navistar conceded that it was aware of all the supply chain issues affecting GLS's 1,100 tractors before it signed the Agreement in April 2022. ECF No. 51-15, Carmichael Dep. 381:6-382:2; ECF No. 51-28, Dep. Ex. 181 at NAV00082410.

9.      Uncontested.

10.      Contested. Jim Lollis was *Navistar's* agent, working for *Navistar* dealership Summit Truck Group, and later transferred to *Navistar* dealership Allegiance Trucks. Ex. 2, Lollis Dep. 11:9-21, 12:4-21, 14:15-23.  Uncontested that GLS expressed its preference to continue working with Lollis.

11.      Contested. Navistar made the decision to divert A26 engines to other customers, told GLS that it would not be able to receive the A26 engines, and proposed providing GLS X15 engines instead (which could not fit in an RH tractor and thus required GLS to convert to LT tractors). ECF No. 51-22, Dep. Ex. 157 at NAV00077311; ECF No. 51-25, NAV00017869; ECF No. 51-27, NAV00017160; ECF No. 52-1, Navistar Dep. 153:24-155:7.

12.      Contested to the extent that *Navistar* made the decision to change the engines, not Allegiance. *See supra* at ¶ 11.

13.     Uncontested but immaterial. Navistar's April 2022 production estimate showing a few tractors scheduled for production in July was immaterial; the parties all understood that these estimates were not fixed and that the ordinary practice would be for Navistar to move the production dates up as the contract deadline approached. ECF No. 51, Pls.' Mot. Partial Summ. J. at PageID.1072-73; ECF No. 51-24, Lollis Dep. 103:16-104:2; ECF No. 51-31, Perkins Dep. 41:13-42:18, 103:12-104:4; ECF No. 51-33, Belisle Dep. 175:5-12, 176:17-177:3; ECF No. 51-34, Dep. Ex. 209 at NAV00061276-77; ECF No. 52-1, Navistar Dep. 55:14-57:18. Moreover, Navistar did not rescind its offer as set forth in the April 2022 Agreement despite a unilateral right to do so, and continued to make the promise of delivery by the end of June 2022 despite the April spreadsheet. *See* ECF No. 51-2, Blain Decl. ¶¶ 6-7; ECF No. 51-35, Dep. Ex. 60; ECF No. 51-36, NAV00133580.

14.     Contested insofar as Navistar says updates started "much earlier" but ultimately the paragraph is immaterial. *See supra* at ¶ 13.

15.     Uncontested but immaterial. *See supra* at ¶ 13.

16.     Uncontested but immaterial. *See supra* at ¶ 13.

17.     Uncontested but immaterial. *See supra* at ¶ 13.

18.     Uncontested but immaterial. *See supra* at ¶ 13.

19.     Uncontested but immaterial. *See supra* at ¶ 13.

20.     Uncontested but immaterial. *See supra* at ¶ 13.

21.    Uncontested but immaterial. *See supra* at ¶ 13.

22.    Uncontested but immaterial. *See supra* at ¶ 13.

23.    Uncontested but immaterial. *See supra* at ¶ 13.

24.    Uncontested but immaterial. *See supra* at ¶ 2.

25.    Uncontested but immaterial. *See supra* at ¶ 2.

26.    Uncontested but immaterial. *See supra* at ¶ 2.

27.    Uncontested but immaterial. *See supra* at ¶ 13.

28.    Contested, as Central's business records show it received the first MY 2023 tractor on May 19, 2022. ECF No. 50-11, Ex. J. This paragraph is, however, immaterial. *See supra* at ¶ 13.

29.    Contested. GLS contracted to purchase the goods and is a buyer under the Uniform Commercial Code as adopted by Michigan ("UCC"). *See infra* at 18-19. GLS delegated to its affiliate ELC the responsibility to pay for and accept delivery of the MY 2023 tractors, which Navistar did not complain about until late in this litigation. ECF No. 51-2, Blain Decl. ¶¶ 9-10, 13, 15, 17-18.

30.    Uncontested but immaterial. *See supra* at ¶ 29.

31.    Contested. *See supra* at ¶ 29.

32.    Contested but immaterial. Exhibit K to Navistar's Motion for Summary Judgment was not signed by ELC. *See* ECF No. 50-12 at 2. Ultimately, however, this is immaterial. *See infra* at 18-19.

