UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GLS LEASCO, INC. and CENTRAL
TRANSPORT LLC,

     Plaintiffs,                   Case No. 23-cv-12927

v.                              Hon. Mark A. Goldsmith

NAVISTAR, INC.,            Magistrate Judge Anthony P. Patti

     Defendant.

---

## DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# <u>TABLE OF CONTENTS</u>

**Page**

ISSUES PRESENTED ........................................................................................... iv

CONTROLLING OR MOST APPROPRIATE AUTHORITY ................................... v

COUNTER-STATEMENT OF MATERIAL FACTS ........................................... 1

ARGUMENT .................................................................................................... 9

I.    Navistar did not breach the Letter Agreement, and at a minimum there are genuine disputes of fact regarding whether a breach occurred. ........................... 9

    A.    The Letter Agreement did not promise delivery dates. ........................... 10

    B.    The Letter Agreement's potential production schedule was not a firm production commitment. .................................................... 12

    C.    There is a genuine dispute of fact regarding whether each truck was delivered by a reasonable time. ............................................... 14

    D.    Plaintiffs have no evidence of cognizable damages. ................................. 16

II.    Navistar's affirmative defenses contain triable issues. .......................................... 17

    A.    To the extent the Letter Agreement constituted a firm production schedule, it is void under the impossibility doctrine. ............................... 17

    B.    Navistar's waiver defense presents triable issues. ...................................... 18

    C.    The release contained in the Letter Agreement and Plaintiffs' acceptance of $6.2 Million are valid affirmative defenses. ....................... 20

    D.    Navistar's impracticability defense presents triable issues. ...................... 22

III.    Navistar's affirmative defenses of failure to satisfy conditions precedent and lack of mutuality warrant summary judgment in Navistar's favor. ..................... 23

IV.    CONCLUSION ........................................................................................... 25

LOCAL RULE CERTIFICATION ................................................................... 26

CERTIFICATE OF SERVICE .......................................................................... 27

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Dir. of Off. of State Lands & Invs. v. Merbanco, Inc.*,
2003 WY 73, ¶ 49, 70 P.3d 241 (Wyo. 2003) ................................................. 22

*Greater Lakes Ambulatory Surgical Ctr., LLC v. Meemic Ins. Co.*,
No. 353842, 2021 WL 3234350 (Mich. Ct. App. July 29, 2021) ................................ 24

*Hoffner v. Lanctoe*,
802 N.W.2d 648 (Mich. App. 2010) ................................................................. 22

*King v. Hartford Cas. Ins. Co.*,
No. 10-cv-12209, 2010 WL 5390135 (E.D. Mich. Dec. 22, 2010) .......................... 22

*Kvaerner U.S., Inc. v. Hakim Plast Co.*,
74 F. Supp. 2d 709 (E.D. Mich. 1999) ................................................. 18, 19

*Lathfield Holdings LLC v. Dahl Real Est. LLC*, No. 363502, 2023 WL 6168972 (Mich.
Ct. App. Sept. 21, 2023) ................................................................. 18

*Nathan v. Brownstone Plastics, LLC*,
511 B.R. 863 (E.D. Mich. 2014) ................................................. 17, 18

*Radiance Aluminum Fence, Inc. v. Marquis Metal Material, Inc.*,
461 F. Supp. 3d 531 (E.D. Mich. 2020) ................................................. 20

*SME Holdings, LLC v. Tool Crib, Inc. of Knoxville, Tennessee*,
No. 19-12698, 2021 WL 3861114 (E.D. Mich. Aug. 30, 2021) .......................... 15, 20

*Soloman v. W. Hills Dev. Co.*,
276 N.W.2d 577 (1979) ................................................................. 15

*Walter Toebe Const. Co. v. Kard Welding, Inc.*,
No. 05-73605, 2007 WL 4218961 (E.D. Mich. Nov. 29, 2007) ................................ 15

**Statutes**

MCL 440.1303(1) ................................................................. 19

MCL 440.1303(6)..................................................................................................... 19

MCL 440.2309 ........................................................................................................ 15

MCL 440.2309(1)..................................................................................................... 14

# ISSUES PRESENTED

1.     Should summary judgment on the breach-of-contract claim be denied for Plaintiffs' failure to establish multiple elements, including (1) that Navistar made any promise about delivery dates, (2) what reasonable time for delivery should be read into the contract, (3) that the production schedule was a firm commitment capable of being breached, (4) whether each truck was delivered by a reasonable time, and (5) evidence of damages.

The Court should respond "Yes."

2.     Should summary judgment be denied on Navistar's affirmative defenses, because (1) if the production schedule were a firm commitment, it would be void as impossible to meet, (2) Plaintiffs waived the production schedule by knowingly accepting delayed production, and (3) there is a genuine dispute of material facts as to whether Plaintiffs released all claims?

The Court should respond "Yes."

3.     Should summary judgment be awarded in favor of Navistar on its affirmative defenses of first to breach, failure to satisfy conditions precedent, and lack of mutuality/want of consideration, where GLS never performed under the Letter Agreement by purchasing the trucks.

The Court should respond "Yes."

