UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GLS LEASCO, INC. et al,

        Plaintiffs,

                                       Case No. 23-cv-12927

v.

                                       HON. MARK A. GOLDSMITH

NAVISTAR, INC.,

        Defendant.

_____/

**OPINION & ORDER
(1) GRANTING IN PART DEFENDANT'S MOTION TO DISMISS (Dkt. 36); (2)
DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Dkt. 50); AND (3)
DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (Dkt. 51)**

       This case centers on Defendant Navistar Inc.'s alleged breach of contract, based on its alleged failure to timely produce or deliver trucks for Plaintiff GLS Leasco, Inc. and, GLS's customer, Plaintiff Central Transport LLC.  While the parties had engaged in a course of dealing for a number of years, events in 2022 led to the instant litigation.  In May of that year, the parties signed a letter agreement, which included a production schedule indicating that Navistar would produce 1,100 trucks by the end of June 2022.  See Letter Agreement PageID.277–280 (Dkt. 29-1).  The production and delivery of the trucks did not keep to that production schedule, with the last of the trucks not being delivered to Central Transport until September 2023.  Am. Compl. at ¶ 39.  That lack of timeliness triggered the instant suit, with GLS and Central Transport accusing Navistar of fraud and breach of contract.  Id. at PageID.274–275.  Navistar disputes both claims.

       Before the Court are (i) Navistar's motion to dismiss Plaintiffs' fraud claim (Dkt. 36), (ii) Navistar's motion for summary judgment aimed at Plaintiffs' breach of contract and fraud claims

(Dkt. 50), and (iii) Plaintiffs' motion for partial summary judgment on the breach of contract claim (Dkt. 51). For the reasons discussed below, the Court grants in part Navistar's motion to dismiss (Dkt. 36). The Court denies Navistar's motion for summary judgment (Dkt. 50) and denies Plaintiffs' motion for summary judgment (Dkt. 51).[1]

## I.    BACKGROUND

The following facts are set forth in Plaintiffs' amended complaint (Dkt. 29). Navistar manufactures trucks. GLS buys trucks from Navistar and leases them to Central Transport and other companies. Although the present dispute concerns a 2022 agreement, the parties 2017 agreement figures into the present dispute. In 2017, GLS bought 630 trucks from Navistar, all of which came with a trade-in option, under which Navistar was required to purchase GLS's used vehicles at a significant price. Am. Compl. at ¶¶ 12–14.

In 2021, GLS and Navistar entered into a subsequent agreement in which Navistar agreed to (i) supply GLS with a total of 1,305 trucks, (ii) deliver the total over two time periods, with 1,100 trucks delivered between February and December 2022 and another 205 delivered between January and February 2023, and (iii) recognize GLS's option to trade in 1,436 trucks. Id. at ¶¶ 18–19.

Because it was facing production difficulties, Navistar successfully urged GLS to enter into a new agreement in May 2022, which is the subject of the parties' present dispute. At the time of that agreement, the market for used trucks was historically strong. Id. at ¶ 22. Given that strong

---

[1] Because oral argument will not aid the Court's decisional process, the motions will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). In addition to the pending motions, briefing includes: (i) as to Navistar's motion to dismiss: Plaintiffs' response (Dkt. 43) and Navistar's reply (Dkt. 46); (ii) as to Navistar's motion for summary judgment: Plaintiffs' response (Dkt. 55) and Navistar's reply (Dkt. 59); (iii) as to Plaintiffs' motion for partial summary judgment: Navistar's response (Dkt. 56) and Plaintiffs' reply (Dkt. 60).

market, and given Navistar's new truck production difficulties, GLS intended and expected to purchase and take delivery of new trucks as soon as possible, and then to sell the old trucks in the historically strong re-sale market. See id. at ¶¶ 22–26. Under the May 2022 agreement, the trucks would be produced by the end of June 2022 rather than December 2022, and in exchange for the earlier production schedule, GLS agreed to waive its trade-in option. Id. at ¶ 24.

The specifics of the deal included the following: (i) Navistar agreed to produce 1,100 trucks between January and June 2022 (instead of February to December 2022 as in the prior agreement), and (ii) in exchange for the earlier production schedule and a $6.2 million rebate (roughly $6,000 per truck) to Central Transport and other entities, Navistar was released from its trade-in agreement. Id. at ¶ 29. As of May 2022, the time when GLS signed the agreement, Navistar would have had to pay $57,000 per truck for a trade in, and Navistar would have owed GLS in excess of $50 million for trade-in-trucks. Id.

