# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

GLS LEASCO, INC., and
CENTRAL TRANSPORT LLC,

     Plaintiffs,

vs.

NAVISTAR, INC.,

     Defendant.

Case No. 23-cv-12927-MAG-APP

Hon. Mark A. Goldsmith

Magistrate Judge Anthony P. Patti

---

## DEFENDANT NAVISTAR, INC.'S ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT

Defendant Navistar Inc. ("Defendant" or "Navistar"), by and through its undersigned counsel, answers Plaintiffs GLS Leasco, Inc. ("GLS") and Central Transport, LLC's ("Central" and collectively with GLS "Plaintiffs") Second Amended Complaint ("Amended Complaint") as follows:

## PARTIES, JURISDICTION, AND VENUE

1.     GLS is a Michigan corporation with its registered office and principal place of business located at 12225 Stephens Road, Warren, Michigan.

**ANSWER: Upon information and belief, Navistar admits the allegations of this paragraph.**

2.     Central is a limited liability company organized under the laws of the State of Michigan, with the principal place of business located in Warren, Michigan. Central's

sole owner and member is LTL Holding Company, LLC, a limited liability company organized under the laws of the State of Michigan, with its principal place of business in Warren, Michigan.  LTL Holding Company's members are two individuals who are both Michigan residents, and a Michigan trust whose trustee is a Michigan resident. There thus remains complete diversity between the parties following this amendment.

**ANSWER:  Upon information and belief, Navistar admits the allegations of this paragraph.**

3.    Navistar is a Delaware corporation registered and authorized to conduct business within the State of Michigan, with its principal place of business located in Lisle, Illinois.

**ANSWER: Navistar admits that it was a Delaware corporation authorized to conduct business within the State of Michigan at the time the original complaint was filed.   Navistar has since changed its name to International Motors, LLC (International Motors, LLC d/b/a International Motors LLC in Illinois and Ohio).**

4.    Navistar conducts systematic and continuous business in Macomb County and throughout the State of Michigan, including by maintaining an International Truck distributorship within Macomb County; marketing, distributing and selling trucks, trailers, parts, and accessories within Macomb County and the State of Michigan; creating, soliciting, and servicing a market for such products in Macomb County and the State of Michigan; being registered to conduct business in the State of Michigan;

and entering into multi-million dollar contracts with Macomb County and Michigan business entities (including GLS and the contract at issue) for such products.

**ANSWER:  Navistar admits that it conducts business in Michigan and is registered to do business in Michigan.  Navistar lacks knowledge or information sufficient to form a belief as to the truth of the remaining vague allegations and legal conclusions of this paragraph, and therefore, denies the same.**

5.      This case arises out of a contract Navistar entered into with GLS, negotiating on behalf of several affiliated companies including Central, for over $128 million in Navistar trucks (also referred to as trucks), as set forth in an April 8, 2022 letter agreement. Ex. A.

**ANSWER:  Navistar admits that Exhibit A to the Amended Complaint purports to be a Letter Agreement dated April 8, 2022, the content of which speaks for itself, but denies the remaining allegations of this paragraph.**

6.      The Macomb County Circuit Court had personal jurisdiction over Navistar under MCL 600.711 and 600.715.  Navistar has since removed this case to federal court.

**ANSWER: Navistar denies the allegations of this paragraph, as the lawsuit has been properly removed to the United States District Court for the Eastern District of Michigan pursuant to 28 U.S.C. § 1441(a) and 28 U.S.C. § 1332.**

7.      The amount in controversy exceeds $75,000.

3

**ANSWER:  Navistar admits that GLS has alleged damages in excess of $75,000 but denies the remaining allegations of this paragraph, as the lawsuit has been properly removed to the United States District Court for the Eastern District of Michigan pursuant to 28 U.S.C. § 1441(a) and 28 U.S.C. § 1332.**

8.     Venue was proper in Macomb County under MCL 600.1621.  Navistar has since removed this case to the Eastern District of Michigan, where venue is proper.

**ANSWER: Navistar denies the allegations of this paragraph, as the lawsuit has been properly removed to the United States District Court for the Eastern District of Michigan pursuant to 28 U.S.C. § 1441(a) and 28 U.S.C. § 1332.**

9.     This case was properly assigned to the Macomb County business court under MCL 600.8031 and MCL 600.8035 because it involves a business or commercial dispute in which all parties are business enterprises, and it relates to their contractual agreement and business dealings.  Navistar has since removed this case to federal court.

**ANSWER:  Navistar denies the allegations of this paragraph, as the lawsuit has been properly removed to the United States District Court for the Eastern District of Michigan pursuant to 28 U.S.C. § 1441(a) and 28 U.S.C. § 1332.**

## FACTUAL ALLEGATIONS

10.     GLS is in the business of purchasing, leasing, and selling commercial trucks, including leasing trucks to Central.

**ANSWER:  Upon information and belief, Navistar admits the allegations of this paragraph.**

11.     Navistar sells trucks, buses, and parts, and offers related financial services, within the State of Michigan and throughout the United States and Canada.

**ANSWER:  Navistar admits the allegations of this paragraph.**

12.     GLS - acting for itself and on behalf of various affiliated entities including Central - has made substantial purchases from Navistar in the past, including the six hundred and thirty (630) Model Year 2018 trucks that are at issue in this lawsuit (the "MY2018 Trucks").

**ANSWER:  Navistar admits that GLS has made purchases from Navistar in the past. Navistar denies any remaining allegations of this paragraph.**

13.     The MY2018 Trucks at issue were purchased by GLS Leasco, Inc. for the purpose of leasing those trucks to Central Transport, LLC.

**ANSWER:  Navistar lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and, therefore, denies the same.**

14.     On November 6, 2017, Navistar and GLS entered into an Optional Trade-In Agreement. Under the Optional Trade-In Agreement, as more particularly set forth therein and without limitation, Navistar granted GLS the option to trade in the MY2018 Trucks for a specified residual value.

**ANSWER: Upon information and belief, Navistar admits it entered into an Optional Trade-In Agreement in 2017, the contents of which speak for itself.**

15.     In February 2021, GLS issued a request for quotation for new trucks to multiple original equipment manufacturers, including Navistar.

**ANSWER: Upon information and belief, Navistar admits that GLS issued a request for quotation for new trucks to Navistar in February 2021, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph and, therefore, denies the same.**

16.     In April 2021, GLS notified Navistar that it had been selected to supply 1305 trucks, many of which Navistar would be supplied to Central, with the others to be supplied to other entities GLS was negotiating on behalf of.

**ANSWER:  Navistar admits the allegations of this paragraph.**

17.     Navistar paints the GLS trucks yellow (Central's color, which is unique in the industry) that it knows are intended for leasing to Central.  Navistar also applies Central decals before delivering the trucks directly to Central facilities.

