# Exhibit D

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN


GLS LEASCO, INC., and CENTRAL TRANSPORT LLC,

Plaintiffs,      Case No. 23-cv-12927-MAG-APP

vs.

NAVISTAR, INC.,

Defendant.

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _/

VOLUME I

| | |
|---|---|
| DEPONENT: | KYLE BLAIN, 30(b)(6) for GLS Leasco, Inc. |
| DATE: | Tuesday, September 10, 2024 |
| TIME: | 9:08 a.m. |
| LOCATION: | Kienbaum Hardy Viviano Pelton & Forrest, PLC 280 North Old Woodward, Suite 400 Birmingham, Michigan |
| REPORTER: | Shari J. Pavlovich, CSR-5926 |
| VIDEOGRAPHER: | Bailey Wellman |
| JOB NO: | 32120 |

Fortz Legal Support

www.FortzLegal.com

844.730.4066



Page 162

assigned or sold a truck to LGSI, that LGSI would have that option to trade it back in?

A    No, not necessarily. In the OTB agreement, you have to buy a truck to allow the residual to be enforced.

So if one of the entities bought a truck, it would allow another entity to turn in the truck for the credit.

Q    On the page 3 of 7 on this attachment on the no-trade agreement, you had mentioned before, you had made some modifications to the terms and conditions?

A    Yes.

Q    Under brakes here you have reference -- you crossed that out. This says "drum brakes" and then you've got "disk brakes".

Does this also relate to the Bendix issue?

A    No. We just didn't buy trucks with drum brakes. It just wasn't applicable.

Q    So as far as Central or GLS Leasco was concerned, the trucks that they buy always have disk brakes?

A    They had for many -- since -- for some years.

Page 163

(Deposition Exhibit D-28 was marked for identification.)

BY MR. MURPHY:

Q    Marked as Exhibit D-28, this is an order form. Is this what you would refer to as a spec sheet?

A    Yeah. It could be. I mean, the form is a little different. Order content.

This looks a little more internal, but this has everything that it appears that a spec sheet would.

Q    Okay. And this -- I mean, this is a document -- this was produced by GLS.

A    Okay.

Q    And so how would this document have been conveyed to GLS? Would this be something that Jim Lollis sent to you, for example?

A    Yeah. Generally it would be the dealer would send it to you.

Q    Okay. And is this one here, in particular, it's for -- you have a -- is that your handwriting on the top?

A    No.

Q    "No"?

A    No.

Page 164

Q    Okay.

A    I don't spin my 2s.

Q    Okay. So this is -- do you know what this document relates to, then?

A    Well, I mean, it definitely has the specs related to a truck. I'm a little confused by why it says Minuteman Trucks, Inc. at the top.

It says referenced I.D. is CT 2022 RH.

Q    Well, I'm just trying to figure out what it is. It was produced by GLS.

So is this an order form? Or just, you don't know?

A    It would -- like I said, sometimes the spec sheets, they come in different forms. So you know, that's --

Q    So under order date, it has 8/25/21; requested delivery date, 12/20/2022; and delivery date, 5/14/2022.

A    Where are you seeing -- oh, I see.

Q    Under order details.

A    I'm sorry, what was your question?

Q    My question is: What -- I'm trying to figure out what is going on with this order that was being placed by Jim Lollis.

Page 165

It looks like it was for 75 trucks. For which entity is this order being placed for? Is it for Central or is it for Universal?

MR. PELTON: Object, lack of foundation.

THE WITNESS: The 75 matches the number of RHs that Central Transport ended up getting. GLS you know, started buying.

The order date of August 25th, 2021, you know, that reflects our initial -- I believe when the trucks were first ordered from the 2021 agreement.

Request delivery date, I don't know. I mean, build date, you know, lines up.

But yeah, I'm with you. There's some things in here that obviously we got this from either Navistar or Jim, somebody. And I don't know if the intent was to show the spec.

BY MR. MURPHY:

Q    And do you know who would have placed that order for those 75 trucks on behalf of GLS Leaseco?

A    No. I mean, it lists salesperson Jim Lollis.

Q    Okay. So to your knowledge Jim Lollis is the

Page 166

person responsible for placing the orders on behalf of Central Transport and/or GLS Leasco?

MR. PELTON: Object, lack of foundation.

THE WITNESS: As far as I know. I mean, in between when he was between Rush and Allegiance, it's unclear. It looks like this was done -- I mean, it even lists Summit Truck Group as the -- as the dealer, and this is March 15 of 2022. So I'm confused like you are.

BY MR. MURPHY:

Q    Is this document familiar to you at all? Or is this, like, the first time you've ever seen an order content form like this?

A    You know, I've seen a lot of variations of specs. I mean, the guys might pull them from the different -- you know, sometimes it's -- you know, your initial spec before orders are placed.

This is probably a spec that they pulled, you know, once the order was already in place. I don't know if this is standard or not.

Q    Okay. And from GLS Leasco's perspective, you

Page 167

have no idea who Minutemen Trucks, Inc. is?

A    No, I don't. That's a good question, though.

Q    I'm going to mark -- I'm not going to mark anything because this has already been marked as Exhibit 79. This is a Exhibit that was marked during Mr. Lollis' deposition.

And this is a document with an attachment showing order and production dates that Mr. Fink shared with Mr. Lollis.

And when you open this document up, it shows what Mr. Lollis testified was the switch from the RH order on behalf of Central to the LT order and that occurring on March 29, 2022.

Do you see that?

MR. PELTON: Object, form, foundation.

THE WITNESS: You're referring to the column that says "cancel date"?

BY MR. MURPHY:

Q    Yes, sir. I'm not asking you to, you know, tell me what this document is. I'm just asking, does that fit with your recollection at all as to when Mr. Lollis switched from the RH to the LT version of -- for the tractors

Page 168

for Central?

MR. PELTON: Object, form, foundation.

THE WITNESS: Yeah, I don't remember exactly when that happened. And I certainly wouldn't have known when it internally they made that adjustment.

BY MR. MURPHY:

Q    Okay. So you have no idea when Mr. Lollis changed his order for 555 trucks to go from an RH to an LT order?

MR. PELTON: Object, mischaracterizes his prior testimony.

THE WITNESS: Can you state that one more time, sorry?

BY MR. MURPHY:

Q    Yeah, sorry. You -- I mean, you're here on behalf of GLS Leasco. And I'm asking you on behalf of GLS: When Mr. Lollis, as your dealer, interfacing dealer, when he changed the order from RH tractors, 2023 RH tractors to 2023 LT tractors.

MR. PELTON: Object, form, foundation.

THE WITNESS: I don't recall the

Page 169

exact date. You know, as I said previously, I know it was between February and March.

BY MR. MURPHY:

Q    Okay. But you have no reason to disagree that if this date here says the order was changed on March 29, 2022, you have no reason to disagree with that on behalf of GLS Leasco?

A    I don't have any reason to disagree with it.

Q    Okay.

THE WITNESS: Should I keep this separate?

MR. PELTON: No, it's still an Exhibit to your dep.

(Deposition Exhibit D-29 was marked for identification.)

COURT REPORTER: 29.

BY MR. MURPHY:

Q    Okay. I've marked as Exhibit D-29 an email from Mr. Carmichael to yourself and copying Mr. Lollis. And he's attaching the updated cover letter for Central, Universal, and PAM.

First of all, do you have a recollection of receiving this email from Mr. Carmichael?

A    Let me read it. (Witness reviewing document.)

Page 170

Okay.

Q   Okay. Mr. Carmichael is sending you an updated cover letter; is that correct?

A   Yes.

Q   Okay. And in the first note he says to you in the first bullet point on the email, he says:
"All pricing is based on original specs prior to any changes that Joe has requested via Jim."
When he says "Joe", is he referring to Joe Hanvey?

A   Yes.

Q   Okay. Okay. And was Joe making changes on -- was he making those through Jim?

