# Exhibit E

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GLS LEASCO, INC., and
CENTRAL TRANSPORT LLC,

    Plaintiffs,

   -vs-                Case No. 23-CV-12927-MAG-APP

NAVISTAR, INC.,

    Defendant.

_____/

DEPONENT:  BRIANNE PERKINS
DATE:      Wednesday, September 18, 2024
TIME:      9:00 a.m.
LOCATION:  KIENBAUM, HARDY, VIVIANO,
           PELTON & FORREST, PLC
           280 North Old Woodward Avenue, Suite 400
           Birmingham, Michigan
REPORTER:  Karen Fortna, CRR/RMR/RPR/CSR-5067
JOB NO:   32781

Page 78

value.

Q.   Okay.  So you basically identify a price that you would go down to, a bottom price.  And do you know how you came up with that price?

A.   We used the same research based on the value and mileage.

Q.   Okay.  And approximately how many trucks did you sell through Ritchie Brothers?

A.   I would have to look.  I don't recall.

Q.   Okay.  I mean, they would be reflected in these documents, correct?

A.   I would think so, yes.

Q.   So we can just count them up.

Okay.  So that was the auction site.  What about the other aspect that you sold that you mentioned?

A.   So Ritchie List.  So that is just an advertisement basically.  So if you were to go onto their site, you would go onto the Ritchie List side versus the auctioneer side.  If you had interest in the truck, you would reach out to me, the seller, and then we would figure out if you would like to buy the truck.

Q.   And so when did you start using Ritchie Brothers to sell trucks?

Page 79

A.   I don't recall off the top of my head.

Q.   You can look at the document.

A.   I don't know if this would reflect exactly when we started.  This might be when we sold them, but this would not reflect when we started advertising.  I wouldn't know that.

Q.   Okay.  But at some point in time, you decided, "Well, we're going to now enlist Ritchie Brothers to try to sell these trucks."  Do you know why that decision was made?

MR. DAVIS:  Object to foundation.  Go ahead.

THE WITNESS:  So for me, it was as much attention as I could get on the trucks, the better, right?  So the way I'm looking at it is if I'm trying to sell an item, the more marketing that I'm doing, the more attention I'm getting from the general public, thus increasing my ads to sell the truck.

BY MR. MURPHY:

Q.   And so was it your decision then to enlist Ritchie Brothers to sell the model year 2018 tractors?

A.   Yes.

Q.   Okay.  And was it successful?

A.   Sometimes.

Page 80

Q.   And are there still -- when you say "sometimes," why don't you tell me, how was it successful?

A.   Every so often we found a buyer, but not always would we have a truck that would sell right away.  Sometimes the trucks would sit for months with no interest.

MR. MURPHY:  Okay.  You can hand me the exhibit back, please.

THE WITNESS:  Sure.  Did you want to go through the rest?

MR. MURPHY:  Correct me if I'm wrong, but I think all the rest of them are Ritchie Brothers transactions.

THE WITNESS:  Yes.  Some of these are from 2024, which I was not involved in.

MR. MURPHY:  Thank you.

BY MR. MURPHY:

Q.   Were you involved at all in collecting the documents that were reflected in Exhibit D-50?

A.   Could you explain?

Q.   When it came for GLS to collect the documents and produce them in this lawsuit, were you involved with collecting the transactional documents reflecting the sale of these trucks?

MR. DAVIS:  Just be careful, if you ever

Page 81

talked to any attorneys internal or external about gathering documents, I don't want you to discuss what those communications were; otherwise, you can answer the question.

THE WITNESS:  Okay.  If you're asking if I produced the invoice?  Is that what you're asking?

MR. MURPHY:  Yes.  I'm basically trying to figure out where these invoices came from.

THE WITNESS:  I don't do invoicing.  That would have been handled by our invoicing person.

BY MR. MURPHY:

Q.   So there's a specific invoicing person that would handle all of these documents?

A.   Correct.

Q.   I apologize if I asked the question.  Who is that person again?

A.   It was Becky Butler at the time.

Q.   I want to show you what's been previously marked as Exhibit D-17.

A.   Is that the same thing?

Q.   So this is a document between Jim Lollis and yourself and there's a number of people copied and also sending it to Ashley Pelletier.

A.   Yes.

Page 82

Q. Do you recall at all receiving documents similar to this? I don't want to ask you if you remember receiving this exact document because that's an unfair question, but was this something normally Mr. Lollis would send you?

