UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GLS LEASCO, INC. and
CENTRAL TRANSPORT, LLC,

        Case No. 23-cv-12927

    Plaintiffs,

        Hon. Mark A. Goldsmith

v.

        Magistrate Judge Anthony P. Patti

    NAVISTAR, INC.,

Defendant.

---

**Plaintiffs' Opposition to Navistar's Motion to Exclude the Opinions of
Plaintiffs' Damages Expert Michael Kahaian**

**Table of Contents**

Statement of Issue Presented ................................................................................ ii

Controlling or Most Appropriate Authorities ....................................................... iii

Table of Authorities ..............................................................................................iv

Introduction ...........................................................................................................1

Background ............................................................................................................2

    A.    The Economic Context: A Historic Peak followed by a Sudden Crash ...........................................................................................2

    B.    The Experts' Shared Framework ...........................................................2

    C.    The Three Points of Factual Contention .................................................3

Standard of Decision .............................................................................................4

Argument ...............................................................................................................5

    I.    Navistar's motion incorrectly asks the Court to weigh factual evidence rather than verify the reliability of a methodology that both GLS and Navistar's experts rely on. .......................................................5

    II.    Navistar's own arguments betray any claim that Mr. Kahaian is "guessing" or lacks any basis for his assumptions. ...................................7

        A.    Navistar's own witness admitted 30-day delivery is reasonable. .........7

        B.    The "April Delivery" dispute is a minor factual distraction ................9

        C.    Mr. Kahaian's factual assumptions on resale pricing and timing are grounded in the record and industry standards. ...........................11

    III.    For all of these reasons, Navistar's attempted reliance on the *Rondigo* Court's exclusion of Mr. Kahaian's testimony is misplaced. ..................16

Conclusion ...........................................................................................................18

## Statement of Issue Presented

Courts only exclude an expert's testimony when the methodology is unreliable and not at all tied to facts in the case, even if disputed. Here, the parties' damages experts agree that any calculation of damages must be centered on a simple formula—the expected resale value of the old tractors when Plaintiffs should have received new tractors under the contract, minus the actual resale value of the old tractors—diverging in their conclusions only on disputed facts and factual assumptions about mitigation, with Plaintiffs' expert tying his opinions to record facts and reliable industry data related to the used tractor market. Should the Court permit Plaintiffs' expert to testify before the jury as to his opinion on damages?

## Controlling or Most Appropriate Authorities

1. Fed. R. Evid. 702 & advisory committee's note to 2023 amendment

2. *In re Scrap Metal Antitr. Litig.*, 527 F.3d 517 (6th Cir. 2008)

3. *In re Onglyza Prods. Liab. Litig.*, 93 F.4th 339 (6th Cir. 2024)

4. *United States v. Sammons*, 55 F.4th 1062 (6th Cir. 2022)

# Table of Authorities

**Cases**

*Burgett v. Troy-Bilt LLC*,
  579 F. App'x 372 (6th Cir. 2014) ........................................................6, 7

*Counts v. Gen. Motors, LLC*,
  606 F. Supp. 3d 547 (E.D. Mich. 2022)...........................................11

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)...................................................... 4, 5, 7

*Gen. Elec. v. Joiner*,
  522 U.S. 136 (1997)....................................................................7

*In re Flint Water Cases*,
  No. 5:16-cv-10444, 2024 WL 4120237 (E.D. Mich. Sept. 9, 2024) ....................5

*In re Onglyza Prods. Liab. Litig.*,
  93 F.4th 339 (6th Cir. 2024) ...............................................................6

*In re Scrap Metal Antitr. Litig.*,
  527 F.3d 517 (6th Cir. 2008)............................................................5, 7

*In re Sulfuric Acid Antitrust Litig.*,
  235 F.R.D. 646 (N.D. Ill. 2006)........................................................12

