**EXHIBIT A**

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

GLS LEASCO, INC., and CENTRAL

TRANSPORT LLC,,

         Plaintiffs,

    v.                                    Case No.

NAVISTAR INC.,                            23-cv-12927

         Defendant.

DEPOSITION OF JUSTIN FINK

DATE:          Wednesday, July 31, 2024

TIME:          9:14 a.m.

LOCATION:      Veritext Offices

               600 North Pearl Street, Suite 2230

               Dallas, TX 75201

OFFICIATED BY: Paul Krueger

JOB NO.:       6751285

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 66

Q That's what I was going to ask.

A Yeah.

Q So the trucks were not being delivered to Summit, and then for Summit to then pass on to Central; correct?

A To my knowledge, they were not. Central has a lot of terminals across the U.S. I don't believe they were coming to our -- to Summit locations. I believe they were going straight to Central's businesses, but can't recall exactly.

Q Okay. Let me just close out -- if you have any -- you've talked about responsibilities for Navistar -- I'm sorry -- responsibilities for Summit generally. Spec'ing, ordering the trucks. Are there any other general responsibilities that would fall to Summit in a co-op agreement?

A Just close communication with -- with Navistar and the customer as needed.

Q Okay. Now, what would generally be some of the responsibilities on Navistar under a co-op agreement?

MR. MURPHY: Object to form. Foundation.

A Don't -- don't recall those -- those exact co-op contracts and where the -- where the

Page 67

responsibilities are spelled out.

Q Well, in general. I mean, you've --

A Yeah.

Q -- you've handled numerous co-op contracts; correct? So what are the general things that fall on Navistar? Delivery is one of them. Is that fair?

MR. MURPHY: Object to form. Compound question. Foundation.

MR. DAVIS: Go ahead.

THE WITNESS: I'd say build the trucks -- deliver the trucks using their company to the desired locations.

BY MR. DAVIS:

Q Okay. Anything else?

A Certain -- finalize approving the -- the pricing, which would have happened before.

Q Okay. Anything else?

A Those are the -- the big things.

Q Those are the main things? Okay. All right. I'm going to go over just a little bit more -- some other terminology. So we talked about SPA. What is OA in the context of --

A OA -- over allowance.

Q Okay. And what does that mean?

A It could be monies applied to a used truck

Page 68

baseline valuation.

Q Explain that a little bit.

A So if an appraiser says a truck's worth 40 grand, OA could be applied to make the value of that 40 -- if it was 6,000, 46,000.

Q Okay. Well, why would you do that? What would be the situation in which you would add to the appraisal? Explain that a little bit more.

A A customer feels strongly that his truck's worth 46 and not 40, and you're, you know, working to make a truck deal.

Q Okay. I see. So you're trying to do a new deal and part of it has to do with buying back old trucks?

They might -- there might be a disagreement as to the value, so OA would generally then be something that would lower your margin on a deal if you're having to add value to what you -- I'm sorry.

In the example you gave, you think the truck's worth 40, but you're going to give the customer 46, so that's going to negatively impact your margin; correct?

A Yes. It could.

Q So is OA something that's one of the factors that's built into the SPA?

Page 69

A It can be.

Q Okay. All right. What is OTB? That's optional trade back; correct?

A Yes.

Q Okay. And obviously if you have an OTB agreement in place, that also is something that factors into the SPA; correct?

A It could. Not necessarily.

Q All right. Well, you say it could. Explain how it could affect the SPA.

A It could, in the same way that I described, where there's a stated value provided to the customer through the OTB contract.

And at time of turn in, if the vehicle is less in value than that stated contract, it could create additional monies required that would be part of the -- of their SPA.

Q So you're saying if the OTB agreement said that the buyback price is X, and the vehicle comes back and you think it's worth less than X, but you still have to pay them X for it. And that's -- is that what you're saying?

A They could make that decision and it could be part of the concession.

Q Okay. What about DTU? What does that stand

18 (Pages 66 - 69)

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

Page 70

for?

A  Delivered to user.

Q  Okay. And what does that refer to then?

