**EXHIBIT C**

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GLS LEASCO, INC. And          )
CENTRAL TRANSPORT LLC,        )
                              )
            PLAINTIFFS,       )
                              )
VS.                           ) CASE NO. 23-cv-12927
                              )
NAVISTAR, INC,                )
                              )
            DEFENDANT.        )

------------------------------------

ORAL DEPOSITION OF

JIMMY DEAN LOLLIS

AUGUST 6, 2024

------------------------------------

ORAL DEPOSITION OF JIMMY DEAN LOLLIS, produced as a witness at the instance of the PLAINTIFF, and duly sworn, was taken in the above-styled and numbered cause on the 6th of August, 2024, from 9:01 a.m. to 4:52 p.m., before Jennifer Norman, CCR in and for the State of Arkansas, reported by machine shorthand, at the 1130 East Millap, Fayetteville, Arkansas 72703, pursuant to the Federal Rules of Civil Procedure.

**Page 42**

A. -- if I remember correctly.

Q. All right. Why don't you turn to the next page, the first page. And so this is another email. This is from you to Kyle, and it's dated January 15, 2021; correct?

A. January 15th?

Q. January 15, 2021.

A. Okay.

Q. All right. And so I'm going to ask you to look at that second paragraph, the third sentence. It says: Navistar notified dealers today that the current production build dates are now in August 2021.

            Do you see that?

A. I see it.

Q. All right. How would those notifications be made?

A. Usually Navistar would send out some sort of a communication letter talking about production. Back then, production was getting pushed out pretty far. Normally a normal order, if you were just in a normal situation let's say four years previous to this or three years previous to that, we could order trucks and literally build them within a few months. So as the issues were getting -- it was getting tight with production and they were starting to send us more notifications how far pushed out we were.

**Page 43**

Q. Okay. And what were they saying were the reasons behind the production being pushed out?

A. I don't remember specific reasons on the emails. Just a guess and what we had understood was the parts availability.

Q. Okay. Is that something Navistar communicated to you in that time frame, that parts availability was an issue?

A. We did get emails or notifications through the dealer portal on occasion about certain parts that were not available and would have to make substitutions. I know that. So...

Q. All right.

A. I'm not saying we had it during this time frame, but, yes, there have been communications like that.

Q. Okay. So these notifications, you would always be receiving these notifications in your role; correct?

A. We would, yes.

Q. Okay. Well, when you say "we," you specifically would receive the notifications?

A. It would be a national communication with everyone.

Q. Okay.

A. You get an email in the morning saying you have a new communication, go in and click on it and you would

**Page 44**

read it.

Q. All right. So it's fair then that even as of January 15, 2021, Navistar was already telling you that it was foreseeing that truck orders would be pushed out many more months than was normal for them; correct?

A. Evidently with this email, yeah.

Q. Okay. Turn to the -- two lines down from that, you say: With the 2018 RH turn-ins starting in August, new truck production and deliveries are starting to get out of sync with your first group of trades.

            Do you see that?

A. Yes.

Q. All right. Do you remember what that had to do with?

A. Well, I see the chart over here that I provided. That would be the turn-in chart for the 2018s based on the optional trade-back agreement. And that's -- again, I'm assuming based on this email what I'm seeing. I'm sure this was my chart because I keep up with this stuff.

            To expand on that, when Central Transport receives trucks, let's say they have a truck, they get their work done on it to get it into service, they

**Page 45**

notify me that this truck went into service on August 12th of 2017, and so I would go into the system and we would do what we call DTU. I don't know what DTU stands for, but it's basically telling the Navistar commuter system the truck is in service; start the warranty on that date.

            So we would look at a turn-in date in four years on that truck. So I kept a schedule of that knowing that we would need to have trucks built at a certain time to keep Central Transport in a situation where they could rotate their trucks accordingly.

Q. All right. And that was well understood that Central needed to get a new truck in order to rotate out the old truck; is that right?

            MR. MURPHY: Object to the form.

A. It was understood that they would have trucks coming out at that time.

Q. Okay. And that's with the optional trade-back agreement. Explain that to me just in your own words how that worked, then.

A. Central or any customer -- but yeah, Central would set up a -- ask for a four-year optional trade-back agreement. So it's four-year, 400,000 mile. Navistar would give them a purchase price of that truck based on them purchasing an equal new truck at that time.



