UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GLS LEASCO, INC. and
CENTRAL TRANSPORT, LLC,

      Plaintiffs,

v.

      NAVISTAR, INC.,

Defendant.

Case No. 23-cv-12927

Hon. Mark A. Goldsmith

Magistrate Judge Anthony P. Patti

**Plaintiffs' Trial Brief
on Factual Proof of Claims**

# TABLE OF CONTENT

BACKGROUND ...........................................................................................................1

    The Parties' Longstanding Business Relationship ............................................1

    In 2021, Defendant Seeks to Minimize or Eliminate Its OTB Liability .........1

    The Parties' April 2022 Agreement.................................................................2

ANTICIPATED FACTS REGARDING ELEMENTS OF CLAIMS......................4

I.      Defendant's Fraud Leading to the 2022 Agreement ......................................4

II.    Defendant Breached the April 2022 Agreement .............................................6

## BACKGROUND

**The Parties' Longstanding Business Relationship**

GLS Leasco, Inc. ("GLS") has purchased semi-truck tractors from Defendant Navistar, Inc. for approximately three decades. Central Transport, LLC ("Central"), GLS's corporate sister company, leases and operates those tractors in its less-than-truckload fleet. Central markets itself on fleet freshness, which drives customer confidence and driver recruitment.

Plaintiffs enjoyed substantial pricing concessions on Defendant's tractors, driven in part by volume but significantly by GLS's contractual resale rights on earlier purchases. In 2017, GLS bought 630 MY 2018 tractors from Defendant and executed an Optional Trade-Back Agreement ("OTB") giving GLS the right to sell them back to Defendant at approximately $62,000 per vehicle—nearly $30,000 above appraised value. The OTB right could only be exercised if GLS purchased new tractors from Defendant.

**In 2021, Defendant Seeks to Minimize or Eliminate Its OTB Liability**

In 2021, GLS initiated negotiations to replace its MY 2018 tractors. Internal documents show Defendant slow-walking discussions and telling its dealer-agents to delay building tractors past the contractual trade-in dates because the $62,000 buy-back amount decreased each month. Agreement came only after GLS threatened legal action. The resulting July 2021 Agreement committed Defendant to supply

1,305 new tractors while GLS retained its OTB rights—but Defendant's Regional Vice President Sean Carmichael then blocked its dealer-agent from ordering and capped orders at 1,000 tractors.

In November 2021—unbeknownst to Plaintiffs—Defendant then instructed its dealer to cut GLS's order to 600 tractors. This decision was driven by the low margin on the deal with Plaintiffs and Defendant's desire to sell its limited supply of vehicles to more profitable (*i.e.*, new and smaller volume) customers. On December 16, 2021, Defendant's employees Carmichael and Mark Belisle told Plaintiffs that Defendant could build only 600 of Plaintiffs' tractors in 2022, citing supply-chain issues with Cummins engines and Bendix collision mitigation systems ("CMS"). That was false; Defendant had the capacity to build the tractors but chose to reallocate production to higher-margin buyers.

A few weeks after the December 2021 meeting, Defendant decided to tell Plaintiffs that it could produce 1,100 tractors in the first half of 2022 if they would accept tractors without the Bendix CMS—but only if GLS would waive its OTB trade-in rights. This was pitched as a benefit to GLS because the used-tractor market was extraordinarily high, even while Defendant Vice President Tony Stinsa suspected that pricing was in a bubble.

**The Parties' April 2022 Agreement**

Defendant proposed the 1,110-tractor, no-trade offer in January 2022, and

Plaintiffs—which desperately needed the tractors—agreed in principle on January 13. Consistent with ordinary practice, Defendant's dealer entered orders before the agreement was signed. Internal communications show Plaintiffs' vehicles were scheduled to be built starting by March, but were not. Defendant then claimed an A26 engine shortage—despite having sufficient supply to fulfill Plaintiff's contractual order—and "swapped" the engine in Plaintiffs' tractors, causing further delay. With full knowledge of these problems, Defendant still presented a signed contract on April 8, 2022, promising to deliver all tractors by end of June 2022.