**Statement of Additional Material Facts**

**A.      The July 2021 Agreement Between GLS and Navistar**

33.      Under the July 2021 Agreement, Navistar promised to deliver 1,100 MY 2023 tractors between February and December 2022. ECF No. 51-8, Dep. Ex. 15 at NAV00051899-900; ECF No. 51-10, Akinosho Dep. 47:22-48:2.

34.      But Navistar was aware, as of May 2021 (two months prior to signing the July 2021 Agreement with GLS), that it had filled its 2022 production schedule. *See* ECF No. 51-8, Dep. Ex. 15 at NAV00051902; ECF No. 51-11, Dep. Ex. 112 at NAV00063269; ECF No. 51-15, Carmichael Dep. 21:21-22:3, 136:24-138:10.

35.      On December 16, 2021, Navistar informed GLS that it would not produce 1,100 tractors for GLS and its affiliates in 2022 and would only deliver 600 tractors instead, citing supply chain issues. ECF No. 51-15, Carmichael Dep. 206:8-18, 272:3-19, 328:24-329:3; ECF No. 51-16, Dep. Ex. 162 at NAV00065876.

**B.      Navistar Agrees to Deliver 1,100 Tractors by the End of June 2022 Under a New Agreement**

36.      In January 2022, Navistar made a new proposal to GLS: if GLS agreed to certain conditions, Navistar would deliver 1,100 new tractors in the first half of 2022. ECF No. 51-15, Carmichael Dep. 273:17-279:3; ECF No. 51-17, Dep. Ex. 164 at NAV00067055.

37.      GLS accepted Navistar's proposal and the parties reached an agreement in principle on January 13, 2022. ECF No. 51-18, Dep. Ex. 166 at NAV00013686.

They then began negotiating the details of a new contract that would supersede the July 2021 Agreement: the April 2022 Agreement. ECF No. 51-23, Dep. Ex. 36 at 1.

38.  The April 2022 Agreement promised an accelerated production schedule: Navistar would deliver 1,100 MY 2023 tractors by the end of June 2022, rather than December 2022. ECF No. 51-15, Carmichael Dep. 273:17-279:3; ECF No. 51-17, Dep. Ex. 164 at NAV00067055; ECF No. 51-23, Dep. Ex. 36 at 1-2.

39.  Sean Carmichael confirmed, in contemporaneous emails, that Navistar was obligated under the April 2022 Agreement to deliver all 1,100 MY 2023 tractors by the end of June. ECF No. 51-19, Dep. Ex. 189 at NAV00028033; ECF No. 51-39, Dep. Ex. 167; ECF No. 51-40, Dep. Ex. 188 at NAV00023147; ECF No. 51-41, NAV00110596; ECF No. 51-48, Dep. Ex. 57 at NAV00016306.

40.  Navistar never withdrew or attempted to modify the April 2022 Agreement after it signed it, but before GLS signed it. ECF No. 51-2, Blain Decl. ¶¶ 6-7.

41.  Navistar never asked GLS if it could extend the delivery schedule for the new tractors past June 2022, and Plaintiffs never agreed that Navistar could extend the delivery schedule for the new tractors past June 2022. *Id.* ¶ 7.

42.  On May 17, 2022, one day before Plaintiffs signed the April 2022 Agreement, at Sean Carmichael's direction, Jim Lollis told GLS that if it did not sign the April 2022 Agreement soon, Navistar would "stop/postpone our production

and hold deliveries of built tractors." ECF No. 51-35, Dep. Ex. 60; ECF No. 51-36, NAV00133580; Ex. 3, GLS Sept. 10, 2024 Dep. 226:10-14.

43.    When it signed the April 2022 Agreement on May 18, 2022, in response to Navistar's threat the day before, GLS expected all the tractors to be built by the end of June 2022. ECF No. 51-30, GLS Dep. 220:19-222:2.

**C.    Navistar Could Have Delivered 1,100 Tractors to Plaintiffs by the End of June 2022**

44.    Navistar originally scheduled all 1,100 of GLS's tractors to be manufactured by May 2022. Ex. 4, NAV00016007-16009.