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

- MCL 440.2309(1)

- *Walter Toebe Const. Co. v. Kard Welding, Inc.*, No. 05-73605, 2007 WL 4218961 (E.D. Mich. Nov. 29, 2007)

- *Soloman v. W. Hills Dev. Co.*, 276 N.W.2d 577 (1979)

- *SME Holdings, LLC v. Tool Crib, Inc. of Knoxville, Tennessee*, No. 19-12698, 2021 WL 3861114 (E.D. Mich. Aug. 30, 2021)

- *Nathan v. Brownstone Plastics, LLC*, 511 B.R. 863, 867 (E.D. Mich. 2014)

- *Lathfield Holdings LLC v. Dahl Real Est. LLC*, No. 363502, 2023 WL 6168972 (Mich. Ct. App. Sept. 21, 2023)

- MCL 440.1303(1), (6)

# COUNTER-STATEMENT OF MATERIAL FACTS

1.      Admitted that GLS[1] purchases and leases semi-truck tractors, including to its affiliate Central, but denies that GLS purchased or leased the model year ("MY") 2023 trucks that are the subject of the letter agreement that Navistar signed on April 8, 2022, and GLS signed on May 18, 2022 ("the Letter Agreement").  (**Exhibit A**, GLS Corp. Rep. Dep., 11/13/24 at p. 58:15–25.)

2-3.      Admitted.

4.      Admitted that GLS, Navistar, and Summit Truck Group ("Summit") entered into a "Navistar, Inc. Optional Trade-In Agreement" that provided GLS with the option to trade in MY 2018 trucks provided the trucks met certain criteria.  (**Exhibit B**, Blain Dep. Ex. D-8.)

5.      Navistar cannot admit or deny whether GLS planned to trade in the MY 2018 trucks but denies that GLS exercised its option to trade in the MY 2018 trucks.

6.      Admitted that Navistar, GLS, and Summit executed a contract for the sale of 1,305 MY 2023 and 2024 International RH trucks on or about July 29, 2021, that included trade-ins for MY 2017 through MY 2019 trucks.  (*See* Ex. B.)

7.      Admitted that GLS retained its right to trade in the MY 2018 trucks subject to Navistar's terms and conditions, among other requirements.  (*See* Ex. B.)

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in Plaintiffs' Motion for Partial Summary Judgment.

8.     Denied that Navistar promised to deliver 1,100 MY 2023 trucks to GLS between February and December 2022 and 205 MY 2024 trucks in 2023.  The contract speaks for itself. (*See* Ex. B.)

9.     Denied that production slots were not available under the 2021 Letter Agreement.  Navistar already allocated production slots to Summit at the beginning of 2021.  (**Exhibit C**, Akinosho Dep., at p. 165:1–167:8.)

10.    Admitted that Navistar informed its dealers (who informed GLS) on July 13, 2021, that its 2022 calendar year production was full, and that Navistar was shutting down its main plant in Escobedo, Mexico, for two weeks because of supply chain issues. (**Exhibit D**, Lollis Dep. Ex. 30.)   Denied that Navistar stopped taking new orders altogether as Navistar went on a temporary order freeze but continued to adjust orders already placed or in-progress. (Ex. C, at p. 120:10–121:15.)

11.    Denied. When asked whether he knew at the time he signed the 2021 agreement that demand exceeded supply, Carmichael testified that "I don't know if I can answer that" and later explained that dealers such as Summit already get allocated a number of production slots to use at their discretion.  (**Exhibit E**, Carmichael Dep., at p. 135:14–138:17.)

12.    Admitted that the 2021 agreement states that Navistar will hold 1,100 new 2023 International RH Daycab production slots from February 2022 to December 2022 but that new tractor delivery was based on "available production at the time of the letter."  The 2021 agreement speaks for itself. (*See* Ex. B.)

2

13.     Admitted that Navistar informed Central on or about December 16, 2021, that its 2022 allocation would be "reduced from 1,100 units down to 600 due to ongoing supplier issues" but no such reduction took place as Navistar later agreed to produce 1,100 units under the Letter Agreement.  (*Compare* Plaintiffs' Brief at ECF No. 51, ¶ 13 *with* Letter Agreement, ECF No. 29-1, PageID.277–280.)

14.     Admitted that Navistar experienced supply chain shortages in 2021-2022, including, without limitation, Bendix collision mitigation systems and A26 engines.

15.     Denied that Navistar proposed to deliver 1100 tractors to GLS in the first half of 2022.  Sean Carmichael had a verbal conversation with Kyle Blain in early January 2022 and "floated that we *build* them 350 a month in March, April and May to get them to their 1,100 for the year and they (GLS) would accept a $10,000 no trade credit on all the OTB units."  (ECF No. 51-17, PageID.1267.)

16.      Admitted that GLS entered into the Letter Agreement on May 18, 2022, but denied that Navistar entered into an agreement reflecting the terms described in paragraph 15. (ECF No. 51, PageID.1059, ¶ 15; *see* Letter Agreement, ECF 29-1, PageID.280.)

17.     Admitted that used truck prices on certain heavy trucks was high in January 2022.  However, paragraph 17 does not specify a time period.

18.     Admitted that the parties began negotiating the sale of 1,100 semi-trucks in January 2022 but denied that the parties had reached an agreement at that time.

19.     Admitted that Mr. Carmichael stated in his email "*[a]s we sit right now*, all units will be built and delivered by June." (ECF 51-15, PageID.1255, p. 328:6–13; ECF No. 51–48.)  Denied that the draft contract stated all units would be delivered by June.

20.     Admitted that Navistar was aware of supply chain issues involving the A26 engines in the spring of 2022.

21.     Admitted.

22.     Admitted.  However, Carmichael did not believe it would affect the PAM/Central/Universal truck builds.  (Ex. E, at p. 380:15–381:4; *see also* ECF No. 51-15, PageID.1258–1259.)