During the negotiations, the parties were aware of the following facts: (i) GLS would be unable to take advantage of the strong used truck market until Navistar replaced its old trucks with new trucks; (ii) the used trucks were part of Central Transport's fleet, and the new trucks would be leased to them; (iii) GLS agreed to waive its option to trade in the trucks in consideration of the promised earlier production schedule; and (iv) the strong market might not remain indefinitely, and taking advantage of the strong market was a key reason GLS agreed to the waiver. Id. at ¶ 30.

Per the agreement, Navistar was supposed to produce 75 trucks during March 2022; another 225 trucks in April 2022; and a third installment of 330 trucks in May 2022. Id. at 37. However, by the end of May, Navistar had only delivered 18 of the 630 new trucks. Id. ¶ 38. By the end of the contract period, the price for the 2018 used trucks had dropped over 75%, causing GLS to lose tens of thousands of dollars for each used truck, totaling tens of millions of dollars in

damages.  Id. at ¶ 41–42.  GLS also suffered higher maintenance, fuel, and repair costs for its old trucks because of the production delay.  Id. at ¶ 43.

GLS and Central Transport theorize that Navistar's actionable conduct was prompted by the less profitable nature of their relationship, as compared to other customers.  Navistar provides discounts to large volume purchasers of its trucks, such as GLS.  This discount is called a "special price allowance" (SPA).  Id. at ¶ 46.  GLS had one of the highest discounts—possibly the highest discount—in Navistar's southwest region.  Id. at ¶ 47.  This meant that GLS was one of Navistar's least profitable customers.  Id.  In addition to the steep discounts, the buy-back option made GLS an even less profitable customer for Navistar.  Id. at ¶ 49.  GLS contends that this arrangement led to Navistar prioritizing truck production for customers it deemed more profitable.  Id. at ¶¶ 50, 57.

In 2021—a timeframe in which Navistar has claimed that it lacked the capacity to fulfill all of its promised orders—it did not allocate production on a proportional basis to all customers, according to the allegations in the amended complaint.  Id.  An internal spreadsheet, dated August 27, 2021 and used by Navistar in the reallocation process for the Southwest Region (which included GLS and Central Transport), showed that nearly all of the reallocation of production was taken from customers with the lowest profit margins, including GLS and Central Transport.  Id.; Lollis Email at PageID.968–979 (Dkt.50-7).

In December 2021, Navistar told GLS that it could only produce 600 trucks for GLS instead of the 1,305 promised in the 2021 agreement because Navistar did not have the available production to build the trucks.  Am. Compl. at ¶ 61.  GLS contends that this was a false statement and that Navistar could have produced more than 600 trucks; instead, it shifted production to other customers.  Id. at ¶¶ 62–63.  GLS and Central Transport assert that this was all part of a fraudulent scheme to get them to waive their trade-in agreement.  Id. at ¶ 64.  A few weeks later, Navistar

told GLS and Central Transport that it could produce 350 additional trucks per month in March, April, and May of 2022 in exchange for GLS and Central Transport waiving their trade-in rights. Id. at ¶ 68.

In April 2022, the parties' draft agreement contained a production chart indicating that Navistar had built 42 trucks for GLS in January; 32 in February; and 342 in March.  2022 Agreement at PageID.278.  However, Navistar had, in fact, only manufactured 131 trucks for GLS during that period. Am. Comp. at ¶ 81.  On May 17, 2022, Navistar told GLS that if it did not sign the contract, Navistar would stop or postpone all truck production and deliveries to GLS. Carmichael Dep. at 379–380 (Dkt. 51-15).  GLS signed the contract the next day.  Id.  A few days later, Navistar told GLS that it had moved the projected production dates to a later point in time for all its trucks—but it had made that decision earlier in May and before GLS signed the contract. Am. Compl. at ¶ 96.  GLS states that it would not have entered the May 2022 agreement and waived its trade-in rights had it known that Navistar's representations—regarding what it could produce under the 2021 agreement and what it would produce under the May 2022 agreement—were false.  Id. at ¶ 104.

## II.    ANALYSIS

The Court will begin its analysis with Navistar's motion to dismiss GLS and Central Transport's fraud claim and will then proceed to the dueling motions for summary judgment.