**ANSWER: Navistar admits to painting certain trucks yellow and applying decals to certain trucks at the request of Central. Navistar denies the remaining allegations in this paragraph.**

18.     On July 13, 2021, GLS entered into a letter agreement with Navistar and its dealer representative, Summit Truck Group, for the supply of 1,305 International trucks (the "July 2021 Letter Agreement").

6

**ANSWER: Navistar admits that the parties signed a document dated July 13, 2021 and that said document speaks for itself, and Navistar denies any allegation contrary to or inconsistent with it, and otherwise denies the remaining allegations of this paragraph.**

19.     Under the July 2021 Letter Agreement, as more particularly set forth therein and without limitation:

      **a.** Navistar agreed to supply 1,100 2023MY trucks and 205 2024MY trucks for $113,843 per truck;

      **b.** Navistar recognized GLS's option to turn in 1046 used trucks (including the MY2018 Trucks);

      **c.** Navistar agreed that the new MY2023 units would be produced and delivered to GLS from February 2022 to December 2022; and,

      **d.** Navistar agreed that the new MY2024 units would be produced and delivered to GLS from January 2023 to February 2023.

**ANSWER: Navistar admits that the parties signed a document dated July 13, 2021 and that said document speaks for itself, and Navistar denies any allegation contrary to or inconsistent with it, and otherwise denies the remaining allegations of this paragraph.**

20.     At the end of 2021, Summit Truck Group was sold to Rush Enterprises, and at Navistar's behest, Navistar and GLS entered into negotiations for a new letter agreement excluding Summit Truck Group.

**ANSWER:  Navistar admits it entered into negotiations with GLS at the end of 2021 for a new letter agreement. Navistar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph, and therefore denies same.**

21.    On April 8, 2022, Navistar and GLS entered into a new letter agreement (the "Letter Agreement"), Ex. A, which stated: "This Letter Agreement is intended to replace the previous agreement among GLS LeasCo., Summit Truck Group and Navistar dated July 13th, 2021." *Id.* at p. l.  The Agreement identified, by name, Central along with other entities who were the intended recipients of the trucks.

**ANSWER:  Navistar admits that Navistar and GLS signed the April 8, 2022 document attached as Exhibit A to the Amended Complaint, and further states that the contents of the April 2022 Letter Agreement speak for themselves and Navistar denies any allegations contrary to or inconsistent with it.**

22.    During the negotiation of the Letter Agreement and at the time the parties entered into the Letter Agreement, it was widely known in the trucking industry, and was specifically known to Navistar and GLS, that the market for used trucks was historically strong.

**ANSWER:  Navistar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore, denies the same.**

23.     At the time, Navistar stated that it had difficulty producing new trucks with its Bendix Fusion collision mitigation system, and told GLS that it would have additional production slots opening up for customers willing to accept delivery of new trucks without the Bendix system. GLS agreed.

**ANSWER:  Navistar admits only that it experienced historic supply chain issues and that supply of the Bendix Fusion collision mitigation system was delayed. Otherwise, denied.**

24.     Consistent with the foregoing, the negotiations leading up to the Letter Agreement involved the following key points:

    **a.** With full awareness of GLS's intention and expectation to purchase and take delivery of new trucks as soon as possible, and then to sell in the historically strong re-sale market the MY2018 Trucks that were being replaced by the new trucks, Navistar proposed an earlier delivery schedule for new trucks intended for GLS to lease to Central if GLS would accept delivery without the Bendix system (to be installed at a later date);

    **b.** In exchange for the earlier production schedule that allowed GLS to sell its MY2018 Trucks in the historically strong re-sale market, GLS expressed its willingness to consider waiving its trade-in option (including with respect to the MY2018 Trucks);

c. To further entice GLS to enter into this transaction, Navistar offered a rebate payment related to new tractor purchases, which ended up being $6.2 million in the Letter Agreement (or roughly $6,000 per new tractor), with the bulk of those payments to be issued to Central Transport.

**ANSWER: Navistar admits that the parties negotiated a number of key points with respect to the April 8, 2022 Letter Agreement including producing certain trucks with a Bendix Prewire with credit for aftermarket install, and certain payments to Central and/or its affiliates conditioned upon GLS adding OnCommand 3G/4G and 5G for all 2021 model year and newer units as well as other points. The April 8, 2022 Letter Agreement speaks for itself and Navistar denies any allegations contrary to or inconsistent with it. Navistar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph and, therefore, denies the same.**

25. The earlier production schedule for the new trucks was a critical part of the consideration Navistar offered to GLS.

**ANSWER: Navistar denies the allegations of this paragraph.**

26. GLS would never have waived its trade-in rights, including with respect to the MY2018 Trucks, in the absence of Navistar's agreement to the earlier production schedule, which both parties understood would allow GLS to sell the MY2018 Trucks in the historically strong re-sale market.

10

**ANSWER: Navistar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, therefore, denies the same.**

27. In order to secure the earlier production slots, GLS agreed to allow Navistar to complete the installation and wiring of its Bendix system after delivery of GLS's new trucks.

**ANSWER: Navistar admits that it built trucks without the Bendix system to GLS as contemplated by the Letter Agreement. Navistar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph and, therefore, denies the same.**

28. Consistent with the foregoing, GLS and Navistar entered into the Letter Agreement with the mutual understanding and recognition that Navistar's earlier production schedule for the new trucks would allow GLS to take advantage of the historically strong market conditions for used trucks (including for the MY2018 Trucks). Central was the intended beneficiary of these new trucks, which GLS and Navistar understood would be used to replace the used trucks in Central's fleet on the promised timetable in the Letter Agreement.

**ANSWER: Navistar denies the allegations of this paragraph.**

29. Accordingly, under the Letter Agreement, as more particularly set forth therein and without limitation:

a. Navistar agreed to produce 1100 MY2023 trucks from January 2022 through May 2022 (instead of the previously agreed upon production schedule of February 2022 to December 2022). *Id* at pp.1-2.

b. In exchange for Navistar's promised earlier production schedule and a $6,200,000 rebate to Central and other entities related to the new tractor purchases, Navistar was released from its obligation to pay GLS the previously agreed upon residual value of specified used trucks (including the MY2018 Trucks).

c. The Letter Agreement's "No Trade Agreement" provision confirms that the residual value of the MY2018 Trucks (z. e., the amount Navistar would have been required to pay for trade-ins in the absence of the No Trade Agreement provision), as of May 1,2022, was $57,000 per vehicle.

d. The "No Trade Agreement" provision confirms that in the absence of this agreement, Navistar would have owed GLS, at GLS's option, in excess of $50 million for trade-in vehicles, including nearly $35 million for the MY2018 Trucks.

e. The "No Trade Agreement" provision states: "This Agreement Letter is all encompassing for any and all current or future issues for 941 model year 2017 – 2019 International units and terminates any and all other agreements pertaining to these units." *Id.* at p.3.