A   It appears that way, yes.

Q   Okay. And he says:
"Jim can provide walk in changes and pricing."
Do you recall if Jim walked you through the changes and the differences in the pricing?

A   I don't recall. I mean, generally would have, but I don't recall.

Q   It says:
"Bendix prewire is not included in

Page 171

the price."
That's the Bendix issue we spoke about earlier; correct?

A   Correct.

Q   And is the Bendix, that's not a brake, really, at issue; right? That's something that deals with the radar?

A   Yeah. That's the CMS system, Fusion.

Q   And CMS, does that control monitor or what?

A   Collision Mitigation System.

Q   Collision Mitigation System, gotcha, okay.
Then in the next statement he says here:
"New truck delivery schedule need to be updated based on getting specs finalized in our system."
Do you see that?

A   I see that.

Q   Okay. Do you ever recall following up with Mr. Carmichael or Mr. Lollis concerning the new truck delivery schedule?

A   No. It's in the agreement.

Q   Right. And do you know if it was ever updated from what is attached to this email?

A   Well, this is dated 4/4. 4/8 was the one that

Page 172

Sean signed and sent to me.
So I would assume -- I would believe that that was the updated, you know, delivery schedule --

Q   And on this --

A   -- or production schedule.

Q   If you turn to the actual agreement, draft agreement that's attached, on the second page of it there's a schedule there.
Do you see that?

A   Yes.

Q   Okay. Can you tell me on that schedule, which trucks relate to Central trucks and which trucks relate to Universal trucks?

A   No. No, not entirely.

Q   Okay. Well, was Central expecting to have 42 trucks built in January?

A   Those were the trucks going to Universal --

Q   Okay.

A   -- that we talked about.

Q   We just went over the prior Exhibit. Only four trucks had been -- the start build date in January instead of 42.
Do you see that -- or do you recall that from the prior Exhibit?

Page 173

A   Yeah, we reviewed it today.

Q   Okay. And so we already know that the very first delivery schedule here -- or these build schedules is wrong; correct?

A   Can you restate that?
(Record repeated.)
THE WITNESS: Okay. We know it as we're reviewing it today because we looked at that schedule of the Universal deliveries.

BY MR. MURPHY:

Q   Right. But that Universal -- those delivery -- the delivery in the Universal trucks -- blah.
That was shared with your team, though; right? That was shared with Brianne Perkins and Joe Hanvey. And so that information was conveyed to them; right?

A   They were on the email, yes.

Q   Yes. So they knew that this schedule was incorrect, the very first delivery of 42 trucks in January?
MR. PELTON: I'm going to object. Mischaracterizes the documents.
THE WITNESS: I don't know what they knew.

Page 174

BY MR. MURPHY:

Q    Okay. Well, you know they received an email that said there were going to be four trucks built in January.

A    Was that built or produced? Or built or delivered? I can't recall.

Q    I believe it was -- said build day on there.

A    It said build day?

Q    Yeah.

A    Then, yes.

Q    Okay. And this -- when you look at this, Mr. Blain, is this a schedule that relates to when the trucks are going to be built? Or is it a schedule that relates to when the trucks are going to be delivered?

A    It says "new truck build month".

Q    Okay. But up above that, it says:
         "New truck delivery based on available production at the time of this letter."
         And so I'm trying to figure out, from GLS's perspective, does this mean when they were going to be receiving the trucks or just when Navistar was going to begin building the trucks?

Page 175

A    This schedule (indicating)?

Q    Yes, sir.

A    I would say that's the build month.

Q    Okay.

A    What was the other -- you were pointing at something on the -- or reading something from the first page?

Q    Yeah. The first page on the bottom -- and as you'll see when we get to the final executed agreement, that shifts down to the next page.
         That one says "new truck delivery". And so I'm trying to figure out from GLS Leasco's perspective, is that a delivery schedule or is it a build schedule or don't you know?

A    Well, I would agree that it's -- it's confusing. The header says "delivery". And then the header of the table says the "build month".
         So I guess my expectation was that was the build month, when that truck was -- those trucks were going to be built.

Q    Okay. And so build month isn't the same as delivery, then?

A    No. We established that earlier.

Page 176

Q    Okay. And it's your general expectation that the build date and the delivery date are two to four weeks apart?

A    Yes.

Q    Okay. So in this document here, if there were 300 LT trucks being built in April, you're expecting that you're going to be receiving 300 LT trucks sometime in May; correct?

A    Correct.

Q    Okay. And same for March. If you're building 342 trucks in March, you're expecting that you'd be delivered 342 trucks sometime in April?

A    Yes.

Q    Right. And same with 32 in February and the 42 in April -- or in January; correct?

A    Yes.

Q    Okay. As of this date, April 4, 2022, had Navistar met any of those expectations of yours?

A    I'm not certain.

Q    Well, we already know -- I mean, well, you got to know when Central received the trucks, correct, because it's in your Complaint.
         You say in your Complaint that

Page 177

Central received 18 trucks in May. And that was it --

A    Um-hmm.

Q    -- right? So based on just that allegation alone, that Central -- the very first trucks Central received were not until May.
         Was Navistar meeting its expectations as of April 4, 2022?

A    Well, if I remember correctly -- we can go back to the schedule. But I believe that the last production schedule that I had, there were 75 trucks that were to be built on March 31st. In which case, on April 4th, I wouldn't have expected to receive those trucks.

Q    Okay. So it's your understanding that Navistar was going to be manufacturing 75 trucks in March for Central?

A    I think it's Exhibit D-19.
         MR. PELTON: I'm sorry, Exhibit what?
         THE WITNESS: Sorry, D-19. This might not be.
         My recollection is that we expected -- I don't think the CT truck, the

Page 178

Central truck production for GLS started until the end of March.

So I wouldn't have expected at that point that we would have actually had any delivered to our facilities.

BY MR. MURPHY:

Q   When would you have expected to receive those trucks? The end of April, then?

A   Yeah, yeah, end of April.

Q   But we know as it relates to Universal that this schedule was not being met as of April 4, 2022; correct?

MR. PELTON: Objection, lack of foundation.

THE WITNESS: Yeah. As I said before, I wasn't keeping as close watch on Universal's deliveries at that point.

BY MR. MURPHY:

Q   Okay. Well, if I told you Universal didn't receive a delivery of a truck until March, would you have reason to disagree with me?

A   No. I would have no reason to disagree with you.

Q   Someone at Universal must know when they received these trucks; correct?

Page 179

A   Sure.

Q   And that was never communicated to you?

A   It wouldn't be communicated to me unless they thought there was a problem. Because they had dialogue with Navistar and Allegiance.

Q   So they didn't think it was a problem that Navistar had only started building four trucks in January when they were expecting 42 were going to be built?

MR. PELTON: Objection, mischaracterizes the record.

THE WITNESS: The only dialogue we had was about that original 75 trucks. And I know, you know, that's what the expectation was.

BY MR. MURPHY:

Q   And those original 75 trucks, they did not meet that expectation, did they? They didn't deliver one of those trucks by January 15, as requested by you on behalf of Universal?

A   No.

Q   Okay. So at least at this point in time you know that that production schedule is in question; correct?

A   I guess I didn't question.

Page 180

Q   Well, you didn't look at it and go, How can this be right? This has got to be the wrong production schedule because Sean's telling me in this email it's got to be updated.

And it says I'm going to get 42 trucks in January, when you already know that four have been built.

MR. PELTON: Objection, mischaracterizes the document and testimony.

THE WITNESS: I didn't question when my OEM submitted a contract to me signed with a schedule, that they had no plan on delivering on that schedule or hadn't already.

BY MR. MURPHY:

Q   Okay. And so even though you were -- you had information available to you to tell you exactly when you were going to get delivery of these trucks, that that schedule -- you had no questions or concerns about the viability of that schedule?

MR. PELTON: Objection, mischaracterizes the documents and the testimony.