A. Production updates, yes.

Q. Okay. And when you received a document like this, what would you review in connection with your job?

A. So what I'm going to look at is have I seen any that agreed to shift production that is going to be beyond anything that we wouldn't be able to recoup from. Does that make sense how I'm answering that?

Q. So your primary role was to look at the production timing?

A. No.

Q. Okay. What was your primary role in reviewing this information?

A. So for me, I have to get supplies there, decals for our trucks, like unit numbers, things like that, hand-held chargers for the plants to install, so I need to make sure that I'm ahead of any production schedule so that way I'm not a holdup for production.

Q. Okay. I see. And so when you're looking at this document, you're looking -- let's just flip to the

Page 83

second page. And these are all CT 2023 RHs; do you see that?

A. I do.

Q. And do you see that the whole lot is CT 2023 RHs?

A. I do.

Q. Okay. Now I think we established this in the prior dep. I think that's not technically correct because some of these trucks are being purchased for Universal; is that correct?

A. Not for me, but we just purchased for Central Transport.

Q. Right. And --

A. So that's --

Q. But I believe this is -- when you sent this to both you and Ashley Pelletier and that some of these trucks were intended for Universal?

A. No, these are Central Transport.

Q. Okay. So it's your understanding when you look at this document that every truck in this was intended for Central Transport?

A. On this document, yes.

Q. What gives you that conclusion?

A. Because it says Central Transport next to it.

Q. The CT?

A. Yes.

Page 84

Q. Okay. And so in the email to you and Ashley, when Jim says, "Universal: The second group of 32 of 75 production dates are not correct. I have noted this to Navistar," you're thinking he sent this to Ashley Pelletier by mistake?

A. No, because she works for Universal. And I wouldn't be concerned with anything that they would do, so I wouldn't have even given that a second thought.

Q. Okay. And so when you're reviewing this document, would there be anything in here to indicate to you, "I've got to go out and I have to order some labels and" --

A. No, because I had already done it at that point.

Q. Okay.

A. Because of the very, very short timeline, I did not wait. And usually I will section it so that we were not inundating anybody with a ton of supplies at one time, but because we knew we were going to get these trucks in three months, I said send it all at once.

Q. Okay. So you ordered all of the decals at one time?

A. Correct.

Q. And what other parts did you order in order to get

Page 85

these trucks ready?

A. I work with our IT group so we would have something called a hand-held that the drivers use. We have to install a charger in it.
And I also would get something called a digi, which we were using for like a telecom device from our IT group and we would ship those out for them to install post-production.

Q. And when you looked at this production schedule and you saw -- this says "Production Dates," but you saw, I would say, the vast majority of them just says, "TBD." What does that mean to you?

A. To be determined.

Q. Okay. And did that at all raise a concern with you at this time?

A. No.

Q. Why not?

A. Production fluxes all the time.

Q. Okay.

A. That's very common.

Q. So it's nothing uncommon that production dates will fluctuate?

A. Correct.

Q. Okay. Let me show you what was previously marked as Exhibit D-18. So this document is from you to

Page 86

Joe and Kyle?

A. Correct.

Q. So when you look at these schedules here, would you have prepared these charts?

A. This is something I would have received from Lollis.

Q. Okay. So –

A. I don't know what this last page is though.

Q. Yeah, it's just from GLS' production, but it probably shouldn't – it was inadvertently included.

A. Yeah, that's not something I would have seen before.

Q. Okay. So on this email, you have Central and Universal production dates and you're saying that these charts that were on the second and third page, these would have came from Mr. Lollis?

A. Correct.

Q. Okay. And this is in a different format than the Excel spreadsheet we just looked at. Do you know how he came up with this information?

A. I don't.

Q. Okay. And with respect to Universal, would you not have paid any attention to this schedule?

A. No.

Page 87

Q. So the only one you were concerned with would be the Central one?

A. That is correct.

Q. Okay. And why would you have been sending this to Joe and Kyle?

A. Because I work with them on a team.

Q. Okay. What would they need the information for?

A. Joe would oversee any mechanical issues, so if there's anything going wrong with the trucks, he would need to know how many we're seeing, how many is coming in, is the flow of our down equipment related to this, so he's going to monitor it from a mechanical standpoint. And Kyle is the VP and was my boss at the time, so reporting to him was standard.