*Innovation Ventures, L.L.C. v. Custom Nutrition Lab'ys, L.L.C.*,
  520 F. Supp. 3d 872 (E.D. Mich. 2021)...................................................5

*Jahn v. Equine Servs, PSC*,
  233 F.3d 382 (6th Cir. 2000)..............................................................5

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999)...................................................................17

*Nelson v. Tennessee Gas Pipeline Co.*,
  243 F.3d 244 (6th Cir. 2001)................................................ 12, 13, 16

*Park v. Kia Motors Am., Inc.*,
  No. 22-5654, 2024 WL 4024667 (6th Cir. Sept. 3, 2024)..............................8, 17

*Rondigo, L.L.C. v. Casco Twp., Mich.*,
    537 F. Supp. 2d 891 (E.D. Mich. 2008) ........................................................ 16, 17

*Stuhlmacher v. Home Depot U.S.A., Inc.*,
    774 F.3d 405 (7th Cir. 2014) ........................................................................... 11

*United States v. Sammons*,
    55 F.4th 1062 (6th Cir. 2022) ...................................................................... 5, 11

*Virginia v. West Virginia*,
    238 U.S. 202 (1915) ........................................................................................ 13

**Rules**

Fed. R. Evid. 702 ..................................................................................... 2, 4, 5

Fed. R. Evid. 702 advisory committee's note to 2023 amendment .................... 6, 11

**Introduction**

Navistar's motion inappropriately seeks to use *Daubert* as a preview of its jury argument, rather than as a safeguard against unscientific methodologies. Although Navistar claims GLS' expert Mick Kahaian's methodology is unreliable, its own expert, Mark Hosfield, uses the exact same economic calculation to determine damages:

$$[Expected\ Resale\ Value] - [Actual\ Resale\ Value] = [Lost\ Resale\ Value]$$

Rather than actually claim any difference in the intellectual frameworks utilized by both experts, Navistar's motion instead simply argues about facts that the jury will determine.

Both experts identify the 2018 tractors whose sales were postponed due to Navistar's delay, both determined a "but-for" the breach resale value, and both compared that value to the actual resale value. Not only do both experts agree on the formula, both rely on the authoritative industry publication *Truck Paper* to establish market trends. And with that formula, both calculate nearly the same expected resale value, with Mr. Hosfield's figure differing from Mr. Kahaian's by less than $4,000 per truck.

The divergence in this case is not methodological—the only thing *Daubert* is concerned with. It is factual, with the largest damage dispute being in the mitigation analysis. Mr. Kahaian analyzes damages through reference to actual sales data—the

real prices GLS received while attempting to sell trucks in a crashing market. Mr. Hosfield ignores that reality in favor of a speculative "should have sold by" date of 30 days, assuming a perfect market liquidity that did not exist. But Navistar's disagreement with Mr. Kahaian's factual inputs is a matter of credibility and weight for a jury, not a basis for exclusion under Rule 702. Its motion should be denied.

## Background

### A. The Economic Context: A Historic Peak followed by a Sudden Crash

The experts do not disagree that the used truck market experienced a historic spike in early 2022 followed by a precipitous decline after June 2022. Because Navistar failed to deliver 1,100 replacement trucks on time, GLS was forced to hold its MY2018 fleet longer than planned, missing the market peak and ultimately selling into a collapse.

### B. The Experts' Shared Framework

Both experts utilize the same basic damages calculation. The total difference between their results is **$19,409,711**, which stems from three specific factual inputs:

| Damages Component | Kahaian (Plaintiffs) | Hosfield (Navistar) | Difference |
|---|---|---|---|
| **Expected "But-For" Value** | $39,503,900 | $37,194,560 | **$2,309,340** |
| **Mitigation Offset (Sold & Unsold)** | $14,615,769 | $31,627,062 | **($17,011,293)** |
| **Total Lost Resale Value** | $24,888,131 | $5,567,498 | **$19,320,633** |