A  That's a -- my understanding is that's a metric that Navistar uses to track sales. You know, when it's delivered to user, that generally means the truck is paid for and it counts as a -- as a -- a sale for a -- for a dealer or maybe for other --

MR. DAVIS: Okay. All right. Can we take a short break?

THE OFFICER: All right. Off the record, at 10:40 a.m.

(Off the record.)

THE OFFICER: We're back on the record at 10:51 a.m.

BY MR. DAVIS:

Q  All right. Mr. Fink, I wanted to go back to some of the -- I guess I'd say for lack of a better word, the changes that occurred during the -- when the pandemic started, you had said one of the issues was that there was more -- in your view, there was more demand than there was supply of new vehicles. Is that accurate? I recounted your testimony accurately there?

A  In certain times. If -- over the last

Page 71

years, yes, that's been the case.

Q  And it's fair to say that you believed that Navistar actually was over -- let's see -- they were exaggerating their production numbers suggesting that they could produce more vehicles than they truthfully could. Is that fair?

A  I don't -- say that again.

Q  Yeah.

A  Say that one more time.

Q  Was it your belief that Navistar greatly exaggerated the amount of new vehicles it could produce, and you believe that it -- well, let's rephrase it. Let me just do it this way. I'm just going to show --

MR. DAVIS: I'll show him the document.

THE WITNESS: Okay.

MR. DAVIS: Yeah. All right.

MR. MURPHY: Thanks Tom.

BY MR. DAVIS:

Q  And I'm going to direct you to the second email in the chain from you to Sean Carmichael dated February 10, 2021. Do you see that?

A  Got it. Yep. Okay. Wait. So the one -- oh right in the middle here? That?

Q  Correct.

Page 72

A  Okay.

Q  On number one, you see that? All right. You say -- you said to Carmichael February 10, 2021, "I believe Navistar is greatly exaggerating the production for 2021. And we cannot make irresponsible use truck decisions as a result of Navistar exaggerations on production." You see that; correct?

A  Yeah.

Q  Okay. And that was your belief as of February 10, 2021?

A  Okay.

Q  Correct?

A  Looks like it.

Q  Okay. And I want to ask what was -- well, explain that. Why did you feel that way?

A  I'm just going to read this from -- oh, the rest is over here.

Q  Okay. So my question was that you believe that Navistar is greatly exaggerating the production for 2021. And I'm asking why did you have that belief?

A  I can only surmise from this that it was because they were asking for the production and for us to put values on used trucks that were over a year out, which we generally would not do.

Page 73

And the reason for that is it appears was that -- that they -- they had -- they -- they were full, or they had a lot of production through that time period.

Q  Okay. Well my question was what was the basis of your belief that Navistar was greatly exaggerating their production?

MR. MURPHY: Object to form. Asked and answered.

A  I don't know.

Q  So as you sit here today, do you remember -- you're saying you can't remember a situation where Navistar produced less trucks than had been promised to Summit or to Summit's customers?

MR. MURPHY: Object to form. Vague and ambiguous.

A  You're asking if they -- ask -- ask that please, again?

Q  I'm asking do you recall -- you say -- so you're not disputing that you wrote this; right?

A  Oh, no.

Q  Okay. But you don't recall -- you don't remember why you thought that?

MR. MURPHY: Object to form. Asked and answered.

19 (Pages 70 - 73)

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

Page 74

A   I don't recall why I thought they were exaggerating their production at that time.

Q   Okay. And now I'm asking in more general terms. Do you ever remember specifically situations where you believe Navistar promised vehicles to you or to your customers and it didn't deliver?

A   There were certain -- there were things that came up there where that could happen.

Q   Okay. Well, what were some of those things?

A   Could be a supplier issue -- just in general -- plant, you know, shut down for various reasons.

Q   And these are all things that were foreseeable in that timeframe as far as you were concerned; right?

MR. MURPHY:  Object to form.

MR. DAVIS:  You can answer.

THE WITNESS:  I don't -- I don't remember.