**Page 46**

Q. All right. So that purchase price, that was known as the residual value?

A. You could call it that.

Q. Okay. And that residual would only be provided -- well, the residual would be a discount off of the new truck, then?

A. No.

Q. Okay.

A. It would be a -- so you didn't discount the new truck like a trade-in like you would call on a car. Central would pay the full price for the new truck; and then as soon as they had the truck -- the used truck ready to turn in, then it would be turned in, and then Navistar would pay Central for the truck.

And, actually, the way it worked, the dealer -- it had to go through the dealer. So the dealer would write the check, and then Navistar would pay us for the truck.

Q. I see. And just to clarify, though, as you said, under the agreements, the OTB agreements, if Central did not purchase a new truck, it would not get that residual payment?

A. Correct.

Q. Okay. Okay. So do you recall this -- you state here that the new truck with -- you say: New truck

**Page 47**

production deliveries are starting to get out of sync with your first group of trades.

Do you recall that situation?

A. Based on the email that you provided me, that would make sense that if we don't look at purchasing or putting an order together pretty soon, then we would not be able to replace the trucks on the same schedule as they were supposed to -- should be coming out of service.

Q. All right. And that is because of the fact that Navistar was telling you that its production was already pushed out until August; right?

MR. MURPHY: Object to form and foundation.

A. That sounds correct, yes.

Q. Okay. And that wasn't the normal situation? Normally it wouldn't be -- production wouldn't be pushed out this far, a year past --

A. Well, this letter -- this email is dated January. And now we're saying we're eight months out. So that was -- that would be an unusual situation based on historic production dates.

Q. All right. All right. So I wanted to follow up on one other thing on this dealer notification issue. I'm going to hand you --

**Page 48**

THE COURT REPORTER: It's 30.

MR. DAVIS: Thirty? All right.

(Exhibit 30 marked for identification.)

Q. I'm going to hand you Exhibit 30. And I'm just going to be directing you to the first email here and the first paragraph here.

A. Just the first email?

Q. Yeah, just the first email.

A. Okay.

Q. All right. So you see there's a sentence that says "Navistar announced today," and the date of this email is July 13, 2021; correct?

A. Yes.

Q. Okay. This says: Navistar announced today to all the dealers that 2022 calendar production is full and they said they are shutting their main Class 8 plant in Escobedo, Mexico, in two weeks to try to get caught up on supply chain issues.

Do you see that?

A. I see that.

Q. Do you recall that announcement?

A. I don't, not off the top of my head.

Q. Okay. Justin Fink would have also been in a position to receive these Navistar notifications?

A. Well, Justin was CEO. He would have actually seen

**Page 49**

a lot more in-depth communication than a salesperson would.

Q. All right.

A. So he may be on -- so, again, I'm not saying I didn't see this. I just don't remember this exact communication.

Q. All right. Well, whether or not you remember the specific notifications, do you recall there came a point in time in 2021 where you were told that the 2022 production calendar was already full?

A. I don't remember that specifically off the top of my head. I know that we were definitely in dire straits on getting production done.

Q. And that was true as of July 2021?

MR. MURPHY: Object to the form and foundation.

Q. Go ahead.

A. I guess. I don't know.

(Exhibit 31 marked for identification.)

Q. All right. All right. You can hand that to the court reporter. All right. Here is Exhibit 31. And I'm mostly going to be focusing on the first page here. All right?

A. Okay. I've kind of gone through this.

Q. Okay. All right. So this is from Justin Fink,

Page 50

but you're copied on it; correct?

A. Correct.

Q. All right. Do you recall -- having read this document, do you recall this time frame in the negotiation period?

A. I don't recall this specific document because there was multiple documents like this. I know that -- again, this is February of 2021. I know that there was multiple discussions going back and forth on how we could accommodate Central Transport with different types of pricing, different types of SPAs, different types of trade agreements to try to get the order completed.

And it was almost like brainstorming, going back and forth between the dealer and the -- and the OEM with Navistar. This actually may be one where -- it looks like this was sent out at 5:00. I know we sent one to him one night about 9:00 o'clock at night. We were sitting there doing conference calls, trying to figure out how we were going to make this work and trying to, you know -- dealer is always trying to negotiate a better price for the customer through the OEM.

Q. All right. So you said the dealer is trying to negotiate a better price for the customer?

Page 51

A. That's -- we -- yes. I always felt that way. I felt like we work for the customer almost like an attorney representing a customer to the OEM sometimes.

Q. Okay. Well, let me -- and I'm going to come back to this specific document.

But as we sit here today, can you think of -- during this whole process, can you think of any criticisms or complaints you had with the way Navistar handled itself in this process?

A. I don't really understand the question.

Q. Sure. Well, you said that you viewed yourself almost as representing the customer, the end customer, which would have been Central here; right?