Plaintiffs did not immediately sign, as the parties were finalizing a separate trade-in agreement for the new tractors. Despite now claiming that Plaintiffs' "delay" in signing meant that it could not deliver all tractors by the end of June, Defendant never withdrew the April 2022 Agreement. Instead, on May 17, 2022, Carmichael directed Defendant's dealer-agent Jim Lollis to warn Plaintiffs' Vice President Kyle Blain that Defendant would "stop, postpone our production, and hold deliveries of built tractors" unless Plaintiffs signed immediately and gave up GLS's trade-in rights. Faced with that ultimatum, Plaintiffs signed on May 18, 2022.

Defendant did not discharge its duties. By June 30, 2022, only 298 of the 1,100 total tractors had been delivered, most to Plaintiffs' sister company Universal. The delay prevented GLS from selling the used MY 2018 tractors on the open market before it crashed. Carmichael confirmed the breach and knowledge of consequences,

– 3 –

writing: "All builds where [*sic*] to be completed by the end of June per written agreement," and that "Navistar had a no trade agreement that made it very important to hit the June dates so Central could sell those . . . units in the open market."

## ANTICIPATED FACTS REGARDING ELEMENTS OF CLAIMS

**I.      Defendant's Fraud Leading to the 2022 Agreement**

Plaintiffs assert fraud in the inducement based on Defendant's December 2021 misrepresentation that it could produce only 600 tractors for Plaintiffs in 2022. Under Michigan law, such fraud requires: (1) a material misrepresentation; (2) falsity; (3) scienter; (4) intent to induce reliance; (5) actual reliance; and (6) resulting injury. *Belle Isle Grill Corp. v. Detroit*, 265 Mich App 463, 477 (2003).

***Material Misrepresentation.*** Carmichael and Belisle told Blain on December 16, 2021 that Defendant could only produce 600 of Plaintiffs' ordered tractors in 2022 due to supply chain constraints. This induced Plaintiffs to negotiate a new deal.

***Falsity***. The December 2021 statement was false. Defendant had the capacity to build Plaintiffs' tractors. Instead, it allocated production to smaller, more profitable customers. Records indicate that Defendant built more than 12,725 tractors from January 2022 to June 2022, of which 5,440 were originally scheduled for production after July 1 but moved up and allocated to other customers. Of those, 5,120 of them (94%) had been ordered *after* Plaintiffs' order.

***Knowledge of Falsity / Scienter.*** Defendant knew the 600-unit ceiling was a

deliberate allocation decision, not a capacity constraint. Among other things, documentation shows that, prior to December 2021, Defendant had placed Plaintiffs on a list identifying lowest-margin customers for indefinite deferral.

*Intent to Induce Action.* The 600-tractor claim maneuvered GLS into abandoning its OTB rights and signing the April 2022 Agreement. In reality, Defendant's lie created, in Belisle's words, an "opportunity" for Defendant to be rid of this OTB liability. Defendant intended Plaintiffs to act on its false claims.

*Reasonable Reliance.* Plaintiffs reasonably relied on the December 2021 representation. As Blain will explain, Plaintiffs had no reason to know that Defendant had reallocated production to other customers for profit-motivated reasons rather than facing a genuine supply-side constraint. Defendant is a sophisticated manufacturer with access to its own production data, which Plaintiffs did not have. Moreover, Defendant cited specific causes—Bendix and Cummins supply chain issues—that were plausible.

*Fraud Damages.* The fraud damages measure the value of the OTB rights that Defendant's misrepresentation induced GLS to waive. But for the fraudulent 600-tractor representation, GLS would have retained the right to sell back 594 MY 2018 tractors at a guaranteed $62,000-per-unit floor, subject to certain deductions under the 2017 OTB and July 2021 Agreement. Plaintiffs' expert Michael Kahaian applies that base with the deductions keyed to the delivery schedule under the July 2021

– 5 –

Agreement, yielding an Expected Resale Value of approximately $32.08 million. After deducting actual resale values and the $5.60 million no-trade credit, net Lost Resale Value is approximately $12.29 million; adding repair and fuel costs of $1,966,029 yields total fraud damages of $14,255,445.