45.    Navistar executives had the authority to reallocate tractor production among customers, including by pulling up production for certain customers and pushing production out. ECF No. 51-33, Belisle Dep. 175:5-12, 176:17-177:3; ECF No. 52-1, Navistar Dep. 55:14-57:18.

46.    From January through June 2022, Navistar built 12,725 tractors. Ex. 5, NAV00133353.[1]

47.    5,440 (or 43%) of those tractors were originally scheduled for production after July 1, 2022, but Navistar moved them up to the January-to-June period. *Id.*

---

[1] This spreadsheet is too voluminous to attach as a PDF, so Plaintiffs have only attached an excerpt here. Plaintiffs can make the spreadsheet available to the Court in native format upon request.

48.     Of those 5,440 tractors, 5,120 (or 94%) were ordered by other customers of Navistar after Navistar's dealer ordered Plaintiffs' tractors. *Id.*

49.     From May 18, 2022, the day Plaintiffs signed the April 2022 Agreement, to June 30, 2022, the explicit deadline for the manufacture and delivery of the MY 2023 tractors under the Agreement, Navistar built 3,287 tractors, 2,459 of which had the same engine that Plaintiffs purchased. *Id.*; ECF No. 51-23, Dep. Ex. 36 at 1, 4.

## D.     Navistar Breaches the April 2022 Agreement, Damaging Plaintiffs

50.     Within eight days of GLS signing the April 2022 Agreement, Navistar's dealer sent Kyle Blain a new schedule pushing production of 399 tractors to July 2022 and beyond. Ex. 6, LOLL-0000060-61.

51.     Ultimately, Navistar delivered 18 of the tractors meant for Central in May 2022, 95 in June 2022, 74 in July 2022, 80 in August 2022, 31 in September 2022, 11 in October 2022, 29 in November 2022, 50 in December 2022, 65 in January 2023, 103 in February 2023, 39 in March 2023, 6 in April 2023, 1 in May 2023, 18 in June 2023, 6 in July 2023, 1 in August 2023, and 1 in September 2023. ECF No. 50-11, Ex. J.

52.     Navistar's failure to timely build and deliver the new tractors caused GLS to lose $24,857,011 in profits, as GLS could not sell the MY 2018 tractors in a historically strong used tractor market. Ex. 7, Pls.' Expert Report at 13.

53.     Navistar's breach of contract likewise damaged Central by (a) forcing it to cover the increased maintenance and repair costs on the MY 2018 tractors; (b) causing it additional fuel expenses because the MY 2018 tractors were less fuel-efficient; and (c) forcing it to expend additional money to recruit drivers, as the MY 2018 tractors were manual transmission and the market for drivers who can drive manual transmission tractors is smaller, more competitive, and more expensive. *Id.*; ECF No. 51-44, Central Dep. 15:3-16:22.

## Introduction

Navistar's Motion for Summary Judgment is oddly cast. Navistar's own witnesses have agreed—both contemporaneously and at depositions—that Navistar's promise was to manufacture and deliver 1,100 tractors to GLS and its affiliates by the end of June 2022. But Navistar's Motion is based on the unstated, and false, premise that the parties' agreement was to a rigid, inflexible adherence to a proposed production schedule for new tractor delivery in March, April, and May 2022. And even starting from this incorrect premise, Navistar must resort to inapposite case law from the late nineteenth century rather than controlling Michigan law in support of its defenses. Navistar's motion should be quickly dismissed as meritless.

Navistar's primary claim that it was "impossible" or "impracticable" to fulfill the promises it made fails because, in Michigan, that defense may only be asserted

if the events giving rise to the impossibility were unforeseeable. But here, not only was the purported "impossibility" foreseeable, Navistar *actually knew* about it but made the promises anyway. And the record further shows that Navistar's performance was not impossible or impracticable; indeed, it produced 12,725 tractors in the time frame in question, but gave those tractors to other customers.

Navistar next tries to rely on a perceived technicality, wrongly claiming that because GLS assigned its contractual right to pay for and accept delivery of the tractors to an affiliated company, Plaintiff is not a "buyer" under the contract and cannot assert UCC rights. But the UCC provision in question expressly defines a "buyer" to include the party who *contracts* to buy the goods—which GLS (the contracting party) and Central (the intended third-party beneficiary) are.