23.     Admitted.

24.     Denied.  The Letter Agreement specifies build months, not delivery months, and further states "New Truck Delivery – based on available production at the time of this letter."  (Letter Agreement, ECF No. 29-1, PageID.278.)

25.     Denied that the Letter Agreement specified delivery dates.  The Letter Agreement contemplates a build schedule that is subject to available production and speaks for itself.  (Letter Agreement, ECF No. 29-1, PageID.278.)

26-27. Admitted that GLS accepted payment in the amount of $6,200,000 under the Letter Agreement and agreed to "dispose of all 941 trades associated with this package."  The Letter Agreement speaks for itself.  (ECF No. 29-1, PageID.279.)

28.     Admitted.  However, paragraph 28 is incomplete and does not quote the "No Trade Agreement" entirely.  (ECF No. 29-1, PageID.279.)

4

29.     Admitted that GLS did not sign the Letter Agreement until May 18, 2022.

30.     Admitted that Jim Lollis sent an updated production schedule to GLS on April 13, 2022, that provided "Est. Build Date" for 75 RH trucks and 555 LT trucks. The production schedule speaks for itself.  (ECF No. 51-31, PageID.1621–1634.)

31.     Denied.  Ms. Perkins testified that production schedules can fluctuate "tremendously" and that "this one in particular is my favorite because it has 15 that go into then July."  (ECF No. 51-32, PageID.1635-1638, p. 42:4–7; 103:12–104:4.)

32.     Admitted that Lollis stated that the chart referenced in his email referred to build dates and "it's a pretty fluid environment for a while on the numbers."  Denied that Lollis was discussing a specific Navistar production schedule.  (ECF No. 51-24, PageID.1585, p. 103:16-104:2.)

33.     Admitted it may be possible to change customer orders with dealership and CRC approval but not after production is line set.  (**Exhibit F**, Belisle Dep., at p. 95:19–97:2.)

34.     Admitted.

35.     Denied that the Letter Agreement contains a delivery schedule or that Navistar agreed to deliver all the trucks by the end of June 2022.  (ECF No. 29-1, PageID.277–280.)

36.     Admitted that Lollis sent a text to Blain stating that GLS needed to sign the Letter Agreement.  The text message speaks for itself.

37.     Admitted.

38.     Denied.  GLS was provided with production schedules prior to executing the Letter Agreement reflecting build dates past June 2022. (ECF No. 50, PageID.884–89; ECF No. 33-5, PageID.456–57; ECF No. 50-8, PageID.981–92.)

39.     Navistar admits that it built a total of 4,701 day cabs and 6,067 sleeper cabs by the end of June 2022; however, the at-issue trucks here are not sleeper cabs.

40.     Admitted.

41.     Navistar contends that paragraph 41 is unclear because it fails to state what Carmichael purportedly admitted to.

42.     Denied that Navistar had a contractual obligation to build or deliver all the new trucks by the end of June 2022.  (ECF No. 29-1, PageID.277–280.)

43.     Denied. Navistar admits that it did not build 1100 tractors under the Letter Agreement by the end of June 2022.  (ECF No. 51-38, PageID.1659.)

44.     Navistar denies GLS's assertion that the timing of its build and delivery of new trucks to Central resulted in lost profits to GLS.  In fact, GLS received 113 of the MY 2023 trucks by June 2022, but only sold 20 in that month and failed to sell 98 trucks that it allegedly could have sold immediately.  (**Exhibit G**, GLSN-0002914.) Brianne Perkins from Central testified she created the spreadsheet GLSN-0002914 to track MY 2023 deliveries.  (**Exhibit H**, Perkins Dep., at p. 31:9–12.)[2]

---

[2] Plaintiffs' second amended complaint conflicts with this number, alleging that Plaintiffs received 95 MY 2023 trucks by June 2022, whereas Central's internal records reflect 113.  Nevertheless, both reflect that Plaintiffs did not receive a MY 2023 truck by May 18 the date Blain signed the Letter Agreement.

45.     Denied.  Navistar contends that Plaintiffs' reference to App. D, Sch. 1 of Navistar's expert report does not support Plaintiffs' statement of material fact.  The market data reflecting the average market value of MY 2018 trucks speaks for itself.

46.     Admitted that Central has alleged additional maintenance and repair costs associated with running the MY 2018 trucks past their trade in dates, but Navistar denies this allegation as true.  Navistar denies this allegation as Central continued to use the MY 2018 trucks in its fleet, which simultaneously earned revenue for Central and earned leasing revenue for GLS, even when new trucks were available to replace the MY 2018 trucks.  (**Exhibit I**, Schmalenberg Dep., at p. 49:3–17; 143:1–144:11.)

47.     Admitted that Central has alleged additional fuel expenses.  Navistar denies that it has any liability for the additional fuel expenses.  (*See id.*)

48.     Admitted that Central has alleged additional "driver recruitment costs." Navistar denies that it has any liability for such costs.

49.     Denied.  GLS's corporate representative testified he was not aware of any written or formal assignment and testified that there was a mere informal "understanding."  (**Exhibit J**, Blain Dep., 9/11/2024, at p. 284:9–285:20.)

50-51.  Admitted.

52.     Navistar denies the legal conclusions stated in this paragraph.

53.     Admitted.

54.     Navistar has no documentary evidence to contradict Blain's affidavit concerning the financing for the 630 new trucks as this issue was never raised in discovery nor is it relevant.

55.     Navistar has no evidence to contradict Blain's affidavit concerning ELC's debt as this issue was never raised in discovery nor is it relevant.