### A.  Fraud[2]

---

[2] To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007).  The plausibility standard requires courts to accept the alleged facts as true and to make all reasonable inferences in favor of the plaintiff.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

GLS and Central Transport claim they were fraudulently induced into entering the May 2022 contract, and, in doing so, waived their trade-in rights.  Am. Compl. at ¶¶ 45–104, 109–114.  They bring two fraud theories.  Their first one is that Navistar lied about its limited production capacity in 2021 as part of a scheme to fraudulently "induce Plaintiffs to enter into a new contract [the May 2022 agreement]."  Id. at ¶ 102.  Their second fraud theory is that Navistar "had no intention of performing," rendering its promises contained in the May 2022 agreement bad-faith promises.  Id. at ¶ 85; see id. at ¶¶ 70, 94, 102.  A bad-faith fraud claim is recognized as a species of fraudulent inducement.  See Charter Twp. of Shelby v. Tech. Integration Grp. Servs., Inc., No. 297190, 2013 WL 951379, at *4 (Mich Ct. App. Mar. 5, 2013) (punctuation modified) ("Essentially, fraud by a bad-faith promise is the same as fraud in the inducement.").  Navistar's principal response is that the claim is barred by the economic loss doctrine.  Def. Mot. at 2–9.  The Court agrees with Navistar regarding the second theory but disagrees regarding the first.

The economic loss doctrine is a judicially created doctrine that prohibits a contracting party, in certain circumstances, from bringing tort claims against a party who has breached the contract, thereby confining the dispute to the strictures of the Michigan Uniform Commercial Code (U.C.C.).  See Mich. Compl. Laws § 440.  The Michigan Supreme Court's first detailed explanation of the doctrine held that it would be applied "where a plaintiff seeks to recover economic loss caused by a defective product purchased for commercial purposes."  Neibarger v Universal Coops., Inc., 486 N.W.2d 612, 618 (Mich. 1992).  The court explained that the doctrine was necessary for a variety of reasons: to implement the specific provisions of the U.C.C., promote standardization of commercial law, and allow sellers greater predictability of their potential liability for product failure.  Id. at 619.

6

After <u>Neibarger</u>, courts wrestled with the question of whether all tort claims were barred by the doctrine.  The Michigan Court of Appeals concluded that an exception must be made for fraudulent inducement claims.  <u>Huron Tool and Eng'g Co. v Precision Consulting Servs., Inc.</u>, 532 N.W.2d 541, 545 (Mich. App. 1995).  It reasoned that "[f]raud in the inducement presents a special situation where parties to a contract appear to negotiate freely—which normally would constitute grounds for invoking the economic loss doctrine—but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior."  <u>Id</u>. at 545.

However, the court went on to explain that if the fraudulent representations were "indistinguishable from the terms of the contract," then there was no wrongdoing independent of the breach of contract.  <u>Id.</u> at 546.  In such a scenario, the allegations of fraud would not be deemed "extraneous to the contractual dispute," and the plaintiff would be restricted to contractual remedies.  <u>Id.</u>  In <u>Huron Tool</u>, the court found that the allegations of fraudulent representations went to the quality and characteristics of the software system the defendants had sold to the plaintiff—and hence not extraneous to the contract—rendering the tort claims barred by the doctrine.  <u>Id.</u>

In contrast, where a defendant's allegedly fraudulent conduct is not essentially the same as the failed contractual undertaking, the exception to the economic loss doctrine will apply, and the fraud claims would be assertable.  For example, in <u>Ypsilanti Comty. Util. Auth. v Meadwestvaco Air Sys., LLC</u>, 678 F. Supp. 2d 553 (E.D. Mich. 2009), the fraud claims against the seller of an air-purification system were not barred because the misrepresentations—that defendant was backed by an $8 billion company, was insured, and was supported by a research department and technical group—were not part of the contract.  <u>Id.</u> at 567.  Similarly, in <u>Llewellyn-Jones v. Metro</u>

Prop. Grp., LLC, 22 F. Supp. 3d 760 (E.D. Mich. 2014), where real estate investors in a project to purchase multiple homes sued the seller, the fraud claims were not barred because the wrongful conduct—which included showing homes to the plaintiffs that were not truly for sale and supplying them with forged lease documents and false information regarding rental payments—were extraneous to the contract.  Id. at 779.