12

**ANSWER:  Navistar denies that it agreed to produce 1100 MY2023 trucks from January 2022 through May 2022. Further answering, GLS did not sign the Letter Agreement until May 18, 2022 and delayed ordering 555 of the trucks until March of 2022.  Navistar admits the average residual sale price for the Central 2018 International RH613 model tractor was $57,000 but the averages fluctuated based on OTB, mileage at the time of trade in, and the trucks meeting full trade terms and conditions, all of which varied vehicle by vehicle.  Navistar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph and, therefore, denies the same.**

30.     Navistar was fully aware during negotiation of the Letter Agreement and at all relevant times that:

   a.  GLS would be unable to sell its used trucks, including the MY2018 Trucks, and take advantage of the historically strong used truck market, until Navistar replaced the used trucks with new trucks;

   b.  the used trucks in question were a part of Central's fleet, and the new trucks would be leased by GLS to Central to replace the used trucks.

   c.  time was of the essence for the Letter Agreement's production schedule for new trucks;

   d.  GLS had agreed to waive its option to trade-in the MY2018 Trucks in consideration of Navistar's promised earlier production schedule;

  **e.** the used trucks market was historically strong and would not remain so indefinitely;

  **f.** there was a risk of a price drop in the market for used trucks with a production delay; and,

  **g.** taking advantage of the historically strong market conditions for used trucks was the key reason GLS traded the security of Navistar's residual trade-in obligations for Navistar's earlier production schedule.

**ANSWER: Navistar denies the allegations of this paragraph, including subparts (a) through (f) and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations concerning the reasons why GLS entered into the Letter Agreement and, therefore, denies the same.**

31. Navistar's knowledge of the market conditions is further demonstrated by Navistar's own efforts to capitalize on the historically strong used track market during the relevant time period.

**ANSWER: Navistar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, therefore, denies the same.**

32. On May 2, 2022, *Fleet Maintenance* published an article entitled, "Navistar relocates Used Truck Center to better serve high-demand market."

**ANSWER: Navistar admits the allegations of this paragraph.**

33.     The article states that "Navistar recently opened a new 13,000 sq.-ft. Used Track Center located in Joliet, Illinois."

**ANSWER: Navistar states that the contents of the referenced article speak for themselves and denies any allegations contrary to or inconsistent with them, and otherwise admits the allegations of this paragraph.**

34.     Tony Stinsa, a Navistar vice president, provided the following quotation for the article: "The used truck market continues to be in a state of abnormally low available inventory and historically high pricing levels...Within the International [*i.e.* Navistar brand] used truck ecosystem, we are participating actively in this market."

**ANSWER: Navistar states that the contents of the referenced article speak for themselves and denies any allegations contrary to or inconsistent with them, and otherwise denies that the referenced article contains the quote exactly as written in paragraph 31 of the Amended Complaint.**

35.     It was entirely foreseeable to Navistar, and Navistar knew at the time the parties entered into the Letter Agreement, that its failure to meet the production schedule would impair GLS's ability to take advantage of the historically strong market conditions for used trucks and could result in consequential damages in the form of re-sales at lower prices than would have been available if the promised production schedule was honored and fulfilled.

**ANSWER:  Navistar denies the allegations of this paragraph.**

36.     Under the Letter Agreement, Navistar promised to produce all new trucks, including the replacements for the MY2018 Trucks, by the end of May 2022.

**ANSWER:  Navistar denies the allegations of this paragraph.**

37.     Specifically, Navistar promised to produce the new trucks intended to replace the MY2018 Trucks as follows:

> **a.** 75 RH model Trucks during March 2022;
>
> **b.** 225 LT model Trucks during April 2022;
>
> **c.** 330 LT model Trucks during May 2022.

**ANSWER:  Navistar denies the allegations of this paragraph.**

38.     However, by the end of May, Navistar had only delivered 18 of the 630 new trucks intended to replace the MY2018 Trucks.

**ANSWER:  Navistar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, therefore, denies the same.   Further answering, Navistar admits that it built a total of approximately 367 trucks by the end of May 2022, 112 for Central Transportation and 255 for Universal Transportation.**

39.     Navistar's late delivery of the new trucks extended well over a year. Rather than adhere to the production schedule it promised in the Letter Agreement, Navistar delivered the new trucks intended to replace the MY2018 Truck as follows:

> **a.** 95 in June 2022;
>
> **b.** 74 in July 2022;

**c.** 80 in August 2022;

**d.** 31 in September 2022;

**e.** 11 in October 2022;

**f.** 30 in November 2022;

**g.** 50 in December 2022;

**h.** 66 in January 2023;

**i.** 103 in February 2023;

**j.** 39 in March 2023;

**k.** 6 in April 2023;

**l.** 1 in May 2023;

**m.** 18 in June 2023;

**n.** 6 in July 2023;

**o.** 1 in August 2023;

**p.** 1 in September 2023.

**ANSWER: Navistar denies that the parties agreed to a production delivery schedule in the Letter Agreement.  Navistar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph and, therefore, denies the same.**

40.     Navistar's failure to timely deliver the new trucks intended to replace the MY2018 Trucks precluded GLS from selling the MY2018 Trucks during the period of

Navistar's delay and precluded GLS from benefitting from the historically strong market conditions for used trucks.

**ANSWER:  Navistar denies the allegations of this paragraph.**

41.     During the months following the time period in which Navistar was contractually obligated  to have completed its deliveries, the price for the MY2018 trucks dropped by over 75%, causing GLS to suffer substantial damages in the form of lost sales revenue.

**ANSWER:  Navistar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, therefore, denies the same.**

42.     As a direct result of Navistar's delay, GLS lost tens of thousands of dollars in lost revenue and profits for each one of the MY2018 Trucks it sold, totaling tens of millions of dollars in damages.

**ANSWER:  Navistar denies the allegations of this paragraph.**

43.     In addition, as a direct result of Navistar's production delay, Central sustained far higher maintenance, fuel, driver recruitment, and repair costs due to the need to keep the MY2018 Trucks in service instead of replacing them with new trucks.

**ANSWER:   Navistar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, therefore, denies the same.**

44.     It was entirely foreseeable to Navistar, and Navistar knew, that Central would sustain far higher maintenance, fuel, driver recruitment, and repair costs and financing costs if Navistar did not timely deliver the new trucks under the Letter Agreement.

**ANSWER:  Navistar denies the allegations of this paragraph.**

## SUPPLEMENTAL FACTUAL ALLEGATIONS

45.     Navistar offers different prices to different customers, with smaller customers generally paying higher prices—often significantly higher prices—than purchasers of larger quantities of vehicles for the same class of truck.