THE WITNESS: My understanding was that we had a written agreement that had a

Page 181

table that represented the build dates for our trucks, and it was signed on April 8th. Signed by me in May.

That that was the schedule when those trucks were going to be built. I did not question that, no.

BY MR. MURPHY:

Q   Okay. And now we're definitive that it's a build date and not a delivery date. Those are two different things.

A   That's correct.

Q   Okay. So your understanding of that agreement on behalf of GLS Leasco is that those dates and that agreement and that schedule are build dates, not delivery dates?

A   Well, they're build months, but yes.

Q   Okay.

THE WITNESS: This a good time to take a break?

MR. MURPHY: Yes, no problem.

VIDEOGRAPHER: Off the record at 2:29 p.m.

(Short recess taken at 2:29 p.m.)

VIDEOGRAPHER: Back on the

Page 182

record at 2:35 p.m.

(Back on the record at 2:35 p.m.)

(Deposition Exhibit D-30 was marked for identification.)

BY MR. MURPHY:

Q    Marking as D-30 another email. Actually, it's the same email as the prior one, dated April 4, and it attaches the agreement. But this is from GLS's production, and there's some handwritten notes on the agreement.
I just wanted to clarify. Are those, in fact, your handwritten notes?

A    Yes. It looks like my handwriting.

Q    At least as of April 4, 2022 you're continuing to negotiate the contents of this Letter Agreement?

A    Well, I mean, I'm making notes on it.

Q    Do you know if any of these notes or proposed revisions that you made were incorporated into the agreement?

A    I would have to compare them. I mean, many of these are just notes to myself.

Q    On the bottom there where you say, "Need VIN list of" -- and then it -- do you know what

Page 183

that is in reference to? It's on page 58.

A    It might have been as a result of a conversation with Sean. Probably refers to 2018, I would imagine. I don't know what else 18 would be a count of.

Q    And would that 18 reference the VIN list for the model year 2018 tractors that you wanted to trade -- or that you wanted to sell?

A    I don't know.

Q    Okay. And the statement includes cars -- or "CARB warranty on Cummins for all models" what does that reference to?

A    CARB, California Air Resources Board. It's a coverage, basically. It's more of a note than anything else. Looks like we had a conversation, and it was just making notes as to what I was told.

(Deposition Exhibit D-31 was marked for identification.)

MR. PELTON: 31?

COURT REPORTER: Correct.

MR. MURPHY: Yes, sir.

BY MR. MURPHY:

Q    And so it looks like in this Exhibit D-31, Mr. Carmichael is sending you a copy of the

Page 184

agreement dated April 8, 2022 and his signature is on the document.
And he's stating that he's updated the cover letter that represents the changes requested below. And then it appears you have some changes listed below.
Do you see that?

A    Yeah. This one's double-sided. Do I need a single sided?

Q    That's fine. That's all I got.

A    Okay. I'm sorry. I see his signature. It's dated 4/8.
Was there something more that you want me to verify?

Q    I wanted to verify that this is, in fact, a contract that GLS Leasco is suing on; correct?

A    It appears that way, yeah.

Q    Okay. And if you look at that page now, of the actual agreement, you go to that schedule, is it your testimony that this schedule, this build schedule, was the most important piece of this agreement, from GLS's perspective?

A    It was very important, yes.

Q    I'm asking: Would this be the most important aspect of this deal?

Page 185

A    Yeah. It was a -- it was essential, the timing.

Q    Okay. And so before you signed this contract, you would want to make certain that this schedule was going to be adhered to; is that correct?

A    Well, I would have expected if it came from Navistar with this table included, signed by the vice president, that, you know, I probably would have taken it at face value that this is the plan for the builds.

Q    Okay. But you would have wanted to make certain that that build schedule was adhered to; correct?

A    I'm not, you know, in the manufacturing environment. I don't -- I don't run the plant. I can't build the trucks.
I have to assume that and believe that what I'm told in these agreements is going to be fulfilled.

Q    Yeah. But this agreement's different, though. This agreement is looking back at stuff that's already happened. Not about looking forward on their manufacturing moving forward.
So I'm talking about looking

Page 186

back here, because it's April and this contemplates build days in January, February, and March.

What did you do to verify that these build dates were being adhered to?

MR. PELTON: Object to form of the question and speech that is inaccurate and preceded the question.

THE WITNESS: Can you restate that?

(Record repeated.)

MR. PELTON: Same objection.

THE WITNESS: Okay. I didn't go back and verify that each of these had been fulfilled. You know, for Universal, I believe that they were going to be fulfilled on the schedule that was provided.

BY MR. MURPHY:

Q Okay. Well, tell me where Central fits into this schedule.

A Excuse me? I don't understand the question.

Q Well, tell me what build -- what months they were building trucks for, for Central under the schedule.

How do I determine that?

Page 187

A Well, in February we received a production schedule that was the last schedule that I saw that, you know, included Central -- GLS's trucks for Central. This matched up to that.

Q Actually, they don't match up. The February schedule deals with all RH trucks, not LT trucks.

It called for 75 in January, 75 in February. This is completely different.

I'm trying to figure out, on this schedule what portion of these trucks were going to be built for Central?

MR. PELTON: Object to the form, argumentative, inaccurate.

THE WITNESS: I was still relying on those February dates. I mean, the way I understand it, a slot, a production slot is a production slot.

Whether it's an RH or an LT that goes into that slot, you know, it's still a chassis getting a cab put on it.

BY MR. MURPHY:

Q And my question's much simpler. I'm just trying to figure out on these build dates, which of them relate to Central versus which

Page 188

of them relate to Universal and which of them relate to PAM.

A You can't tell this from this particular schedule.

Q So it's completely unclear?

A It's unclear which are going to be Universal and Central Transport slots. It's very clear the timing of those production slots. Very clear.

Q Well, it's Central that was purchasing the LT trucks, though; correct?

A Yeah, the majority of them.

Q So you can discern from this schedule, at least as to the LT trucks, which ones Central is purchasing?

A Yeah.

Q So at least according to this schedule, 300 trucks should be being built in April of 2022 for Central?

A Okay, yeah.

Q Right?

A Yeah.

Q Okay. And based on your prior testimony, that if that schedule had been adhered to, you would have expected to have taken delivery of

Page 189

those 300 trucks from April -- in end of April, early May; is that correct?

A Yeah. It would have been sometime during May, depending on when the production was in April.

Q Okay. And in March, I believe your testimony was, you were expecting 75 trucks to be built for Central?

A Um-hmm.

Q And those would have been the RH trucks; is that correct?

A Yeah, I believe so.

Q Okay. And so according to your testimony, the two to four weeks between build time and delivery time, you would have expected to receive those 75 trucks that were supposed to be built in March, sometime in mid-April; is that correct?

A Mid- to late April.

Q Okay. And I mean, I know this schedule is very important. Who was providing you with information concerning when these trucks were going to be delivered? Who were you relying upon?

A From which -- what standpoint?

Q Within your own organization, was there

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

GLS LEASCO, INC., and CENTRAL TRANSPORT LLC,

Plaintiffs,        Case No. 23-cv-12927-MAG-APP

vs.

NAVISTAR, INC.,

Defendant.
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _/

VOLUME II

DEPONENT:      KYLE BLAIN ,30(b)(6) for
               GSL Leasco, Inc.
DATE:          Wednesday, September 11, 2024
TIME:          8:57 a.m.
LOCATION:      Kienbaum Hardy Viviano
               Pelton & Forrest, PLC
               280 North Old Woodward, Suite 400
               Birmingham, Michigan
REPORTER:      Shari J. Pavlovich, CSR-5926
VIDEOGRAPHER:  Shawn Capron
JOB NO:        32780



Page 244

associated with the $6.2 million payment, Central/Universal and PAM Transportation have been compensated for the following."

The first is:

"Assistance for the disposal of the 941 units included in the table above."

What is that referring to?