Q. Okay. And when you say reporting to Kyle was standard, any time you got a production update, that would be something you would convey to Kyle?

A. No, but I would give him weekly updates.

Q. Okay. So would you get more than weekly updates then from Mr. Lollis?

A. They were irregular.

Q. Did you say irregular?

A. Correct, as far as the timing goes. Sometimes I would get one, sometimes I would not, sometimes I

Page 88

would ask for one.

Q. And here, Ms. Perkins, you're saying to Joe and Kyle in the second sentence, "He did get an update today, but stated it showed trucks in August, which he is pushing back on to get in the schedule by June. He did state he feels optimistic about it." Do you see that?

A. I do.

Q. And is that just another example of the production date shifting?

A. Correct. So whenever I would see something, "Hey, these are in August," that's when I'm going to say, "Hey, Jim, un-huh, we're getting these trucks by June; do something." This is a result of that conversation.

Q. Earlier you testified you didn't have conversations about the production schedules, it was primarily through email.

A. So it would be an update. So if I'm saying hey -- sorry. If it's via email versus a conversation, I apologize, it would be me asking, "Hey, I see that these have slipped. Can we get them pushed back in so we have June production?"

Q. Right. I just want to make sure I have all the information.

Page 89

A. Of course.

Q. And that's why I want to know about your verbal conversations with Mr. Lollis.

A. Of course.

MR. MURPHY: Okay. We can take a short break.

THE WITNESS: Okay.

(Whereupon a break was taken from 10:48 a.m. to 10:56 a.m.)

MR. MURPHY: Back on the record.

BY MR. MURPHY:

Q. I'm going to mark -- or not mark. I'm going to show you what's been previously marked as Exhibit D-19. Now this is another email from Mr. Lollis just about a week later on February 13, 2022, with an updated production schedule. Do you recall receiving this document?

A. Not in particular, but it looks familiar.

Q. Okay. Is there anything, after reviewing this document, that refreshes your recollection at all?

A. Not in particular. It doesn't stand out.

Q. Okay. And when you see a document like this from Jim, an email with this production update, how do you interpret what that means?

MR. DAVIS: Object to form.

Page 90

THE WITNESS: What do you mean by interpret?

MR. MURPHY: Like what information is he conveying to you in this document?

THE WITNESS: He's telling us when the trucks are supposed to start production.

BY MR. MURPHY:

Q. Okay. And when Jim -- in your experience, your decade-long experience with Jim, when he sends you a document that has a production start date, when would you expect to receive the trucks based on that production start date?

A. Roughly two weeks to a month after production.

Q. Okay. And why do you say roughly two weeks to a month?

A. So it has to go to a center after it leaves the plant to get all of the decals, items that we discussed previously installed, and then it has to go to the transporter and then the transporter has to make it to us.

Q. Okay. But the truck also has to get built, correct?

A. Right, but that would be at the plant prior to that.

Q. Well, this says, "Production starts."

Page 91

A. Right.

Q. So that's what I'm trying to get. You said two to four weeks and you described a process of where --

A. After the plant.

Q. After it's built?

A. Right.

Q. So what's your understanding of how long it would take for the truck to actually get built at the manufacturing plant?

A. I've never asked, but I've always assumed it would be same day.

Q. Okay. So production starts on one day and gets built all in one day?

A. I would assume, but I don't know for sure.

Q. And what do you base that assumption on?

A. Just timeline in the past, how long I've seen the trucks. So I would assume if there's a large group set on one date and if I get them, on average, two to four weeks after, that would be my assumption.

Q. Okay.

A. They move very fast.

Q. At this point, though, when you see production starts and you see 75 on 3-31-2022, you're expecting that you're going to receive 75 trucks two to four weeks later?

Page 92

A. After the production date? Is that what you're asking?

Q. Yes.

A. Yes.

Q. Okay. And same for the April 1, 2022, date, that's another 75 trucks, so you would expect to receive at least as of the end of April approximately 150 trucks?

A. Roughly, yes.

Q. Okay. And same with April '22, you would receive — you would expect to receive another 75 trucks within two to four weeks from that date?

A. Yes.

Q. Okay. And would you base your -- I know this was a little bit of a -- you said you ordered all the decals and all that information all at one time.