### C. The Three Points of Factual Contention

There are three primary differences in Mr. Kahaian and Mr. Hosfield's analysis, the largest of which stems from <u>factual</u> assumptions relating to mitigation:

**1.** **Delivery Timing.** Mr. Kahaian assumes deliveries would have started 30 days after production (March–May 2022) based on Navistar's provided schedules, and based on record evidence that Navistar could build trucks in a day and deliver them to the United States within weeks, when necessary. (Ex. 1, Averhart Dep. at 13, 18, 50.) He also assumed that Navistar would have started delivering trucks based on the "handshake" deal reached in January 2022 before Navistar signed the agreement in mid-April 2022, both because (a) Navistar had a preexisting obligation to build trucks for GLS, with those trucks being used to satisfy some of the production under the April agreement, (ECF No. 90-3); and (b) this early production *actually happened*, with Navistar starting production under the agreed-to but still unsigned contract starting in February, by building 43 tractors for Universal in February, and 107 in March, (Ex. 2, Dep. Ex. 79).

Mr. Hosfield, by contrast, assumed Navistar would deliver trucks within a 45- to 90-day window from production, with trucks produced under the April 2022

agreement delivered in May 2022 through July 2022. This timing difference accounts for only **$2.3 million**—a small fraction of the total dispute.[1]

**2.     Mitigation on Sold Trucks.** Mr. Kahaian uses the actual proceeds ($13.1M) GLS received for the 428 2018 trucks it sold as "mitigation," subtracting those proceeds from his damages calculation. Mr. Hosfield ignores these real numbers and makes up a value of $24.1M by assuming GLS "should have" sold all trucks within 30 days of receiving new ones, regardless of the market crash conditions GLS was in.

**3.     Mitigation on Unsold Trucks.** GLS was unable to sell 166 of its trucks. Mr. Kahaian used their current scrap/auction value according to *TruckPaper* (~$8,500/unit) as mitigation. Mr. Hosfield, on the other hand, assumes every one of these trucks would have sold by April 2023 for a total value of $7.5M. Mr. Hosfield also uses *TruckPaper*.

### Standard of Decision

Federal Rule of Evidence 702 tasks the Court as a gatekeeper to ensure that expert testimony "rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The proponent must demonstrate by a preponderance of the evidence that the expert's opinion

---

[1] Indeed, Mr. Kahaian's analysis assumes delivery of only 75 of the 630 units in April 2022, (ECF No. 90-4, PageID.3239), a small percentage of the total trucks expected.

reflects a "reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(d). The Court's focus must be "solely on principles and methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 595.

In the Sixth Circuit, this threshold is "a liberal one." *Innovation Ventures, L.L.C. v. Custom Nutrition Lab'ys, L.L.C.*, 520 F. Supp. 3d 872, 880 (E.D. Mich. 2021). The "rejection of expert testimony is the exception, rather than the rule." *In re Scrap Metal Antitr. Litig.*, 527 F.3d 517, 529–30 (6th Cir. 2008). Even when an expert relies on "allegedly erroneous facts," the Court will admit the testimony so long as there is "some support for those facts in the record." *Id.* at 530.

## Argument

**I.  Navistar's motion incorrectly asks the Court to weigh factual evidence rather than verify the reliability of a methodology that both GLS and Navistar's experts rely on.**

The gatekeeping function of Rule 702 is designed to exclude junk science, not to referee a "battle of the experts" over the credibility of their factual inputs. *In re Flint Water Cases*, No. 5:16-cv-10444, 2024 WL 4120237, at *6 (E.D. Mich. Sept. 9, 2024); *accord In re Scrap Metal*, 527 F.3d at 529–30. The issue is whether the methodology is, among other things, replicable and testable, *United States v. Sammons*, 55 F.4th 1062, 1072 (6th Cir. 2022), not whether it is factually "unchallengeable," *Jahn v. Equine Servs, PSC*, 233 F.3d 382, 393 (6th Cir. 2000). When the dispute is factual, the proper course is to let the "adversary system"

prevail, with the jury deciding which expert to credit. *Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 376 (6th Cir. 2014) (citation omitted); Fed. R. Evid. 702 advisory committee's note to 2023 amendment.