BY MR. DAVIS:

Q   Okay. All right. Let's talk -- before we come to this, we're going to go through a lot of the documents on the negotiations, but do you recall generally when the negotiations -- the process started in 2021 for a new deal with Central?

Page 75

A   Looks like from here it's February of 2021.

Q   Okay. Well, what do you remember independently of just looking at this document?

A   Oh.

Q   How does the process start from your recollection?

A   Well, we -- we had sold Central a lot of trucks over the years. We were always in regular discussions with them.

We had, you know, contracts -- OTBs where used trucks were scheduled to come out. So we were always planning to sell them new trucks to replace those used trucks. Conversations were usually always ongoing, regular.

Q   All right. So you don't remember specifically how the negotiations in 2021 started then?

A   I don't recall how they started -- what starting point.

Q   Okay. Let's go with --

THE OFFICER:  Just for clarity purposes, you wanted to submit Exhibit 2?

MR. DAVIS:  What do you mean?

THE WITNESS:  You -- I didn't -- you didn't say --

Page 76

MR. DAVIS:  I marked it as Exhibit 2 and handed it to him. That was the document marked -- the one we were just reading from on greatly exaggerating the production is Exhibit 2.

(Exhibit 2 was marked for identification.)

BY MR. DAVIS:

Q   And you have that in front of you; correct?

A   Yes.

Q   All right. Just want to make sure.

Q   All right. I am going to hand you Exhibit 3.

(Exhibit 3 was marked for identification.)

A   Thank you.

Q   And I'm going to direct you to the February 4th email.

A   Okay.

Q   All right. So what I'd handed you is Exhibit 3. Just for the record, it is a email chain. The top email in the chain is Tuesday, February 16, 2021, that you have sent to Kerri Podewell. Who is Kerri Podewell, by the way?

A   I believe at the time she was a manager in their CSA -- their Central Sales Administration group.

Page 77

Q   Central Sales Administration?

A   Yeah.

Q   All right. And then you had forwarded to her an email that you wrote to Sean Carmichael February 4, 2021; correct?

A   Looks like it.

Q   Okay. And then if you go to the next page, you see that there is a request for an invitation by Central to participate in negotiations for the 2021 tractors; correct?

A   It's in the body of --

Q   -- to the next page?

A   Yeah.

Q   Halfway down. "Dear valued partner, congratulations."

A   Oh, okay.

Q   All right.

A   It doesn't have a date on here, but this is part of the email chain?

Q   This part of the email chain. Yeah.

A   Okay -- okay.

Q   All right. So does -- looking at this, does this now refresh your recollection as to the beginnings of the 2021 negotiation process?

A   Yes.

20 (Pages 74 - 77)

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 78

Q   Okay. All right. So I want to walk through this a little bit. So you are sending this to Sean. You're saying, "Here's what we're thinking in response to the Central PAM Universal RFP, which is below. It feels there's a ton to do on this deal." So you see that; right?

A   Yeah.

Q   Okay. So I just wanted to draw your attention to a few points. So first of all, you're submitting this to Carmichael; correct? So you're the one that's coming up with the initial proposal?

A   Key deal points to -- yes. To Sean. Yeah.

Q   Now, when you say here, "We have a total blended and fully loaded SPA of 64.15 percent." Do you see that?

A   Yes.

Q   Okay. So if you flip to -- you see there's attachments to this as well, and I just want you to look at that and see if you are able to -- here's one example. If you turn to the second page, a big Excel spreadsheet that folds out here?

A   Yeah.

Q   "Central blended day cabs." You see that at the top?

A   Yeah.

Page 79

Q   All right. So this is one example, I think, of a SPA worksheet; correct?

A   This -- yes. This looks like one that was developed by the dealer -- by us at Summit.

Q   Right. So that's why I want to walk through then. So you see here they have new truck price, and it says, "$109,700." You see that?

A   Mm-hmm.

Q   And then after that it says, "SPA 1421PP." Do you know what that refers to there?

A   Oh, price pages. That's the price book. They update their price book throughout the year, so you have to reference -- this is a salesman that put this together, but you reference the price pages that are -- you're working up your proposal on.