A. I know what -- I know what the customer wants. We discuss that with them. We know where they need to be. We know what the original agreements were. So we try to make sure that we go back to them with a reasonable quote; but we have to get that from Navistar, and so we have to ask sometimes for specific discounts. "Hey, we need to be here. We need to be here."

And Navistar will come back, "Well, this is where we want to be." So -- and, obviously, at the end of the day, we have to present to the customer whatever Navistar tells us to present.

Page 52

Q. Okay. All right. So here is my question, then. So I guess you're -- well, let me ask you this.

What's your general familiarity with what this lawsuit has to do with? Let's put it that way. In your words.

A. The way I understand this, it has to do with the delivery timing of the deal that was supposed to hit in 2022.

Q. All right. And say a little bit more about that. What do you mean by that?

A. Well, the trucks were not delivered as the cover letter states.

Q. All right. All right. And so you were involved with -- either at Summit, Rush, or Allegiance, you were handling this account from the first agreement being signed all the way until the last truck under that agreement was delivered; right?

A. I was.

Q. And the last truck wasn't delivered until sometime in 2023; right?

A. Yes. There was one lone straggler. There was one truck that was totaled out as it was being transported to Central Transport, and we had a brand-new one built. So that was kind of the last straggler. It literally wasn't delivered until August of 2023. But

Page 53

I think the -- besides that one, I think the final production was delivered in June or July of 2023.

Q. Okay.

A. I think that's right. I've got all that documented, but I don't have it in front of me.

Q. And we'll get to that in a little bit later. So my question is just in general. So you were involved in the process from signing the first contract until the last truck was delivered.

I'm asking you in general: Do you have any complaints or criticisms about the way Navistar handled things during that time period?

MR. MURPHY: Object to form.

Q. You can answer.

A. I'm trying to think. I'm not sure exactly what you're asking me there.

Q. Okay. Well, do you think there's any problems with the way Navistar handled itself at any point in the process?

MR. MURPHY: Object to form.

A. The only thing I can think of, again, is the trucks were not delivered as originally communicated.

Q. Okay.

A. And I know there's emails, I'm sure -- and you'll probably have them. There's e-mails where I'm going



**Page 54**

back and forth with Navistar on that, plus I'm also going back and forth with the customer, explaining to them that we're not going to make deadline. And usually at least once or twice a week on average, I would give them a production update.

MR. EVERETT: Jim, just answer the question. We'll be here to close if we start with that.

THE WITNESS: Sorry about that.

Q. All right. So going back to Exhibit 31, then. If you look two-thirds of the way down the page, do you see a bullet point 2, 2018MY OTB? Do you see that paragraph?

A. On the first page?

Q. First page, yeah.

A. Number two?

Q. Yeah.

A. Yes.

Q. All right. So I just had a couple questions about this. So first, do you see the email, it says: If the production environment in August '21 through February '22 causes rollout, then the 62,000 should be reduced by the 750 per month in the signed OTB contract?

Do you see that?

**Page 55**

A. Yes.

Q. All right. Having read that, do you recall what that related to?

A. Are you asking if I recall this specific paragraph?

Q. I'm asking if you recall what is specific- -- what is being discussed there.

A. Let me read it one more time here.

Q. Sure.

A. So, obviously, the rollout has to do with if Navistar -- if Central Transport would keep the truck longer than the turn-in date, the anniversary date of the turn-in, the four-year anniversary date, then Navistar would charge 750 a month roll-out fee which would reduce the residual price of the truck.

So I'm not sure on this if they're saying that if Central isn't purchasing the trucks and then that creates rollout, then Navistar won't -- won't -- or will still charge the rollout. I'm sorry. They wouldn't credit Central or give Central a pass not to have rollout. I believe that's what that's saying.

Q. All right. And look at the second under bullet -- it's 2a there. It says: According to your spreadsheet, International customer trade values have been reduced by a total of 4,468,000. This will not

**Page 56**

work unless match OTB minus rollout.

Do you see that?

A. I see.

Q. All right. Do you remember there came a time where Navistar was suggesting they were not going to pay the agreed-on OTB values to Central?

A. I -- I don't remember the time, no.

Q. Well, whether you remember a specific time, do you remember that actually coming up where Navistar was suggesting they were not going to pay Central what they agreed to pay them?

MR. MURPHY: Object to the form and foundation.

Q. Go ahead.

A. Again, I don't remember specific negotiation terms. There was -- back in the early part of 2021, there was multiple back-and-forth with Navistar and how they wanted to handle the account. There may be emails that I can look at and reference, but I'm not familiar.