Plaintiffs will also seek exemplary damages based upon testimony by Blain, as provided in the Blain Affidavit on such damages.

## II. Defendant Breached the April 2022 Agreement

***Contract Breach Elements.*** The April 2022 Agreement is a valid, binding contract—Defendant executed it April 8, Plaintiffs signed May 18—supported by Defendant's promise to deliver 1,100 MY 2023 tractors, including 630 tractors for Central, by June 30, 2022, in exchange for the OTB waiver.

The parties' intent will be shown through, among other things, the April 2022 Agreement's language, contemporaneous negotiation materials, Plaintiffs' witness testimony as to intent, and written admissions of Defendant and its agents. This includes Carmichael's written admission that Defendant "agreed to deliver 1100 units by June 2022" through the parties' agreed-upon rolling delivery schedule, and Navistar's admission it "delivered less than 1,100 new 2023 International trucks to GLS before June 30, 2022."

There is no dispute that Defendant did not deliver 1,100 tractors by June 30, 2022. Records show that only 114 tractors were delivered to Central by then, and

final delivery did not occur until September 2023. Carmichael said it plainly in December 2022: "[W]e could not produce the new trucks as promised so Central could pull out the trades in time."

**Defendant's Affirmative Defenses Fail.** Defendant asserts several defenses: (1) specification changes and supply-chain disruptions made June 30 delivery impracticable; (2) waiver based upon the $6.2 million payment under the April 2022 Agreement; (3) accord and satisfaction; and (4) release. None are persuasive.

*(1) Commercial Impracticability.* Commercial impracticability excuses non-performance only when an unforeseeable event occurred, its non-occurrence was a basic contract assumption, and it rendered performance impracticable. *Chainworks, Inc. v. Webco Indus., Inc.*, 2006 WL 461251, at *9 (W.D. Mich. Feb. 24, 2006); MCL 440.2615(a). Defendant relies on two events: the A26-to-X15 engine switch and the Bendix CMS supply chain issues. Both fail the foreseeability requirement.

The Events Were Foreseeable. Michigan law requires that the event giving rise to impracticability be "unanticipated": not merely unforeseen, but genuinely outside the parties' contemplation at contracting. *Hemlock Semiconductor Operations, LLC v. SolarWorld Indus. Sachsen GmbH*, 867 F.3d 692, 702 (6th Cir. 2017). Every event Defendant relies upon was known to it before contract signing:

- The A26-to-X15 specification change occurred March 29—six weeks before Defendant signed and seven before Plaintiffs signed the April 2022 Agreement. Carmichael admitted the engine shortage predated the agreement. Defendant could have withdrawn its offer, but did not.

– 7 –

- The Bendix CMS issues were foreseeable and Defendant's own justification for restructuring the very contract it now seeks to disavow. As "one of the justifications for amending the contracts," it cannot support impracticability. *Exelon Generation Co. v. Gen. Atomics Techs. Corp.*, 559 F. Supp. 2d 892, 904 (N.D. Ill. 2008).

Defendant Made the Specification Change. Impracticability does not excuse performance when the condition making it impracticable was within the promisor's own control. *Prater v. Sezgin*, 2005 WL 927149, at *4 (Mich. Ct. App. Apr. 21, 2005). Defendant chose to reallocate Plaintiffs' A26 engines to other customers, proposed substituting the X15-engines into Plaintiffs' tractors, and then wrote this change into the contract it later signed. Stripping Plaintiffs' order of its original engine type and building those engines into other customers' tractors was an allocation decision made for Defendant's own benefit. Defendant cannot create impracticability via its own choices. *Roth Steel Prod. v. Sharon Steel Corp.*, 705 F.2d 134, 150 (6th Cir. 1983).