Finally, Navistar argues for summary judgment on Plaintiffs' fraud claim, arguing that Plaintiffs could not reasonably rely on Navistar's false promises because it knew production was impossible. But—for the same reasons as above—not only was production possible, it happened; the tractors were simply given to other customers. There is, at a minimum, a fact question on reasonable reliance. Navistar's summary judgment motion should be denied.

## Standard of Review

Under Federal Rule of Civil Procedure 56, a court should only "grant summary judgment if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a). When parties file cross-motions for summary judgment, courts "evaluate

each motion on its own merits and view all facts and inferences in the light most

favorable to the nonmoving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir.

1994).

**Argument**

I. **Navistar's affirmative defenses of impossibility and impracticability both fail under the undisputed facts of this case, requiring denial of its Motion for Summary Judgment on Plaintiffs' contract claims.**

Michigan has well-developed case law on the impossibility doctrine. It should

thus be telling that, instead of citing this law, Navistar's summary judgment motion

relies on two United States Supreme Court cases from the 1800s and a federal

bankruptcy court decision. (*See* Def.'s Mot. Summ. J. ("Def.'s Mot."), ECF No. 50

at PageID.884.) Under Michigan's impossibility doctrine, Navistar's claims fail as

a matter of law. But even under its incorrect view of the law, there would be a

material question of fact precluding summary judgment.

A. **Navistar cannot rely on an impossibility or impracticability defense because the events giving rise to "impossibility" were foreseeable and avoidable.**

In Michigan, impossibility is an affirmative defense that excuses non-

performance of a contractual promise if that promise becomes objectively

impossible to perform. *Roberts v. Farmers Ins. Exch.*, 737 N.W.2d 332, 342 (Mich.

- 12 -

Ct. App. 2007); *Mich. Bean Co. v. Senn*, 287 N.W.2d 257, 259 (Mich. Ct. App. 1979). Although "absolute impossibility is not required," a defendant must make "a showing of impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved." *Roberts*, 737 N.W.2d at 342 (quotation marks and citation omitted).

However, application of the doctrine requires "circumstances beyond the control of the parties" to render the performance of a contract impossible. *Bissell v. L.W. Edison Co.*, 156 N.W.2d 623, 626 (Mich. Ct. App. 1967). The doctrine does not "excuse the performance of every obligation that creates a scheduling conflict with a higher priority . . . or otherwise renders performance inconvenient." *Prater v. Sezgin*, 2005 WL 927149, at *4 (Mich. Ct. App. Apr. 21, 2005) (citing *Bissell*); *J.J. Fagan & Co. v Burns*, 226 N.W. 653, 679 (Mich. 1929) ("A late start or miscalculation of difficulties or time does not excuse failure to produce."). Moreover, the circumstances giving rise to the alleged impossibility must have been *unforeseeable* to the party seeking to have its performance excused. *Vergote v. K Mart Corp.*, 404 N.W.2d 711, 717 (Mich. Ct. App. 1987). Otherwise, the impossibility defense is inapplicable; if the circumstances are foreseeable, "a man may contract to do what is impossible, as well as what is difficult, and be liable for

- 13 -

failure to perform." *Bissell*, 156 N.W.2d at 626-27.[2] At bottom, absent facts evincing government orders or directives outright prohibiting a party's exact performance, Michigan courts are extremely reluctant to find impossibility. *Compare id.* at 624-27 (finding impossibility of partial performance due to state highway department outright prohibiting the plaintiff's ability to dredge the fill material at the center of the contract) *with Fitness Int'l, LLC v. Nat'l Retail Props. Ltd. P'ship*, 2022 WL 7723954, at *6 (Mich. App. Oct. 13, 2022) (finding no impossibility because governor's order only barred the plaintiff from operating as a gym during COVID-19 pandemic, but did not prohibit the plaintiff from paying the rent during the shutdown). Under this authority, Navistar's impossibility arguments fail as a matter of law.