56.     Admitted that at least some invoices were sent from Allegiance to Greg Nestler of Navistar Capital, a BMO Financial Group Program.

57.     Admitted Navistar did not alert ELC that it had not received payment for the MY 2023 trucks; however, ELC's purchase of the MY 2023 trucks was transacted through the dealership, Allegiance Truck Group, not by direct payments to Navistar.

58.     Navistar admits it never objected to the fact that ELC paid the invoices because the transaction was handled by Allegiance Truck Group, not Navistar.

59.     Denied.  The Optional Trade Back ("OTB") agreement for the 2023 trucks contained prohibitions on assignment, and GLS testified that the OTB and Letter Agreement were part of one transaction.  (Ex. A, at p. 33:15–34:22.)

60.     Admitted that Plaintiffs have sued for breach of contract and fraud. Navistar denies it is liable for these or any of Plaintiffs' claims.

61.     Admitted that Navistar has asserted affirmative defenses, the basis for which is supported by the relevant deposition exhibits, testimony, and interrogatory answers describing the same.

## NAVISTAR'S STATEMENT OF ADDITIONAL MATERIAL FACTS

Navistar incorporates by reference its statement of facts supporting its Motion for Summary Judgment.  (ECF No. 50, PageID. 877–883.)

## ARGUMENT

**I.    Navistar did not breach the Letter Agreement, and at a minimum there are genuine disputes of fact regarding whether a breach occurred.**

Plaintiffs' summary judgment motion fails for a simple and straightforward reason: The Letter Agreement contains no requirement or agreement that Navistar would "deliver 1,100 new tractors to GLS and its affiliates by the end of June 2022." There are no promised delivery dates in the Letter Agreement at all, only potential "build" dates, and the record demonstrates that all parties recognized that "build" does not equate to delivery.  Because Navistar was not obliged to deliver 1,100 trucks to GLS by June 2022, the fact that Navistar did not do so cannot support a breach.

Moreover, the summary judgment record shows that build dates in the Letter Agreement were not firm commitments.  Instead, they were a contingent and caveated representation of the available schedule at the time they were proposed in *February 2022*, that all parties recognized could change and *had changed* by the time Plaintiffs executed the Letter Agreement four months later, on May 18.

Regardless, in the absence of any promised delivery schedule, the UCC requires only that goods be delivered in a reasonable time.  GLS did not even move for summary

9

judgment on the basis that the MY 2023 trucks were not delivered in a reasonable time, and that is a quintessential fact question that is disputed here.

Finally, even if Plaintiffs could show breach, as Navistar explained in its Motion for Summary Judgment, Plaintiffs have no evidence of recoverable damages, which are an essential element of Plaintiffs' breach-of-contract claim.

## A.   The Letter Agreement did not promise delivery dates.

Plaintiffs' argument that it is entitled to summary judgment because "1,100 new tractors" were not delivered by the end of June 2022 fails because the Letter Agreement made no such promise.

In their complaint, Plaintiffs acknowledged that the Letter Agreement's schedule was a production schedule, not a delivery schedule: "Navistar's failure to meet the required production schedule is a material breach of the Letter Agreement." (ECF No. 29, PageID.273.)[3] This is the *only* material breach Plaintiffs alleged.

But now Plaintiffs seek summary judgment by arguing that Navistar breached what they call the "April 2022 Agreement" because it did not "*deliver* 1,100 new tractors to GLS and its affiliates by the end of June 2022." (ECF No. 51, PageID.1067 (emphasis added).) Even if Plaintiffs had pled a count asserting such a theory, the Letter

---

[3] A "build" or "production" date is the date a truck is assembled on Navistar's production line. But after that date, trucks undergo additional steps, such as inspection and detailing, passing through customs, and transportation, and can take up to 120 days after build to actually be delivered to a customer. (*See, e.g.*, Ex. E, at p. 290:6–8 (detailing that it could take up to 120 days to be delivered to a customer); **Exhibit K**, Lollis Dep., at p. 271:15–272:7 (describing certain post-production, pre-delivery steps.)

Agreement does not contain any requirement that Navistar deliver the trucks by the end of June 2022 – or, for that matter, by any other date. If it did, Plaintiffs would have quoted that language, instead of conspicuously failing to quote any language from the Letter Agreement at issue. (ECF No. 51, PageID.1067–68; *id.* at PageID.1060, ¶ 24.)

Plaintiffs ignore the Letter Agreement's language because it contains a potential production schedule, not a promised delivery schedule. The Letter Agreement's first sentences refer to "production dates" and "production slots," not delivery dates. (ECF No. 50-2, PageID.901.) The Letter Agreement states only that Navistar was "working diligently to secure" 1,100 *production slots*." (*Id.* (emphasis added).) Unsurprisingly, then, the schedule in the Letter Agreement sets out "build" months, not "delivery" months:

| New Truck Build Month | RH New Truck Builds | LT New Truck Builds | Trades |
|---|---|---|---|
| January | 42 | | 0 |
| February | 32 | | 0 |
| March | 342 | | 0 |
| April | 42 | 300 | 0 |
| May | 3 | 339 | 0 |
| June- Spillover month | | | 0 |
| Total | 461 | 639 | 0 |

Even if the language were ambiguous (it is not), Plaintiffs have admitted that "build dates" or "production dates" are different than "delivery dates," and that the Letter Agreement contemplated build dates, not a delivery schedule. (**Exhibit L**, GLS Corp. Dep., 9/10/24, at p. 175:11–22 (responding to question about whether it was "a delivery schedule" or "a build schedule" by stating, "my expectation was that was the build month, when that truck was – those trucks were going to be built"); *id.*, at p.