Where a plaintiff alleges fraudulent inducement on the theory that the defendant did not intend to keep his contractual promise, such a claim is not considered extraneous to the contract. That circumstance was presented in Orleans Int'l, Inc. v. Mistica Foods, L.L.C., No. 15-13525, 2016 WL 2851349 (E.D. Mich. May 16, 2016), where the seller of food products sued the buyer for failure to purchase.  The court held that the allegation that the defendant did not intend to keep its promise was not extraneous to the contract, reasoning that "Plaintiff is essentially asking the Court to find a fraud in the inducement claim where Defendants merely failed to uphold their side of the agreement."  Id. at *6.  Because the alleged misrepresentation "directly relates to performance of the contract…[t]his is precisely the type of misrepresentation Huron Tool established does not give rise to an independent cause of action in tort."  Id. (punctuation modified).

Here, GLS and Central Transport's fraudulent inducement claim is based on two different alleged misrepresentations that Navistar deployed to induce them into signing the May 2022 agreement: (i) that in December 2021 Navistar told GLS and Central Transport it "could only produce 600 trucks for" them in 2022, Am. Compl. at ¶ 61, and (ii) Navistar subsequently represented to GLS and Central Transport that it would produce 1,100 trucks by the end of June if it signed the agreement.  Id. at ¶¶ 79–94.  The latter type of representation, regarding Navistar's intent to produce goods in accordance with the agreement, does not fall within Michigan's

exception to the economic loss doctrine.  The representation is nothing more than a statement that it will perform the contract; that is implicit in every contractual promise.  On the other hand, the former representation concerned Navistar's inability to produce trucks in accordance with the 2021 agreement; it was what allegedly induced GLS and Central Transport to enter into the May 2022 agreement.  Like misrepresentations in Meadwestvaco and Llewellyn-Jones, the misrepresentation about its inability to produce trucks as promised under the 2021 contract was intended by Navistar to induce Plaintiffs' entry into the 2022 contract—but was not itself an undertaking in the contract. Therefore, this representation is extraneous to the May 2022 agreement and not barred by the economic loss doctrine.[3]

Accordingly, the Court grants Navistar's motion to dismiss GLS and Central Transport's fraud claim with respect to the second alleged misrepresentation but not the first.

### B.  Navistar's Motion for Summary Judgement (Dkt. 50)[4]

---

[3] Navistar also asserts that the economic-loss doctrine bars GLS and Central Transport's fraud claim because the damages they allege are indistinguishable from the ones in their breach of contract claim. Def. Mot. at 6–9.  Some courts have analyzed whether harm from a tort is "distinct" from the harm imposed by a contract breach in determining whether the economic loss doctrine applies.  See, e.g., Huron Tool, 532 N.W.2d at 545.  However, Navistar has not established, as a matter of law, that the fraud and breach harms are equivalent.  Reviewing the record developed to date, it is at least arguable that the alleged loss under the fraud theory of trade-in rights would be "distinct" from the loss caused by a failure to timely deliver trucks.

[4] In assessing whether a party is entitled to summary judgment, the Court applies the traditional summary judgment standard as articulated in Scott v. Harris, 550 U.S. 372, 380 (2007).  A court will grant a motion for summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  If the movant makes an initial showing that there is an absence of evidence to support the nonmoving party's case, the nonmovant can survive summary judgment only by coming forward with evidence showing there is a genuine issue for trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 324–325 (1985).

Navistar's motion seeks judgment on GLS and Central Transport's breach of contract claim based on the defenses of impossibility, impracticability, and lack of standing.  Def. Mot. at 8–20. The following facts bear on these issues.

Navistar entered into the May 2022 agreement on May 18, 2022, to manufacture and deliver 1,100 model-year 2023 trucks.  See Letter Agreement PageID.277–280.  The production schedule outlined in the agreement required trucks to be built between January and June 2022.  Id. However, at the time of signing, both parties were aware that most of the monthly production schedule deadlines had already passed, and Navistar had not delivered the required trucks.  Am. Compl. at ¶¶ 37–38.  GLS later assigned its purchase rights to Equipment Leasing Company, LLC (ELC), which paid for and took title to the trucks.  See Invoice at PageID.1038–1044 (Dkt. 50-14). GLS and Central Transport allege breach of contract and fraud and seek consequential damages. Am. Compl. at ¶ 105–114.  Navistar moves for summary judgment, asserting the affirmative defense of impossibility, challenging GLS's standing, and challenging GLS and Central Transport's fraud claim on the basis of reasonable reliance.  Def. Mot at 7–20.