**ANSWER:  Navistar admits that customers pay different prices for trucks depending on various configurations and specialized features.  Navistar lacks knowledge or information sufficient to form a belief as to the truth of the remaining conclusory allegations of this paragraph and, therefore, denies the same.**

46.     Navistar internally has a "Special Price Allowance" figure (or "SPA") calculated for each of its customer contracts. The SPA is calculated as a percentage, with that percentage reflecting the discount from the list price of the vehicle. A higher SPA means that the customer is receiving a larger discount and thus a higher SPA means that the customer is less profitable for Navistar.

**ANSWER:  Navistar admits that a "Special Price Allowance" is calculated as a percentage discount for certain customers but denies that it applies to every**

**customer as alleged in this paragraph. Navistar further admits that a higher SPA generally means a customer is receiving a higher discount but denies the remaining allegations of this paragraph.**

47.    In 2021 and 2022, Plaintiffs (who Navistar treated as a single customer in internal documentation) had one of the highest—if not the very highest—SPA of all dealer-led transactions in Navistar's Southwest Region. Plaintiffs were thus one of Navistar's least profitable customers.

**ANSWER: Navistar admits that under the July 2021 Agreement GLS had an SPA of 61.7% which was higher than some customers and lower than others and that certain customers were more profitable than Plaintiffs. Navistar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph and, therefore, denies the same.**

48.    Plaintiffs' high SPA stemmed from several factors. Plaintiffs were a longtime, loyal customer of Navistar that continued to make purchases from Navistar during a period of time where Navistar was suffering from significant reputational and financial troubles due to the highly-publicized failure of its Maxxforce truck engine. As one of a then-dwindling number of fleet customers, Navistar had offered GLS favorable pricing.

**ANSWER: Navistar admits Plaintiffs' SPA is based on several factors but denies that those factors include the vague and conclusory allegations of this paragraph and further denies any remaining allegations in this paragraph.**

20

49.     Another major contributor to Plaintiffs' high SPA was Navistar's agreement to buy back the used MY 2018 Trucks from Plaintiffs at a specified $62,000 per-truck price if Plaintiffs purchased a new replacement truck. As of 2021, Navistar's Used Truck Organization believed that Plaintiffs' trucks were worth far less, and Navistar viewed its repurchase obligation as a financial albatross that made selling new trucks to Plaintiffs particularly unprofitable.

**ANSWER:  Navistar lacks knowledge or information sufficient to form a belief as to the truth of the vague and conclusory allegations of this paragraph and, therefore, denies the same. Plaintiffs fail to specify when in 2021 Navistar allegedly valued Plaintiffs' MY 2018 Trucks "far less" than $62,000 (the value of used trucks fluctuated significantly throughout the year). This paragraph also does not identify with any specificity the condition or mileage of the MY 2018 Trucks (which can also impact value significantly).**

50.     Perversely, Plaintiffs' loyalty to Navistar—and the favorable pricing that followed from that loyalty—would cause Navistar to view Plaintiffs as an undesirable customer once Navistar found itself with far greater demand for new trucks than it had supply. In this environment, Navistar could make significantly more profit for itself by selling trucks to customers with a lower SPA.

**ANSWER:  Navistar admits that some customers with lower SPAs are more profitable than others.  Navistar lacks knowledge or information sufficient**

to form a belief as to the truth of the remaining allegations of this paragraph and, therefore, denies the same.

51.     When originally negotiating with Plaintiffs in early 2021, Navistar proposed various schemes to avoid paying the full residual value that had been negotiated in the 2017 Optional Trade Back ("OTB") agreement, including (1) proposing significant delays in providing new trucks to Plaintiffs, knowing Plaintiffs could not timely turn in its old trucks, thus triggering a monthly penalty to the residual value owed by Navistar under the OTB agreement; and (2) proposing timely delivery of new trucks, but refusing to allow OTB trade-ins until many months after new truck delivery, again to trigger this OTB penalty clause. Justin Fink—the CEO of the Navistar dealer responsible for Plaintiffs' account—called Navistar's conduct "insanity" and insisted Navistar fulfill its contractual promise on the OTB turn-in.

**ANSWER:   Navistar admits that Mr. Fink authored an email dated 2/16/21 in connection with negotiations between Navistar and Plaintiffs over an RFP. Navistar further admits that this email references Navistar "insanity."  The email speaks for itself, and Navistar denies the remaining allegations of this paragraph.   Mr. Fink testified that he did not recall what he was referencing when he wrote "Navistar Insanity".  Fink Dep. P. 104-105.**

52.     It was only after GLS threatened legal action—through a letter by its General Counsel on July 1, 2021—that Navistar came to an agreement to produce new

trucks that allowed Plaintiffs to trade back the used trucks under the parties' previous trade-back agreement.

**ANSWER:  Navistar admits that it executed an Agreement with Summit Holdings, Central Transport, and Navistar on or about July 29, 2021, but denies the remaining allegations of this paragraph.**

53.     Under the July 2021 Letter Agreement, Navistar promised to supply 1305 new RH model heavy trucks to GLS and its affiliated entities Central and Universal. The schedule was 100 per month starting in February 2022, with a final delivery of 105 trucks in February 2023.

**ANSWER:  Navistar admits the July 2021 Letter Agreement includes a new truck delivery schedule "based on available production at the time of this letter."  The July 2021 Letter Agreement speaks for itself and Navistar denies any allegations inconsistent therewith.**

54.     Despite signing the July 2021 Letter Agreement, Navistar continued to view GLS/Central as an undesirable, low-margin customer. Navistar had no intention of producing the new trucks promised under that July 2021 Agreement, despite having the manufacturing capacity to do so.

**ANSWER:  Navistar denies the allegations of this paragraph.**

55.     The July 2021 Letter Agreement was signed on July 29, 2021. Although Navistar promised to produce 1305 trucks for Plaintiffs under that agreement,

Southwest Regional Vice President Sean Carmichael immediately refused to allow Navistar's dealer to order all the trucks promised.

**ANSWER: Navistar denies the allegations of this paragraph. Navistar's dealer was unable to place the orders the following month because the price pages submitted by the dealer contained errors in the SPA terms and conditions.**

56.     Ultimately, in late August 2021, Navistar permitted its dealer to order only 1,000 RH model trucks for Plaintiffs, rather than the 1305 called for in the July 2021 Letter Agreement.

**ANSWER: Navistar admits that on or about August 25, 2021, it received an email from the dealership indicating "(1000) RHs order for Central Transport." Navistar denies any remaining allegations in this paragraph.**

57.     At this time, Navistar had many available customers for the supply of trucks it could manufacture. While Navistar has claimed that it simply lacked the capacity to fulfill all its promised orders, it did not simply allocate production on a proportional basis to all customers. Rather, it picked winners and losers, with profit margin being a key factor by Navistar in deciding which customers would be denied their promised trucks so that Navistar could sell them to higher-margin customers. An internal spreadsheet dated August 27, 2021 and used by Navistar in the reallocation process for the Southwest Region (where Plaintiffs were assigned) showed that nearly all of the reallocation of production was taken from customers with the lowest profit margins, including Plaintiffs.