A   It's referring to the trucks that are listed in the table above.

Q   Okay. And that would include the 612 2018 International trucks that were Central trucks?

A   Yes.

Q   Okay. And so "assistance for the disposal" of those units, what does that mean to you on behalf of GLS Leasco?

A   I perceived it as the tradeback agreement and the residual value for trading in the truck to Navistar, that we were giving up that option.

Q   And why were you agreeing to that?

A   Because at that time, you know, our experience was that the market was very good for used trucks, extraordinarily good.

And we were going to take advantage of it and believed that we could, you know, gain profit by selling the equipment

Page 245

ourselves.

Q   Okay. And that's true as of May 18th, 2022?

A   As of May 18th, yes. I'm sorry, yes.

Q   Yeah. Okay. And based on your recollection, at what point in time did that historically strong market start to decline?

A   It appeared, you know, really after June, July, and then it started to sink pretty rapidly.

Q   In June and July of 2022?

A   Yes.

Q   Okay. Okay. The second bullet point says:

"Rental invoices associated with the delayed, current, and future production on units that were to be serviced in the first quarter of 2022."

What are you referring to there?

A   That's in regard to, you know, Universal's -- you know, the situation we talked about yesterday, where we had originally a commitment to deliver trucks to Universal by the beginning of January for a new operation, and the fact that those were not delivered timely. And the repositioning in rental costs that Universal had to sustain.

Page 246

Q   So that second bullet point is exclusive to Universal, and it doesn't -- the rental invoices weren't submitted on behalf of Central?

A   Not that I remember.

Q   Okay. And that relates to, in that production schedule, the months of January and February when those trucks were supposed to be produced for Universal? There was a delay in that production?

A   Well, the original commitment was January 1st. I know that we've seen some emails that said January 15th.

But yes, it's in reference to the first 70 or 75 trucks that were -- Universal was supposed to receive.

Q   Okay. And so that $6.2 million payment was in compensation for the delay in the current and it says future production of those trucks for Universal?

A   I understood it was in regard to those, yeah, those additional trucks that they needed.

Q   And I believe yesterday we were looking at some calculations where you were actually calculating the amounts for that rental

Page 247

payment for Universal; is that correct?

A   Yeah. Putting together, trying to figure it out exactly what those costs would be in various points.

Q   The next bullet point says:

"Rental invoices associated with previous model year's delayed production, resulting in 2017 to 2019 International trade units remaining in service."

What is that referring to?

A   You know, I don't recall anything about -- specifically about rental invoices. You know, there were issues with downtime. And we had been discussing a, you know, a downtime stipulation. I can't recall whether Central was compensated for that.

But you know, there was an exorbitant number of trucks that were out of service that required rental trucks in, you know, 2021, leading into this agreement.

Q   And this statement, when it refers to 2017 to 2019 International trade units remaining in service, that would include the Central 2018 units that are referenced in that chart above; correct?

Page 248

A   Yes, it would have to.

Q   We talked about some of the downtime. It seems like the next bullet point actually addresses the downtime, at least with respect to the QLS.

But could you explain what -- you know, what your understanding of that next bullet point was meant for?

A   **Yeah. I think -- you know, I guess I tied the two together. You know, because -- yeah, that's basically what I just described.**

**The down time due to, you know, defects in the equipment. I think at one point we had in excess of about 300 trucks down, out of service.**

Q   Now, walk me through the process of when you would take delivery of a truck for Central and then you would essentially replace the 2018 fleet with that new truck.

I mean, how did that mechanically work?

MR. PELTON: Object, beyond the scope of the dep topics.

You can answer individually.

**THE WITNESS: New truck arrives.**

Page 249

**You know, there's an inspection. You know, maybe some minor details, putting on a fire extinguisher, you know, in the cab. Some minor things that we would handle.**

**You know, and then depending on, you know, the invoicing and payment, you know, we would plate the unit. It would be put into service. And then that truck would go out.**

**Basically, we would make arrangements to bring the old truck in, and the new truck would go back in its place, you know, to our facility.**

BY MR. MURPHY:

Q   Okay. So you wouldn't move forward and sell a 2018 truck before you received a new truck, would you?

A   **You try to.**

Q   Okay. You try to sell --

A   **You try to make arrangements with -- you know, and we did, with wholesalers, based on our expectation as to when they would come out.**

Q   Okay. And how would you have those expectations when the trucks would come out?

A   **How would I have that time frame?**

Q   Yeah.

Page 250

A   Based on the production delivery schedule.

Q   And that's the one that Brianne Perkins was maintaining?

A   Yes.

Q   With Mr. Lollis?

A   **Maintaining?**

Q   Or I guess, monitoring with Mr. Lollis? That Exhibit we looked at yesterday?

A   **Yeah. The emails and the updates?**

Q   Yes.

A   **Yeah.**

Q   So you were relying upon that information in order to determine when to sell the used trucks, the 2018 used trucks?

A   **No. Typically -- and my understanding is, it's with any trade package, whether it's the OEM or it was us.**

**We were trying to make arrangements, you know, in February and March to sell those, you know, lots of those units, a lot, as in a package, you know, prior to the arrival.**

Q   And which -- which entities were you negotiating with in that -- did you say February and March time frame?

Page 251

A   **Yeah, that's what I recall.**

Q   So you were already making arrangements with third parties in an effort to line up sales of the 2018 model year trucks?

A   **Yes.**

Q   Which entities were you negotiating with?

A   **I think the one that, you know, comes to mind most presently is All Truck, I believe, was the entity. They're a wholesaler.**

Q   Okay.

A   **There were others that we were speaking to, but I think they were the most that we got furthest along with.**

Q   And how many trucks were you contemplating selling to All Truck in that time frame?

A   **Several hundred.**

Q   200 --

A   **Yes.**

Q   -- 300, or as many as you could?

A   **Well, yeah. My recollection is that we were talking about 200 trucks.**

Q   Okay. And were you guys negotiating a price at that time?

A   **Yes.**

Q   Do you recall what that price was?

Page 252

A   I don't. I apologize. I should have looked at that. I'm sure we have the documents referencing it.

Q   And would you have been communicating with All Truck via email or via text? Or how would you communicate with them?

A   A lot of these deals, including these, it's a lot of verbal communication. I believe there are -- we have emails related to it.

Q   Were there proposals exchanged between the parties?

A   Generally, it's a little more informal with the wholesalers. You come to agreement on it. You know, you have a time frame.

    And then, when the trucks started arriving, you do have something in writing that lays out the terms and the expectations of the equipment that we're selling them, of course, and an understanding there. And then it's the invoice.

Q   Did you end up selling any trucks to All Truck?

A   No, not of the Internationals.

Q   Okay. And what about -- was that the only entity that you were looking to sell

Page 253

Internationals to? Or were there other wholesalers, as well?

A   No. There were other wholesalers I know that we were talking to that had an interest. And All Truck was one that we got furthest along with.

    I would have to look up the names of the others. There were several other wholesalers.

Q   And that would have been in that same time frame, the February/March time frame of 2022?

A   Yeah, yeah. I mean, probably most heavily in March.

Q   And why didn't the transaction with All Truck move forward?

A   Because at the point that, you know, we could make the trucks available, you know, we needed -- we needed the replacement in order to make the 2018 available.

    By the time that we could commit to the delivery of the trucks, you know, there were some indications that the market was cooling, potentially, or at least some concerns along that line, as I recall.

    And they weren't willing to

Page 254

commit and eventually backed out.

Q   Okay. So it had nothing to do with the delivery of the new model 2023 tractors from Navistar?

    MR. PELTON: Objection, mischaracterizes what he just said.

    THE WITNESS: No. It did.

BY MR. MURPHY:

Q   Okay.

A   That those deliveries began to be less certain, you know, as we got into May, end of May.

Q   You were starting the negotiations in February and March; correct?

A   Yeah.