A. Correct.

Q. So you didn't base it at all on these production schedules, you just went ahead and ordered them all?

A. Correct, because I knew we were getting so many in such a tight window, I was not going to be a part of any delay.

Q. Right. And who did you order the decals from?

A. Oh, gosh, I would have to look at who we were using

Page 93

then. We switched decal providers a few time.

Q. Did you have issues with the decals in this particular matter?

A. No.

Q. You don't recall getting decals where the letters were a little off and had to be replaced?

A. No, but that was something that would happen all the time. So the PDI center, when they botch installation, do I have to replace the decal because they've messed it up? Yes.

Q. And you would handle that process as well?

A. Yes.

Q. And when the trucks are received by Central, how would you determine where these trucks are going to be delivered to?

A. It depended on where we had the need to take the trucks out. So in this case, we were taking out 2018, so we would have these delivered to places that would be shop locations surrounding any 2018 areas so that we could easily get the old truck off the road and the new truck on with minimal impact to operations.

Q. Okay. So the model year trucks are typically kept together in certain locations?

A. That is correct.

Page 94

Q. Okay. And so with respect to the model year 2018 tractors, what locations were those trucks maintained at?

A. I would have to go back and look. I don't recall.

Q. But you would expect in those locations they wouldn't mix 2018s with 2019s or 2020s?

A. Correct.

Q. And that's for ease of trading them in or replacing them and replenishing the fleet?

A. No, that's for ease of maintenance. So if we group a certain type of trucks together, so if I have all 2018 Internationals, they're going to have like parts, so if I need to get my shop trained on how to work on the truck, get the parts, it's going to be easier if I have all one type of truck in one arena.

Q. Okay. And at least with respect to this production schedule that's being sent to you, do you have an independent recollection of where those first 75 were earmarked to go?

A. I don't remember.

Q. And would there be some type of resource or document that you could look at to determine where those trucks would have --

A. I would have to look at that because I don't think

Page 95

I was as involved in moving the trucks around then so I don't think I would. For me, I would just have when I received it and when I put it in service.

Q. And at least in looking at this, can you tell what type of truck is being purchased in this chart?

A. From looking at this document?

Q. Correct.

A. Are you asking if I didn't have prior knowledge would I understand it or would I understand it at the time of receipt?

Q. I'm asking if there's anything on this document that would indicate the model of the truck.

A. On this document in particular, there's nothing that states the model.

Q. Okay. I'm going to show you what was previously marked as Exhibit D-25. This is again another production update by Mr. Lollis, dated February 25, 2022, and it's directed to you and Ashley with copies to Joe Hanvey, Jay Mason, Dustin Taylor, Sean Carmichael, and it looks like Mr. Lollis copied himself at his gmail address.

Do you recall ever corresponding with Mr. Lollis at his gmail address?

A. Not off the top of my head.

Page 96

Q. And do you know why he would have included -- strike that.

Do you know why Mr. Hanvey and Mr. Mason would be included on this document?

A. So Joe Hanvey is part of our maintenance team and he's going to be on most of these documents with us. Anything mechanical related, he's always going to be copied. Regardless if this is production or not, he's going to want to know, again, how many are in our fleet, is it affecting our numbers, is it affecting our maintenance costs.

Jay Mason is the VP of maintenance at Universal and I'm not certain, but I am pretty sure Ashley reported to him.

Q. Okay. And so what's confusing about this document is he's sending you another production update, and when you look at the company, this one, for whatever reason, says all UTS. Do you see that?

A. I do.

Q. And the prior one we looked at said all CT.

A. Correct.

Q. So what I'm trying to figure out is if there's 1,100 trucks on here, to your knowledge, were some of them inadvertently labeled UTS versus CT?

MR. DAVIS: Objection to foundation.

Page 97

Calls for speculation. Go ahead.

THE WITNESS: I would not know.

MR. MURPHY: Okay. I mean --

THE WITNESS: According to this, they all say Universal, so I would not have any hesitancy to believe that, but like I said, if it's a Universal, I'm not going to really give it a second glance.

BY MR. MURPHY:

Q. So when he sends you this update and he says, "Brianne, I need unit numbers and shipping on the first groups to build," you would respond and say, "You sent me the wrong document; these are all Universal builds, not Central builds"?

A. No, I would not.

MR. DAVIS: Objection. Form and foundation. Go ahead.

THE WITNESS: No, I would not have said that. I would only look at the part that was just addressed to me. And I see he has, "Brianne and Ashley, attached is production status as of 2-25." When I would have opened this up and saw there was no Central, I wouldn't have given it a second thought. The part that I would have read is, "Brianne, I need unit numbers and shipping on the first groups to build."