Here, Navistar's motion faces an insurmountable hurdle: its own damages expert, Mr. Hosfield, utilizes the exact same damages equation as Mr. Kahaian. Both experts follow a three-step methodology: (1) identify the 2018 tractors impacted by the delay in delivering 2023 replacements; (2) determine a "but-for" resale value on those 2018 tractors had they been delivered on time; and (3) subtract a "mitigation" value for the sale of the 2018s. When both sides' experts "use the same methodology," that is itself a powerful indicator of reliability and admissibility. *In re Onglyza Prods. Liab. Litig.*, 93 F.4th 339, 347 (6th Cir. 2024) (cleaned up).

Here, Mr. Hosfield and Mr. Kahaian did not only use the same methodology, their conclusions largely aligned. In his report, Mr. Hosfield performed a sensitivity analysis using alternative delivery assumptions. According to his calculations, adopting his preferred delivery schedule results in an Expected Resale Value of $37,194,560, (*see* Ex. 3, Hosfield Supp. Rep. Ex. 3, Sch. 2 (adding up Column "[3]")), compared to Mr. Kahaian's Expected Resale Value of $39,503,900, (ECF No. 90-4, PageID.3243–45, 3274–75, ¶¶ 35, 40 & Ex. D Sch. 2)—a modest difference of $2,309,340 (or roughly $3,998.78 per truck). This significant agreement in the expert's conclusions further supports the admissibility of

– 6 –

Mr. Kahaian's testimony, given that "conclusions and methodology are not entirely distinct from one another" in the *Daubert* analysis. *Gen. Elec. v. Joiner*, 522 U.S. 136, 146 (1997).

Given that Mr. Hosfield and Mr. Kahaian agree on the formula *and* the outcome, it is apparent that Navistar's attack is not on Mr. Kahaian's science, but his factual sources. But the remedy for that is "vigorous cross-examination" and "presentation of contrary evidence," not exclusion. *Daubert*, 509 U.S. at 596.

## II.   Navistar's own arguments betray any claim that Mr. Kahaian is "guessing" or lacks any basis for his assumptions.

Throughout its motion, Navistar cites the very record evidence that Mr. Kahaian relies upon and simply disagrees with it.  (*See* Mot. 10–20.) This alone shows that "there is some support for those facts in the record," *In re Scrap Metal*, 527 F.3d at 530, rendering exclusion, improper and leaving it to the "adversary system" to resolve the disagreement, *Burgett*, 579 F. App'x at 376. Navistar's three primary critiques fall squarely into the realm of "contested sets of facts" to be decided by a jury. Fed. R. Evid. 702, advisory committee's note to 2023 amendment.

### A. Navistar's own witness admitted 30-day delivery is reasonable.

Navistar argues that Mr. Kahaian's assumption of a 30-day delivery window after production is "speculative." But an expert may base opinions on "assumed facts" so long as they find "some support . . . in the record." *Park v. Kia Motors Am.,*

*Inc.*, No. 22-5654, 2024 WL 4024667, at *10 (6th Cir. Sept. 3, 2024). Here, the 30-day window is not just supported—it was confirmed by Navistar's own witnesses.

Specifically, Maria Averhart—Navistar's manager in charge of Order to Delivery Operations—testified that while build times vary, most trucks are assembled in a single day. (Ex. 1, Averhart Dep. at 13, 18, 50). And while Ms. Averhart tried to assert that customers are generally told delivery can take "up to 45 days," she could not deny that 30 days was possible and reasonable. (*Id.* at 52–59.)