Q   And are the price pages -- is that what you referred to before as the published Navistar information as to the sticker price essentially of the trucks?

A   Yes. It's related -- related to that.

Q   Okay. But the price point is a Navistar figure?

A   The price pages are Navistar.

Q   Sorry. Price pages, I apologize.

A   Navistar information that the dealers use.

Page 80

Q   Okay. So when it says -- when it has the 109,700, that is the price point number?

A   That is an estimate that we prepared for discussion purposes on the dealer side.

Q   Okay. And then how -- does that mean where it says 50 SPA, that means that that would be discounted by 50 percent? Or what does that refer to?

A   That would refer to the base level concession -- base level SPA.

Q   Well, and that's what I'm getting at. So if the price there is 109,700, does that mean that after the 50 -- the SPA of 50 is applied, it'd be half of that price -- half of that 109,700?

A   No.

Q   Okay. Well, then explain what that means then.

A   So the -- approximately the list price might be 215,000 or something. And -- and then the concession is applied at 50 percent, and it would arrive at the -- you know, approximate 109.

Q   I see. So actually that 109 -- the list price is actually, like, 220?

A   Could be. Some.

Q   All right. But 5050 SPA is approximately a 50 percent reduction from the sticker price. Is that

Page 81

right?

A   I believe so.

Q   Okay. Then look at the next thing -- it says, "Co-op fee to dealer." You see that? And then it says, "750."

A   Mm-hmm.

Q   Okay. And co-op fee to dealer -- what does that refer to? You get paid for every vehicle in a co-op deal, or at least this one?

A   Correct. There's a set amount of margin that the dealer makes. It looks like that would be the -- the amount that's outlined in the co-op contract.

Q   So that co-op fee to dealer -- that is the only margin that the dealer's going to make on that deal is the 750?

A   That's the only margin that the dealer is allocated to make on a per truck basis.

Q   All right.

A   For the transaction.

Q   Okay. And now it says the SPA has a 0.40?

A   Yeah. So if you look over there on the right, one point of SPA equates to $1,883. And so that 0.4 is representing $750 of monies that are being provided. So 750 of 1883 I think is 0.4.

21 (Pages 78 - 81)

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

Page 82

Q   Right.  So you're saying that the 0.4 SPA is reflecting that -- you've said that higher SPA means lower margin for the dealer; right?  I'm sorry.  Lower margin for Navistar; correct?

A   I think.  I'm not in their system, but I think so, yes.  In general.  Yeah.

Q   Well, I understand.  But if they're paying you $750 per vehicle, that's $750 less they're making on the same transaction; right?

A   Yes.

Q   So that's added into the SPA?

A   That's how we're looking at it, yes.

Q   Okay.  And then the next one says, "Engine warranty credit, 48,400."  And then that says, "$3,300."  What does that refer to?

A   That should be the cost of the warranty for us to apply that to the deal for the customer.  So $3,300 to buy the warranty on a per truck basis represents 1.75 of additional concessions that we're requiring to be able to have the warranties and offer the warranties to the customer.

Q   I see.  And so the warranty -- basically, that's the cost to Navistar to offer that warranty to this customer?

A   Yes.

Page 83

Q   And it's -- I mean, it must be an optional warranty.  That's why it's being added to this.  You don't have to give that warranty?

A   That's correct.

Q   Okay.  So that again, would then lower the profitability to Navistar because it's paying out $3,300 in warranty it didn't have to; right?

A   That's correct.

Q   Okay.  And then it says then, "Trade OA."  And then it says, "29,817."  What does that refer to?

A   That I believe is a forecast of monies required to achieve the customer's desired trade-in value.

Q   Okay.  And so you were involved in this one.  Why was -- well, you would agree that the OA -- that was 29,000 per vehicle?

A   Correct.

Q   29,817?

A   Correct.

Q   Okay.  And so do you believe that the OA was going to be significant on each one of these vehicles?

A   It looks like we believed it at that time whenever this was developed.