(Exhibit 32 marked for identification.)

MR. DAVIS: All right. This is going to be number 32.

THE WITNESS: 2018. This was what they were going to offer to turn in.

**Page 57**

MR. EVERETT: Yeah.

THE WITNESS: Okay.

Q. All right. Having reviewed this email dated February -- it's dated -- well, let's just state for the record the top one is from Justin Fink to Mark Belisle, Sean Carmichael, and you're blind copied on it; right?

A. Looks like it, yes.

Q. And that's Friday, February 12th, 2021?

A. Correct.

Q. All right. And then the next email on the chain is from you to Carmichael, copying Justin Fink. And it says: Sean, see the 2018 RH residual trade value appraisal; correct?

A. Right.

Q. And that's your email; right?

A. Yes.

Q. So now having reviewed this email, does that refresh your recollection as to whether there was a time period where Navistar was trying to not pay Central the promised amount on the OTB trade?

A. Yes. It looks like that they were not wanting to have -- they were not wanting to come up with the total amount of money. Different things can happen on that as far as where the UTO, or the used truck

**Page 58**

organization, which is what these appraisals are. And sometimes they would come up with what they would want to give, and then Navistar has to make up the difference as an overall balance, which would be part of the SPA.

Q. All right. And so looking at the top email there where Justin Fink is saying that -- well, you just chuckled. Why did you chuckle?

A. I just read: This is insane.

Q. Well, that's what I was going to ask you about. So you remember that?

A. It's -- I mean, obviously he wrote it. It sounds -- it sounds familiar sometimes going back and forth with some of these issues.

Q. All right. And when he says here that the existing OTB contract they have at $62,000 August times November times three months at 750 rollout equals $59,750 in November, so is Justin Fink there -- in your understanding, is he saying that they're owed 62,000 minus rollout for three months which should equal $59,750; correct?

MR. MURPHY: Object to the form and foundation.

Q. Go ahead.

A. I would say that's correct.

**Page 59**

Q. Okay. And Justin is saying what's insane is that the new contract is going to offer 53,000; right?

A. Yes.

Q. All right. And you said that it sounded familiar, the reference to Navistar's insanity; is that right?

A. No. It just sounds like language Justin would use.

Q. All right.

A. I'm not referencing directly to Navistar.

Q. All right.

A. That's his character.

Q. All right. All right.

MR. EVERETT: Are you through with 32?

MR. DAVIS: I'm going to be giving him -- yeah. Well, no. Actually, hold on to that. I just want to give the dates.

Q. That date on there, just for the record, that's Friday, the -- November -- I'm sorry, Friday, February 12th; correct?

A. Yes.

(Exhibit 33 marked for identification.)

Q. All right. So I'm going to give you Exhibit 33. And, for the record, what I've handed you is a February 16, 2021, email from Justin Fink to Kerri Podewell, and you're blind copied on it as well;

**Page 60**

correct?

A. Correct.

Q. All right. So I'm just going to direct you to the first email. So let me know when you've been able to take a look at that.

A. Okay.

Q. All right.

A. Okay.

Q. All right. So -- well, let me just ask you this: Did Justin blind copy you on emails quite frequently?

A. Me?

Q. Yeah.

A. Usually when I was involved in working through helping with numbers and things like that, he would -- he would blind copy me on that if he would send them to Kerri or even Sean or something like that because he wanted me to be -- obviously be involved and understand what the upper-level negotiations were looking like.

Q. Okay. So you know who Kerri Podewell is, then?

A. Excuse me?

Q. You know who Kerri Podewell is?

A. Kerri at the time was a lady that worked with Navistar. She was a -- I think they called them a CSA. Basically, she's the one that developed the

**Page 61**

discounts with Sean. So Sean would have to go to that part of Navistar and confirm all the discounts.

Q. All right. So I want to direct just your attention to the second sentence, the second line where he says: However, the Navistar insanity on Friday forced us to quote much lower on other OE trade trucks which will almost certainly jeopardize our deal.

Do you see that?

A. I see that.

Q. All right. What does that refer to?

MR. MURPHY: Object to the form and foundation.

Q. Go ahead.

A. Again, I would have to go back and reference what we actually sent them at that time because there was multiple quotes that went to Central. But I assume it has to do with the -- my guess is it would have to do with the trade values.

Q. Well, what does -- well, first of all, it's a Friday. The email that you saw previously was -- well, let me just ask you this way.

You're familiar with these concepts and terms; right, that are in these two emails?

A. Excuse me?