Performance Was Not Actually Impracticable. Even setting foreseeability aside, impracticability requires "extreme and unreasonable difficulty, expense, injury or loss." *Roberts v. Farmers Ins. Exch.*, 275 Mich. App. 58, 74 (2007). The record forecloses this defense. Between January and June 2022, Defendant built 12,725 tractors, moving up 5,440 originally scheduled after July 1 and allocating 5,120 to customers who ordered after Plaintiffs, and thousands with Plaintiffs' engine type. The tractors were built. Just not for Plaintiffs.

– 8 –

<u>Defendant Did Not Comply with Statutory Requirements.</u> Finally, under the UCC, to claim commercial impracticability when it affects only part of the seller's duties, the seller "must allocate production and deliveries among his customers . . . in any manner which his fair and reasonable," and "notify the buyer seasonably that there will be delay or nondelivery and, when allocation is required . . . , of the estimated quota thus made available for the buyer." MCL 440.2615(b), (c). Defendant has never presented any evidence of how it fairly allocated tractors among its customers, or how it gave statutorily required notice. This too undercuts any claim of impracticability.[1]

*(2) Waiver.* Defendant has simply never presented any evidence supporting Plaintiffs' voluntary and intentional abandonment of a known right. At all times, Plaintiffs objected to Defendant's conduct and delivery delays.

*(3) Accord and Satisfaction.* Here, too, Defendant simply has not presented any evidence of a conditional tender of money in satisfaction of an unliquidated claim. Defendant never tendered anything to Plaintiffs in express satisfaction of its obligation to facilitate the trade or buy-back of the MY 2018 tractors, and GLS

---

[1] Plaintiffs additionally note that they moved for summary judgment on Defendant's impracticability defense, but the Court specifically withheld judgment on that issue at that time. ECF No. 72, PageID.2971 & n.8. Given the development of the case, this issue appears ripe for judgment as a matter of law, and the Court should grant judgment to Plaintiffs, precluding Defendant from raising impracticability at trial.

– 9 –

issued a formal Notice of Material Breach and filed this lawsuit—conduct wholly inconsistent with accord and satisfaction.

(4) *Release.* Finally, Plaintiffs never signed a release of any claims related to the MY 2018 tractors, received no consideration for one, and at no point communicated an intent to permanently relinquish their damages rights. To the contrary, GLS immediately complained when—days after signing the agreement—Navistar announced that it would be pushing deliveries of vehicles to months past the deadline, with Navistar acknowledging that they had, in fact, not performed.

**Damages for Breach of Contract.** Because of Defendant's breach, Plaintiffs lost their opportunity to sell the MY 2018 tractors during the hot market in mid-2022, losing out on millions of dollars of sales, and incurring significant additional costs to run the older, less-efficient tractors. Kahaian has analyzed these lost sales opportunities, and Plaintiffs will seek breach-of-contract damages consistent with his reports. Plaintiffs will also seek pre-judgment and post-judgment interest.

Respectfully submitted,

By: ___/s/ Thomas J. Davis___
Thomas J. Davis (P78626)
KIENBAUM HARDY VIVIANO PELTON &
FORREST, P.L.C.
Counsel for Plaintiffs
280 N. Old Woodward Ave., Ste. 400
Birmingham, MI 48009
(248) 645-0000
Date: June 16, 2026          tdavis@khvpf.com

– 10 –

## LOCAL RULE CERTIFICATION

I, Thomas J. Davis, certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts). I also certify that it is the appropriate length. Local Rule 7.1(d)(3).

*/s/ Thomas J. Davis*
Thomas J. Davis (P78626)
Kienbaum Hardy
Viviano Pelton & Forrest, P.L.C.
280 N. Old Woodward Ave., Ste. 400
Birmingham, MI 48009
(248) 645-0000
tdavis@khvpf.com

**CERTIFICATE OF SERVICE**

I hereby certify that on June 16, 2026, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to all ECF participants on record.

<div style="margin-left:45%">

_/s/ Thomas J. Davis_
Thomas J. Davis (P78626)
Kienbaum Hardy
Viviano Pelton & Forrest, P.L.C.
280 N. Old Woodward Ave.
Ste. 400
Birmingham, MI 48009
(248) 645-0000
tdavis@khvpf.com

</div>