*First*, Navistar argues that when GLS signed the contract on May 18, 2022, "both parties knew it would be impossible" to meet the production schedule, which called for tractors to be built in April 2022. (Def.'s Mot., ECF No. 50 at PageID.885-89.) Navistar's argument misstates that the parties' agreement was the manufacture and delivery of 1,100 tractors *by the end of June 2022*, rather than strict, undeviating

---

[2] Navistar's Motion does not assert a defense of commercial impracticability under the UCC, but the same foreseeability standard applies to that doctrine. *See Chainworks, Inc. v. Webco Indus., Inc.*, 2006 WL 461251, at *9 (W.D. Mich. Feb. 24, 2006). Moreover, UCC impracticability has a second, largely-fact based requirement: that the party fairly and reasonably allocated production among its customers. Mich. Comp. Laws § 440.2615(b).

compliance with the April 2022 Agreement's production schedule. (*See* Counter-Statement of Material Facts and Statement of Additional Material Facts ("Facts") ¶¶ 2, 4-5, 7, 36-39.) But even assuming Navistar's conception of the contract was correct, Navistar admits that it knew, as of May 2022, that it had not produced the tractors in March or April 2022. (Def.'s Mot., ECF No. 50 at PageID.887.) Yet Navistar did not rescind its offer before GLS accepted it—something Navistar had a unilateral right to do. Facts ¶ 40; *Bd. of Control of E. Mich. Univ. v. Burgess*, 206 N.W.2d 256, 259 (Mich. Ct. App. 1973). Instead, Navistar effectively renewed that offer on May 17, 2022 by demanding that GLS sign the contract or else Navistar would stop production and the delivery of already-built tractors. (Facts ¶ 42.) In other words, even under Navistar's erroneous reading of the contract, it contracted to do something that it knew was impossible and thus remains liable for its breach. *Bissell*, 156 N.W.2d at 626-27.

*Second*, Navistar argues that GLS made changes to its order in March 2022 that made production impracticable. (Def.'s Mot., ECF No. 50 at PageID.889-890.) Navistar's argument is misleading and nonsensical. The changes at issue were the result of Navistar's own decision in March 2022 to reallocate A26 engines slated for use in GLS's tractors to other customers, and to offer GLS the more-expensive X15 engine in order to remain on schedule. (*See* Facts ¶¶ 11-12.) Navistar's own decision to prioritize other customers' A26 engine orders to GLS's detriment is not the sort

of circumstance that permits invocation of the impossibility doctrine in the first place. *See Prater*, 2005 WL 927149, at *4. Moreover, Navistar's argument is factually incongruous. Navistar concedes that it knew as of March 29, 2022 of the changes creating the "impracticability" (Def.'s Mot., ECF No. 50 at PageID.889), yet nonetheless signed the Agreement at issue in April 2022 and renewed its offer on May 17, 2022 when it pressured GLS to sign. (Facts ¶¶ 9, 42.) Navistar cannot rely on foreseeable events—let alone *actually known* events—to excuse promises it made in the April 2022 Agreement.

Finally, although Navistar does not explicitly rely on supply chain disruptions, it weaves that excuse throughout its brief as a reason it was unable to deliver on its promises. (*See* Def.'s Mot., ECF No. 50 at PageID.879, 885, 890.) But Navistar was plainly aware that supply chain disruptions were possible when it offered GLS the tractors in April 2022. (Facts ¶ 8.) Indeed, given that Navistar explicitly claimed in December 2021 that supply chain issues would prevent it from performing under the July 2021 Agreement and therefore caused the parties to enter into the new April 2022 Agreement (*id.* ¶¶ 35-37), it necessarily follows that this "factor was neither unforeseen nor outside the parties' contemplation." *Exelon Generation Co. v. Gen. Atomics Techs. Corp.*, 559 F. Supp. 2d 892, 904 (N.D. Ill. 2008) (rejecting an argument that mining conditions were unforeseeable because they were "one of the justifications for amending the contracts" at issue). And Navistar undisputedly knew

- 16 -

that it had already filled its 2022 production schedule *by May 2021*, yet continued to make GLS and others production promises it now appears it knew it could not keep. (Facts ¶¶ 33-34.) Case law is clear: a party cannot knowingly overpromise and then rely on impossibility to excuse its inevitable failure to deliver. *Roth Steel Prod. v. Sharon Steel Corp.*, 705 F.2d 134, 150 (6th Cir. 1983). Navistar's impossibility defense is absurd and should be rejected as a matter of law.