11

175:23–25 ("Q: Okay. And so build month *isn't the same as delivery*, then? A: *No*. We established that earlier.").)

Plaintiffs try to evade the Letter Agreement's plain language (and their admission) by asserting, in paragraph 24 of their statement of material facts, that Navistar promised to deliver trucks by the end of June 2022. The documents referenced in paragraph 24 do not support that assertion. Like the Letter Agreement, the documents Plaintiffs cite refer to a schedule for production, not for delivery. (*E.g.*, ECF No. 51-29 (email from Blain containing a schedule for "*[e]xpected* truck *production* by month," without mention of delivery); ECF No. 51-15, PageID.1261, p. 392:4–5 ("All *builds* were to be completed by the end of June per written agreement"); ECF 51-19, PageID.1269 (same).) Regardless, even if the evidence did contradict the Letter Agreement, it would at most create disputes of fact.

The only truly undisputed fact, based on the Letter Agreement's text and GLS's corporate representative's testimony, is that the Letter Agreement contains no requirement that Navistar "deliver 1,100 new tractors to GLS and its affiliates by the end of June 2022." Accordingly, summary judgment should be denied.

**B.    The Letter Agreement's potential production schedule was not a firm production commitment.**

Moreover, at least three points from the record make clear that the Letter Agreement's production schedule was not a firm commitment.

First, the Letter Agreement contains no express promise to produce trucks on the schedule. Instead, it and the surrounding documentation contains copious language caveating that the production schedule is what was currently available when it was sent to Plaintiffs in February 2022. For example, Mr. Carmichael's February 17 cover email, sent with the initial draft, qualified that the production schedule was based on the situation "as we sit right now."[4] (ECF No. 51-15, PageID.1255, p. 328:6–13; ECF No. 51-48.) The Letter Agreement itself stated that Navistar is "working diligently to secure production slots," not that such production slots were and would continue to be guaranteed. And the production schedule was expressly caveated to be "based on available production at the time." But GLS did not accept the production schedule "at the time." It let the Letter Agreement "sit" for over three months, and did not accept the production slots that were available in February 2022. (ECF 50-2, PageID.904; ECF No. 50-3, PageID.922, p. 135:3-7 (Blain testifying that the letter agreement was not "a done deal" until he signed it).)

Second, all parties understood the production schedule was outdated by the time it was signed. It even contains production dates that ***pre-date*** GLS's execution on May 18. The schedule was not updated because there was no expectation that the estimates were a binding commitment; Plaintiffs executed the agreement knowing that the "build months" of January, February, March, and April had come and gone with only a

---

[4] Plaintiffs omit Mr. Carmichael's qualification from their statement of facts. (ECF No. 51, PageID.1059, ¶ 19.)

minimal amount of the 758 trucks called for in those months having yet been built. (ECF No. 29, ¶¶ 37–38 ("[B]y the end of May, Navistar had only delivered 18 of the 630 new tractors intended to replace the MY 2018 Tractors.").)

Further, <u>before</u> Plaintiffs signed it, they received updated production estimates showing a build schedule *past* June 2022. (ECF No. 50, PageID.884–89; ECF No. 33-5, PageID.456–57; ECF No. 50-8.) And after execution, Plaintiffs received further production estimates pushed into November 2022 and did not object at the time. (*See* **Exhibit M**, LOLL-0018719–30 (e-mail update from Lollis reflecting production "some … now in early November.").) From this evidence, a jury could infer that the Letter Agreement's schedule was not a firm commitment. (ECF No. 33-5, PageID.456–57; ECF No. 50-8.)

<u>Third</u>, the Letter Agreement specifically contemplated the possibility of production delays. It included a payment of $6.2 million that was intended to compensate for, among other things, "delayed current or ***future production of units***." This language shows that the parties knew the production schedule was not firm, and instead expressly provided compensation for the anticipated future delays.

### C. There is a genuine dispute of fact regarding whether each truck was delivered by a reasonable time.

In any event, because the Letter Agreement does not impose a delivery date, Michigan's UCC required only that the trucks be delivered in a "reasonable time." *See* MCL 440.2309(1) ("The time for shipment or delivery or any other action under a

14

contract if not provided in this article or agreed upon shall be a reasonable time."); *see also Walter Toebe Const. Co. v. Kard Welding, Inc.*, No. 05-73605, 2007 WL 4218961, at *7 (E.D. Mich. Nov. 29, 2007) (interpreting Ohio's equivalent to MCL 440.2309, noting "the record does not disclose any term governing delivery dates to which both parties unambiguously assented," and so "[s]ummary judgment as to what constitutes a 'reasonable time' for delivery is therefore inappropriate.").

Whether Navistar delivered in a reasonable time is necessarily a fact-intensive, truck-by-truck analysis inappropriate for summary judgment. *Soloman v. W. Hills Dev. Co.*, 276 N.W.2d 577, 579 (1979) ("What constitutes a 'reasonable time' depends upon the facts and circumstances of the case"); *SME Holdings, LLC v. Tool Crib, Inc. of Knoxville, Tennessee*, No. 19-12698, 2021 WL 3861114, at *5 (E.D. Mich. Aug. 30, 2021) (denying summary judgment because a court should not "substitute its own assessment of the facts for the jury's in order to define a reasonable time for delivery").