### 1. Impossibility and Impracticability of Performance

Navistar argues that the production schedule was void due to impossibility and impracticability.  Def. Mot. at 8–13.  These related defenses are asserted in opposition to GLS and Central Transport's two breach theories.  One theory is that the breach occurred when Navistar failed to comply with the monthly production schedule for April through June 2022, which would have been before the contract was even signed.  The second theory is that the breach occurred at the end of June, when Navistar failed to produce the total number of trucks it had agreed to produce.  Navistar argues that the contract was impossible under the first theory and impracticable under the second.  Def. Mot at 8–13.

10

### a. Strict Impossibility

If the parties to a contract know, at the time a contract is formed, that performance is impossible, then the contract is void.  E.g., Jacksonville, M., P. Ry. & Nav. Co. v. Hooper, 160 U.S. 514, 528 (1896) ("Impossible conditions cannot be performed; and, if a person contracts to do what at the time is absolutely impossible, the contract will not bind him, because no man can be obliged to perform an impossibility."); Nathan v. Brownstone Plastics, LLC, 511 B.R. 863, 867 (E.D. Mich. 2014) ("Where the impossibility of performance is known to both parties at the time of making the agreement, the promise is not binding.") (quoting Rogers Plaza, Inc. v. SS Kresge Co., 189 N.W.2d 346, 356 (Mich. App. 1971)); 17A Am. Jur. 2d Contracts § 126 ("Where an obvious legal or physical impossibility of performance appears on the face of the contract, the contract is void.").

Navistar asserts that when GLS signed the contract on May 18, 2022, both parties knew that it would be impossible to meet the contract's production schedule, as both parties knew that the trucks allegedly scheduled to be produced in January through April 2022 had not been built (nor delivered).   Def. Mot. at 9.   Navistar also contends that GLS contributed to this delay/impossibility because it waited 40 days to sign the agreement.  Id. at 11.  By the time the parties signed the contract, Navistar had already failed to meet the production schedule.  While the production schedule stated that 758 trucks would be built by the end of April, both parties knew that only 61 had been built (and none delivered), so when GLS signed the contract in May it was impossible to meet the schedule because the dates had already passed.  Id. at 11–12.  Thus, Navistar argues, the production schedule was impossible to meet and consequently void.

While it is true that it was impossible for Navistar to meet the monthly production schedule that had already passed before it had even signed the agreement, GLS and Central Transport assert

that they are not advancing that theory.  Pls. Resp. at 10.  Rather, they insist they are pursuing only the second breach theory: that the breach occurred when Navistar failed to deliver all the trucks by end of June 2022.  Id. at 14–15.

Because Navistar's strict impossibility defense is directed solely at a breach theory GLS and Central Transport disavow, summary judgment cannot be awarded based on that defense. However, GLS and Central Transport will be barred from advancing that theory at trial.

### b. Impracticability

Navistar does address the evidence relative to the second breach theory when invoking the impracticability defense.  Navistar argues that fulfilling the production schedule by the end of June was impracticable because, on March 29, 2022, Allegiance Truck Group (Navistar's dealer through which GLS ordered the trucks) changed the specifications to 555 of the vehicles.  Def. Mot. at 13–14.  At the time that these changes were made, Navistar's production line was already in place, which Navistar asserts made it unable to produce the trucks on schedule.  Def. Mot. at 13–14; Lollis Dep. at 308 (Dkt.50-4); Navistar Corp. Rep. Dep. at PageID.948–952 (Dkt. 50-5). This changed order—coupled with a supply-chain impact in May 2022 that caused 1,253 lost production slots—made timely production of the trucks impracticable, according to Navistar.  Def. Mot. at 14.

Under Michigan law, to establish impracticability, a movant need not show that performance is impossible, but "there must be a showing of impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved." Roberts v. Farmers Ins. Exch., 737 N.W.2d 332, 342 (Mich. Ct. App. 2007) (punctuation modified).  The impracticability defense only applies when "an unanticipated circumstance has made performance of the promise vitally different from what should reasonably have been within the contemplation of both parties when

12

they entered into the contract." <u>Hemlock Semiconductor Operations, LLC v. SolarWorld Indus. Sachsen GmbH</u>, 867 F.3d 692, 702 (6th Cir. 2017).