24

**ANSWER: Navistar admits that it prepared several forecasts for truck allocations and applied a methodology based on the production capacity allocated down through dealers and fleets. Navistar denies that it picked winners and losers by profit margin and denies that it reallocated production based on an August 27, 2021 spreadsheet. Navistar further states that it lacks knowledge or information sufficient to identify which spreadsheet is referenced in this paragraph and, therefore, denies the same.**

58.     On October 22, 2021, Chester Ciesielski—the Navistar Vice-President responsible for the heavy truck business throughout Navistar—recommended to Carmichael that Plaintiffs have all but 600 of their promised orders reallocated to other customers.

**ANSWER: Navistar admits that as of October 22, 2021, Mr. Ciesielski recommended holding 600 trucks for Central in 2022 and moving 705 to the following calendar year. The remaining allegations are denied.**

59.     Minutes from a November 16, 2021 Navistar Dealer Advisory Committee meeting quote Navistar Group Vice President of Dealer Sales and Operations Mark Belisle as stating that his "goal is to have 25% of what we build in 2022 going to small customers" and that Navistar's "large customers are not going to be able to get all the trucks they want, need, or think they need." Belisle confirmed at his deposition that he made this statement.

**ANSWER:  Navistar admits that the minutes from the Navistar Dealer Advisory Committee meeting on November 16, 2021 state:**

**Mark Belisle:   Important that every dealer has faith in small to mid-size customers.  All of you have stock on the order board and what you do with that stock will determine how many customers we sell in the overall network.  We are not going to whack every stock truck at a dealership.  My goal is to have 25% of what we build in 2022 going to small customers.  RVPs will be meeting to discuss 2022 dealer allocation.  All of the large customers are not going to be able to get all the trucks they want, need, or think they need.  It's important to build our customer base in 2022.  Not an easy task.**

**The meeting minutes speak for themselves and Navistar denies any allegations inconsistent therewith.**

60.    On December 16, 2021, Belisle and Carmichael travelled to Plaintiff's headquarters in Warren, Michigan to meet with Plaintiffs' representative Kyle Blain and others.

**ANSWER:  Navistar admits the allegations of this paragraph.**

61.    At the December 16, 2021 meeting with Blain, Belisle and Carmichael announced to Plaintiffs, for the first time, that Navistar would only produce 600 trucks for Plaintiffs in 2022 instead of 1,305 trucks, claiming that they did not have the available production to build the trucks.

**ANSWER: Navistar admits that notes from the December 16, 2021 meeting state "Centrals 2022 Allocation will be reduced from 1,100 units down to 600 due to ongoing supplier issues," but denies the remaining allegations of this paragraph.**

62.     This was a false statement; Belisle knew that Navistar *did* have the capacity to build more than 600 trucks for Plaintiffs in 2022; indeed, he had the discretion to allocate production to Plaintiffs to fulfill Navistar's contractual obligations.

**ANSWER:  Navistar denies the allegations of this paragraph.**

63.     Instead, Belisle and his team had simply reallocated that production away from Plaintiffs to sell to more profitable customers, including Navistar's favored, higher-margin "small" customers that Navistar did not have any existing contractual obligation to sell to.

**ANSWER:  Navistar denies the allegations of this paragraph.**

64.     Belisle made the false statement as part of a fraudulent scheme to deprive GLS and Central of the trade-back agreement that Navistar had been seeking to avoid going back to early 2021.

**ANSWER:  Navistar denies the allegations of this paragraph.**

65.     Only a few weeks later, in an internal email dated January 7, 2021, Mark Belisle disclosed to several senior executives—including Carmichael and Used Truck Organization Vice President Tony Stinsa—that he and Carmichael created an "opportunity" with Plaintiffs that he wanted to "pursue ASAP."

**ANSWER:  Navistar admits that Mr. Belisle's January 7, 2021 email states, "Gentlemen we have an opportunity with Central that I believe we need to pursue ASAP."  The email speaks for itself and Navistar denies any allegations that are inconsistent therewith.**

66.     In that email, he acknowledged the falsity of his statement to Kyle Blain a few weeks earlier by revealing that Navistar could produce at least 1,100 additional trucks as "incremental production" (that is, *beyond* the existing production that Navistar had made available to other customers) in the next few months.

**ANSWER:  Navistar admits that Mr. Belisle's email states that "Sean has floated that we build them 350 a month in March, April and May to get them to their 1,100 for the year . . ." but denies the remaining allegations in this paragraph.**

67.     Further, the Bendix unavailability issue did not impact Navistar's ability to produce 1,305 trucks for Plaintiffs under the July 2021 Letter Agreement. Discovery has disclosed that Navistar planned to offer Bendix pre-wire to all its heavy truck customers in December 2021 and did offer it to all in January 2022. Plaintiffs agreed to accept the Bendix pre-wire option (and Navistar purported to implement it) while the July 2021 Letter Agreement was still in effect, to the trucks ordered under that Agreement.

**ANSWER: Navistar admits that Plaintiffs agreed to accept the Bendix accommodation package but denies the remaining allegations of this paragraph.**

68.     In the January 7, 2022 email, Belisle explained the "opportunity" that he and Carmichael had been concocting: Carmichael had "floated" to Kyle Blain that Navistar now had additional production and could produce 350 trucks per month in

March, April, and May of 2022 in exchange for Plaintiffs waiving their rights to trade in their used MY2018 Trucks to Navistar at the promised residual price.

**ANSWER: Navistar admits that Mr. Belisle sent an email on January 7, 2022 that stated "Sean has floated that we would build them 350 a month in March, April and May to get them their 1,100 for the year and they would accept a $10,000 no trade credit on the [sic] all the OTB units."  Mr. Belisle's email speaks for itself and Navistar denies any allegations or assumptions inconsistent therewith.**

69.    In the same email, Belisle noted that if GLS accepted this proposal, Navistar would save an average of $21,093 owed to Plaintiffs for each of the 612 MY18 RH trucks that GLS otherwise could turn in. He posited that Navistar "can turn this from a $7000 - $8000 [variable margin]… deal to a $17,000 or $18,000 [variable margin] per unit deal or approx $11m increase."

**ANSWER: Navistar admits that Mr. Belisle sent an email on January 7, 2022 and the quoted language is contained in the email.  Mr. Belisle's email speaks for itself and Navistar denies any allegations or assumptions inconsistent therewith.**

70.    Navistar, in fact, had no intention of providing trucks to Plaintiffs on this accelerated timetable. Instead, it relied on its knowledge that Plaintiffs had a significant need for new trucks—trucks that Navistar had already promised and then threatened

to renege on providing—and the false promise of accelerated production to induce Plaintiffs into waiving contractual rights that Navistar felt were unfavorable.