Q   And you were expecting delivery of those Navistar trucks -- or at least the first 75 in sometime in April; correct?

A   Um-hmm.

Q   Then you were expecting another 300 sometime in late April, early May; is that correct?

A   Yeah. Yeah, if we're going with two to four weeks on a delivery time frame, yes.

Q   Okay. And so at what point in time did you become concerned that you were not going to be

Page 255

able to replace the trucks that you would have -- you know, potentially sell to All Truck with the new model year 2023 tractors?

A   I think it wasn't so much that, you know, I was concerned that we were going to get the trucks. It was the timing.

Q   Okay. And so when did you learn of this timing?

A   I think it was more that we couldn't give them a solid date because, you know, you do have to get the new truck in, like I described.

    And then there is a time period to get the 2018 back off of the road or the truck being replaced off the road. So that can be two to four weeks in itself.

    So really, we were looking at, you know, a June time frame to be able to start providing those trucks.

Q   And by then they had already decided the market had cooled and they were not interested in purchasing the trucks anymore?

A   Yeah, if I remember correctly. I mean, they started to get a little skittish about the market, and it wasn't as solid at that point.

Page 256

Q   Did they offer to purchase them at a lower price? Or they just cut off all negotiations at that point?

A   Really, at that point, don't remember whether we went back to them with a lower price at that time because we were talking about a large quantity of trucks.
You know, they were already probably discounted from the value that we thought the trucks would bring.
I can't remember exactly how it ended.

Q   You had mentioned a couple hundred; right? 200 trucks that you were trying to sell, and you started negotiations in February and March.
But you had 612 model year 2018 trucks. Were you intending on selling all 612 in that January through June time frame of 2022?

A   Yeah. We were planning on replacing them all with the '23s and pulling all the 2018s out and selling them.

Q   Okay. But like, who else were you talking to to make up the 400 more trucks to try to get

Page 257

those trucks sold, as well?

A   Well, we were advertising it, as well, to individual buyers. I mean, we were talking to a lot of smaller dealers, not necessarily the large wholesalers.
You know, Navistar had an interest in a group of those trucks, as well. Or had, you know, I guess, stated they had an interest, potentially, as well. I think it was an export deal.
So there were other -- other large groups that we were talking to. We were advertising and started the advertising in April for more of a retail, smaller lot perspective.
And then we had other dealers that we were speaking to, as well.

Q   So your recollection is you started advertising to sell model year 2018 trucks in April of 2022?

A   Correct, um-hmm.

Q   And that was directed more toward the retail customers?

A   Well, yeah. You know, smaller lots. You wouldn't -- you may run into a guy that wants

Page 258

a hundred to 200 trucks. But yeah, those would sell for, you know, in smaller lots.

Q   So those were just one-off deals or a handful of trucks?

A   It could be 20 trucks. We utilized TruckPaper. A lot of different entities look at TruckPaper, from dealers to individual buyers. And I'm sure wholesalers look in there, as well.

Q   Was it your expectation that you were going to make up, you know, the difference of what you were going to sell to All Truck with all of these retail sales?
Or were you looking at other, you know, larger transactions?

A   We would entertain larger transactions, certainly.

Q   But did you entertain any larger transactions?

A   I think our biggest group that we sold was 25. I mean, if we had people that wanted, you know, 50-plus, you know, yes, we would have entertained it.
I don't recall that we had other -- other groups, specifically.

Q   Okay. I want to be specific to this January

Page 259

through June '22 time frame. Other than this transaction with All Truck, were there other significant transactions that you were looking at to sell, you know, large groups of trucks?

A   And "large" defined as?

Q   More than 50.

A   Okay. You know, other than, you know, the potential with Navistar and All Truck, I don't recall any other real large ones like that.

Q   On this last bullet point on this Exhibit D-38 on the list of bullet points we were looking at. It says:
"This agreement is all encompassing for any and all current and future issues for 941 model year 2017 to 2019 International units and terminates any and all other agreements pertaining to these units."
What is your understanding of what that provision means?

A   That it encompasses what -- you know, the prior bullet points and that this agreement replaces the 2021 agreement.

Q   Okay. So would you agree with me that this agreement would supersede the 2021 agreement?

Page 260

A   Yes.

Q   Okay. And that this agreement was intended to resolve all current and future issues for the 941 model year 2017 to 2019 International units?

A   Yeah. Related to, you know, the OTB agreement, the obligation that Navistar had to buy those back. And then, you know, these issues that hadn't already been covered on from other perspectives -- downtimes and such.

Q   So it's your understanding that this resolved all issues related to the OTB agreement?

A   Yes.

Q   And on the last page, Mr. Blain, I know we touched on this yesterday, but do you know if Allegiance Truck Group ever signed this contract?

A   I expect that they did. I don't recall -- I think I recall seeing one that had been fully, you know, with an Allegiance signature, but I don't recall.

Q   Okay.

(Deposition Exhibit D-39 was marked for identification.)

Page 261

BY MR. MURPHY:

Q   I'm marking as Exhibit D-39. This is an email from you to Mr. Carmichael, copying Wale Akinosho and Kyle, copying yourself.
    This is that optional tradeback agreement that we referenced earlier; right?

A   Um-hmm, yes.

Q   And the optional tradeback agreement, the parties to that agreement are Navistar, Inc. and GLS Leasco, Inc.; correct?

A   Correct.

Q   Okay. And what is -- what is contemplated by this optional tradeback agreement?

A   What the purpose of this is?

Q   I apologize, I'll rephrase the question.
    I'm trying to understand, like, you know, what is the purpose of this agreement from GLS Leasco's perspective?

A   Okay. This gives us, GLS Leasco, the option that when buying a replacement truck for these particular units, they can trade in the truck for the value that is included in the agreement. A credit from Navistar for that amount.

Q   Okay. Do you understand why you would have

Page 262

copied Wale Akinosho on this email?

A   I'm not certain. Maybe he had probably been on when it was sent. Well, he was included when Sean sent it to me.

Q   Okay. And on paragraph C on page 2 of 7 of the optional tradeback agreement it talks about non-assignability.
    And then I think we touched on this yesterday, it says, "Any" -- and then:
    "Outside Moroun family (ownership change in customer will automatically terminate any obligation of Navistar under this agreement.)"
    Do you know if this optional tradeback agreement has been assigned to any different entity?

A   No.

Q   Is that the revision that you made -- there's a reference yesterday about outside the Moroun family.

A   Yeah. The affiliated companies and --

Q   And when you exercise your rights under this optional tradeback agreement are you trading the trucks back in to the dealership, in this case Allegiance? Or they get traded back in

Page 263

to Navistar or both?

A   Generally, it's back to Navistar in our agreements.

(Deposition Exhibit D-40 was marked for identification.)

BY MR. MURPHY:

Q   I've marked as Exhibit D-40. And this is an email from you to Mr. Lollis, and you're copying Brianne Perkins and Becky Butler.
    Both of whom were working in maintenance at Central; is that correct?

A   Becky, we talked about that yesterday. She was in charge of licensing.

Q   Okay.

A   And then Brianne Perkins is in the maintenance department.

Q   And when you say "in charge of licensing" what exactly does that entail?

A   Making sure, you know, that she gets the titles in our name, and goes to the -- works with the licensing bureaus to put license plates on the trucks. Making sure that they're registered properly.

Q   So in this email, you're asking Mr. Lollis:
    "What is the status of our truck

Page 264

deliveries?"
Do you see that?

A  Um-hmm.  Yes.

Q  And what was the status -- or what did Mr. Lollis, you know, inform you when you asked him that question?

A  I believe that's when I got the updated production schedule several days later that showed trucks being -- being pushed out of -- the production being pushed out to through September and maybe October.

Q  Okay.  And was that in response to your email to Mr. Lollis?

A  I don't know if it was directly in response. I believe the date on that -- that document was the 26th.  So I'm assuming, then, it followed shortly after.