Page 98

BY MR. MURPHY:

Q. Okay. And what would you do in response to that?

A. I would send him return unit numbers that would match up with the VIN numbers and any destinations that we had at the time.

Q. So this says on your attachment, "CT-UTS VIN list, 2-25-22." Do you see that?

A. I do.

Q. And so when you look at these VIN numbers, would you be able to tell whether any of these correspond with Central VIN numbers?

A. Not without looking.

Q. Okay. So why don't we compare this document with the previous one we looked at. It also had the list of VIN numbers.

A. This here, D-17?

Q. I believe that's the right one. Yep. I'm trying to get to the bottom of this mystery here. And I'm assuming that these VIN numbers are going to be similar, but maybe they're not.

By looking at these documents, can you at all tell whether some of these UTS trucks were inadvertently identified as UTS when they should have been Central?

MR. DAVIS: Calls for speculation. Go

Page 99

ahead.

THE WITNESS: If you look at the last six digits of the VIN, that's a pretty good indicator.

MR. MURPHY: Okay.

THE WITNESS: And if you look at that, none of those are even similar, so no, I wouldn't have.

BY MR. MURPHY:

Q. So the last six digits are three -- you're specifically referring to the 38219?

A. So if we are looking at this page here.

Q. Okay. Which one are you looking at?

A. Right now I have D-17 in my hand and I'm on page 3.

Q. Okay. Page 3. Yep.

A. So go to the fourth column. That's the VIN number.

Q. Yes.

A. If you look at the last six digits, you'll kind of see a pattern, 526, 526, 602, et cetera.

Q. Uh-hum.

A. Now if you go over to the Universal one, 738, 661, 618, et cetera, so those are not in the same boat.

Q. So there's going to be specific VIN numbers assigned to Central versus specific VIN numbers assigned to Universal?

A. Yes.

Page 100

Q. And they typically come in certain groups?

A. I don't understand what you're asking.

Q. Let me think about that one.

So if Mr. Lollis testified in his prior deposition that sometimes he would inadvertently identify a Central truck as Universal or all Central trucks, that's not your experience when dealing with Mr. Lollis?

MR. DAVIS: Object to foundation. Go ahead.

THE WITNESS: Has he made a mistake before? Is that what you're asking?

MR. MURPHY: Yeah, I'm just asking, when he's sending you these production updates, was it your experience at all or did you have any experiences where he would inadvertently identify a Central truck as a Universal truck or vice versa?

MR. DAVIS: Form and foundation. Go ahead.

THE WITNESS: Not that I can recall.

MR. MURPHY: Okay. Now I'm asking just your experience and what you recall in your work in dealing with Mr. Lollis.

THE WITNESS: Are you asking if he's made

Page 101

many mistakes or what are you asking?

MR. MURPHY: No, I'm not asking that. I just wanted to make sure I clarified the question because I don't understand the foundation objection.

MR. DAVIS: You were testifying as to what Lollis said.

MR. MURPHY: No, I'm not. I'm asking her what her understanding was.

MR. DAVIS: That's a different question then, so I haven't made a new objection, so go ahead.

THE WITNESS: Can we repeat what I'm supposed to answer here?

MR. MURPHY: I'll move on.

THE WITNESS: Okay.

BY MR. MURPHY:

Q. So I'm marking as Exhibit D-32 -- I'm not marking, but previously marked D-32. This is another production update by Mr. Lollis and this is dated April 13, 2022.

A. Okay.

Q. Do you recall receiving this document?

A. Not specifically.

Q. Would this be something that you would typically

Page 102

expect to receive from Mr. Lollis?

A. Yes.

Q. And does the spreadsheet at all -- I know you don't remember this specific spreadsheet, but is this in the format that you're typically used to receiving?

A. Common, yes.

Q. Okay. And so as you look at this spreadsheet that he attaches, it's referred to as "CT 2023 RH - LT VIN List, 4-13-22."

A. Yes.

Q. Okay. And I think previously we looked at some documentation suggesting that all the trucks were RHs that were going to be purchased for Central, but now they're identified as LTs. Do you see that?