Averhart's reticence vanished after she was confronted by internal emails from March 2022. In those emails, her own subordinate Mike Nester responded to a "critical list" request from Regional VP Sean Carmichael and Truck Sales Manager Wale Akinosho—both key players in the GLS transaction. (*Id.* at 54–56.) Nester confirmed that for critical orders, Navistar could "minimize" the timeline and start delivering trucks in 14–17 days. (*Id.* at 58–59 & Dep. Ex. 262.) While Averhart claimed this timeline did not include all stages of the process, she finally conceded that a total timeline of **25-to-28 days** from build to delivery was possible. *Id.* at 62–65. These figures are also supported by the number of days it took GLS to deliver the MY 2023 replacement trucks. Navistar's own delivery data details that the trucks were delivered to GLS on average 32 days after the updated build dates. (Ex. 4, 2023 Truck Build & Deliveries.xlsx.)

Given Averhart's sworn testimony, Navistar's claim that a 30-day delivery window is "speculative" is intellectually dishonest. Mr. Kahaian's assumption is grounded in the exact metrics that Navistar witnesses admitted it used for its own prioritized customers.

In this manner, Navistar is hypocritical—and simply wrong—to claim that Mr. Kahaian has "cherry-pick[ed]" information and turned a "blind eye" to other data to support his conclusions. (Mot. 12, 17.) Navistar took a similar tack in questioning Mr. Kahaian at his deposition, where Mr. Kahaian explained that it was improper to look at an "isolated footnote" in his report, and that it was multiple sources of information "in connection with one another" that "provide a foundation or basis" for his conclusions. (Ex. 5, Kahaian Dep. at 148–151.) Thus, ironically, it is Navistar who is attempting to pick and pluck at portions of Mr. Kahaian's testimony without adequate context.

## B. The "April Delivery" dispute is a minor factual distraction

Navistar next argues that because the Court ruled there was no technical breach for failure to deliver in April, any damages predicated on April delivery must be excluded. (Mot. 10.) But that argument is a red herring that confuses a legal ruling on the timing of a breach with the factual reality of the "but-for" world. Even under the Court's ruling, Mr. Kahaian's model remains reliable.

*First*, Navistar ignores the evidence of course of dealing and industry standards upon which Kahaian relied. (*See* ECF No. 90-4, PageID.3239–40, ¶¶ 21–22 & n.3.) Navistar plant officials planned to build trucks based on the new agreement as early as February 2022. (*See, e.g.*, Ex. 6, NAV00072879.) While the contract allowed for a June "spillover" month, it also contemplated rolling deliveries rather than a single bulk delivery on the contract deadline of June 30. (*See* ECF No. 90-3, PageID.3229.). These earlier deliveries did, in fact, occur, with Navistar and its dealers expressly confirming the expectation of earlier production and delivery:

- Navistar dealer Jim Lollis complained that Navistar was prioritizing trucks earmarked for GLS affiliate Universal rather than Central, over Lollis's objection and GLS's expectation, (*see* Ex. 7, NAV00017163; Ex. 8, NAV00017143; Ex. 2, Dep. Ex. 79); and

- Navistar VP Sean Carmichael told Lollis to issue a threat to GLS's Kyle Blain that it had already built trucks under the contract but would withhold them unless Blain signed the contract. (ECF No. 51-35, Dep. Ex. 60; ECF No. 51-36, NAV00133580; ECF No. 55-4, GLS Sept. 10, 2024 Dep. at 226.)

Given that Navistar had already built and delivered trucks by April 2022 in the real world, Mr. Kahaian's assumption that a non-breaching Navistar would have delivered a few more units in the "but for" April 2022 is more than reasonable.