Q   Okay.  And how did you arrive at that figure, if you remember?

Page 84

A   We had a used truck department that would give us a base level appraisal of the vehicles and then we would do a comparison to the contracted values that the customer would be expected -- expecting.  And that would likely be the -- the difference.

Q   Okay.  And just so I'm clear -- so under the optional, there was an optional trade back agreement for the 2018 tractor at issue here; correct?

A   I believe so.

Q   Okay.  And by optional trade back that means Navistar -- I'm sorry -- that means Central doesn't have to give them back to you.  But is that their option; right?

A   That's correct.

Q   And the way the OTB agreements generally work is that Central -- in order to get the OTB value, they have to basically trade it in while purchasing a new truck; right?

A   Correct.

Q   Okay.  So does that OA reflect Summit's belief that Navi -- or that Summit -- or that Central is going to be trading in the old trucks in order to get the new trucks and that's how much that's going to cost Navistar in your estimation?  Is that right?

A   Looks like an estimate of just that.

Page 85

Q   And so that OA -- over allowance -- you said that is your estimate of how much -- you're saying essentially that the actual value of the tractors that are going to be traded in is $29,817 less than what Navistar would be required to pay under the OTB agreement; right?  Is that how you're getting to that figure?

A   I'm sorry.  Say that one -- one more time please.

Q   Yeah.  Sure.  So just use an example -- if the OT -- let's just say it was $50,000 for each truck, was -- there was an OTB agreement that says if Central trades in the vehicle and they buy a new vehicle, Navistar is going to give them $50,000 in trade back value.

A   That --

Q   That number that you've estimated there -- that 29,000 would reflect essentially that you think those used trucks are actually only worth 21,000, but we have to pay them 50 under this whole contract?  Is that how you're getting to that number?

A   Yes.

Q   Okay.  And looking back at page 1 here where you say, "Customer trade values are positioned as what we believe Central has contracts, trade back residuals

22 (Pages 82 - 85)

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 86

for the international -- the internationals;" right? Is that referring to what we just discussed -- look at this.

General key point. Second bullet. I'm sorry. Third bullet.

A   Oh, I see.

Q   The third white bullet. It says customer trade value is our position as what we believe Central has contracts, trade back residuals. Is that what you're talking about? Is that what we were just discussing?

A   Yes.

Q   That the value of the trade backs in your estimation is significantly lower than the OTB value?

A   No.

Q   No? Okay. Well, then why is that referred to?

A   It's -- it's referring to -- this sentence is referring to that the trade values we are reporting are what Central is expecting because they have contracts that say that they're owed those residual values and they have competitors that are giving the same.

Q   Okay. All right. So keep this one. I'm going to come back to it, because I want to go in

Page 87

sequence. So we're going to talk about the email you sent to Kerri in a moment, but I want to give you a different document first.

Q   What was your understanding of when Central was going to want these new trucks?

MR. MURPHY: Object to form. Vague and ambiguous.

A   I don't remember when they wanted them at this time.

Q   All right. Let's see here.

A   Well, it says they wanted them from the -- well, we were presenting them second half of 2021, to middle of 2022.

Q   Okay. Yeah. All going to come back in sequence. Yeah. All right. So I'm going to hand you Exhibit 4.

(Exhibit 4 was marked for identification.)

And what Exhibit 4 is -- you see it is a email chain. Again, the top is from Sean Carmichael to you and Joe Robichaud. You see that; correct?

A   Mm-hmm.

Q   And Mr. Robichaud was your director of used trucks at that time?

A   Yes.

Page 88

Q   Summit's director of used trucks, I mean?

A   Yes.

Q   Okay. And then the next email in the chain is from Joe to Carmichael and you; correct?

A   Yes.

Q   Okay. And then the third one down there is from Carmichael to Fink and Robichaud. That's you and Mr. Robichaud; right?

A   Mm-hmm.

Q   All right. So I want you to just take a look at this and familiarize yourself with it. And I have some questions.

A   Okay. Thank you.

MR. MURPHY: Just off the record real quick.

(Off the record.)