**B.    As a factual matter, at the time the parties contracted, it was not impossible or impracticable for Navistar to manufacture and deliver to GLS the 630 tractors meant for Central.**

Navistar's argument fails for another reason: there is significant factual evidence that Navistar could have timely produced the 630 tractors meant for Central that are at issue in this case. Navistar was already obligated under the *existing* July 2021 Agreement to deliver to GLS hundreds of tractors within the January through June 2022 timeframe. (Facts ¶ 33.) Furthermore, Navistar could have—and, initially, did—schedule all 1,100 tractors for production by the end of June 2022, well before the April 2022 Agreement was signed. (*See* Facts ¶ 44, 46.) Indeed, Navistar built 12,725 tractors between January 2022 and June 2022, more than 10 times what it owed GLS.[3] (*Id.* ¶ 46.) Even looking at the shorter period from May 18, 2022 (when

---

[3] As noted (*supra* at 14), Navistar misstates the April 2022 Agreement's terms: it promised to manufacture and deliver 1,100 tractors by the end of June 2022 (630 of which were intended for Central), rather than, as Navistar implies, strict and unwavering adherence to the month-by-month totals in the production schedule. (Facts ¶¶ 2-5, 7, 36-39.) At best for Navistar, there is a fact question on the meaning

GLS signed the agreement) through June 30, 2022, Navistar built 3,287 tractors. (*Id.* ¶ 49.)

As the Court knows (*see* Pls.' Mot. Compel, ECF No. 54), a key issue in this case is Navistar's reasons for bumping GLS's production slots in favor of other customers. And while Navistar continues to largely refuse to produce relevant documents on the topic (*see generally id.*), the evidence it has produced shows that over *5,440* of the tractors Navistar produced from January 2022 to June 2022 were actually slated to be built after July 1, 2022, but that Navistar moved up their production schedule and gave them to other customers, instead of fulfilling its promised order to GLS. (Facts ¶ 48.) Given that Navistar could have produced GLS and Central's tractors per the terms of the April 2022 Agreement, Navistar is not entitled to summary judgment on impossibility.

## II. Plaintiffs' right to recover consequential damages arising from Navistar's breach is not affected by GLS's subsequent assignment of its purchase rights to affiliate ELC.

Navistar also seeks summary judgment on Plaintiffs' contract claim by arguing (1) that the UCC only permits a "buyer" to seek consequential damages but (2) that the "buyer" here is non-party ELC, because, after GLS signed the April 2022

---

of the April 2022 Agreement. Given that a jury could find that Navistar's promise was to deliver by the end of June 2022, Navistar cannot prevail on summary judgment if a jury could find that Navistar could have produced and delivered the tractors at issue by the end of June. *See Barnes v. B & V Const., Inc.,* 357 N.W.2d 894, 895-96 (Mich. Ct. App. 1984).

Agreement, GLS assigned its right to purchase the tractors to ELC. (Def.'s Mot., ECF No. 50 at PageID.890-92.) But this argument simply ignores the UCC's definition of a "buyer" and the damaged party here, GLS.

Specifically, Navistar cites Mich. Comp. Laws § 440.2714(1) for the proposition that only a "buyer" may recover consequential damages. (*Id.* at PageID.891.) But the UCC defines a "buyer" as "a person who buys *or contracts to buy* goods." Mich. Comp. Laws § 440.2103(1)(a) (emphasis added). Navistar concedes that GLS was the party that contracted to buy the tractors. (*See* Facts ¶ 9.) So, per the plain language of the UCC, GLS is a buyer and may recover consequential damages—here, its lost profits arising from its inability to sell the MY 2018 tractors in a historically-hot used tractor market.[4] (*See id.* ¶ 52.)