For example, 113 of the trucks were delivered by June 2022. Additionally, testimony supports that under normal circumstances it "could take anywhere from 45 to 120 days" from production to get a truck to a customer. (Ex. E, p. 290:6–8.) This process takes time because after production trucks undergo additional steps, such as inspection and detailing. (Ex. K, p. 271:15–272:7 (addressing "details and front bumpers and any other items that Central would like to put on a truck before they're delivered").) So, it could be within the ordinary course of business that a truck built on

15

June 30, 2022, would not be delivered until October 20, 2022.[5]  By October 2022, Central received at least 291 MY 2023 trucks.  (*See* Ex. G.)

Finally, the record is replete with evidence of global supply shortages stemming from Covid-19, specific issues at Navistar's suppliers, and GLS (or its affiliates) changing order specifications, all of which delayed production.  As but one example, GLS canceled orders for 555 trucks that had been placed, and re-ordered trucks with different engines.  (Ex. K, at p. 308:10–309:22; ECF No. 51-47, PageID.1713–1714, ¶ 20; **Exhibit N**, Navistar Corp. Dep., p. 172:20–173:25; 187:17–188:12.)  That change, at the end of March 2022, coupled with supply-chain impacts in May 2022, caused the loss of 1,253 lost productions slots, delaying production.  (ECF No. 51-47, PageID.1713–1714, ¶ 20.)  Moreover, after the agreement was entered, Navistar provided Plaintiffs with delivery estimates that extended into 2023, without any objection at the time.  (Ex. M.)  These factual issues create genuine disputes regarding what constituted a reasonable time for delivery.

### D.    Plaintiffs have no evidence of cognizable damages.

Even if Plaintiffs could make out a *prima facie* case of breach, summary judgment should be denied because Plaintiffs have no evidence of cognizable damages.

As explained in Navistar's motion for summary judgment, Plaintiffs' damages are premised on consequential damages of diminished resale value and

---

[5] While some witnesses gave different estimates, that just shows it is a dispute of fact for the jury to decide.

16

fuel/maintenance expenditures associated with GLS's MY 2018 trucks, which they claim they were not able to sell by June 2022. Plaintiffs cannot recover such consequential damages, because neither was the buyer of the MY 2023 trucks under the Letter Agreement.  (ECF No. 50, PageID.890–92.)  GLS admitted that the buyer was Equipment Leasing Company ("ELC").  (ECF No. 50-3, PageID.918, p. 58:15–25.) Because Plaintiffs do not qualify as a buyer under Michigan's UCC, and because only a buyer can recover consequential damages, Plaintiffs cannot satisfy the damages element of their breach-of-contract claim, which therefore fails as a matter of law.  (ECF No. 50, PageID.890–92.)

## II.    Navistar's affirmative defenses contain triable issues.

The Court should also deny Plaintiffs' request for summary judgment on Navistar's affirmative defenses below, which at a minimum all create triable issues of fact (to the extent they do not entitle Navistar to summary judgment).

### A.    To the extent the Letter Agreement constituted a firm production schedule, it is void under the impossibility doctrine.

As explained above, the Letter Agreement should not be construed as setting forth a firm production schedule.  But as set forth in Navistar's motion for summary judgment, to the extent it is construed that way, it is void under the impossibility doctrine.  That's because Navistar's alleged promise of producing trucks on the timeline set forth in the production schedule was impossible by the time the contract was formed on May 18, 2022. *Nathan v. Brownstone Plastics, LLC*, 511 B.R. 863, 867 (E.D. Mich. 2014)

17

("Where the impossibility of performance is known to both parties at the time of making the agreement, the promise is not binding.").

Plaintiffs argue that the Letter Agreement's schedule was not impossible in May because it simply required Navistar to deliver all trucks by June. (ECF No. 51, PageID.1070.) Until summary judgment, that has never been Plaintiffs' interpretation of the Letter Agreement's June "spillover month." Their corporate representative testified the "spill over" month represented that "5–10" trucks may be *produced* in June. (ECF No. 50-3, PageID.924, p. 197:10–22.) There is at least a genuine issue of fact as to whether the Letter Agreement contains a production schedule that both parties knew would be impossible meet on May 18, at which point most scheduled build dates had passed.

### B.   Navistar's waiver defense presents triable issues.

Additionally, Plaintiffs' knowledge and acceptance of the allegedly delayed productions creates a triable issue as to Navistar's affirmative defense of waiver.

Under Michigan law, waiver occurs "when a party with full knowledge of material facts, does or forbears to do something inconsistent with the existence of the right in question or his intention to rely on that right." *Kvaerner U.S., Inc. v. Hakim Plast Co.*, 74 F. Supp. 2d 709, 718 (E.D. Mich. 1999). "[W]hen a party commits a material breach and the injured party's actions indicate an intent to continue with the contract, this constitutes a waiver of the breach." *Lathfield Holdings LLC v. Dahl Real Est. LLC*, No. 363502, 2023 WL 6168972, at *5 (Mich. Ct. App. Sept. 21, 2023). And Michigan's UCC

specifically provides that the parties' course of performance – including "repeated occasions for performance by a party" whereby one party "with knowledge of the nature of the performance and opportunity for objection … accepts the performance or acquiesces in it without objection" – is "relevant to show a waiver or modification of any term inconsistent with the course of performance."  MCL 440.1303(1), (6).