Navistar's argument fails because it cannot show that the circumstances were unanticipated at the time the parties entered into the agreement in 2022. Here, there is evidence that none of the circumstances that Navistar relies on was unanticipated. The change to the order that resulted in manufacturing line changes occurred on March 29, 2022—over a month before all the parties signed the May 2022 agreement. <u>See</u> Lollis Dep. at 308–309. Therefore, the order and production line changes were arguably not "unanticipated circumstances" at the time of the contract signing. Navistar could have withdrawn its offer but did not. Further, Navistar knew about all of the supply chain issues that impacted production of the trucks before the agreement was signed. Carmichael Dep. 380–389. Thus, the supply chain issues were arguably not "unforeseen."

Because Navistar has not established the impracticability defense, as a matter of law, summary judgment cannot be awarded to it based on that defense. That is a defense that must be addressed at trial.

### 2. Standing

Navistar contends that GLS and Central Transport lack standing to bring a breach of contract claim because they were not the buyers of the trucks. Def. Mot. at 14–16. [5]

The elements of a breach-of-contract claim are that "(1) there was a contract, (2) the other party breached the contract, and (3) the breach resulted in damages to the party claiming breach." <u>Bank of Am., NA v. First Am. Title Ins. Co.</u>, 878 N.W.2d 816, 829 (Mich. 2016). As to the

---

[5] The parties frame the issue as whether GLS and Central Transport have standing to seek consequential damages specifically, but the issue may be more broadly framed as whether GLS and Central Transport have standing to assert any breach claim at all.

damages element, Michigan's U.C.C. provides that even though its remedies are to be liberally construed, "neither consequential or special damages nor penal damages may be had except as specifically provided in this act or by other rule of law." Mich. Comp. Laws § 440.1305(1). The act in turn authorizes consequential damages for a "buyer." See Mich. Comp. Laws § 440.2713(1) (saying that in the event of non-delivery or repudiation a "buyer" may recover damages); Mich. Comp. Laws § 440.2714(1) (stating that for accepted goods, a "buyer" may recover damages.).

After signing the 2022 contract, GLS assigned its purchase rights to ELC, which paid for and took title to the trucks. See Invoice at PageID.1038–1044. Consequently, Navistar argues that GLS and Central Transport lack standing to claim consequential damages because they do not meet the statutory definition of a buyer. Def. Mot. at 14–16. The Court rejects this argument.

The U.C.C. defines a buyer as "a person who buys or contracts to buy goods," and there is no dispute that GLS contracted to buy the trucks.[6] Mich. Comp. Laws § 440.2103(1)(a). Navistar cites only one case to support its argument that GLS is not a buyer: Bryant v. BMW of N.A. LLC, 585 F. Supp. 3d 1178 (E.D. Wis. 2022). In that case, Steamer Motor Company bought a BMW, and its owner Benjamin Schaefer signed the contract on behalf of the company. Id. at 1183. Schaefer sued BMW in his personal capacity rather than having the company sue. Id. at 1180–1181. The court ruled that Schaefer was not the "buyer" because the corporation was the buyer. Id. at 1182. In other words, unlike here, Bryant involved a case where the party suing did not buy or contract to buy the goods.

---

[6] Navistar makes no separate argument regarding Central Transport, although it recognizes that Central Transport's claim is based on a third-party beneficiary theory. Def. Mot. at 14. As a third-party beneficiary, Central Transport may seek consequential damages available to a buyer. See Shay v. Aldrich, 790 N.W.2d 629, 640 (Mich. 2010) (stating that "a party who qualifies as a third-party beneficiary effectively stands in the shoes of the original promisee and has the same right to enforce said promise that he would have had if the said promise had been made directly to him as the promisee" (punctuation modified)).

Navistar counters that even if GLS was a buyer, GLS divested itself of any ownership interest when it assigned to ELC it rights as buyer.  Def. Reply at. 6–7.  This argument, too, misses the mark.  Under the U.C.C., even assignment of "rights under all contracts does not per se assign claims or causes of action, but instead assigns only rights and obligations arising under a contract."  Interceptor Drain Drainage Dist. v. Kilpatrick, 896 F. Supp. 2d 650, 660 (E.D. Mich. 2012) (punctuation modified).  Here, the parties have not quoted the language of the assignment, thus the full extent of the assignment by which GLS assigned its rights to ELC is unclear.  In addition, while GLS had ELC pay the invoices for the new trucks purchased under the May 2022 agreement, GLS remained the owner of the old trucks that it was unable to timely sell due to Navistar's alleged breach—meaning that arguably GLS, and not ELC, suffered the damages from the alleged breach.  See Pls. Resp. at 19, n. 4.