**ANSWER: Navistar denies the allegations of this paragraph.**

71. Navistar proposed this offer to Plaintiffs, with the parties agreeing to the broad outlines of a deal in January 2022 that included (a) the production of trucks for GLS/Central in March, April, and May 2022; and (b) the no-trade agreement. It was further understood that the production timing would allow Plaintiffs to take advantage of the historically strong market conditions for used trucks.

**ANSWER: Navistar denies the allegations of this paragraph.**

72. On January 20, 2022, Navistar and Plaintiffs reached the broad outlines of a new agreement to replace the July 2021 letter agreement, including the number of trucks Navistar would produce for Plaintiffs from January 2022 through May 2022, but other details required finalization.

**ANSWER: Navistar lacks knowledge or information sufficient to admit or deny what is meant by "broad outlines of a new agreement" and, therefore, denies the same. Navistar admits that it was negotiating a new deal with Central, PAM and Universal and there are emails dated January 20, 2022 reflecting the status of the negotiations. The emails speak for themselves and Navistar denies any allegation or interpretation that conflicts with the emails.**

73. On the same date, Belisle, Stinsa, Carmichael, and other Navistar executives participated in a self-congratulatory email chain, bragging and joking about

their apparent success in eliminating GLS's trade-back rights. Carmichael was lauded for doing a "great job here in taking advantage of the used truck market," reflecting Navistar's awareness that Plaintiffs were waiving approximately $62,000 per-vehicle trade-in rights because of the strong used truck market.

**ANSWER: Navistar admits that Mr. Martin sent an internal email on January 20, 2022 that said "[t]old him what a great job Sean has done here in taking advantage of the used truck market?" Mr. Martin's email speaks for itself and Navistar denies any allegations and conclusory statements that are inconsistent therewith.**

74.     Despite promising Plaintiffs accelerated production, Belisle and other executives continued to discuss reassigning production to higher-margin customers.

**ANSWER: Navistar denies the allegations of this paragraph.**

75.     For example, a February 24, 2022 email from Navistar executive Dan Keyser to Belisle and others indicated that Navistar wanted to refocus its truck allocation based on "margin." He provided a list of the 30 Navistar customers with the lowest profit margins (including Plaintiffs), directed the team to "identify lowest margin (highest SPA orders), determine which of this list is not touchable," and for the rest, have production "postponed indefinitely."

**ANSWER: Navistar admits that Mr. Kayser sent an email to Mr. Belisle and others on February 24, 2022, with a subject line "Customer Mix" that proposed different plans and strategies for dealing with potential disruptions**

and lost production. Mr. Kayser's email speaks for itself. Navistar denies that Mr. Kayser's proposal was adopted as implied by the allegations of this paragraph.

76. On April 7, 2022, Belisle emailed Carmichael, instructing him to "make some decisions about who we build for and who we don't build for in a timely fashion," citing profitability and the need for small customers as a factor to consider, as well as "trades (good or bad)."

**ANSWER: Navistar denies the allegations of this paragraph. Mr. Belisle's email is dated April 6, 2022, the content of which speaks for itself.**

77. An April 14, 2022 email from Navistar executive Paul Martin to Navistar's then Head of Commercial Operations Göran Nyberg (and earlier provided to Dan Keyser and Mark Belisle) was explicit about Navistar's intention to lie to its non-preferred customers. It noted Navistar's intention to reassign trucks to more profitable customers but recognized that "if we are seen to be 'picking and choosing' customers in the marketplace, it would be a problem." As to disfavored customers, Belisle, Keyser, and Martin decided that the "story… needs to be" that "due to supply chain issues we are going to need to push orders out."

**ANSWER: Navistar admits that Mr. Martin sent an email dated April 14, 2022, to Göran Nyberg, the content of which speaks for itself. Navistar denies the remaining allegations of this paragraph.**

78.     Navistar has attempted to sell that same story to Plaintiffs, including in this litigation. However, Navistar's Sean Carmichael admitted at deposition that the only "supply chain" issues that allegedly affected Plaintiffs were all known to Navistar and accounted for *before* Navistar signed the April 8, 2022 letter agreement stating 1,100 trucks would be produced by May 2022.

**ANSWER:  Navistar denies the allegations of this paragraph.**

79.     On April 8, 2022, Sean Carmichael signed the final draft of the 2022 Letter Agreement. It states that "[a]t the time of this letter" – that is, April 8, 2022 – "Navistar can supply (1,100) new 2023 International LT/RH production slots from January 2022 through June 2022," and identified "New Truck Build Months" that were "based on available production at the time of this letter."

**ANSWER:  Navistar admits that Mr. Carmichael signed the 2022 Letter Agreement on April 8, 2022 and that the quoted language is contained within the Letter Agreement.  The 2022 Letter Agreement speaks for itself but denies the remaining allegations of this paragraph.**

80.     Carmichael admitted that he was directed to sign the agreement by Navistar's Deal Council—which included Belisle and other top-level Navistar executives.

**ANSWER: Navistar admits that at the time of the events in question, Mark Belisle served on Navistar's deal council. Further answering, to the extent Plaintiffs reference a purported admission in a document, no such document is**

**attached to the Amended Complaint. Navistar further states that any such written document or alleged admission speaks for itself and denies any allegation contrary to or inconsistent with it, and otherwise denies the remaining allegations of this paragraph.**

81. The April 8, 2022 Letter Agreement contained a production chart indicating that Navistar had built 42 new RH trucks for Plaintiffs in January, 32 in February, and 342 in March. Carmichael admitted at his deposition that he knew this representation was false; *i.e.*, he knew that Navistar had only manufactured 131 trucks for Plaintiffs as of the day he represented that over 400 trucks had been built as of March in the April 8, 2022 letter. He also admitted that neither he nor anyone else at Navistar updated the production chart in that letter to account for reality, but instead signed the agreement making the false representation as to past production.

**ANSWER: Navistar states that the 2022 Letter Agreement speaks for itself and denies any allegations inconsistent therewith. Navistar denies the remaining allegations of this paragraph.**

82. Plaintiffs had no access to Navistar's manufacturing data and thus could not identify whether Navistar had built the number of trucks it claimed it had built.

**ANSWER: Navistar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, therefore, denies the same.**

83.     Carmichael further admitted, both in subsequent internal communications and at his deposition, that Navistar's April 8, 2022 Letter Agreement was a promise that all the trucks identified on the production schedule would be built and delivered by June 2022.

**ANSWER:  Navistar denies the allegations and legal conclusions of this paragraph.**

84.     The Letter Agreement Carmichael signed on Navistar's behalf contained another material misrepresentation: it stated that 42 new RH trucks and 300 LT new trucks would be built in April 2022, but Carmichael knew that Navistar had not scheduled anywhere near that level of production for Plaintiffs in April 2022.

**ANSWER:   Navistar admits the 2022 Letter Agreement included a production chart that stated 42 RH New Truck Builds in April and 300 LT New Truck Builds in April that were "based on available production at the time of this letter."  The 2022 Letter Agreement speaks for itself and Navistar denies any allegations inconsistent therewith.**

85.     Navistar had no intention of performing the promises set forth in the April 2022 Letter Agreement when Carmichael signed at the direction of Belisle and other Navistar executives.