Q  If you look at this email chain here, if you go down to the Bates number Allegiance 48, there's another email from you the day earlier, on May 23rd.
You're asking:
"Do we know the status of the MSOs for the straight trucks that we paid off several weeks ago?"

Page 265

What are you referring to there?

A  The MSO is -- it's a manufacturer's document. It's what our licensing department needs in order to register the plates of the particular unit.
This was actually in reference to the straight trucks that we were receiving from Rush Truck.

Q  Okay.  So the MSOs are needed by Ms. Butler to properly license the trucks and get the plates?

A  Correct.

Q  Okay.  Does that have a -- I know we've got a lot of acronyms, but what's MSO stand for if you know?

A  I was already trying to think of that.  It's manufacturer's -- I want to say certificate of origin, but obviously it's an S.

Q  And then you're also asking:
"What is the status of the deliveries on the 2023 RHs?"
Below that.  Do you see that?

A  Yes.

Q  Okay.  And to your recollection, this is the -- is this the first time you asked

Page 266

Mr. Lollis what the status of the deliveries on the 2023 RHs was?

A  I don't know if it was the first time. Clearly, at this point, the agreement's, you know, final.  And the expectation is that, you know, the trucks are going to be coming more rapidly.

Q  When you say "the agreement's final", because you finally signed it on the 18th; correct?

A  Yeah, the updated agreement.

Q  Okay.  So your testimony is you don't know whether or not you asked Mr. Lollis what the status of the delivery was prior to this May 23rd, 2022 email?

A  I may have.  Specifically, I don't remember.
(Deposition Exhibit D-41 was marked for identification.)

BY MR. MURPHY:

Q  I marked as Exhibit D-41, this is an email dated May 26, 2022.  This is between you and Sean Carmichael.
And first of all, do you remember sending Mr. Carmichael this email?

A  Yeah.

Q  So in the email here you're saying:

Page 267

"The following was the expected schedule for production of our trucks."
Then you say:
"We are coming to the end of May and we have 16 trucks delivered and only have visibility to another 38 for Central, totaling 54 trucks.  What should I be expecting at this point regarding delivery of the new trucks?"

A  Um-hmm.

Q  Right?

A  Yeah.

Q  So based on this email, you were expecting delivery of 42 trucks in January -- or -- is that correct?

A  That's what the agreement read.  I mean, that was the production time.

Q  And you were expecting, then, the production time in February would be 32 trucks?

A  Um-hmm.

Q  Is that a "yes"?

A  I'm sorry, yes.

Q  And I don't need to go through each one of these, March and April and May.
And so what did Mr. Carmichael

Page 268

say to you in response to this email?

A  Yeah. This is on the date that we received that updated production schedule. So that this may have been the reason -- the cause to get that.

Q  Did he explain to you why the production schedule had changed?

A  I don't remember what the -- what the explanation was. I'm sure we had some dialogue once, you know, I saw this schedule itself. But I don't remember exactly what we discussed.

Q  Did you have any conversations with Mr. Lollis concerning, you know, why the production schedule changed?

A  I'm certain that we did. You know, I know that, you know, just having gone through the documents, when I received the schedule, I responded, I believe, to Sean and Jim that the change was unacceptable.

And then I know there was dialogue via text with Mr. Lollis and myself.

Q  And but other than, like, the documents that have been exchanged in this case and marked as Exhibits, I mean, I want to know if you have

Page 269

any independent recollection of having a conversation about this issue with either Mr. Lollis or Mr. Carmichael.

A  You know, I'm certain that we did. It's over two years ago. I don't remember distinctly.

Q  Do you recall after you executed that agreement, the Letter Agreement on May 18th, 2022, whether or not GLS made any spec changes to these trucks?

A  After May 18th?

Q  Yes.

A  No.

Q  Okay.

MR. PELTON: Can we clarify that? "No", you don't remember? Or no -- the question was: Do you remember whether.

THE WITNESS: No, I don't remember us making any spec changes in May.

BY MR. MURPHY:

Q  I'm asking just any time after you signed the agreement did you make any changes to the specifications of the trucks?

A  No. Not that I remember, no. I don't think so.

Q  And I'm not trying to trick you. I'm showing

Page 270

you some documents when you're requesting that they change the engine in the Cummins from a 400 to 450-horsepower and change the transmission to an Allison Transmission. That would be news to you?

A  I don't remember it.

Q  Okay.

(Deposition Exhibit D-42 was marked for identification.)

MR. PELTON: Just state for the record objection on the last question being outside the scope of the dep topics.

BY MR. MURPHY:

Q  I'm marking as Exhibit D-41 --

COURT REPORTER: 42.

BY MR. MURPHY:

Q  D-42. These are, from what I've been able to glean, are the invoices for the purchase of all of the trucks for Central. Starting with invoice one and tracking through invoice ten or 12 or 13.

There may be some missing ones. These were obtained through Allegiance's subpoena, not any documents that were produced in this case by GLS or Central.

Page 271

A  Okay.

Q  Do you recognize these documents?

A  Yeah.

Q  Okay. And I see reference in here, and we earlier we alluded to the MSO. I see a reference to the MSOs.

Why was it important to have these invoices for purposes of, you know, the MSO?

MR. PELTON: Object to the form of the question. I think it's without foundation.

THE WITNESS: I mean, each of the OEMs do it a little bit differently. But generally, you know, you get the truck or you're invoiced for the truck and you make the payment.

Then they send the MSO that you need to actually license the truck.

BY MR. MURPHY:

Q  Great. I see a lot of reference in here between you and Mr. Lollis, where Mr. Lollis is saying, Hey, X many trucks have been delivered. I'm going to send you an invoice. I need you to sign it.

Page 308

Q    That's this document; correct?

A    That's this, yes.

Q    And when you were told to collect these documents did you -- you were told to collect all transactions, whether it's daycab or sleeper cab?

MR. PELTON:  Object to -- object to -- based on attorney-client privilege and instruct him not to answer.

BY MR. MURPHY:

Q    Okay.  I see.  And you get to Bates number 2671, there's a shift from, you know, GLS Leasco bill of sale to invoices by Ritchie Brothers IronPlanet.

Do you see that?

A    Yes.

Q    What's Ritchie Brothers IronPlanet?

A    It's an auction site, equipment and just basically everything they sell.

Q    Okay.  On this first -- this first truck that they sold on 2671, it's for the 2018 International RH, and it's a sale price of $1,200.

Was this also excluded from your expert report, or would this have been

Page 309

included?

A    I would expect it was excluded.

Q    Just by the price?

A    Yes.

Q    And why don't we flip through all of these transactions in -- let's just start with the first -- the next one in.

This one would have been for $8,365.  This is for a 2018 International RH.  Would this be part of GLS Leasco's damage claim or not?

MR. PELTON:  I'm going to object.  The witness has asked several times to see the summary sheet that would provide that information to refresh.

THE WITNESS:  If we're going to go through each sheet, I'd need some additional reference.  This was support to the spreadsheet that was submitted.

BY MR. MURPHY:

Q    Okay.  So it's your testimony that we can take these invoices and then we can marry them up with the spreadsheet that was prepared in this case?

A    I would say yeah, you can.  I believe we

Page 310

filtered out the sleepers that were, you know, not part of the case.  Those were probably filtered out.  The rest of these, yes, you can match them up.

And that was my error.  When it was requested for all of the invoices related to 2018s, you know, I thought it was better to give all of the 2018 invoices.

Q    And to your knowledge, GLS Leasco does not possess any other documents related to the transaction or sale of these 2018 model year tractors, other than these documents you've produced here?

A    No.  These are the only invoices.

Q    Okay.  I mean, I'm talking about any other documents related to the transaction that would reflect the condition of the trucks, photographs of the trucks, underlying documents that would support the transaction.

Do any of those documents exist?

A    Documents, no, not that I'm aware.  I mean, Ritchie Brothers, they post the information.  I don't know -- it's not necessarily a document.