A. I do.

Q. Okay. And what was your understanding of why that change was made?

A. I wasn't involved in that.

Q. Okay. So you don't have any understanding then why the change was made?

A. I wasn't concerned with it.

Q. Okay. And when you look at this production update and you compare that with the previous one for Central --

Page 103

A. D-17?

Q. I want to make sure I have the right one because that's multiple ones. Yes, the D-17 one.

A. Or D-25? It looks like that email was sent later.

Q. But does that include the Central or Universal?

A. Let's see. So the D-25, that's going to be Universal.

Q. Right.

A. So stick with D-17?

Q. I want to stick with apples to apples here.

A. Very good.

Q. Okay. So when you would review this document, what information would you pay attention to?

A. So what I'm going to look at is any fluctuation with production dates. So this one in particular is my favorite because it has 15 that go into then July. So for me, that's common, so whenever I'm going to say -- if you recall me saying earlier, race to the finish line.

So at the end of production, to meet our commitment agreement -- and this is every OE -- you're going to see a ton of them flowing in the last month because they want to honor that commitment, right? So now when I see roughly -- what, 10, 15, I think, was it, that went into July?

Page 104

That would not trigger me at all. That's going to say, "Okay, you're going to set these back up into June just like the other ones you pushed into August," right?

MR. MURPHY: And I didn't even ask you about the last 15 transactions. It almost seems like you were coached to testify to that.

THE WITNESS: No, I was looking at it.

MR. DAVIS: Objection. Inappropriate question. It is responsive to what you asked her.

BY MR. MURPHY:

Q. Other than that, does this production schedule change from the one that we looked at previously?

A. Are you saying are the dates different on this document versus D-17?

Q. Yes.

A. Yes.

Q. Okay. And to your recollection, do you recall if you actually received this document?

A. It goes to my email, so I would assume yes, that I did receive it.

Q. Okay. And would this be a document that you would still maintain on your computer?

A. No.

Q. And why is that?

Page 105

MR. DAVIS: Asked and answered.

THE WITNESS: I wouldn't need to keep it.

BY MR. MURPHY:

Q. So you would delete it?

A. Right.

Q. Okay. And you were never instructed not to delete it?

A. No.

Q. So it was your expectation then that as far as the -- and this is a build date, right? These are -- when you look at the dates, these are estimated build dates?

A. Correct.

Q. Okay. So what does it mean to you when it says estimated build date?

A. That it may not be exact and there could be fluctuation.

Q. Okay. And we had talked about it earlier. Between the estimated build date and the actual date you take delivery, you estimated it was two to four weeks?

A. That is correct.

Q. But that doesn't take into account the date -- the amount of time it takes to actually build the truck, but you would just assume that's one date;

Page 106

is that correct?

MR. DAVIS: Object to form and foundation. Go ahead.

THE WITNESS: So I'm sorry, say it one more time.

BY MR. MURPHY:

Q. Earlier you testified that when you reviewed this document and you see estimated build date, you can typically anticipate that you'll be receiving trucks within two to four weeks?

MR. DAVIS: Same objection. Go ahead.

THE WITNESS: Yes.

BY MR. MURPHY:

Q. That's your interpretation of it?

A. Yes.

Q. Okay. And that is based on your experience in how long it takes from the date the truck leaves Navistar's manufacturing facility and ultimately arrives at wherever the Central location is supposed to go?

A. That is correct.

Q. And so when that truck leaves Navistar's manufacturing facility, where does it go next?

A. To a center they have, a PDI center.

Q. Okay. And at that PDI center, is that where they

Page 107

affix the Central labels to the trucks and the digi-wigi or whatever you referred to, or the other parts that you would order; is that where they would place those on the truck?

A. Yes.

Q. Okay. And who would you coordinate with in that process?

A. I wouldn't. That's not something I had to handle.

Q. You just have to get the parts there?

A. That's right.

Q. Okay. And then once they hit that location, then where do they go?

A. Once I deliver the parts to the PDI center?

Q. Yes.

A. They go on the truck.

Q. And the PDI center, what is a PDI center?

A. It's a post-production facility. They'll do inspections. It depends on what you're asking for; different customers ask for different things. So for us, we ask them to review the truck, take a look at decals, take a look at installing all of our -- anything. Anything programming we would want to put in the truck, anything like that.

Q. Okay. And so just getting back to this email, if you would have responded to Mr. Lollis or sent him

Page 108

a follow-up email or sent something to Mr. Blain, would you have maintained those emails or would you have deleted those as well?