*Second*, even if the Court's ruling on the timing of the breach required a factual adjustment to Mr. Kahaian's model, it would not warrant exclusion. Mr. Kahaian assumed 75 trucks would be delivered by April 30, 2022. An expert is

entitled to use alternative inputs for his damages methodology to account for disputed facts. *Stuhlmacher v. Home Depot U.S.A., Inc.*, 774 F.3d 405, 409 (7th Cir. 2014) ("Experts are allowed to posit alternate models to explain their conclusions."); Fed. R. Evid. 702 advisory committee's note to 2023 amendment; *see also Counts v. Gen. Motors, LLC*, 606 F. Supp. 3d 547, 590 (E.D. Mich. 2022) (denying a *Daubert* motion when the challenged testimony "merely proposes an alternative damages scheme to contrast the scheme presented by Plaintiffs' damages expert").

Even under Navistar's narrow reading of the Court's ruling, its obligation to start building trucks was active by mid-April. And given Maria Averhart's admission of a 25–28-day delivery window, it is reasonable to assume that those 75 units would have arrived no later than May 30, 2022. Shifting these few dozen units from April to May results in a minor $227,079 difference in the damages figure, reducing Mr. Kahaian's ultimate damages conclusion from $27,707,769 to $27,480,690. (Ex. 9, Kahaian Dec. ¶¶ 9–14 & Ex. 1.) At best, Navistar has identified the April assumption as a "shaky" factual input that can be tested on cross-examination, not a "methodological" flaw requiring exclusion. *Sammons*, 55 F.4th at 1072.

### C. Mr. Kahaian's factual assumptions on resale pricing and timing are grounded in the record and industry standards.

Finally, Navistar's challenges to Mr. Kahaian's sales assumptions again reflects a misuse of Rule 702 to supplant the role of the jury.

– 11 –

1.      **Mr. Kahaian utilized actual market data, not speculation, for resale value.** Mr. Kahaian used actual market data, not speculation, to determine the but-for value for the resale fleet. He considering pricing information exchanged between the parties, third-party sales data from *TruckPaper* for vehicles with similar specifications, and Navistar's own customer price list. (ECF No. 90-4, PageID.3243, ¶¶ 31–35 & nn.17–26.) This cross-referencing confirmed that Navistar's own internal projections often outpaced industry publications, providing a direct analytical nexus between the data and his conclusions. *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 254 (6th Cir. 2001); *In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 646, 656 (N.D. Ill. 2006).

Navistar criticizes Mr. Kahaian for using average market prices rather than the fire-sale prices GLS eventually achieved. This argument is economically illiterate. The actual prices GLS received in a crashed, post-breach market cannot be used to estimate what it would have earned had Navistar delivered trucks during the historic market peak. Had Navistar complied with the Letter Agreement, those tractors would have been sold to different buyers in an entirely different economic climate.

Ultimately, Navistar's own expert Mr. Hosfield relies on the same authoritative industry publication to establish market trends, foreclosing any argument that such data is too unreliable for Mr. Kahaian to use. As the Supreme Court has long noted, it "is unquestioned that, in proving the fact of market value,

accredited price-current lists and market reports, including those published in trade journals or newspapers which are accepted as trustworthy, are admissible in evidence." *Virginia v. West Virginia*, 238 U.S. 202, 212 (1915). As both experts agree on the source material, Navistar's challenge to Mr. Kahaian's use of them is a matter of weight, not admissibility.

2.     **Mr. Kahaian's expected sales timelines are supported by Navistar's own admissions.** Mr. Kahaian concluded that GLS would have sold its used trucks in the same month it received new ones due to the significant inventory deficits and the historically hot seller's market existing in early 2022, with GLS planning to advertise the units for sale before the new trucks arrived, to avoid delay. (ECF No. 90-4, PageID.3243, ¶¶ 33–34.) He also noted that Navistar's own employees acknowledged this market strength, even taking steps to protect certain "good customers" from price hikes during this time. (*Id.*, n. 21.) This reflects a significant nexus between the evidence and Mr. Kahaian's conclusion. *Nelson*, 243 F.3d at 254.