THE OFFICER: Back on the record. 11:17 a.m.

MR. DAVIS: All right. Thank you.

THE WITNESS: Okay.

BY MR. DAVIS:

Q   Okay. So I just want to walk through your understanding of the second email. Now, this was obviously about six days after you had sent your proposal to Navistar; correct?

Page 89

A   Looks to be, yeah. The 10th.

Q   Yeah. And so this is Mr. Carmichael, and it's in response to -- well this relates to the same deal -- the deal that you're working on to propose to Central; correct?

A   Yes. Looks like it.

Q   Okay. So first they ask you -- I'd just like you to interpret what he's asking for here. So he ask says, "Hey, can you guys put your June 2022, values on the list below?"

And then he says, "On OTB values, if we push out build -- if we push out to build in November of 2021, can we use the rollout to deduct down a base 62k OTB in June of 2021?" What is he referring to there?

MR. MURPHY: Object to form. Foundation.

BY MR. DAVIS:

Q   What did you understand him to be saying there?

A   It looks point -- point number two --

Q   Yes.

A   -- it looks like the out service date of the used trucks that are on that OTB are in the middle of the year. And he's talking about in those contracts, if it's not turned in on time, there's a rollout of

23 (Pages 86 - 89)

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 90

some amount of money that's usually applied to the base value.

Then the rest of it looks like it's getting our opinion of these various groups of trucks use truck values at different mileage buckets and quantities.

Q   Okay.  So just to clarify on that point two then, so you're saying that the OTB contracts basically say you have to turn the truck by, you know, this month and year, and if you trade in after that, there's a lowering of the actual residual?

A   Yes.  That's right.

Q   Okay.  So your understanding of this is Carmichael is saying, "Look, if we don't build the trucks until November of 2021, or later, that means we have to pay less on the residual values;" correct?

A   It looks like -- yeah.  I was saying 750 rollout per month that would deduct off of the 62,000.

Q   Right.  And it was your understanding generally that in order to -- I mean the way it works is you have to trade in the old truck and get a new truck in return; correct?

A   Yes.

Q   Okay.  So they -- basically Carmichael here in your -- how you interpreted this is he's saying,

Page 91

"Look, if we delay building the trucks, then we don't have to pay Central as much;" correct?

MR. MURPHY:  Object to form.

MR. DAVIS:  You can answer.

MR. MURPHY:  Mischaracterizes his testimony.

THE WITNESS:  I don't know if that's what he's --

BY MR. DAVIS:

Q   I'm asking, that's how you interpreted it though; correct?

MR. MURPHY:  Same objection.

A   I'm not sure why he's asking that at this time.  I -- I don't -- I don't know.

BY MR. DAVIS:

Q   Okay.  Let's put it this way.  Given your knowledge of how this this works, it is accurate to say that if they delayed producing new trucks, they would have to pay less money to Central on the trade backs; correct?

A   They can -- they can reserve the right to pay something different if they so choose or to waive the deduct.  But the -- in general, the contract is -- is date specific to when the vehicle's inserviced.

And so four years from the inservice date,

Page 92

generally that vehicle needs to come out.  If it doesn't, it's going to be charged on a per month basis is what the contract says.

Q   Right.  And so that's my point.  So you would agree then that it's consistent with what Sean Carmichael is saying -- is that if we wait to build the trucks later to -- if we delay building the trucks, we will have to pay Central less on the OTBs; correct?

A   I think that's what this is implying.

Q   Okay.  And then Joe asked -- and you were copied on this.  So Joe asked, "Just to clarify, you were wanting Summit's June 2021, value, not 2022?"  You see that; correct?

A   Yes.

Q   Okay.  And just -- what's your interpretation of that then, as a recipient of this email?

A   My interpretation is he's wondering why the header says 2022 and not 2021.

Q   Okay.  And then -- and why would you -- I mean, do you have the same confusion that Joe Robichaud seemed to be suggesting here?

A   Well, based on -- it is February of 2021 -- February 10th of '21, we would at -- we would

Page 93

not generally put trade values out a year -- a year in advance.