And even putting aside Navistar's failure to cite the actual UCC text, Navistar's attempt to manufacture a technicality with respect to the statutory term "buyer" runs headlong into the fact that the UCC *explicitly* allows assignment of contractual duties, which would be illusory if assignment meant that a party would lose its ability to recover damages in the event of a breach. *See* Mich. Comp. Laws § 440.2210(1); *First of Am. Bank v. Thompson*, 552 N.W. 2d 516, 519 n.2 (Mich. Ct.

---

[4] While GLS had ELC pay the invoices for the MY 2023 tractors delivered under the April 2022 Agreement, GLS remained the owner of the MY 2018 tractors that it was unable to timely sell due to Navistar's breach, and thus GLS—not ELC—suffered the damages from the breach. (Facts ¶¶ 3, 29, 48.)

App. 1996) (noting that "assignability is sanctioned under the UCC as a normal and permissible incident of a contract for the sale of goods") (cleaned up); *Macomb Interceptor Drain Drainage Dist. v. Kilpatrick*, 896 F. Supp. 2d 650, 660 (E.D. Mich. 2012) (noting that an assignment under the UCC assigning even "'rights under all contracts' does not *per se* assign claims or causes of action, but instead assigns only rights and obligations arising under a contract").

Central was also damaged due to its inability to timely receive the MY 2023 tractors by being forced to incur additional fuel, maintenance, and driver recruitment costs. (Facts ¶ 53.) Navistar recognizes that Central's claim is a "derivative breach-of-contract claim as a third-party beneficiary." (Def.'s Mot., ECF No. 50 at PageID.890.) It thus acknowledges the rule that "a party who qualifies as a third-party beneficiary effectively 'stands in the shoes' of the original promisee and has the same right to enforce said promise that he would have had if the said promise had been made directly to him as the promisee." *Shay v. Aldrich*, 790 N.W.2d 629, 640 (Mich. 2010) (cleaned up). Thus, an intended third-party beneficiary may seek consequential damages available to a buyer, as it steps into the buyer's shoes for purposes of the contract. *See Bay Gen. Indus., Inc. v. Johnson*, 418 A.2d 1050, 1056 (D.C. 1980) (holding that third-party beneficiary may recover as the "buyer" under the UCC on this basis). Navistar does not argue, in its Motion, that Central is not a third-party beneficiary. (*See generally* Def.'s Mot., ECF No. 50.) And Navistar does

not argue that third-party beneficiaries of UCC buyers are prohibited from recovering consequential damages (it just argues, wrongly, that ELC is the buyer). (*Id.* at PageID.891-92.) Given that Central's third-party beneficiary status is not disputed for purposes of the Motion, Navistar promised Central timely delivery and Navistar is responsible for Central's damages.

Navistar, moreover, cites only one case to support its argument that Plaintiffs are not entitled to consequential damages: *Bryant v. BMW of North America LLC*, 585 F. Supp. 3d 1178 (E.D. Wis. 2022). (*See* Def.'s Mot., ECF No. 50 at PageID.892.) But *Bryant* offers no support. In that case, Steamer Motor Company bought a BMW, and its owner Benjamin Schaefer signed the contract on behalf of the company. *Bryant*, 585 F. Supp. 3d at 1180. Schaefer sued BMW in his personal capacity, rather than having the company sue. *Id.* at 1180-81. The court ruled, in effect, that Schaefer was not the "buyer" because the corporation was the buyer, and Schaefer could not disregard corporate formalities. *Id.* at 1182. In other words, *Bryant* involved a case where the party suing did not buy *or* contract to buy the goods (unlike here). And nothing in *Bryant* suggested that Schaefer was a third-party beneficiary. *See generally id.* This case says nothing about consequential damages and is entirely irrelevant.

In short, GLS is a "buyer" as defined by the UCC and a damaged party to the contract that Navistar breached. Furthermore, Central stands in GLS's shoes as a

- 21 -

buyer for its claim as an intended third-party beneficiary. The Court should deny Navistar's request for summary judgment on this ground.

## III. Plaintiffs' fraud claim also survives summary judgment because there is factual evidence establishing Plaintiffs' reasonable reliance on Navistar's false assertions that it would manufacture and deliver all tractors by the end of June 2022.