Here, Plaintiffs' conduct both before and after executing the agreement shows waiver.  Before executing the agreement, Plaintiffs knew via production updates that all 1,100 MY 2023 tractors would not be built – let alone delivered – by June 2022.  (ECF No. 50, PageID.884–89; ECF No. 33-5, PageID.456–457; ECF No. 50-8.)   Blain testified that the production updates constituted "a material change" from the Letter Agreement's production schedule – *i.e.*, "material facts" supporting waiver, *Kvaerner U.S., Inc.*, 74 F. Supp. 2d at 718 – and he signed the agreement anyway.  (ECF No. 33-5, PageID.456–457.)

Plaintiffs' conduct after executing the Letter Agreement shows waiver, too.  Eight days after GLS signed it, Blain emailed Navistar stating that it was "coming to the end of May and we have 16 trucks delivered and only have visibility to another 38 for [Central]," and asked what he "should … be expecting at this point regarding delivery of the new trucks."  (*See* **Exhibit O**, NAV00089362.)  In other words, Plaintiffs knew the trucks had not been delivered, did not allege breach, and simply requested a production update.  Thereafter, Navistar continually kept GLS apprised of production estimates (*see, e.g.* Ex. M), to no concomitant objection from GLS.  ELC then paid for

19

the trucks. These facts support waiver and preclude summary judgment. *SME Holdings,*
*LLC*, 2021 WL 3861114 at *5 (holding that even assuming the contract imposed a
delivery deadline, the party "waived that breach by encouraging" performance); *Radiance*
*Aluminum Fence, Inc. v. Marquis Metal Material, Inc.*, 461 F. Supp. 3d 531, 542 (E.D. Mich.
2020) (holding that "[t]he delivery dates, at least for the first three containers, were
modified by the parties' agreed performance.").

Plaintiffs' sole argument seeking dismissal of Navistar's waiver defense is based
on an incorrect premise: that "the parties all acknowledged that, regardless of the 'fluid'
production schedule, Navistar had agreed to ***deliver*** all of the new tractors to Plaintiffs
by the end of June 2022." As discussed above, that is not true. More fundamentally,
Plaintiffs' argument that there was a contractual obligation misunderstands a waiver
defense. Waiver ***assumes*** Plaintiffs' contractual interpretation but asserts that
Plaintiffs' conduct waived any such obligation. The evidence discussed above (*i.e.*
plaintiffs' knowledge and acceptance of production dates that differed from the Letter
Agreement production schedule) creates a genuine dispute of fact.

### C. The release contained in the Letter Agreement and Plaintiffs' acceptance of $6.2 Million are valid affirmative defenses.

There is also a genuine dispute of material fact regarding whether Plaintiffs'
claims are barred by release and accord and satisfaction. Specifically, the Letter
Agreement provided for a $6.2 million payment acknowledged to fully "compensate
[Plaintiffs] for assistance for the disposal [resale] of the 941 units included in the table

above" (Plaintiffs' previous-generation trucks).   The Letter Agreement specifically states that $6.2 million payment additionally compensates for rental costs "associated with delayed current and future production of units."   (ECF No. 50-2, PageID.903.) And the Letter Agreement concludes by stating:

> This Agreement Letter is *all-encompassing* for *any and all current or future issues for 941 model year 2017-2019 international units* and terminates any and all other agreements pertaining to these units.

*Id.*  In other words, the parties agreed that the $6.2 million payment would compensate Plaintiffs and resolve any claims related to the future disposal of GLS's 941 model year 2017–2019 International units.   Then, with full knowledge of production delays, Plaintiffs accepted and cashed the $6.2 million payment.  (Ex. J, at p. 259:10–260:10; ECF No. 51-29, PageID.1613.) These facts bar Plaintiffs' claim, which is entirely based upon the alleged diminished resale value of those same tractors due to alleged production delays for the new MY 2023 trucks.

Plaintiffs' motion argues they are entitled to summary judgment because the language cited by Navistar cannot "release, modify, or accord and satisfy Navistar's contractual duty to timely deliver tractors" and that interpreting the clause this way would "render the contract illusory, and its promises entirely nugatory."

But Navistar's defenses do not stretch so broadly.  Navistar does not contend that, if Plaintiffs had a viable breach claim and evidence of damages **unrelated to the 941** previous-generation trucks, the claim would be barred.  Rather, Navistar contends that the release (and/or accord or satisfaction) extends only to "future issues for 941

21

model year 2017-2019 international units," expressly including "disposal," *i.e.* resale of those units. *See Dir. of Off. of State Lands & Invs. v. Merbanco, Inc.*, 2003 WY 73, ¶ 49, 70 P.3d 241, 257 (Wyo. 2003) ("Certainly, 'disposal' could include a sale."). Simply put, Navistar's payment of $6.2 million (and Plaintiffs' acceptance of the offer) compensated Plaintiffs for all current and future production delays, OTB rights, and all other issues *related to the disposal of model year 2017–2019 International units*, full stop.

To the extent Plaintiffs dispute that intent, it simply presents triable issues. *Hoffner v. Lanctoe*, 802 N.W.2d 648, 655 (Mich. App. 2010), *rev'd in part*, 821 N.W.2d 88 (Mich. 2012) (holding that where scope of release was ambiguous it presented a jury issue inappropriate for summary disposition); *King v. Hartford Cas. Ins. Co.*, No. 10-cv-12209, 2010 WL 5390135, at *3 (E.D. Mich. Dec. 22, 2010) ("[W]hether there was a sufficient meeting of the minds for an accord and satisfaction is a question for the jury."). Summary judgment should be denied.