Because Navistar has not established, as a matter of law, that GLS assigned away its rights to any claims or causes of action, this issue remains to be addressed at trial.  Accordingly, the Court denies Navistar's motion for summary judgment.[7]

## C.  GLS and Central Transport's Partial Motion for Summary Judgment (Dkt. 51)

GLS and Central Transport move for summary judgement on their breach of contract claim against Navistar.  Pls. Mot. at 11.  It is premised on the contention that GLS and Central Transport have already established their prima facie case for their breach of contract claim, and that

---

[7] Navistar also argues that Plaintiffs' fraud claim should be dismissed because Plaintiffs have not shown reasonable reliance.  But the argument was made only as to the fraud theory that the Court has dismissed based on the economic loss doctrine.  See Def. Mot. for S.J. at 16–20.  Therefore, the no-reliance argument has no bearing on the surviving fraud theory, and the Court need not address it.

Navistar's affirmative defenses, including impossibility and impracticability, fail as a matter of law. Id. at 12–25.[8]

Under Michigan law, a breach of contract requires proof of (i) a valid contract, (ii) a breach of that obligation, and (iii) resulting damages. Miller-Davis Co. v. Ahrens Const., Inc., 848 N.W.2d 95, 104 (Mich. 2014). GLS and Central Transport assert that they have established the existence of a valid contract and Navistar's obligation to deliver 1,100 trucks by June 2022. Pls. Mot. at 11. They add that Navistar admits it did not meet this deadline, satisfying the breach element. Id. GLS and Central Transport also claim that they demonstrate damages, including lost profits and increased costs, resulting from the delay. Id. Thus, GLS and Central Transport assert that they have set forth a prima facie case for breach of contract. Id.

Navistar disagrees that there was a breach and maintains that there is at least a triable issue. Def. Resp. at 9–16. It argues that the May 2022 agreement did not promise any delivery dates and the agreement laid out a "potential production" schedule, rather than a delivery schedule.[9]

GLS and Central Transport are unable to point to anything within the contract itself that conclusively establishes a June 2022 delivery due date—instead, they rely on statements made by Navistar employees in July of 2022. See Pls. Reply at 2. Indeed, a production schedule sent to GLS and Central Transport before they signed the agreement projected that production would go beyond the end of June 2022, Lollis Email at PageID.968–979, and the agreement specifically

---

[8] Navistar has stated that it intends to withdraw certain affirmative defenses, see Def. Resp. to Pls. Mot. for S. J. at 23, n.6. As to any remaining affirmative defenses not addressed in the instant Opinion that Navistar intends to assert, the Court will confer with the parties to determine whether the rulings in this Opinion give sufficient guidance as to whether a fact question precludes awarding summary judgment to such defenses.

[9] Indeed, the spreadsheets sent to Plaintiffs before they signed the contract list "EST BUILD DATE" and make no mention of delivery. Lollis Email at PageID.968–979.

contemplated the possibility of production delays, as evidenced by a provision for the payment of $6.2 million that was intended to compensate for "delayed current or future production of units," Letter Agreement at PageID.279. Additionally, Navistar asserts that it often takes 45 to 120 days from the end of production to delivery. Carmichael Dep. at 290. This would mean that even trucks built on June 30, 2022 would not be expected to be delivered until between mid-August and the end of October 2022. Thus, Navistar asserts that there is a genuine issue of material fact regarding whether each truck was delivered within a reasonable time. Resp. at 14–16.

Because each side has supported its view of what schedule the 2022 agreement required, there is a genuinely disputed factual issue. The Court, therefore, agrees with Navistar that whether the 2022 contract was breached remains a triable issue.

The Court denies GLS and Central Transport's motion for partial summary judgment (Dkt. 51).

### III. <u>CONCLUSION</u>

The Court grants in part Navistar's motion to dismiss (Dkt. 36). The Court denies Navistar's motion for summary judgment (Dkt. 50) and Plaintiffs' motion for partial summary judgment (Dkt. 51).

**SO ORDERED.**

Dated: September 26, 2025                                   s/Mark A. Goldsmith
Detroit, Michigan                                          MARK A. GOLDSMITH
                                                           United States District Judge

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 26, 2025.

s/Joseph Heacox
JOSEPH HEACOX
Case Manager