**ANSWER:  Navistar denies the allegations of this paragraph.**

86.     Navistar did not inform Plaintiffs that its representations as to production in the Letter Agreement were false. Nor did it inform Plaintiffs that it had no intention

of fulfilling the promises in the Letter Agreement. Instead, Navistar— which generally communicated information about production through its dealership contact (here, Jim Lollis from Allegiance Trucks)—claimed to Plaintiffs that it was producing the promised trucks on schedule.

**ANSWER:  Navistar denies the allegations of this paragraph.**

87.     On May 4, 2022, Mr. Lollis saw that several hundred Central trucks had their production dates pushed out several months past the June 2022 delivery date. He asked whether these were "real" moves or not—Navistar would often use dummy dates on its order board temporarily when readjusting allocation among customers— but Navistar did not inform Lollis that the moves were "real." Lollis thus believed that production and delivery of Plaintiffs' new trucks would be substantially completed as scheduled.

**ANSWER:  Navistar admits that Mr. Lollis sent an email on May 4, 2022, regarding "Central LT Production Dates Changed" and asked Mr. Carmichael to confirm "these moves are not a schedule adjustment and are true dates."  Mr. Lollis' email speaks for itself and Navistar denies any allegations inconsistent therewith.  Navistar denies the remaining allegations of this paragraph.**

88.     In fact, as of May 2, 2022, Navistar had made the decision to push Plaintiffs' orders past the production and delivery dates outlined in the Letter Agreement, which Plaintiffs had not yet signed. Sean Carmichael's subordinate Wale

Akinosho—working with Mark Belisle's subordinate David Brown—created a "tracker" sheet indicating how many of Plaintiffs' orders were being pushed out.

**ANSWER: Navistar denies that the 2022 Letter Agreement contained delivery dates. Navistar admits that Plaintiffs knew before signing the 2022 Letter Agreement that production build dates had been pushed out and that Mr. Akinosho and Mr. Brown exchanged files reflecting Central's production build dates on May 4, 2022. Mr. Akinosho and Mr. Brown's emails speak for themselves and Navistar denies any allegations inconsistent therewith.**

89.    Navistar did not inform Plaintiffs that it was pushing production of trucks out past the promised delivery dates. To the contrary, Navistar was scheming to ensure that Plaintiffs signed the Letter Agreement (thus eliminating Plaintiffs' trade-back rights) before Plaintiffs found out that it would not receive the bargained- for production schedule.

**ANSWER: Navistar denies the allegations and legal conclusions of this paragraph. The 2022 Letter Agreement did not include "promised delivery dates" and Plaintiffs knew as early as April 13, 2022, that production build dates were delayed and pushed out past June 2022.**

90.    In an April 29, 2022 email chain, Sean Carmichael and Navistar executive Dan Simnick discussed an email from Kyle Blain related to the promised trucks. In the email, Simnick indicated that Navistar should not do anything "until they at least sign the agreement letter."

**ANSWER: Navistar admits that Mr. Carmichael and Mr. Simnick exchanged emails on April 29, 2022, the content of which speaks for itself. Navistar denies any allegations and conclusory statements inconsistent with the emails.**

91.     On May 17, 2021, Carmichael took things a step farther: he told Navistar's agent (dealer contact Jim Lollis) to inform Kyle Blain that "if we do not have a signed agreement based on the 1100 new with no-trades," that "Navistar is going to stop/postpone our production and hold deliveries of built trucks."

**ANSWER: Navistar admits that Mr. Carmichael testified that he "probably told Jim Lollis that, based on we don't want to have a bunch of trucks that Kyle does not plan on taking, or GLS, sitting in the yard."  Navistar denies the remaining allegations of this paragraph.**

92.     Carmichael issued this threat even though Navistar still had a preexisting contractual obligation to deliver at least 100 new trucks per month under the July 2021 Letter Agreement. That obligation had still not yet been superseded.

**ANSWER:  Navistar denies the allegations of this paragraph.**

93.     In the same communication, Lollis informed Plaintiffs that the timely production dates remained correct, as Navistar had not informed Lollis (or Plaintiffs) that the dates had already been moved behind-the-scenes two weeks earlier.

**ANSWER: Navistar admits that Central's production build dates were delayed but denies the remaining allegations of this paragraph.**

94.     Navistar knew at the time of this threat that it had no intention of honoring its promise to deliver the trucks as called for in the Letter Agreement. Indeed, as discussed, Carmichael's subordinate Wale Akinosho had already been tracking Navistar's actions in pushing production of hundreds of Plaintiffs' orders into September 2022 or later. Carmichael (and Navistar) also knew that Plaintiffs would not agree to sign the Letter Agreement had Navistar disclosed this intention not to produce the trucks on schedule.

**ANSWER:  Navistar lacks knowledge or information sufficient to form a belief as to the truth of the allegation concerning whether GLS would have signed the 2022 Letter Agreement and, therefore, denies the same.  Navistar denies the remaining allegations of this paragraph.**

95.     Navistar's threat to stop production and withhold trucks already produced had the intended effect—the next day, on May 18, 2022, Kyle Blain signed the Letter Agreement on Plaintiffs' behalf.

**ANSWER: Navistar admits that Mr. Blain signed the 2022 Letter Agreement on May 18, 2022 but lacks knowledge or information sufficient to form a belief as to the remaining allegations and, therefore, denies the same.**

96.     A few days later—on May 26, 2022—having secured Blain's signature, Navistar finally told Lollis (and through him, Plaintiffs) the truth: Navistar had pushed out production on Plaintiffs' trucks and would not be fulfilling the terms of the Letter Agreement.

**ANSWER: Navistar admits that it produced several production schedules reflecting changes in Central's production dates both before and after Mr. Blain signed the 2022 Letter Agreement that indicated production dates were pushed out.  Navistar denies the remaining allegations of this paragraph.**

97.     In discovery, Carmichael has confirmed (1) that Navistar had breached its Letter Agreement with Plaintiffs; (2) that Navistar knew the representations about its production were false when he signed; and (3) Navistar recognized the negative consequences of that conduct was to preclude Plaintiffs from taking advantage of a historically high used truck market.

**ANSWER:  Navistar denies the allegations of this paragraph.**

98.     For instance, on June 27, 2022 Carmichael wrote to Belisle that the alleged production issues caused "changes to the cover letter [*i.e.*, the Letter Agreement] before we could have the customer sign," and that "[w]e should have delivered all units by the end of June! We are now looking at September at best!"