But you know, the way their

Page 311

process works, it's an auction site.  It has pictures of the equipment.

Q    Is that a wholesale sale, that Ritchie Brothers, or is that a retail sale?

A    It's an auction site.  I don't know if that's a -- you know, another variant between wholesale and -- well, I think it probably is.

Q    I notice that these Ritchie Brothers transactions don't start until, like, December of 2023, January of '24, February of '24.

When you flip through the invoices, do you know why you waited so long to sell these trucks?

A    Because we didn't realize how much the market had dropped.  And we were trying to sell them to private owners.

Because as you can see, the fees and the commissions are extensive.  And it is, you know, as low values as we were being offered on this equipment, we were trying to avoid those additional fees.

Q    Okay.  So how long did you wait to try to sell these trucks through Ritchie Brothers?

A    I think we had some intermittently prior to that.  Yeah.  I'm not sure exactly when the

Page 312

first sale was.

Q   The first sale, at least as far as I can see, there's several being sold on July 20th, 2023. Does that fit with your recollection?

A   Yeah. As far as I can remember.

Q   Was there -- some of them are dated May of 2024.

A   Um-hmm.

Q   Do you recall that?

MR. PELTON: Clarify the question. You're talking about Ritchie Brothers?

MR. MURPHY: That's correct, yeah.

BY MR. MURPHY:

Q   All of these that I'm referring to are the Ritchie Brothers invoices. They span from July of 2023 to May, even June of 2024.

Why didn't you try to sell these trucks earlier through Ritchie Brothers?

A   Well, because we were getting such low values for them and just to pile on the fees and the commissions, you know, we were trying to sell them in other avenues.

Or you know, find some other

Page 313

good use for them. An opportunity so that we weren't paying tens of thousands of dollars to sell a truck.

Q   So this entity, you had a commission they would charge you for selling each one of these trucks?

A   Yes.

Q   And so you made a decision to not use them earlier because you wanted to save on the commission?

A   Well, we were still making every effort to sell them -- sell them directly, utilizing TruckPaper and other avenues, Ritchie List, which is another variant from Ritchie Brothers where there isn't, you know, a 10 to 25 percent commission and $500 in fees.

Q   Okay. And had you engaged Ritchie earlier in the process, like in January of 2023, versus July and even into '24, would you have gotten a higher price for the sale of those trucks?

A   I mean, I'm not certain. But the historical information would tell us that values peaked in May and June. And they haven't gone back up since.

Q   May and June of 2022?

Page 314

A   Correct.

Q   Okay. And at least as it stands here, the only trucks that you attempted to sell or the only trucks that you actually sold in May of 2022 were these trucks to -- actually, let's go through those.

You have the trucks to Vulcan Truck Sales; right? Those are all sleeper cabs, so they're not relevant?

A   Correct.

Q   Those were sold on May 4th, May 13th, May 26th, May 27th, and May 31, at least according to these records.

There are two other transactions on May 25 and 26th, one to RA Equipment -- excuse me, May 25th and 27th. One to RA Equipment and eight trucks sold to Five Crowns. Let me find that for you.

MR. PELTON: Got a page number?

MR. MURPHY: I'm working on it.

THE WITNESS: Am I missing the page that you're referencing?

BY MR. MURPHY:

Q   Nope. Hold on, I'm referencing page 2657. This is the transaction with Five Crowns

Page 315

Trucking.

A   I'm sorry, what was the number? 2657?

Q   Yes. All right. This is dated May 27th, 2022. And it's a transaction -- and who's Five Crowns Trucking?

A   A trucking company in Detroit.

Q   You have a prior relationship with them, or was this a first-time transaction?

A   I believe this was a first-time transaction.

Q   And are these daycabs or are they sleeper cabs?

A   These are daycabs.

Q   And where do we find the -- oh, there's the mileage, okay.

So other than this one sheet of paper for $522,000, there's no other documentation reflecting this transaction?

A   Not that I'm aware of.

Q   And do you recall if Five Crowns Trucking, did they come out and inspect these trucks before they made an offer to purchase them?

A   I don't recall.

Q   And who would have been the main point of contact between Five Crowns Trucking and GLS Leasco?

Page 316

A   It would have been myself or Brianne Perkins.

Q   So Brianne Perkins handled some of these transactions?

A   Yes, she assisted.

Q   Do you know at this time, in May 27th, 2022, whether or not you had eight model year 2023 Central tractors to replace these eight that you were selling?

A   I believe we did. I believe we did.

Q   Okay.

MR. MURPHY: We'll take a short break.

VIDEOGRAPHER: We're going off the record. The time is 10:52 a.m. We're off the record.

(Short recess taken at 10:52 a.m.)

VIDEOGRAPHER: We are now back on the record. The time is 11 a.m.

(Back on the record at 11:00 a.m.)

BY MR. MURPHY:

Q   Just wrapping up corporate representative deposition, GLS Leasco. And wanted to follow up on a few things you touched on earlier,

Page 317

Mr. Blain.

You had mentioned that GLS was exploring some potential sale of 2018 model year tractors to Navistar; correct?

A   Um-hmm.

Q   Who was involved in those negotiations?

A   I don't think we got to the negotiations part. But it was between Sean Carmichael and Brock Frederick.

They had talked about potential opportunities to -- I believe they were -- they would export to Vietnam. They have an outlet there.

Q   Okay. And do you recall how many trucks you were contemplating in that transaction?

A   It was 100 to 200.

Q   And do you recall if you had agreed upon a price?

A   We had not agreed on a price. We didn't have the trucks during the period they needed them.

Q   Okay. What period did they need the trucks?

A   You know, looking back at the text dialogue between myself and Sean Carmichael, it was March. I think it was a March period. March, April.

Page 318

Q   Of 2022?

A   Correct.

Q   And was that the reason why the transaction didn't go forward?

A   That was my understanding.

Q   I mean, was there any other reason that the transaction didn't move forward, other than the fact that you didn't have replacement trucks?

A   Not that I'm aware of.

Q   Do you know -- had you guys agreed upon a price for that transaction?

A   You know, I don't recall if we had gotten to a price on the units.

Q   Do you know who the potential buyer was going to be?

A   I don't know who the outlet is overseas.

Q   So Navistar was effectively acting like a broker in that situation?

A   I don't know what the entities -- if it's something that Navistar -- you know, dealers that they own in Vietnam, or it was just a wholesale outlet for them that they utilized. It came up several times.

Q   Other than that one instance with

Page 319

Mr. Carmichael and this potential sale of tractors in Vietnam, can you think of any other times when GLS was negotiating with Navistar concerning the purchase of these 2018 model year tractors?

A   You know, just in review of the documents, I know there was another conversation later in '22. It was maybe October or November.

Q   And were you part of that conversation?

A   Yes.

Q   And what -- can you describe what that discussion was about?

A   I believe my recollection is it was me, you know, asking if there was still an opportunity there, because now we had the replacements for the trucks.

But the market demand in the U.S. was -- appeared to be trailing off quickly.

Q   So that transaction that you inquired about with Mr. Carmichael in late '22, you guys discussed earlier in March of '22?

A   There was dialogue about the same at that period of time.

Q   Other than those two instances, can you think

Page 320

of any other times when GLS may have been negotiating with Navistar concerning the potential purchase of these tractors?

A You know, I know that I repeatedly talked to Sean and tried to reach Brock Frederick, who handled the used truck sales. Looking for some assistance as we had been given some assurances that they would help.

But you know, and gone back to Sean when I couldn't get a response from Brock. That would have been sometime in between those periods.

Q Okay. Now, when -- if the trucks weren't sold by GLS, I understand a large portion of these model year 2018 tractors are still in GLS's name; correct?

A Correct.

Q Do you recall about how many?

MR. PELTON: I'm sorry, do you recall what?