A. I would have deleted it.

Q. Okay. So if I understand your testimony correctly, if you look at these production dates, anything after June 1st, you would expect to receive it in July, correct?

MR. DAVIS: Object to foundation.

THE WITNESS: I would expect that that build date would be resorted and put back in June as guaranteed.

BY MR. MURPHY:

Q. Okay. But I'm telling you when you received this in -- and there's literally hundreds of these trucks being built -- I can count them up, but a lot of them that are listed from June 1st through July 1st. Your expectation would be that Mr. Lollis would go back to Navistar and have those resorted back into an earlier date?

A. Into June production, yes, so that way we could still receive the unit by the end of the month.

Q. So presumably when you received this document, you're responding back to Mr. Lollis and saying, "Time out, these have got to be resorted and

Page 109

delivered" -- "so they can make delivery by the end of June," correct?

MR. DAVIS: Object to form and foundation.

THE WITNESS: Regularly that is something I would do; I can't guarantee if I did that for this email in particular.

BY MR. MURPHY:

Q. But at least that's what your interpretation is; if you received this, you would say, "These dates are not good; you've got to have them resorted"?

MR. DAVIS: Same objection.

THE WITNESS: Regularly, yes, but in this incident, I can't recall if I did.

BY MR. MURPHY:

Q. Okay. And would the -- I mean, we already went over this ground work, but you would have done that via email, correct?

A. Likely.

Q. So if there is a record of it, it's going to be in some type of email back to Mr. Lollis?

A. Yes, there should be.

Q. Now we talked a little bit about the step column, you know, we talked about the step process with manufacturing process.

Page 110

A.   Yes.

Q.   So is there anything in this step process that would raise any concerns with you?

A.   No, because we finished the spec prior, so that's not something we would be concerned with.

Q.   So does the – for all the LTs, it looks like -- the RH, it has step 28. What is your understanding of what step 28 means?

A.   I don't know what the steps mean.

Q.   Okay. So where it moves down to the LTs and it says "28 line set," that has no meaning to you?

A.   No.

Q.   Does the word "Line set" have any meaning to you?

A.   Not that I would be concerned with, no.

Q.   Okay. Do you understand what line set means?

A.   That means that they have set their line for that batch of production.

Q.   Okay. And so do you understand what "2M fully code" means?

A.   No.

Q.   That's not anything you would concern yourself with, though, correct?

A.   Correct.

Q.   Would you be involved at all with telling Mr. Lollis which CT terminal and which location

Page 111

these trucks would be delivered to?

A.   Correct.

Q.   So as far as filling in this chart, what information would you supply?

A.   So this is not a chart that I have any contribution to, this is his solely alone, but are you asking what data I would give him that would give him the information to add to the sheet?

Q.   That's exactly what I'm asking.

A.   So yes, I would tell him what the unit number for the unit would be that would match up with the VIN.

Q.   Okay.

A.   And then the CT location, CT terminal, where they would deliver to.

Q.   So how would you go about identifying the unit number and matching that up with the VIN?

A.   So that was sent to Becky Butler. She set all our unit numbers. I would give her a VIN list that we would receive from Jim and I would say, "Hey, assign these the unit number," and we would then order decals for them.

Q.   Okay. And when it says, "Last Eight," it has "PN45," and I'm just -- the "Last Eight" column, is that -- and this PN number, does that have any significance to you?

Page 112

A.   That is the last eight of the VIN to the left.

Q.   Gotcha. And what's the significance of the last eight?

A.   I don't know exactly if I know. There is certain letters and numbers in there that can indicate certain things. I don't know what they are off the top of my head, though.

Q.   I'm going to show you what's been previously marked as Exhibit D-42. I want to -- obviously there's a lot of documentation here and it appears you're copied on some of these documents. I know we touched on this earlier. This is the invoicing for the model year 2023 tractors, but do you recall receiving copies of all of the invoices for the model year 2023 tractors?

A.   Yes, so I would review that. So Kyle would have me go through and verify that the units that were listed on the invoice, that we have taken possession of.

Q.   Okay. So your role in this process was, "We're not going to pay for these units until we've taken possession," and you wanted to verify that?

A.   That is correct.

Q.   Okay. And I believe this 6-13-2022 is the very

Page 113

first invoice for these model year 2023 trucks. And the only reason I say that is if you look at -- if you flip to the next email, which is dated June 23rd, it says, "Invoice No. 2."