Navistar argues that GLS's actual sales of only 30 used trucks by June 2022 contradicts this assumption. (Mot. 14.) This is a red herring. The piecemeal trickle of trucks GLS received—well below contractual obligations—hampered GLS's ability from executing the bulk or rolling sales that it had operationally planned for, and which buyers badly needed at the time. As Mr. Kahaian correctly identified, had Navistar delivered the units on time, those tractors would have been sold to different

– 13 –

buyers in an entirely different economic climate.[2] (Ex. 5, Kahaian Dep. at 83–84;

88; 240–242; Ex. 10, GLS 30(b)(6) Dep. at 250–55.)

Ultimately, this is a question for the jury to decide, not a matter for Rule 702.

**3.  Minor truck characteristics go to weight, not admissibility.**

Navistar's complaints about specific truck characteristics—such as paint color or

upholstery—are distractions. Mr. Kahaian used market and auction prices for the

correct vehicle types (make/engine) and a 400,000-mile benchmark—an

approximation that Navistar's own expert, Mark Hosfield, acknowledges is accurate

for this fleet. And, again, Navistar's own admissions suggest it could have sold these

trucks at a substantially higher price even accounting for the characteristics of

Central Trucks. (Ex. 11, Stinsa Dep. at 167–71 & Exs. 105 & 106.) Ultimately, to

the extent a truck being painted yellow or having a ripped passenger seat affects a

truck's value, those are minor adjustments for a jury to weigh, not a basis for

wholesale exclusion under *Daubert*.

---

[2] Tellingly, Navistar tries to argue this both ways. It suggests that if GLS was able to execute a "bulk sale," all at once it would have depressed the market. (Mot. 18.) But Mr. Kahaian's model does not assume an instantaneous dump of inventory; it assumes a three-month rolling sell-off (April through June) corresponding with the expected delivery of replacement units. (*Compare* ECF No. 90-4, PageID.3243, ¶ 34 *with id.*, PageID.3239, ¶ 21 (showing expected deliveries in April, May, and June 2022).) This "bulk discount" assumption reflects yet another classic factual dispute for a jury to ponder.

– 14 –

**4.      Mr. Kahaian's calculation of damages for sold and retained trucks is grounded in factual reality.** Navistar challenges the inclusion of damages for (a) trucks that GLS eventually sold in May and June 2022; and (b) trucks that remain in GLS's operation today. These arguments fail because they ignore the fundamental "but for" purpose of Kahaian's model.

As for trucks sold in May and June 2022, Navistar argues that GLS suffered no loss. This ignores the timing of the market peak in April 2022. (ECF No. 90-4, PageID.3240, ¶ 24 & Chart). A truck that would have sold for approximately $70,575 in the but-for April 2022 world was delayed, and actually sold for $60,000 in the actual-world in May. That creates a cognizable loss to GLS of $10,000. That the truck was eventually sold does not erase this economic damage caused by GLS missing the market peak.

Navistar's challenge to the damages model's inclusion of trucks GLS still operates fares no better. (Mot. 19–20.) Navistar claims that "Plaintiffs simply chose to operate [these trucks] instead of resell." (*id.* at 19). That misstates the record. GLS's witnesses testified that the entire purpose of the Letter Agreement was to obtain new trucks so they could immediately offload the MY2018 fleet during the historically high market. (*See, e.g.*, Ex. 10, GLS 30(b)(6) Dep. at 244–45, 256.) Navistar's breach and fraud deprived GLS of the ability to follow through on that

– 15 –

goal. (ECF No. 90-4, PageID.3243–44, ¶ 37 & Chart.) GLS incurred lost sales and increased costs, and may properly seek damages as a result. *Nelson*, 243 F.3d at 254.