Q   Right.  Because?

A   There's no hard and fast rule, but that is long time.  So he's wondering why does he mean '21, because that's four months from now -- from then versus a year and a half or whatever it was.

Q   Right.  And then Carmichael clarifies that he's actually asking for June 2022, values; correct?

A   It looks like it.

Q   Okay.  And he says, "As we will not build any of these this year."  You see that; right?

A   Yes.

Q   Okay.  So he's asking you for the values, assuming that they do not produce replacement trucks until June of 2022, that's what that means; correct?

A   It looks like it, yes.

Q   Okay.  So now I'm going to go back to Exhibit 2.  All right.  So go back to Exhibit 2.  So we've already looked at number two.  We looked at it out of sequence, but now let's look at it in sequence.  Okay?

So this is your response then; correct?  Looking at the second email that chain you say on number one, "It's not responsible to put values on

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 94

used trucks into June 2022, when a major market correction could occur." You see that?

A   Yes.

Q   Okay. And so this is in -- so why don't you -- you wrote this, so why don't you tell me what you -- why you wrote that -- what you meant by that?

A   Looks like I'm responding or reacting to the question or the request of us to put used truck values out a year or more, which we wouldn't do.

Q   Okay. Well --

A   And --

Q   -- go ahead. I'm sorry. No. I apologize. Continue.

A   And it appears that questioning if other manufacturers can build trucks in the next, you know, three, four month timeframe, why Navistar can't.

Q   All right. Well, let's break this down. So it's not responsible to put used values on used trucks when a major market correction could occur. Tell me about that part of it. A major market correction could occur? Is that something that you believed was foreseeable at the time?

A   I -- nobody can know when, but just over 20 years of being around this -- used truck corrections do occur.

Page 95

Q   Okay. Do you remember what the market was like in 2021, at this time, for used trucks?

A   I -- I don't.

Q   Okay. All right. And then the next sentence is where you say, "Again, I believe Navistar is greatly exaggerating their production for 2021." You see that?

A   Yes.

Q   And, "We cannot make irresponsible used truck decisions as a result of Navistar exaggerations on production." Okay. Correct? So now having looked at this in sequence, does that reflect your recollection as to why you believe Navistar was greatly exaggerating the production in 2021?

A   The period at this time during February of 2021 -- that I'm questioning whether their production or order board is -- is full.

Q   Did you have reason -- oh, go ahead. No. Please.

A   No. I'm -- I'm done.

Q   Well, would Sean Carmichael suggesting that they're not going to build any of these trucks until June of 2022, suggest that the order board was already filled for at least through June of 2022?

MR. MURPHY: Object to form.

Page 96

Foundation.

MR. DAVIS: Go ahead.

THE WITNESS: I'm not sure. I don't know.

BY MR. DAVIS:

Q   Well, what does it -- having looked at this now and refreshing your conversation, what does it reflect to you that Carmichael is telling you in February of 2021, that they weren't going to produce any trucks under a Central deal until June 2022?

A   It looks like I'm wondering if there are other orders in -- in that timeframe or what the reason would be of -- it appears that they're -- they're saying production is full until that timeframe and I'm questioning that.

Q   Okay. All right. And is that what the reference to exaggeration means -- is that they're suggesting that they won't build trucks until June 2022, when they're trying to make a deal in 2021?

A   I think what I'm saying here is the exaggeration part is they're saying they have a lot of production that's ahead or that's covering this time period until November, and I'm questioning without the information, is that accurate?

Q   Okay. So I think that -- so then we're on

Page 97

the same page. You are suggesting if we're making a deal for November 2021, and Carmichael's saying that we're not going to build trucks till 2022, that suggests that they're exaggerating their ability to produce in 2021; correct?

A   Not necessarily. I -- I think what I am suggesting in this note is they're saying they have production to -- during the time periods that we're requesting trucks to be built. And I'm questioning if they're -- that production is as prevalent as they're -- they're telling us.