Finally, Navistar seeks summary judgment on Plaintiffs' fraud claim arguing—as with its impossibility defense—that GLS could not have reasonably relied on Navistar's promise of accelerated delivery because Navistar had not delivered sufficient tractors in March, April, and May 2022. (Def.'s Mot., ECF No. 50 at PageID.892-95.) This argument fails for the same reasons the impossibility defense fails.

Fraud in the inducement involves a "claim . . . that one party was tricked into contracting." *Llewellyn-Jones v. Metro Prop. Grp., LLC*, 22 F. Supp. 3d 760, 778 (E.D. Mich. 2014). A plaintiff must show that the defendant made a material representation that was false; that the defendant knew it was false when it was made, or made it recklessly without knowledge of its truth; that the defendant intended the plaintiff to act upon the statement; that the plaintiff acted in reliance on the statement; and that it harmed the plaintiff. *Belle Isle Grill Corp. v. Detroit*, 666 N.W.2d 271, 280 (Mich. Ct. App. 2003). Here, there is a genuine and material dispute of facts on these elements.

- 22 -

As discussed (*supra* at 14), Navistar's argument misconstrues the nature of the promise in question. The "accelerated production" that was promised was that all tractors would be delivered by the end of June 2022—whereas the original July 2021 Agreement would have had those 1,100 tractors delivered by the end of December 2022. (*See* Facts ¶¶ 33, 38.) Navistar reiterated that promise on May 17, 2022 when it told Kyle Blain that it would stop production and withhold already-built tractors if he did not sign the still-pending April 2022 Agreement. (*Id.* ¶ 42.) Blain signed the next day in response to Navistar's communication with the understanding that all tractors would be built and delivered by the end of June, if not sooner. (*Id.* ¶ 43.) The fact that some earlier production schedules showed a small handful of tractors being produced after June 2022 was not unusual; in the ordinary course, manufacturers like Navistar pull production *forward* to meet their deadlines. (*Id.* ¶¶ 13, 45.) Here, it was only *after* Blain signed the agreement that Navistar told GLS that it would instead manufacture the majority of the tractors at issue after the June 2022 deadline. (*Id.* ¶ 50.)

These facts, at a minimum, create a jury question on reasonable reliance. As of May 2022, it was reasonable for GLS to rely on Navistar's promise that it would deliver 1,100 tractors by the end of June. The record confirms that Navistar in fact produced far more than 1,100 tractors between May 18, 2022 and June 30, 2022, but chose to provide them to other customers rather than fulfill its promise to GLS—a

- 23 -

promise Navistar had no intention of keeping. (*Id.* ¶ 49.) And the record also contains evidence that Navistar did, in fact, pull up *other* customers' orders to an earlier timeframe than it had originally indicated; it just did not do so for GLS. (*Id.* ¶¶ 47-48.) Navistar has no basis to seek summary disposition of the fraud claim.

## Conclusion

The Court should deny Navistar's Motion for Summary Judgment.

Respectfully submitted,

KIENBAUM HARDY VIVIANO
PELTON & FORREST, P.L.C.:

By: */s/ Thomas J. Davis*
    Eric J. Pelton (P40635)
    Thomas J. Davis (P78626)
Counsel for Plaintiffs
280 N. Old Woodward Ave., Ste. 400
Birmingham, MI 48009
(248) 645-0000
epelton@khvpf.com
Date:  January 28, 2025        tdavis@khvpf.com

555821

## LOCAL RULE CERTIFICATION

I, Thomas J. Davis, certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts). I also certify that it is the appropriate length. Local Rule 7.1(d)(3).

*/s/ Thomas J. Davis*
Thomas J. Davis (P78626)
Kienbaum Hardy Viviano
Pelton & Forrest, P.L.C.
280 N. Old Woodward Ave., Ste. 400
Birmingham, MI 48009
(248) 645-0000
tdavis@khvpf.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 28, 2025, the foregoing and all accompanying documents were served via the Court's CM/ECF system, which sent electronic notice of the filing to all counsel of record.

*/s/ Thomas J. Davis*
Thomas J. Davis (P78626)
Kienbaum Hardy Viviano
Pelton & Forrest, P.L.C.
280 N. Old Woodward Ave., Ste. 400
Birmingham, MI 48009
(248) 645-0000
tdavis@khvpf.com