## D. Navistar's impracticability defense presents triable issues.

As Navistar explained in its motion for summary judgment, the order changes made by the dealership that impacted Central's truck specifications made completing production in accordance with the Letter Agreement's production schedule impracticable. Plaintiffs argue a seller cannot rely on impracticability when it continues to accept orders, because the decision to accept orders is within the seller's control. (ECF No. 51, PageID.1080.) But the decision to *change* the order after Navistar accepted a different order was a decision within *Plaintiffs'* control.

22

On Plaintiffs' direction, their dealer representative changed orders in March and April 2022, *after* the relevant manufacturing line was already finalized (lineset) through the end of May. (ECF No. 50, PageID.889-90.) Further, GLS knew that its order changes had required resetting the manufacturing line, and it knew when it signed the Letter Agreement on May 18, 2022, that it would be impracticable to build 342 trucks in the remaining days of May. (Ex. K, p. 162:7–20 ("when you finally line-set, . . . that means the trucks cannot be changed" and line-setting happens "around 30 days before production"), p. 308:11-19; Ex. H, p. 110:15-17; *see also* Ex. F, p. 95:19–96:19 (testifying that when the line is "set through a particular date," no different types of truck can be made: "You cannot" insert "something else" into the line set).) As a result, both parties knew at the time of contracting that it was impracticable to build sufficient trucks in May (342) to meet the production schedule. As a result, any remaining obligation Navistar might have had to build trucks after May 18, 2022, was therefore void. These facts at least create a genuine dispute as to whether it was commercially unreasonable to expect Navistar to complete all remaining production by June 2022.[6]

## III. Navistar's affirmative defenses of failure to satisfy conditions precedent and lack of mutuality warrant summary judgment in Navistar's favor.

Navistar's defenses of lack of mutuality of obligation and failure to satisfy

---

[6] Because its motion to dismiss is pending, Navistar has not yet answered the second amended complaint. When it does, Navistar intends to withdraw its defenses of estoppel, laches, prior breach, and novation. Plaintiffs' motion for summary judgment as to those defenses should be denied as moot.

condition precedent survive summary judgment because the Letter Agreement did not actually oblige Plaintiffs to purchase trucks and Plaintiffs in fact never did so.  The Letter Agreement contains no language, for example, requiring that Navistar "shall" supply the trucks, nor that Plaintiffs "shall" purchase them.  And the lack of mutuality (or failure to actually purchase the trucks) is clear from Plaintiffs' admission that only ELC—which is not a plaintiff—made any purchase.

Plaintiffs request summary judgment by seeking to contradict that fact with an affidavit from Kyle Blain that claims that (1) GLS did purchase the trucks, and (2) GLS simply assigned the trucks to ELC and delegated its duty to pay.  (ECF No. 51-2, PageID 1088.) In other words, GLS suggests it created a binding mutuality of obligation by in fact purchasing the MY 2023 trucks and assigning them to ELC.  Mr. Blain's affidavit does not attach any documentation of this assignment, and it appears the assignment occurred, if at all, entirely in Mr. Blain's mind.  At most, the affidavit creates a dispute of fact, because while serving as GLS's corporate representative, Mr. Blain admitted that GLS never purchased the trucks in the first place.

Indeed, a party cannot assign something it does own and GLS never owned the trucks.  The most Mr. Blain could therefore have ever "mentally assigned" was GLS's rights to purchase trucks under the Letter Agreement.  If that is what he assigned, then GLS's claims should be dismissed because it is not a real party in interest and not a buyer of trucks under the U.C.C..  *See Greater Lakes Ambulatory Surgical Ctr., LLC v. Meemic Ins. Co.*, No. 353842, 2021 WL 3234350, at *4 (Mich. Ct. App. July 29, 2021)

(reversing denial of summary disposition because "there is no genuine issue of material fact that plaintiff lacked standing and was not a real party in interest having assigned its rights"); *see also infra* at 16–17 (explaining how GLS is not a buyer and has no damages).

In other words, there are only two possibilities supported by the record. Either there was an assignment of rights to ELC, and ELC created mutuality of obligation through performance and satisfied conditions precedent when it actually purchased the trucks—in which case GLS lacks standing and damages. Or there was never any assignment at all and no trucks were purchased pursuant to the Letter Agreement—in which case GLS's claims fail for lack of mutuality of obligation and failure to satisfy conditions precedent (purchasing the trucks). At this stage, Plaintiffs' request for summary judgment should be denied.

## IV.   CONCLUSION

Navistar respectfully requests that the Court deny GLS's and Central's motion for summary judgment and for any further relief that the Court deems just and appropriate.

Dated:  January 28, 2025

BARNES & THORNBURG LLP

*/s/ Scott R. Murphy*
Scott R. Murphy (P68015)
Anthony C. Sallah (P84136)
171 Monroe Ave. NW, Suite 1000
Grand Rapids, MI 49503
616-742-3930
smurphy@btlaw.com
asallah@btlaw.com
*Attorneys for Defendant Navistar, Inc.*

## LOCAL RULE CERTIFICATION

I, Scott R. Murphy, certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts). I also certify that it is the appropriate length. Local Rule 7.1(d)(3).

BARNES & THORNBURG LLP

Dated: January 28, 2025

*/s/ Scott R. Murphy*
Scott R. Murphy (P68015)
*Attorney for Defendant Navistar, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 28, 2025, the foregoing was electronically filed using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List.

BARNES & THORNBURG LLP

Dated: January 28, 2025

*/s/ Scott R. Murphy*
Scott R. Murphy (P68015)
*Attorney for Defendant Navistar, Inc.*