**ANSWER:  Navistar admits that Mr. Carmichael sent Mr. Belisle an email dated June 27, 2022, the content of which speaks for itself.  Navistar denies any allegations inconsistent with Mr. Carmichael's email.**

99.     As another example, in a December 13, 2022 email to Navistar finance executive Kerri Podewell, Carmichael wrote the following:

A) All builds where [*sic*] to be completed by the end of June per written agreement that came after order board and allocation adjustment. B) We had a no trade agreement that made it very important to hit the June date so Central

could sell these 2017,2018,2019 units in the open market… Unfortunately, we could not produce the New Trucks as promised, so Central could pull out the trades in time.

**ANSWER: Navistar admits that Mr. Carmichael sent Ms. Podewell and Holly Coombes an email dated December 13, 2022, the content of which speaks for itself.  Navistar denies any allegations inconsistent with Mr. Carmichael's email.**

100.    Navistar manufactured at least 4701 heavy day-cab trucks and at least 6067 heavy sleeper trucks between January 2022 and May 2022—more than enough to timely fulfill the entire 1,100 truck order under the Letter Agreement.

**ANSWER: Navistar admits that it manufactured approximately 4,700 heavy day-cab trucks and 6,000 heavy sleeper cab trucks from January 2022 to May 2022 but lacks knowledge or information sufficient to form a belief as to the precise number or timeframe and, therefore, denies the same.  Navistar denies the remaining allegations of this paragraph.**

101.    Belisle could have, but refused to, use his authority to ensure timely production of Plaintiffs' trucks as promised.

**ANSWER:  Navistar denies the allegations of this paragraph.**

102.    Rather, Navistar intentionally and willfully breached its agreement, having made (1) false representations of material fact to induce Plaintiffs to enter into a new contract in the first place; and (2) promises it had no intention of keeping, both when

Navistar signed the April 8, 2022 Letter Agreement and when it coerced Plaintiffs into signing the Agreement on May 18, 2022.

**ANSWER:  Navistar denies the allegations of this paragraph.**

103.   Navistar took these actions for its own financial benefit in eliminating Plaintiffs' trade-back rights—knowing it had already secretly decided *not* to fulfill the agreement.

**ANSWER:  Navistar denies the allegations of this paragraph.**

104.   Had Navistar not made the false representations, Plaintiffs would not have entered into the Letter Agreement and would not have waived their rights to trade in their used trucks.

**ANSWER: Navistar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, therefore, denies the same.**

## COUNT ONE: BREACH OF CONTRACT

105.   GLS and Central incorporate the foregoing allegations.

**ANSWER:  Navistar incorporates by reference the foregoing allegations.**

106.   The Letter Agreement constitutes a binding contract between GLS and Navistar, with GLS and Central among the identified beneficiaries of that contract.

**ANSWER: This paragraph contains legal characterizations and argument, to which no response is required. To the extent a response is required, Navistar denies the allegations of this paragraph.**

107. Navistar's failure to meet the required production schedule is a material breach of the Letter Agreement.

**ANSWER: Navistar denies the allegations of this paragraph.**

108. GLS and Central have suffered tens of millions of dollars of damages caused by Navistar's material breach of the Letter Agreement, including without limitation consequential damages, incidental damages, and lost profits related to GLS's inability to sell its used trucks into the historically strong used truck market as intended and expected by both parties at the time of the Letter Agreement, and Central's increased maintenance, fuel, driver recruitment, and repair costs during the period of Navistar's delay.

**ANSWER: Navistar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, therefore, denies the same.**

**WHEREFORE**, Navistar requests that the Court dismiss Plaintiffs' Second Amended Complaint, with prejudice, enter judgment in Navistar's favor on all counts, and such further relief as the Court deems just and equitable.

## COUNT TWO: FRAUD

109. GLS and Central incorporate the foregoing allegations.

**ANSWER: Navistar incorporates by reference the foregoing allegations.**

110. Navistar made material misrepresentations—both material misrepresentation of facts, and material misrepresentation of their intention to honor the promises set forth in the Letter Agreement.

**ANSWER: Navistar denies the allegations of this paragraph.**

111. The representations, including the alleged intention to honor the terms of the agreement at the time each party signed, were knowingly false when made, or made recklessly, without any knowledge of their truth.

**ANSWER**: **Navistar denies the allegations of this paragraph.**

112. The material misrepresentations were made with the intention that they should be acted on by Plaintiffs.

**ANSWER: Navistar denies the allegations of this paragraph.**

113. Plaintiffs acted in reliance on the material misrepresentations.

**ANSWER: Navistar denies the allegations of this paragraph.**

114. Plaintiffs were injured as a result of the material misrepresentations.

**ANSWER**: **Navistar denies the allegations of this paragraph.**

**WHEREFORE**, Navistar requests that the Court dismiss Plaintiffs' Second Amended Complaint, with prejudice, enter judgment in Navistar's favor on all counts, and such further relief as the Court deems just and equitable.

**GENERAL DENIAL**

To the extent any of the foregoing allegations are not specifically admitted, each is hereby denied.

**AFFIRMATIVE AND ADDITIONAL DEFENSES**

1.    Plaintiffs' Amended Complaint fails to state a claim upon which relief can be granted.

2.    Plaintiffs' Amended Complaint is barred by waiver, estoppel, release, laches, novation, modification, and/or undue delay.

3.    Plaintiffs' Amended Complaint is barred because GLS was the first party to materially breach.

4.    Plaintiffs' Amended Complaint is barred because it has failed to satisfy the conditions precedent to recovery.

5.    Plaintiffs' Amended Complaint is barred by the doctrine of impossibility and/or impracticability.

6.    Plaintiffs' claims are barred to the extent it failed to mitigate its damages.

7.    Plaintiffs' claims are barred because the transaction with Navistar lacked mutuality of obligation and/or want of consideration with respect to the parties' respective obligations under the alleged April 2022 Letter Agreement.

8.    Plaintiffs' claims are barred, in whole or in part, due to the doctrine of accord and satisfaction.

9.     Plaintiffs' claims are barred, in whole or in part, based on the course of dealing and/or course of performance between the parties.

10.    Navistar reserves the right to assert additional affirmative defenses as the case progresses.

Dated:  October 10, 2025                    BARNES & THORNBURG LLP

                                            _/s/ Scott R. Murphy_
                                            Scott R. Murphy (P68015)
                                            Anthony C. Sallah (P84136)
                                            171 Monroe Ave. NW, Suite 1000
                                            Grand Rapids, MI 49503
                                            616-742-3930
                                            smurphy@btlaw.com
                                            asallah@btlaw.com
                                            *Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 10, 2025 a copy of the foregoing pleading was filed electronically and served by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.

Dated:  October 10, 2025

BARNES & THORNBURG LLP

_/s/ Scott R. Murphy_
Scott R. Murphy (P68015)
Anthony C. Sallah (P84136)
171 Monroe Ave. NW, Suite 1000
Grand Rapids, MI 49503
616-742-3930
smurphy@btlaw.com
asallah@btlaw.com
_Attorneys for Defendant_