BY MR. MURPHY:

Q About how many of these model year 2018 tractors that GLS still owns?

A I'm going to say it's probably about 280.

Q And would that be reflected in Mr. Kahaian's

Page 321

expert report as an Exhibit, which tractors had been sold and which ones had been retained by GLS?

A Yes.

Q Okay. And I'm not -- I have it up in front of me. So I did not bring a copy of that with me today. I apologize for that.

That's the list you were referring to earlier that you could reference to match up trucks with the invoices; correct?

A Yeah. I believe that was as of, like, July 20th or 21st. You know, there's since been more trucks sold.

Q Okay. So since that list was prepared, additional tractors have been sold?

A Yes.

Q Do you know how many?

A I don't know exact. I'm going to say 20.

Q And do you know the parties to those transactions?

A Well, we recently sold some in Ritchie Brothers live auction. I don't know the exact count. There were some 2019 and 2020 Internationals in there, as well.

Q Okay. Would that have been included in those

Page 322

documents that we just looked at?

A It would not have because this was, you know, past several weeks. They can certainly be updated.

Q Okay. Why hasn't GLS Leasco sold, you know, a good -- several hundred of these trucks?

A We would like to sell more of them. Really, I mean, the situation we were posed with, was that we were going to have to pay, you know, just based on, you know, the loan values that were still owed on them, you know, it would cost us $15,000 to sell a truck.

So it would have been seeking other uses. Some, you know, we put back in service just because we couldn't -- they were going for such low values.

Q Okay. And so do you know how many of these tractors were placed back into service or remained in service the whole time?

A Yeah. I think it's around 100 units.

Q Okay. So do you have documentation to reflect which of those units continued to -- I assume they were running freight?

A Yes.

Q Okay. And getting paid money to run that

Page 323

freight?

A Yes. We were -- we were using them in lieu of some of the newer trucks. They really weren't -- they weren't needed trucks. It was more the fact of the loss we were going to take by not utilizing them.

Q But these hundred or so trucks that you maintained ownership of, they continued to run, and they continued to generate revenue on behalf of GLS Leasco; is that correct?

A They're in operation, yeah.

Q And is there a way for you to track how much revenue these trucks that are still in operation are generating for GLS Leasco?

A I'm not sure how I would necessarily do that.

Q Is there an average, you know, profit per mile or any type of metric that you would measure the profits that are being generated by moving freight of these 2018 tractors?

A There -- I'm sure there is a way. Off the top of my head, I don't know how we'd do that.

Q You don't track that information?

A Well, I guess it's the basis that you would want to bump it up against.

Are we talking a revenue per

Page 324

mile type of scenario? I said there's probably a way to do that. Off the top of my head, I don't know the best way.

Q   Is there a way for you to identify, for example, the RH, you know, 2018 tractor, here's the VIN number.
    Is there a way you can pull that up and determine how much revenue that particular tractor generated over the, you know, last 12 months?

A   Okay. I can continue to answer the same question.
    Like I said, I'm certain there is a method. Off the top of my head, I don't know the best way.
    MR. MURPHY: All right. Well, I think we can conclude the GLS Leasco corporate rep deposition and move into the Central transport deposition.

        - - -

        EXAMINATION
BY MR. PELTON:
Q   A couple questions. Just to clarify, can you find Exhibit 4, D-4?
A   (Witness complies.) Yes.

Page 325

Q   Okay. Then I want to mark this. I guess it would be 51.
    (Deposition Exhibit D-51 was marked for identification.)
    MR. PELTON: So D-51. All right, Scott?
    MR. MURPHY: Yeah, it's fine by me.
BY MR. PELTON:
Q   Looking at page 582, is that -- second to the last page in the Exhibit. And is that the same as Exhibit 4?
A   Yes.
Q   Okay. But this also has an attachment to the February 12th letter to Mr. Moroun from Justin Fink?
A   Yes.
Q   Attached to this, also, is an email. Is this the cover email, this first page for that Exhibit 4?
A   It appears that it is.
Q   All right. And the second and third pages of the Exhibit, what is that? Second and third pages of the Exhibit, what is it?
    MR. PELTON: Let me see this.

Page 326

BY MR. PELTON:
Q   The second and third page of the Exhibit. It's control level 580 and 581, what is it?
A   This is the request for quote that we sent out on behalf of the fleets in January of 2021.
Q   What's the date?
A   January 27, 2021.
Q   All right. And is this what Mr. Lollis is responding to?
A   Yes.
Q   Does your request for proposal ask that they direct the proposal to anyone in particular?
A   Yeah. It was supposed to be directed to myself.
Q   All right. And was there anywhere where you asked that it be directed to Mr. Moroun's attention?
A   No.
Q   At this point in time, in 2021, when were the model year 2018s that had been purchased, when were those -- when was the OTB going to expire on those?
A   I believe it started in April of -- July or August of 2021.
Q   All right. And is there a penalty if the

Page 327

tradeback occurs later --
A   Yes.
Q   -- under the OTB agreement?
A   Yes.
Q   If you turn to Exhibit D-38, which is the April 8th Letter Agreement.
    MR. MURPHY: Object to form, mischaracterizes the date of the agreement.
    THE WITNESS: Yes, sir.
BY MR. PELTON:
Q   Like to direct your attention back to the no trade agreement on the third page of the agreement.
A   Yes, sir.
Q   And you reviewed earlier with Mr. Murphy, the bullet points under the 6.2 million payment?
A   Yes, sir.
Q   Okay. All right. The third bullet says:
    "Rental invoices associated with previous model years delayed production, resulting in 2017 to 2019 International trade units remaining in service."
    Did that relate to the effort in 2021 to begin the process to sell these back to the -- or turn them back in under the OTB

Page 328

agreement from 2017?

MR. MURPHY: Object to form.

THE WITNESS: Well, you know, as a result of the delay and, you know, meeting up with the OTB agreement, yeah. I mean, we were looking at, you know, extending the life of these vehicles; but yes, that could be in relation to that, as well.

MR. PELTON: Okay. That's all the questions I have. We're going to reserve the right to read under Rule 30 E.

MR. MURPHY: Thank you.

VIDEOGRAPHER: This concludes the videotape deposition. We are now going off the record. The time is 11:16 a.m. We're off the record.

(Deposition concluded at 11:16 a.m.)

- - -

Page 329

CERTIFICATE

STATE OF MICHIGAN

COUNTY OF WAYNE

I do hereby certify the witness, whose attached testimony was taken in the above matter, was first duly sworn to tell the truth; the testimony contained herein was reduced to writing in the presence of the witness, by means of stenography; afterwards transcribed; and is a true and complete transcript of the testimony given. I further certify that I am not connected by blood or marriage with any of the parties, their attorneys or agents, and that I am not interested directly, indirectly or financially in the matter of controversy. In witness whereof, I have hereunto set my hand at Westland, Michigan, September 24, 2024.

*Shari J. Pavlovich*

Shari J. Pavlovich, CSR-5926
Notary Public, Wayne County, Michigan
My commission expires 4/14/2025

Page 330

DEPOSITION ERRATA SHEET

Our Assignment No.: 32780

Case Caption: GLS Leasco, Inc. and Central Transport, LLC v. Navistar, Inc.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ____ day of _____, 2024.

_____

KYLE BLAIN 30(b)(6) for GLS Leasco, Inc.

Page 331

DEPOSITION ERRATA SHEET

Reason for change:_____
Page No._____Line No.___Change to:_____
_____
Reason for change:_____
Page No._____Line No.___Change to:_____
_____
Reason for change:_____
Page No._____Line No.___Change to:_____
_____
Reason for change:_____
Page No._____Line No.___Change to:_____
_____
Reason for change:_____
Page No._____Line No.___Change to:_____
_____
Reason for change:_____
Page No._____Line No.___Change to:_____
_____

SIGNATURE:_____DATE:_____
KYLE BLAIN 30(b)(6) for GLS Leasco, Inc.