A.   It does say that.

Q.   Okay. And so I assume that this is Invoice No. 1. Does this refresh your recollection at all as to which entity actually purchased the model year 2023 tractors?

MR. DAVIS: Object to foundation for the series of assumptions you made at the beginning there. Go ahead.

THE WITNESS: So no, because that tells me who they billed it to, but I can't tell you how we paid it.

BY MR. MURPHY:

Q.   Okay. Who could tell you how you paid it?

A.   Perhaps somebody in our finance department, I'm guessing.

Q.   Okay. So if the invoice is to Equipment Leasing Company LLC, there's a possibility that some other entity actually paid for it?

A.   If it was billed incorrectly, yes.

Q.   Okay. So do you believe this was billed incorrectly?

Page 114

A. I don't know because I don't recall the timeline that we switched over.

Q. Okay. Who would know the timeline as to when that was switched over?

A. Gosh, perhaps our company attorney. I'm not really sure.

Q. Is it your belief that these were incorrectly billed?

MR. DAVIS: Asked and answered. Foundation. Go ahead.

THE WITNESS: No, I'm not really sure. I don't think so, but I wouldn't know. I don't really deal with finance, so that's not something I would be concerned with.

BY MR. MURPHY:

Q. Okay. How would you go about making sure that you have possession of these tractors before the invoices are paid?

A. So as we stated earlier, our shops would receive the vehicle and then they would let me know that they have received it.

MR. MURPHY: Okay. I think we'll mark this as Exhibit D-53.

MR. DAVIS: This one is new?

MR. MURPHY: Yep.

Page 115

(Marked for identification: Deposition Exhibit No. D-53.)

BY MR. MURPHY:

Q. Okay. So this is an exchange between you and Mr. Lollis with a copy to Becky Butler and it's dated May 11, 2022.

So the exchange starts with Mr. Lollis asking you to send updated titling information. Do you see that on the second page?

A. That's addressed to Becky Butler; that's not addressed to me.

Q. Okay. At least that question -- the email is addressed to you and Becky Butler, but at least the question is really a Becky Butler question?

A. That is correct.

Q. So what would Becky Butler send to Jim in order to give him the titling information, if you know?

A. I don't know.

Q. But in the email, at least you're responding to Mr. Lollis, not Becky Butler, correct?

A. Let's see. I asked him, "Have we received any projected delivery dates yet?"

Q. I think it starts out -- at least if I'm reading this correctly -- oh, yes, you do say that, and then I think you initially say, "For daycabs? I am

Page 116

waiting for a concrete answer if yes."

A. That's from Jim.

Q. That's from Jim to you?

A. Correct, that's his response. Because why would I have that answer?

Q. I don't know. It says above that Brianne -- "On May 11, 2022, at 12:06, Brianne Perkins wrote, 'For day cabs? I am waiting for a concrete answer if yes.'" And then, "Do you have any projected delivery dates yet?" That's why the way I read it.

A. So I'm reading it in the opposite direction. "Do you have any projected delivery dates from me?" Jim is replying, "For day caps? I'm waiting for a concrete answer if yes."

Q. Okay. And did Mr. Lollis respond back to you and say, "No ETAs as of yesterday, but there are plenty in transit"?

A. Correct.

Q. So at lease as of May 11, 2022, you hadn't received any model year 2023 tractors; is that right?

A. I can't say that from this message.

Q. Okay. So are you thinking you may have received trucks before that?

A. I think so, yes.

Q. What would you base that understanding on?

Page 117

A. Just the timeline produced and promised.

Q. Okay. So you're expecting you would have at least 75 trucks as of May 11, 2022, correct?

A. I don't know about the quantity. I never bank on a concern because of the shifting, but I would assume that I would have had some by this time, yeah.

Q. And if you hadn't received any by that time, would that have raised concerns?

A. No.

Q. Why not?

A. Production shifts all the time.

MR. MURPHY: Let's take a quick break and I'll go through the rest of my notes here.

(Whereupon a break was taken from 11:31 a.m. to 11:40 a.m.)

MR. MURPHY: Back on the record. I'll mark this as Exhibit No. D-54.

(Marked for identification: Deposition Exhibit No. D-54.)

BY MR. MURPHY:

Q. Ms. Perkins, this is another exchange between you and Mr. Lollis and I just want you to kind of walk me through the exchanges here and explain what's going on.

A. Sure.