**III.    For all of these reasons, Navistar's attempted reliance on the *Rondigo* Court's exclusion of Mr. Kahaian's testimony is misplaced.**

Navistar attempted reliance on *Rondigo, L.L.C. v. Casco Twp., Mich.*, 537 F. Supp. 2d 891 (E.D. Mich. 2008), undermines rather than supports its motion. In *Rondigo*, Mr. Kahaian's report purportedly relied upon "a sampling of invoice activity in 2005" limited to one "four day sample," for which the court concluded he had no explanation for selecting that sample, particularly when it appeared to completely contradict the plaintiff's own official manuals estimating a significantly reduced number of customers. 537 F. Supp. 2d at 895–96. And the court also criticized the fact that the plaintiffs in *Rondigo* asserted a significantly greater acreage available for commercial use than the defendant but offered "no logical connection between this site plan's available [ ] acreage and the expert's calculations and conclusions," and never "actually articulate[d] how many acres the report did consider available for composting as a basis for calculations," offering conflicting arguments. *Id.* at 896–97. And finally, the *Rondigo* court faulted Mr. Kahaian's start dates for his loss calculations because they attempted to place the defendant on the hook for damages "more than a year before" the plaintiff completed certain regulatory requirements that would have allowed it to operate on the property,

– 16 –

rendering commencement of operations (and thus possible losses) impossible in that period. *Id.* at 897–98; *see also id.* at 898.

But as is evidenced from the discussion above, these failings in his *Rondigo* testimony are not present here. Unlike the legal impossibility thwarting a year of calculated damages in *Rondigo*, Navistar's impossibility claims here rely on actively disputed legal arguments and facts, which "do[ ] not render [Mr. Kahaian's] conclusion unreliable.'" *Park*, 2024 WL 4024667, at *10. Nor is there lacking any "logical connection" between Mr. Kahaian's damages calculations and the evidence he relies upon here. *See Rondigo*, 537 F. Supp. 2d at 896. *Rondigo*, for all its analysis, considered a significantly different expert report and factual record.

And the differences in how the *Rondigo* plaintiffs attempted to utilize Mr. Kahaian and his work here were explicitly noted. In the *Rondigo* loss report, Mr. Kahaian outright acknowledged that those plaintiffs did not "engage[ ] [him] to compile, review, or examine [information for this report] in accordance with attestation related standards established by the American Institute of Certified Accountants," *id.* at 898, underscoring the fact that *those* plaintiffs did not even actually engage Mr. Kahaian for the sort of intellectually rigorous testimony "that characterizes the practice of an expert in the field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). That is decidedly not the case here, and no such admission of lesser standards is found in Mr. Kahaian's report in this case.

– 17 –

## Conclusion

The Court should deny Navistar's motion to exclude the expert testimony of GLS's damages expert, Mr. Kahaian.

Respectfully submitted,

KIENBAUM HARDY
VIVIANO PELTON & FORREST, P.L.C.:

By:  */s/ Thomas J. Davis*
  Eric J. Pelton (P40635)
  Thomas J. Davis (P78626)
Counsel for Plaintiffs
280 N. Old Woodward Ave., Ste. 400
Birmingham, MI 48009
(248) 645-0000
epelton@khvpf.com
Date:  January 20, 2026  tdavis@khvpf.com

598009

– 18 –

## LOCAL RULE CERTIFICATION

I, Thomas J. Davis, certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts). I also certify that it is the appropriate length. Local Rule 7.1(d)(3).

*/s/ Thomas J. Davis*
Thomas J. Davis (P78626)
Kienbaum Hardy
Viviano Pelton & Forrest, P.L.C.
280 N. Old Woodward Ave., Ste. 400
Birmingham, MI 48009
(248) 645-0000
tdavis@khvpf.com

# CERTIFICATE OF SERVICE

I hereby certify that on January 20, 2026, the foregoing and all accompanying documents were served via the Court's CM/ECF system, which sent electronic notice of the filing to all counsel of record.

/s/ Thomas J. Davis
Thomas J. Davis (P78626)
Kienbaum Hardy
Viviano Pelton & Forrest, P.L.C.
280 N. Old Woodward Ave., Ste. 400
Birmingham, MI 48009
(248) 645-0000
tdavis@khvpf.com

598009