Q   Okay. Well let's go to number two then. You say on number two, "There is no good reason that the trucks can't be built in July 2021, and thereafter, so to stay on the 612 2018 MY [ph] OTB turnout schedule." Do you see that?

A   I do.

Q   Okay. And so just clarify what you mean by that.

A   There's -- looks to be some speculation on my part in there. I'm -- I'm not working for Navistar so I'm suggesting there's no good reason, but I don't -- I don't know that. I'm -- I'm challenging the -- that we could build the truck sooner. From my opinion, it looks like.

25 (Pages 94 - 97)

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 98

Q   Right.  Well it's not just that, it's that are -- is it fair to say that you're questioning the suggestion that you delay producing trucks beyond -- well, let's back up.

Is it fair to say that what you're questioning is Sean's proposal that we delay producing trucks beyond July 2021, in order to get that discount off of the trade-in values when there's no good reason for that?  Is that a fair interpretation?

MR. MURPHY:  Object to form.

MR. DAVIS:  Go ahead.

THE WITNESS:  After, you know, reading paragraph two, it appears that's what I am challenging.

BY MR. DAVIS:

Q   Okay.  And as you sit here now, do you know what was the basis of your statement that there was no good reason that the trucks can't be built in July 2021?

A   I don't know.

Q   Okay.  So you may have known something.  You just don't recall is what you're saying?

A   Possibly.  I don't know.

Q   Well, let's -- let's just -- let's just walk through how you would.  You said you don't have access

Page 99

to their system, but you certainly would know whether other trucks that you've ordered are being -- are coming in on time; correct?  You would've known that?

A   I would've known that.

Q   What are then -- is that one way that you might have been able to determine whether they were having -- whether they were exaggerating their production capability at that time?

A   There would've been lots of data points that I would've had -- just relationships with other dealers or dealer council or other customers at Summit.  There would've been several data points that I would've made that comment.

Q   Okay.  And if you wanted to -- I understand you're saying you don't recall now, but if you wanted to recreate that, what would those data points be?  What would you want to look to in that timeframe to be able to, you know, either support or refute your connection there?

A   Oh, it would've been, you know, other customers that -- similar type trucks that we as a dealer group may have ordered and seen when they were built -- where they're going to be built rather.

You know, there are, you know, production reports that we -- that we would see from time to

Page 100

time.  It would be -- it would be something -- it -- some -- a combination of different data points.

Q   I see.  So basically you would know what was happening to other similar customers and whether they were getting trucks on time or not?

A   Potentially.  It would've been more of that orders were placed for -- for other customers and you could see where they were scheduled to build.  But things changed.  I mean, things were changing a lot in that -- in this time period.

Q   All right.  Looking at the very last paragraph in your sentence there -- I am sorry.  Last sentence in your paragraph where it says, "Summit has proposed."

So it says, "Summit has proposed to take the 750 other trades, and I believe we are higher than UTO investment values on these.  We need Navistar to honor their commitment on the 703 from Central and 28 and 13 from PAM."  Do you see that?

A   Yes.

Q   Okay.  So can you just -- a lot of jargon on that.  So could you break that down for me -- what you're saying here?

A   Think what this is saying is that Summit, the dealer group, would take the other brands of

Page 101

trucks such as the Peterbilts, the inter -- the -- not the internationals -- the freight liners, and the Peterbilts.  And we would want Navistar to take the international branded trade-ins.

Q   And those being -- when you say higher than the UTO investment values, what is that referring to?

A   The Navistar used truck organization would give us an appraisal on -- on -- as part of our process -- deal process, they would give us an appraisal on all the trucks.  And we would evaluate those appraisals and determine where our Summit opinions might be.

Q   And is this suggesting that you think on the other trades -- the other non-international vehicles -- that the value to Summit would've been higher than what the UTO investment value was?  Is that what that's saying?

A   It looks like that.  Yes.

Q   And is that a reflection of maybe where the used truck market was at that time?

A   I think it might -- it -- don't -- not necessarily.  It's -- it could be that we were -- you know, had more contacts in the secondary market to sell Peterbilts or freight liners than we did international at that time.

26 (Pages 98 - 101)